DEBORAH CONNOR, Acting Chief
Money Laundering and Asset Recovery Section (MLARS)
MARY BUTLER
Chief, International Unit
WOO S. LEE
Deputy Chief, International Unit
KYLE R. FREENY, Trial Attorney
JONATHAN BAUM, Trial Attorney
Criminal Division
United States Department of Justice
  1400 New York Avenue, N.W., 10th Floor
  Washington, D.C. 20530
  Telephone: (202) 514-1263
  Email:  Woo.Lee@usdoj.gov

SANDRA R. BROWN
Acting United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
STEVEN R. WELK
Assistant United States Attorney
Chief, Asset Forfeiture Section
JOHN J. KUCERA (CBN: 274184)
CHRISTEN A. SPROULE (CBN: 310120)
Assistant United States Attorneys
Asset Forfeiture Section
  312 North Spring Street, 14th Floor
  Los Angeles, California 90012
  Telephone: (213) 894-3391/(213) 894-4493
  Facsimile: (213) 894-7177
  Email: John.Kucera@usdoj.gov
        Christen.A.Sproule@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CERTAIN RIGHTS TO AND INTERESTS IN SHARES OF SERIES D PREFERRED STOCK IN PALANTIR TECHNOLOGIES,<br><br>Defendants. | No. CV 17-4446<br><br>**VERIFIED COMPLAINT FOR FORFEITURE *IN REM***<br><br>[18 U.S.C. § 981(a)(1)(A) and (C)]<br><br>[F.B.I.] |

The United States of America brings this complaint against the above-captioned asset and alleges as follows:

## PERSONS AND ENTITIES

1.    The plaintiff is the United States of America.

2.    The defendants in this action are Certain Rights to And Interests In Shares of Series D Preferred Stock In Palantir Technologies (hereinafter, the "DEFENDANT ASSETS"), more particularly described in Attachment A.

3.    The only person believed by the government to have an interest that may be affected by this action is Tarek Obaid.

4.    Contemporaneously with the filing of this complaint, plaintiff is filing related actions seeking the civil forfeiture of the following assets (collectively, the "NEW SUBJECT ASSETS"):

    a.    **THE EQUANIMITY:**  All right and title to the yacht M/Y Equanimity, including all appurtenances, improvements, and attachments thereon, and all leases, rents, and profits derived therefrom.

    b.    **THE VICEROY HOTEL GROUP ASSETS:**  All right to and interest in the Viceroy Hotel Group ("Viceroy") owned, held or acquired, directly or indirectly, by "JW Hospitality (VHG US) LLC" (formerly known as "Wynton Hospitality (VHG US) LLC") and "JW Hospitality (VHG Intl) Ltd." (formerly known as "Wynton Hospitality (VHG Intl) Ltd."), including any right to collect and receive any profits and proceeds therefrom, and any interest derived from the proceeds invested in the Viceroy by JW Hospitality (VHG US) LLC and JW Hospitality (VHG Intl) Ltd. ("VICEROY HOTEL GROUP ASSETS").

    c.    **ELECTRUM ASSETS:**  All right and interest in the Electrum Group, including (i) Global Holdings, L.P. ("Electrum Global"); (ii) TEG Global GP Ltd.; and (iii) TEG Services Holding Inc. ("Electrum Services") (collectively "Electrum"),  owned, held or acquired, directly or indirectly, by JW Aurum (Cayman) Gp Ltd. ("JW Aurum"), including any right to collect and receive any profits and

proceeds therefrom, and any interest derived from the proceeds invested in the Electrum Group by JW Aurum (hereinafter, "ELECTRUM ASSETS").

d.    **"DUMB AND DUMBER TO" RIGHTS:**  All rights to and interests in the motion picture "Dumb and Dumber To" belonging to Red Granite Pictures, a film production company located in Los Angeles, California 90069, including copyright and intellectual property rights, as well as the right to collect and receive any profits, royalties, and proceeds of distribution owned by or owed to Red Granite Pictures or its affiliates and/or assigns in connection with its role in producing "Dumb and Dumber To" (hereinafter, the "DUMB AND DUMBER TO RIGHTS");

e.    **"DADDY'S HOME" RIGHTS:**  All rights to and interests in the motion picture "Daddy's Home" belonging to Red Granite Pictures, a film production company located in Los Angeles, California 90069, including copyright and intellectual property rights, as well as the right to collect and receive any profits, royalties, and proceeds of distribution owned by or owed to Red Granite Pictures or its affiliates and/or assigns in connection with its role in producing "Daddy's Home" (hereinafter, the "DADDY'S HOME RIGHTS");

f.    **METROPOLIS POSTER:**  One framed, 3-sheet color lithograph poster created by the German artist Heinz Schulz-Neudamm for the 1927 silent film "Metropolis."

g.    **ONE MADISON PARK CONDOMINIUM:**  All right and title to the real property located in New York, New York[1] owned by Cricklewood One Madison LLC ("ONE MADISON PARK CONDOMINIUM"), including all appurtenances, improvements, and attachments thereon, as well as all leases, rents, and profits derived therefrom.

h.    **FLYWHEEL SHARES:**  All right and interest in the shares of Flywheel common stock held or acquired by FW Sports Investments LLC.

---

[1] Pursuant to L.R. 5.2-1, residential addresses are listed by the city and state only.

i.     **11.72-CARAT HEART-SHAPED DIAMOND:** One 11.72-carat heart-shaped diamond with GIA number 2155273833.

j.     **8.88-CARAT DIAMOND PENDANT:** One 8.88-carat fancy intense pink diamond pendant surrounded by 11-carat fancy intense pink diamonds.

k.     **MATCHING DIAMOND JEWELRY SET:** One 18-carat white gold diamond jewelry set, including diamond necklace, diamond earring, diamond bracelet, and diamond ring.

l.     **11-CARAT DIAMOND EARRINGS:** One pair of 18K white gold diamond earrings consisting a 5.55-carat diamond with GIA number 2165455706 and a 5.49-carat diamond with GIA number 2165635932

m.     **MATCHING DIAMOND RING AND EARRINGS:** One pair of diamond earrings and matching diamond ring, consisting a 7.53-carat flawless type 2A diamond with GIA number 2145864026, a 3.05-carat flawless type 2A diamond with GIA number 2136117071, and a 3.08-carat flawless type 2A diamond with GIA number 2145977021.

n.     **PICASSO PAINTING:** One painting entitled "Nature Morte au Crane de Taureau" by Pablo Picasso.

o.     **BASQUIAT COLLAGE:** One collage entitled "Redman One" by Jean-Michel Basquiat.

p.     **ARBUS PHOTOGRAPH:** One photograph entitled "Boy with the Toy Hand Grenade" by Diane Arbus.

5.     Plaintiff has previously filed the following complaints, seeking civil forfeiture of the following assets (referred collectively, together with the NEW SUBJECT ASSETS, as the "SUBJECT ASSETS"):

a.     Case number CV 16-5362 DSF (PLAx), *United States v. The Wolf of Wall Street Motion Picture,* Including any Rights to Profits, Royalties and Distribution Proceeds owed to Red Granite Pictures, Inc. or its Affiliates and/or Assigns (**"THE WOLF OF WALL STREET"**).

1    b.  Case number CV 16-5368 DSF (PLAx), *United States v. The Real*

2 *Property Known as The Viceroy L'Ermitage Beverly Hills (*"**the L'ERMITAGE**

3 **PROPERTY**").

4    c.  Case number CV 16-5369 DSF (PLAx) *United States v. All Business*

5 *Assets of The Viceroy L'Ermitage Beverly Hills, Including All Chattels and Intangible*

6 *Assets, Inventory, Equipment, and All Leases, Rents and Profits Derived Therefrom*

7 ("**THE L'ERMITAGE BUSINESS ASSETS**").

8    d.  Case number CV 16-5377 DSF (PLAx) *United States v. Real*

9 *Property located in Beverly Hills, California* (**"HILLCREST PROPERTY 1"**).

10    e.  Case number CV 16-5371 DSF (PLAx) *United States v. Real*

11 *Property Located in New York, New York* (**"PARK LAUREL CONDOMINIUM"**).

12    f.  Case number CV 16-5367 DSF (PLAx) *United States v. One*

13 *Bombardier Global 5000 Jet Aircraft, Bearing Manufacturer's Serial Number 9265 and*

14 *Registration Number N689WM, its Tools and Appurtenances, and Aircraft Logbooks*

15 (**"BOMBARDIER JET"**).

16    g.  Case number CV 16-5374 DSF (PLAx) *United States v. Real*

17 *Property Located in New York, New York* (**"TIME WARNER PENTHOUSE"**).

18    h.  Case number CV 16-5378 DSF (PLAx) *United States v. Real*

19 *Property located in Los Angeles, California* (**"ORIOLE MANSION"**).

20    i.  Case number CV 16-5375 DSF (PLAx) *United States v. Real*

21 *Property Located in New York, New York* (**"GREENE CONDOMINIUM**").

22    j.  Case number CV 16-5364 DSF (PLAx) *United States v.* Any Rights

23 to Profits, Royalties and Distribution Proceeds Owned by or Owed to JW Nile (BVI)

24 Ltd., JCL Media (EMI Publishing Ltd), and/or Jynwel Capital Ltd, Relating to EMI

25 Music Publishing Group North America Holdings, Inc., and D.H. Publishing L.P., Inc.

26 and D.H. Publishing L.P. (**"EMI ASSETS"**).

27    k.  Case number CV 16-5370 DSF (PLAx) *United States v. All Right to*

28 *and Interest in Symphony CP (Park Lane) LLC, Held or Acquired, Directly or*

*Indirectly, by Symphony CP Investments LLC and/or Symphony CP Investments Holdings LLC, Including Any Interest Held or Secured by the Real Property and Appurtenances Located at 36 Central Park South, New York, New York, Known as The Park Lane Hotel, Any Right to Collect and Receive Any Profits and Proceeds Therefrom, and Any Interest Derived From the Proceeds Invested in The Symphony CP (Park Lane) LLC by Symphony CP Investments LLC and Symphony CP (Park Lane) LLC* (**"SYMPHONY CP (PARK LANE) LLC ASSETS"**).

l.      Case number CV 16-5376 DSF (PLAx) *United States v. United States v. Real Property Located in New York, New York* (**"WALKER TOWER PENTHOUSE"**).

m.      Case number CV 16-5379 DSF (PLAx) *United States v. Real Property located in Beverly Hills, California* (**"LAUREL BEVERLY HILLS MANSION"**).

n.      Case number CV 16-5366 DSF (PLAx) *United States v. one pen and ink drawing by Vincent Van Gogh titled "La maison de Vincent a Arles"* (**"VAN GOGH ARTWORK"**).

o.      Case number CV 16-5366 DSF (PLAx) *United States v. One painting by Claude Monet titled "Saint-Georges Majeur"* (**"SAINT GEORGES PAINTING"**).

p.      Case number CV 16-5366 DSF (PLAx) *United States v. €25,227,025.83 Euros held in an escrow account at UBS, S.A. in Switzerland constituting the proceeds of the sale of a painting by Claude Monet titled "Nympheas"* (**"PETITE NYPMHEAS PROCEEDS"**).

q.      Case number CV 16-5380 DSF (PLAx) *United States v Real Property in London, United Kingdom, owned by Qentas Holdings* (**"THE QENTAS TOWNHOUSE"**).

r.      Case number CV 17-4240 DSF (PLAx) *United States v. Real Property in London, United Kingdom owned by Stratton Street (London) Ltd.* (**"THE STRATTON PENTHOUSE"**).

1        s.    Case number CV 17-4242 DSF (PLAx) *United States v. Real*
2  *Property in London, United Kingdom owned by Seven Stratton Street (London) Ltd.*
3  (**"STRATTON FLAT"**).
4        t.    Case number CV 17-4244 DSF (PLAx) *United States v. Real*
5  *Property in London, United Kingdom owned by Eight Nine Stratton Street (London)*
6  *Ltd.* (**"STRATTON OFFICE BUILDING"**).

## NATURE OF THE ACTION

7

8        6.    This is a civil action *in rem* to forfeit assets involved in and traceable to an
9  international conspiracy to launder money misappropriated from 1Malaysia
10  Development Berhad ("1MDB"), a strategic investment and development company
11  wholly-owned by the government of Malaysia.[2]  The United States seeks forfeiture of
12  property located in the United States and abroad, including in the United Kingdom and
13  Switzerland, pursuant to 18 U.S.C. § 981(a)(1)(C), on the ground that it was derived
14  from violations of U.S. law, and pursuant to 18 U.S.C. § 981(a)(1)(A) on the ground that
15  it is property involved in one or more money laundering offenses in violation of 18
16  U.S.C. §§ 1956 and/or 1957.

17        7.    1MDB was ostensibly created to pursue investment and development
18  projects for the economic benefit of Malaysia and its people, primarily relying on the
19  issuance of various debt securities to fund these projects.  However, over the course of
20  an approximately five-year period, between approximately 2009 and at least 2014,
21  multiple individuals, including public officials and their associates, conspired to
22  fraudulently divert billions of dollars from 1MDB through various means, including by
23  defrauding foreign banks and by sending foreign wire communications in furtherance of
24  the scheme, and thereafter, to launder the proceeds of that criminal conduct, including in
25  and through U.S. financial institutions.  The funds diverted from 1MDB were used for
26  the personal benefit of the co-conspirators and their relatives and associates, including to
27  purchase luxury real estate in the United States and overseas, pay gambling expenses at

28

---

[2] Malaysia is a sovereign country located in Southeast Asia.

Las Vegas casinos, acquire more than $200 million in artwork, purchase lavish gifts for family members and associates, invest in a major New York real estate development project, and fund the production of major Hollywood films.  1MDB maintained no interest in these assets and saw no returns on these investments.

8.     The criminal conduct alleged herein occurred in at least four principal phases:

9.     The "Good Star" Phase:  The fraudulent diversion of funds from 1MDB began in approximately September 2009, soon after 1MDB's creation.  Between 2009 and 2011, under the pretense of investing in a joint venture between 1MDB and PetroSaudi International ("PetroSaudi" or "PSI"), a private Saudi oil extraction company, officials of 1MDB and others arranged for the fraudulent transfer of more than $1 billion from 1MDB to a Swiss bank account held in the name of Good Star Limited ("Good Star Account").  Officials at 1MDB caused this diversion of funds by, among other things, providing false information to banks about the ownership of the Good Star Account.  Contrary to representations made by 1MDB officials, the Good Star Account was beneficially owned not by PetroSaudi or the joint venture, but by LOW Taek Jho, a/k/a Jho Low ("LOW"), a Malaysian national who had no formal position with 1MDB but who was involved in its creation and exercised significant control over its dealings.  LOW laundered more than $400 million of the funds misappropriated from 1MDB through the Good Star Account into the United States, after which these funds were used for the personal gratification of LOW and his associates.[3]  LOW and 1MDB officials tried to cover up this diversion of funds by converting 1MDB's interest in the joint venture into opaque securities and then causing those securities to be fraudulently overvalued.

10.     The "Aabar-BVI" Phase:  In 2012, 1MDB officials and others misappropriated and fraudulently diverted a substantial portion of the proceeds that

---

[3] All amounts referenced in dollars ($) are denominated in U.S. dollars and all dates, times, and monetary amounts are approximate.

1   1MDB raised through two separate bond offerings arranged and underwritten by

2   Goldman Sachs International ("Goldman").  The bonds were guaranteed by both 1MDB

3   and the International Petroleum Investment Company ("IPIC"), an investment fund

4   wholly-owned by the government of Abu Dhabi, in the United Arab Emirates

5   ("U.A.E.").[4]  Beginning almost immediately after 1MDB received the proceeds of each

6   of these two bond issues, 1MDB officials caused a substantial portion of the proceeds –

7   approximately $1.367 billion, a sum equivalent to more than forty percent of the total net

8   proceeds raised – to be wire transferred to a Swiss bank account belonging to a British

9   Virgin Islands entity called Aabar Investments PJS Limited ("Aabar-BVI").

10      11.    Aabar-BVI was created and named to give the impression that it was

11   associated with Aabar Investments PJS ("Aabar"), a subsidiary of IPIC incorporated in

12   Abu Dhabi.  In reality, Aabar-BVI has no genuine affiliation with Aabar or IPIC, and the

13   Swiss bank account belonging to Aabar-BVI ("Aabar-BVI Swiss Account") was used to

14   siphon off proceeds of the 2012 bond sales for the personal benefit of officials at IPIC,

15   Aabar, and 1MDB and their associates.  Funds diverted through the Aabar-BVI Swiss

16   Account were transferred to, among other places, a Singapore bank account controlled

17   by TAN Kim Loong, a/k/a Eric Tan ("TAN"), an associate of LOW.  Those funds were

18   thereafter distributed for the personal benefit of various individuals, including officials at

19   1MDB, IPIC, or Aabar, rather than for the benefit of 1MDB, IPIC, or Aabar.

20      12.    The "Tanore" Phase:  In 2013, several individuals, including 1MDB officials,

21   diverted more than $1.26 billion out of a total of $3 billion in principal that 1MDB raised

22   through a third bond offering arranged by Goldman in March 2013.  The proceeds of this

23   bond offering were to be used by 1MDB to fund a joint venture with Aabar known as the

24   Abu Dhabi Malaysia Investment Company ("ADMIC").  However, beginning days after

25   the bond sale, a significant portion of the proceeds was instead diverted to a bank account

26   in Singapore held by Tanore Finance Corporation ("Tanore Account"), for which TAN

27

28          [4] The United Arab Emirates is a sovereign nation in the Arabian Peninsula,
    comprising seven separate emirates, including the Emirate of Abu Dhabi ("Abu Dhabi").

1   was the recorded beneficial owner.  Although the Tanore Account had no legitimate

2   connection to 1MDB, the then-Executive Director of 1MDB, "Jasmine" LOO Ai Swan

3   ("LOO"), was an authorized signatory on the account.  1MDB funds transferred into the

4   Tanore Account were used for the personal benefit of LOW and his associates, including

5   officials at 1MDB, rather than for the benefit of 1MDB or ADMIC.

6        13.   The "Options Buyback" Phase:  In 2014, an additional roughly $850 million

7   in 1MDB funds was misappropriated under the guise of paying Aabar to relinquish

8   certain options it had been given in consideration of IPIC's guarantee of the 2012 bonds.

9   1MDB borrowed a total of $1.225 billion from a syndicate of banks led by Deutsche

10  Bank in Singapore to fund these payments to Aabar.  In fact, however, 1MDB and Aabar

11  officials diverted more than $850 million to Aabar-BVI and another similar entity

12  incorporated in the Seychelles ("Aabar-Seychelles") that appeared to be, but was not,

13  affiliated with IPIC and Aabar.  From there, the funds were used, among other things, to

14  purchase a luxury yacht for LOW's personal benefit.  A portion of the diverted loan

15  proceeds was also used in an elaborate, Ponzi-like scheme to create the false appearance

16  that 1MDB's earlier investment in the PetroSaudi joint venture had been profitable.

17       14.   The proceeds of each of these four phases of criminal conduct were

18  laundered through a complex series of transactions, including through bank accounts in

19  Singapore, Switzerland, Luxembourg, and the United States.  Use of the U.S. financial

20  system was an essential feature of both the fraudulent diversion of 1MDB funds and of

21  the subsequent movement of ill-gotten proceeds around the world.

22       15.   Numerous assets, including the DEFENDANT ASSETS, were acquired

23  with funds unlawfully diverted from 1MDB, or funds traceable thereto.  As a result, the

24  DEFENDANT ASSETS are subject to forfeiture to the United States pursuant to 18

25  U.S.C. § 981(a)(1)(A), because it is property involved in one or more money laundering

26  transactions in violation of 18 U.S.C. §§ 1956 and/or 1957, and 18 U.S.C. § 981(a)(1)(C)

27  because it is property constituting or derived from proceeds traceable to one or more

28

violations of U.S. law defined as a specified unlawful activity in 18 U.S.C. §§ 1956(c)(7) and/or 1961(1).

## JURISDICTION AND VENUE

16.     This is a civil forfeiture action brought pursuant to 18 U.S.C. § 981(a)(1)(A) and (C).

17.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355.

18.     Venue lies in this district pursuant to 28 U.S.C. §§ 1355(b)(1)(A) and 1355(b)(2) because acts and omissions giving rise to the forfeiture took place in the Central District of California, and/or pursuant to 28 U.S.C. § 1395(b), because the DEFENDANT ASSETS are located in the Central District of California.

## BACKGROUND:  RELEVANT INDIVIDUALS AND ENTITIES

19.     **1Malaysia Development Berhad** ("**1MDB**") is a strategic investment and development company wholly-owned by the Malaysian government, through the Malaysian Ministry of Finance.  It was formed in 2009 when the Malaysian government took control of a municipal entity called Terengganu Investment Authority ("TIA"). 1MDB's governance structure has been comprised of a senior leadership team, a Board of Directors ("1MDB Board of Directors" or "1MDB Board"), and a Board of Advisors. Unless otherwise specified, references to 1MDB may include any of its wholly-owned subsidiaries.

20.     **PetroSaudi International Ltd.** ("**PetroSaudi**" or "**PSI**") is a private Saudi Arabia-based oil services company incorporated in Saudi Arabia, which maintains offices in the United Kingdom.

21.     **1MDB PetroSaudi, Ltd.** was a purported joint venture between 1MDB and PetroSaudi formed in or around September 2009 for the stated purpose of exploiting certain energy concessions PetroSaudi purportedly owned in Turkmenistan and Argentina.

11

22.     **International Petroleum Investment Company** ("**IPIC**") is an investment entity wholly-owned by the Abu Dhabi government.  Its management is comprised of a Chairman, Deputy Chairman, Board of Directors, and Managing Director.

23.     **Aabar Investments PJS** ("**Aabar**") is a public joint stock company incorporated under the laws of Abu Dhabi and a subsidiary of IPIC.

24.     **Aabar Investments PJS Ltd.** is the name of at least two different entities created to mimic the IPIC subsidiary Aabar Investments PJS: (a) one incorporated in the British Virgin Islands in March 2012 by QUBAISI and HUSSEINY ("Aabar-BVI"), and (b) one incorporated in the Seychelles[5] in May 2014 by HUSSEINY ("Aabar-Seychelles").  Aabar-BVI maintained a bank account at BSI Bank in Switzerland, and Aabar-Seychelles maintained a bank account at UBS AG in Singapore.  IPIC and Aabar recently clarified that neither entity is their affiliate.

25.     **Abu Dhabi Malaysia Investment Company** ("**ADMIC**") is a purported joint venture between 1MDB and Aabar that was created in or around March 2013 for the stated purpose of promoting the growth and development of Malaysia and Abu Dhabi.  It was never capitalized.

26.     **LOW Taek Jho, a/k/a/ Jho Low** ("**LOW**") is a Malaysian national who advised on the creation of TIA, 1MDB's predecessor.  LOW has never held a formal position at 1MDB, and he has publicly denied any involvement with 1MDB after its inception.  LOW nevertheless exercised significant control over 1MDB during the time period relevant to this Complaint.

27.     **1MDB OFFICER 1** is a Malaysian national who served as the Executive Director of 1MDB from the time of its creation until approximately March 2011.  During this time, 1MDB OFFICER 1 was a "public official" as that term is used in 18 U.S.C. § 1956(c)(7)(B)(iv) and a "public servant" as that term is used in Section 21 of the Malaysian Penal Code.

---

[5] Seychelles is a sovereign country located in the Indian Ocean off of East Africa.

12

28. **1MDB OFFICER 2** is a Malaysian national who served as 1MDB's Chief Executive Officer ("CEO") between at least 2009 and 2013. During this time, 1MDB OFFICER 2 was a "public official" as that term is used in 18 U.S.C. § 1956(c)(7)(B)(iv) and a "public servant" as that term is used in Section 21 of the Malaysian Penal Code.

29. **"Jasmine" LOO Ai Swan ("LOO")** is Malaysian national who served as 1MDB's General Counsel and Executive Director of Group Strategy during, at a minimum, 2012 and 2013. LOO was a main point of contact between 1MDB and Goldman in connection with the three Goldman-underwritten bond offerings in 2012 and 2013. During this time, LOO was a "public official" as that term is used in 18 U.S.C. § 1956(c)(7)(B)(iv) and a "public servant" as that term is used in Section 21 of the Malaysian Penal Code.

30. **1MDB OFFICER 4** is a Malaysian national who served as the Executive Director of Finance at 1MDB from, at a minimum, 2012 to 2015. He worked on the Goldman bond deals and served as a main point of contact on two loans that Deutsche Bank arranged for 1MDB in 2014. During this time, 1MDB OFFICER 4 was a "public official" as that term is used in 18 U.S.C. § 1956(c)(7)(B)(iv) and a "public servant" as that term is used in Section 21 of the Malaysian Penal Code.

31. **1MDB-SRC OFFICER**, a Malaysian national, was the Chief Executive Officer and Director of SRC International Sdn. Bhd. ("SRC International") from late 2011 through 2013, at a minimum. SRC International was a one-time subsidiary of 1MDB that was transferred to direct ownership by the Malaysian Ministry of Finance in 2012. In 2011, prior to assuming his role at SRC International, the 1MDB-SRC OFFICER was the Chief Investment Officer of 1MDB. During these time periods, the 1MDB-SRC OFFICER was a "public official" as that term is used in 18 U.S.C. § 1956(c)(7)(B)(iv) and a "public servant" as that term is used in Section 21 of the Malaysian Penal Code.

32. **MALAYSIAN OFFICIAL 1** is a high-ranking official in the Malaysian government who also held a position of authority with 1MDB. During all times relevant

13

to the Complaint, MALAYSIAN OFFICIAL 1 was a "public official" as that term is used in 18 U.S.C. § 1956(c)(7)(B)(iv) and a "public servant" as that term is used in Section 21 of the Malaysian Penal Code.

33.    **Riza Shahriz Bin Abdul AZIZ** ("**AZIZ**"), a Malaysian national, is a relative of MALAYSIAN OFFICIAL 1 and a friend of LOW.  He co-founded Red Granite Pictures, a Hollywood movie production and distribution studio, in 2010.

34.    **"Eric" TAN Kim Loong** ("**TAN**") is a Malaysian national and an associate of LOW.  He also served as a proxy for LOW in numerous financial transactions.  He was the stated beneficial owner of several bank accounts into which misappropriated 1MDB funds were transferred.

35.    **Khadem Abdulla Al QUBAISI** ("**QUBAISI**"), a U.A.E. national, was the Managing Director of IPIC from 2007 to 2015 and the Chairman of Aabar in at least 2012 and 2013.  During this time, he was a "public official" as that term is used in 18 U.S.C. § 1956(c)(7)(B)(iv) and a "public official" as that term is used in Article(5) of United Arab Emirates Law, Federal Law No (3) Of 1989 On Issuance Of The Penal Code.  QUBAISI also was a director of Aabar-BVI.

36.    **Mohamed Ahmed Badawy Al-HUSSEINY** ("**HUSSEINY**"), a U.S. citizen, was the CEO of Aabar from 2010 to 2015.  During this time, he was a "public official" as that term is used in 18 U.S.C. § 1956(c)(7)(B)(iv) and a "public official" as that term is used in Article(5) of  United Arab Emirates Law, Federal Law No (3) Of 1989 On Issuance Of The Penal Code.  He was also a director of Aabar-BVI and Aabar-Seychelles.

## EVIDENCE SUPPORTING FORFEITURE

37.    The DEFENDANT ASSETS represent a portion of the proceeds of roughly $4.5 billion misappropriated from 1MDB.  That misappropriation occurred in multiple phases over the course of several years.  The misappropriated funds were then used to purchase the DEFENDANT ASSETS, as well as to fund the co-conspirators' lavish lifestyles, including purchases of artwork and jewelry, the acquisition of luxury real

14

estate and luxury yachts, the payment of gambling expenses, and the hiring of musicians and celebrities to attend parties.  The use of the diverted 1MDB funds for the personal benefit of the co-conspirators and their associates was not consistent with the purposes for which 1MDB raised the funds, and neither 1MDB nor the government of Malaysia realized any returns on these purchases and expenditures.

## I.    BACKGROUND ON THE FORMATION OF 1MDB

38.    1MDB is an investment and development entity wholly-owned by the government of Malaysia, through the Ministry of Finance ("MOF").  It grew out of an entity called "Terengganu Investment Authority" ("TIA").[6]  In or around February 2009, the Malaysian municipality of Terengganu, assisted by Goldman, formed TIA with the stated purpose of investing and managing that municipality's public funds.  To raise capital for its operations, TIA issued and sold Islamic medium term notes ("IMTNs"), a form of debt security, valued at 5 billion Malaysian ringgit (MYR).  By 2009 conversion rates, this amounted to approximately $1,425,680,000.  The IMTNs were 30-year notes with a yield of approximately 5.75 percent, issued with the assistance of AmBank in Malaysia.

39.    LOW Taek Jho, a/k/a Jho LOW ("LOW"), a Malaysian national, served as an advisor to TIA and its founders as early as January 2009.

40.    Electronic communications between Goldman employees and individuals involved with TIA confirm that LOW was involved in the creation of TIA.  For example, on or about January 14, 2009, 1MDB OFFICER 1, who served as TIA's Executive Director of Business Development and later became the Executive Director of 1MDB, sent an email to, among others, LOW and Goldman employees with the subject line "Re: Project TIARA."  In this email, 1MDB OFFICER 1 stated, referring to LOW: "I think it is best to get Jho involve[d] at every stage.  Jho will revert on the suitability of dates n [sic] time for the next 48 hrs."

---

[6] Except where a distinction is made, all references to 1MDB may refer to TIA before it was renamed 1MDB.

41.     On or about March 31, 2009, LOW sent an email to a Goldman employee and 1MDB OFFICER 1 with the subject line "Re – Press Answer URGENT."  In the email, LOW stated:

> Bro, here is outline of the issues I would like to discuss with the Terengganu Investment Authority. In essence the disquiet surrounding the plan is that the fund will operate entirely on borrowed money, which is largely anathema because it puts taxpayer's money at risk. Could they elaborate on this concern?
>
> There is also the issue of transparency and will the money go towards portfolio investments or be used to buy strategic stakes in companies.? [sic]

42.     According to Malaysian news reports and archived 1MDB press releases, in or around July 2009, the Malaysian Ministry of Finance assumed control of TIA and the more than $1 billion in IMTNs issued by TIA.  In September 2009, TIA's name was changed to 1Malaysia Development Berhad, or 1MDB.  The Malaysian government also became a guarantor on the IMTNs.  1MDB was to act as a strategic development company, wholly-owned by the Malaysian government, with a mission to promote Malaysian economic development through global partnerships and foreign direct investment.  The Malaysian government exercised a high degree of control over 1MDB pursuant to its governing documents, including its Articles of Association.

43.     Upon its formation, MALAYSIAN OFFICIAL 1 assumed a position of authority with 1MDB.  MALAYSIAN OFFICIAL 1 had the authority to approve all appointments to, and removals from, 1MDB's Board of Directors and 1MDB's Senior Management Team.  In addition, any financial commitments by 1MDB, including investments, that were likely to affect a guarantee given by the government of Malaysia for the benefit of 1MDB or any policy of the Malaysian government, required the approval of MALAYSIAN OFFICIAL 1.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## II.    THE GOOD STAR PHASE:  MORE THAN $1 BILLION IS MISAPPROPRIATED FROM 1MDB

### A.    EXECUTIVE SUMMARY OF THE GOOD STAR PHASE

44.    As one of its first investment projects, 1MDB entered into an agreement in September 2009 with PetroSaudi International ("PetroSaudi" or "PSI"), a private Saudi Arabia-based oil services company, to form a joint venture called 1MDB PetroSaudi Ltd. ("the 1MDB-PetroSaudi JV" or "Joint Venture").  The stated purpose of the Joint Venture was to exploit certain energy concession rights in Turkmenistan and Argentina that PetroSaudi purported to own.  Under the terms of the agreement, (a) 1MDB agreed to invest $1 billion in cash in the Joint Venture in exchange for a forty percent (40%) equity interest in the Joint Venture, and (b) PetroSaudi agreed to give the Joint Venture the mineral extraction concessions it purportedly owned in Turkmenistan and Argentina in exchange for a sixty percent (60%) equity interest in the Joint Venture.  PetroSaudi's energy concession rights were allegedly valued at approximately $2.7 billion.

45.    Both 1MDB's Board of Directors and Bank Negara, Malaysia's Central Bank, approved the transfer of $1 billion to the Joint Venture.  However, as set forth in greater detail in the sections that follow, LOW and his associates caused $700 million of the $1 billion that was to be invested in the Joint Venture to be sent to an account at RBS Coutts Bank in Zurich ("RBS Coutts") held in the name of Good Star Limited ("Good Star Account").

46.    Between May and October 2011, approximately $330 million in additional funds were wired at the direction of 1MDB officials to the Good Star Account purportedly in connection with a financing agreement executed between 1MDB and the 1MDB-Petrosaudi JV.

47.    Although 1MDB officials represented, including to Deutsche Bank in Malaysia, that Good Star was a wholly-owned subsidiary of PetroSaudi, this was not true.  According to banking records, Good Star was a company controlled by LOW, and

LOW was also the Good Star Account's beneficial owner and sole authorized signatory. At the time, LOW was a 29-year-old with no official position with 1MDB or PetroSaudi.

### B. INCEPTION OF GOOD STAR AND THE GOOD STAR ACCOUNT

48.     RBS Coutts bank account records indicate that Good Star Limited was formed in the Seychelles on or about May 18, 2009.   The sole director of Good Star is listed as Smart Power, of which LOW is the sole director.  LOW is listed on the bank records as Good Star's secretary.  Smart Power's ownership equity in Good Star consists of a single bearer share of company stock.  That single bearer share was issued to LOW on or about June 2, 2009, seven days before he opened the Good Star Account.  In exchange for that single bearer share, LOW paid $1 in consideration.

49.     A Memorandum issued pursuant to Good Star's Articles of Association indicates that the company's books, records, and minutes would be maintained at 50 Raffles Place in Singapore, c/o SINGAPORE BANKER 1.  SINGAPORE BANKER 1's office is also designated as the location where "all correspondence" to Good Star should be sent.  At the time, SINGAPORE BANKER 1 was employed as a banker at RBS Coutts in Singapore.  RBS Coutts' Singapore branch occupied an address at 50 Raffles Place in Singapore.

50.     On or about June 9, 2009, LOW opened the Good Star Account at an RBS Coutts branch in Singapore by completing an "Application for Opening an Account/Custody Account by Legal Entities."  The application bears LOW's signature. LOW also completed a form entitled "Establishment of the Beneficial Owner's Identity," which identified LOW as the sole beneficial owner of the Good Star Account.  LOW also completed a form entitled "Resolutions," in which LOW was named as the sole authorized signatory on the Good Star Account.  This form also bears LOW's signature. Included in the account opening records was a copy of a page from LOW's Malaysian passport containing, among other things, LOW's photograph.

1

2

### C.   1MDB FORMS A JOINT VENTURE WITH PETROSAUDI IN SEPTEMBER 2009

3    51.    The idea for a joint venture between PetroSaudi and 1MDB was discussed

4   in late summer of 2009, including during a meeting that LOW arranged between

5   MALAYSIAN OFFICIAL 1 and the co-founders of PetroSaudi aboard a yacht off the

6   coast of Monaco.  Although LOW had no official position with 1MDB, he had

7   significant involvement in setting up the 1MDB-PetroSaudi joint venture.  On or about

8   September 7, 2009, LOW emailed his parents, brother, and sister: "Just closed the deal

9   with petrosaudi.  Looks like we may have hit a goldmin[e]."

10    52.    On or about September 18, 2009, the 1MDB Board of Directors ("Board")

11   met at the Royale Chulan Hotel in Kuala Lumpur, Malaysia.  The 1MDB Board minutes

12   of that meeting provide that the purpose of the meeting was to discuss the anticipated

13   creation of the 1MDB-PetroSaudi JV.  The following individuals were present: (i)

14   1MDB OFFICER 1, (ii) the CEO of 1MDB ("1MDB OFFICER 2"), (iii) the Chairman

15   of the 1MDB Board, (iv) 1MDB's Director of Investments, and (v) three 1MDB

16   Directors.

17    53.    The Board minutes further indicate that 1MDB OFFICERS 1 and 2 offered

18   a Position Paper during the September 18, 2009 meeting.  The Position Paper, signed by

19   1MDB OFFICERS 1 and 2, included a formal request that the 1MDB Board authorize

20   1MDB "to invest US$1 bln into the [1MDB-PetroSaudi JV] upon signing of the [1MDB-

21   PetroSaudi JV Agreement] as its contribution to the capital of the [1MDB-PetroSaudi

22   JV]."

23    54.    The Board minutes state further that, on or about September 18, 2009, the

24   1MDB Board authorized 1MDB to enter into negotiations with PetroSaudi for the

25   purpose of creating the 1MDB-PetroSaudi JV.  However, the 1MDB Board also resolved

26   that 1MDB's management should report back to the Board regarding some of the issues

27   raised by the Board, including whether (i) an expert selected by 1MDB could be used to

28

assess the value of PetroSaudi's assets and (ii) PetroSaudi could also be required to invest at least $1 billion in cash into the 1MDB-PetroSaudi JV.

55.     A special meeting of the 1MDB Board was held on September 26, 2009, which was attended by 1MDB OFFICERS 1 and 2 and members of the Board. LOW also attended this meeting.  Just prior to the meeting, LOW spoke by telephone with MALAYSIAN OFFICIAL 1.

56.     According to the 1MDB Board minutes of the September 26, 2009 meeting, 1MDB's Board passed a resolution authorizing 1MDB to transmit $1 billion to the 1MDB-PetroSaudi JV.  Specifically, the 1MDB Board approved 1MDB's resolution to transfer $1 billion from 1MDB through a foreign exchange transaction with Deutsche Bank (Malaysia) Berhad ("Deutsche Bank"), "into the bank account of [the 1MDB-PetroSaudi JV] for the purpose of subscribing of 1 billion ordinary shares in [the 1MDB-PetroSaudi JV]."  The resolution was signed by the Chairman of the 1MDB Board and 1MDB OFFICER 2.

57.     The Joint Venture Agreement ("JVA") between 1MDB and PetroSaudi was executed on or about September 28, 2009.  Under the terms of the JVA, 1MDB agreed to invest $1 billion into the 1MDB-PetroSaudi JV in exchange for one billion equity shares, equivalent to a 40% equity stake in the 1MDB-PetroSaudi JV.  In turn, PetroSaudi agreed to place into the 1MDB-PetroSaudi JV certain assets valued at approximately $2.7 billion, purportedly consisting of "energy interests in the Turkmenistan sector of the Caspian Sea" and "the Argentinean provinces of Rio Negro" and Chubut.  1MDB OFFICER 2 signed the JVA on behalf of 1MDB; Tarek Obaid ("OBAID"), the CEO and co-founder of PetroSaudi, a Saudi national, signed on behalf of PetroSaudi.

58.     The JVA provided further that 1MDB's $1 billion contribution was to be made in "immediately available cleared funds to a bank account in the name of, and nominated by, [the 1MDB-PetroSaudi JV] with BSI Bank."

59.     BSI Bank is a private bank based in Switzerland that maintained a branch in Singapore.  The JVA required that 1MDB and PSI officials be joint signatories on the

BSI Bank account into which 1MDB's contribution to the Joint Venture was to be deposited.  The JVA expressly required that, upon 1MDB's contribution of $1 billion, the 1MDB-PetroSaudi JV was to "deliver to 1MDB evidence, in the name of BSI Bank, establishing that 1MDB was a joint beneficial owner" of the account at BSI Bank into which 1MDB's contribution to the 1MDB-PetroSaudi JV was deposited.

60.     On or about September 22, 2009, the chief investment officer for PetroSaudi ("PETROSAUDI OFFICER"), a U.K. national, contacted BSI in Geneva to discuss the opening of a bank account for the Joint Venture.  During the account opening process, the PETROSAUDI OFFICER explained the anticipated structure of the Joint Venture investments and advised that an unspecified portion of 1MDB's $1 billion investment in the Joint Venture would be paid to LOW as a commission for having made the introduction between MALAYSIAN OFFICIAL 1 and the Petrosaudi co-founders.  BSI refused to enter into a business relationship with the Joint Venture due to concerns about the transaction.  In an email dated September 28, 2009, a banker at BSI in Lugano wrote, "I don't like the transaction at all!  In particular the role and involvement of Mr Low Taek Jho 'looks and feels' very subspicious [sic] to me."  The Joint Venture then approached  J.P. Morgan (Suisse) about opening an account, without disclosing the same details about the structure of the investment.  The Joint Venture opened an account at J.P. Morgan (Suisse) on or about September 30, 2009, contrary to the terms of the JVA.

61.     The JVA also required that by September 30, 2009 (within two days of the JVA's execution), the 1MDB-PetroSaudi JV pay to PetroSaudi $700 million, purportedly as repayment for a loan PetroSaudi made to the 1MDB-PetroSaudi JV.  According to the JVA, PetroSaudi agreed to make this loan to the Joint Venture just three days prior to execution of the JVA, that is, on or about September 25, 2009.

62.     Notwithstanding the reference in the JVA to a "loan" from PetroSaudi to the Joint Venture, PetroSaudi made no such loan, based on the following facts and circumstances, among others:

a.     On September 25, 2009, before the JVA was signed, PetroSaudi purportedly agreed to make the loan, which was due to be repaid on or about September 30, 2009.  There is no apparent commercial purpose for this loan.

b.     The bank account maintained by the Joint Venture at J.P. Morgan (Suisse), into which 1MDB ultimately transferred $300 million, was not opened until September 30, 2009, after the loan was purportedly made.

c.     Although PetroSaudi opened an account at J.P. Morgan (Suisse) in June 2009, this account was "inactive" until December 2009.

d.     The Malaysian Public Accounts Committee ("PAC"), a committee within the Malaysian Parliament responsible for examining the accounts of public authorities and other bodies administering public funds, conducted an examination of 1MDB and its financial activities, and it produced a public and non-public report of its findings.  According to an English-language translation of the public report available on the PAC's website, the auditors tasked by the PAC to examine 1MDB's activities were unable to validate documents related to PetroSaudi's purported $700 million loan to the 1MDB-PetroSaudi JV and were unable to verify the existence of such a loan.

e.     As detailed below, the $700 million went to an account controlled by LOW, not by PetroSaudi.

63.     Regardless of the veracity of the purported loan from PetroSaudi to 1MDB-PetroSaudi JV, the Position Paper that was presented to the 1MDB Board did not disclose the existence of any loan, or any anticipated loan, from PetroSaudi to the Joint Venture.  Nor did the Position Paper disclose the need for 1MDB to direct any portion of its $1 billion investment in the Joint Venture to PetroSaudi (rather than the Joint Venture) in repayment of a loan.  Indeed, at the time that the 1MDB Board authorized the $1 billion investment in the 1MDB-PetroSaudi JV on September 26, 2009, the Board was not told that any portion of the $1 billion investment in 1MDB-PetroSaudi JV would be transferred to any entity other than the Joint Venture.  Even though Article 75 of 1MDB's Articles of Association requires that 1MDB's Board approve all investment

22

decisions, the Board did not approve the use of 1MDB's investment in the Joint Venture to repay PetroSaudi for a loan, let alone to pay an entity unaffiliated with PetroSaudi.

64.    On or about September 30, 2009, 1MDB issued a press release entitled, "[PSI] and [1MDB] in US $2.5 billion joint-venture partnership, opens new door to FDIs [Foreign Direct Investments.]"  The press release stated:

> The [1MDB-PetroSaudi JV's] objective is to seek, explore, and participate in business and economic opportunities which result in the enhancement and promotion of the future prosperity and long-term sustainable economic development of Malaysia.  It is expected to actively make investment in the renewable energy sector.  The [1MDB-PetroSaudi JV] is also expected to be a vehicle for investments from the Middle East into the region, thereby giving Malaysia the edge in drawing investments from the cash- and resource-rich region.

## D.    FALSE REPRESENTATIONS TO BANKS CAUSING $700 MILLION DIVERSION FROM 1MDB TO THE GOOD STAR ACCOUNT

65.    As set forth below, members of 1MDB's Senior Management Team, including 1MDB OFFICERS 1 and 2, made material misrepresentations and omissions to Deutsche Bank officials in order to cause Deutsche Bank to divert $700 million of 1MDB's funds to the Good Star Account.

66.    On or about September 30, 2009, a letter signed by 1MDB OFFICER 1 was delivered "BY HAND" to Deutsche Bank in Malaysia instructing the Bank to transfer (i) $300 million to an account at J.P. Morgan (Suisse), S.A. in Switzerland (the "$300 million wire transfer") and (ii) $700 million to an account at RBS Coutts in Switzerland (the "$700 million wire transfer").  The instructions specified the account numbers for the two destination accounts but did not identify account names or beneficiaries.

67.    J.P. Morgan Chase Bank ("J.P. Morgan") records show that the Swiss J.P. Morgan account number referenced in the instructions to Deutsche Bank (that is, the

account that was to receive the $300 million wire transfer) belonged to an account held in the name of the 1MDB-PetroSaudi JV (hereinafter, the "J.P. Morgan JV Account").

68.     RBS Coutts records show that the RBS Coutts account referenced in the instructions to Deutsche Bank (that is, the account that was to receive the $700 million wire transfer) was the Good Star Account.

69.     These two transactions were to be carried out as foreign exchange transactions, in which Deutsche Bank, on behalf of 1MDB, was to exchange an equivalent sum of Malaysian Ringgit ("MYR") for $1 billion in U.S. dollars.

70.     In an email dated September 30, 2009, at 1:09 p.m., a 1MDB official represented to a Deutsche Bank employee (the "Deutsche Bank Employee"), that the "beneficiar[y]" of the $300 million wire transfer was the Joint Venture and the "beneficiar[y]" of the $700 million wire was PetroSaudi.  In that same email, the 1MDB official indicated to Deutsche Bank that, "[i]n order to avoid any unforeseen circumstance, we are not incorporating the name of the beneficiary in our instruction letter and please follow our instruction according."

71.     Under Malaysian law, 1MDB was required to obtain approval from Bank Negara, Malaysia's Central Bank, before completing either of the ordered wire transfers. On or about September 30, 2009, at approximately 2:05 p.m., the Acting Deputy Director of Bank Negara's Foreign Exchange Administration Department sent a letter via facsimile to 1MDB OFFICER 1 (the "Bank Negara Letter").  In this letter, Bank Negara acknowledged that "the funds for the approved investment will be remitted to PetroJV's account maintained with J.P. Morgan SA and RBS Coutts Bank Ltd."  The reference to "PetroJV" was intended to refer to the 1MDB-PetroSaudi JV.

72.     Later that same day, 1MDB OFFICER 1 provided a copy of the Bank Negara Letter to Deutsche Bank, prior to Deutsche Bank's initiation of the $700 million wire transfer.

73.     On September 30, 2009, at approximately 2:39 p.m., the Deutsche Bank Employee, a Deutsche Bank supervisor ("Deutsche Bank Supervisor"), and 1MDB

1  OFFICER 1 had a telephone conversation regarding the requested $700 million wire

2  transfer.  During this conversation, 1MDB OFFICER 1 falsely represented that the

3  beneficiary of the $700 million wire was PetroSaudi.  In truth, the beneficiary of the wire

4  was Good Star.  Their exchange, conducted in English, was as follows:

5

6  1MDB OFFICER 1           Hey, No [mah], I, whatever mistake they've made you

7                           cannot go back [ask] them.  They [already] give you

8                           approval from [Bank Negara] all the way to the top.

9  Deutsche Bank            Um-hum . . .

10 Supervisor

11 1MDB OFFICER 1           Uh.  You want to, hang on, this one ___.  The ___ is

12                          asking me to go and send it now.

13 Deutsche Bank            Okay, okay, okay. Let, let, let me just convince my

14 Supervisor               compliance person.  This is, I'm, I'm fine with you

15                          about the compliance side, uh, it's. It's a little bit sticky

                            with this.  But let me just try –

16

17 1MDB OFFICER 1           Good.

18 Deutsche Bank             --and convince her

19 Supervisor

20 1MDB OFFICER 1           Yeah, and __ I don't know how to answer you know,

21                          that's why I'm under tremendous pressure –

22 1MDB OFFICER 1           Then, they going to be so upset ____?

23

24 Deutsche Bank            Um-hum-hum.  But it is okay for us to call [Bank

25 Supervisor               Negara] if we need to, huh?  Just, just to uh –

26

27 1MDB OFFICER 1           Yeah, yeah, yeah, yeah, yeah, yeah

28 Deutsche Bank            Because it's not my decision.
   Supervisor

| | | |
|---|---|---|
| 1 | 1MDB OFFICER 1 | But— |
| 2 | | |
| 3 | Deutsche Bank Supervisor | --[it's my] compliance uh person. |
| 4 | | |
| 5 | 1MDB OFFICER 1 | [You tell your] compliance. |
| 6 | Deutsche Bank | Yeah. |
| 7 | Supervisor | |
| 8 | 1MDB OFFICER 1 | If they don't send it [ah] |
| 9 | | |
| 10 | Deutsche Bank Supervisor | Yeah. |
| 11 | | |
| 12 | 1MDB OFFICER 1 | _____ will [blame] them [____], the deal goes off, you know. |
| 13 | Deutsche Bank | Okay, okay, okay. |
| 14 | Supervisor | |
| 15 | 1MDB OFFICER 1 | No, I'm serious you know, you know this ___? |
| 16 | | |
| 17 | Deutsche Bank Supervisor | No, no, I understand.  Understand.  Yeah. |
| 18 | | |
| 19 | 1MDB OFFICER 1 | You know, if, do whatever you [can] do, either they |
| 20 | | send it now or they, they, they double [back], or whatever, but they cannot wait for this, you know. |
| 21 | | |
| 22 | Deutsche Bank Employee | Yeah, just, just, just one quick question [1MDB OFFICER 1], what— |
| 23 | | |
| 24 | 1MDB OFFICER 1 | But if they're going to overkill on the compliance thing |
| 25 | | uh they have to be responsible you know. |
| 26 | Deutsche Bank Supervisor | I understand that.  Uh— |
| 27 | | |
| 28 | | |

| | |
|---|---|
| Deutsche Bank Employee | Yes, that's, that's fine.  But just one question as to why is it going to [PetroSaudi] itself?  Is there any particular reason? |
| 1MDB OFFICER 1 | Actually – |
| Deutsche Bank Employee | Ah— |
| 1MDB OFFICER 1 | --for us, we don't care.  Because 700 million I mean it's a __ advance [that's] owed to them. |
| Deutsche Bank Employee | Oh, I see. |
| 1MDB OFFICER 1 | Alright.  They give us instructions, send [whatever] they want to send it. ____. |
| Deutsche Bank Employee | Ah, I see, I see.  Okay.  Okay. |
| 1MDB OFFICER 1 | And for us what we care about making sure they have issue us one billion dollars [shares]. |
| Deutsche Bank Employee | Ah. |
| 1MDB OFFICER 1 | --and the three hundred million goes to the account where [we control]. |
| Deutsche Bank Employee | Ah.  Okay.  That, that's— |
| 1MDB OFFICER 1 | ____ to them.  This is where they want to send, they want to send to Timbuktu also, we don't care. |
| Deutsche Bank Employee | Yeah, that's fine.  Alright.  We just wanted to understand the background. |
| 1MDB OFFICER 1 | So [if] your compliance is overkill in terms _____ -- |

| Deutsche Bank Employee | Yeah. |
| 1MDB OFFICER 1 | --the message— |

**\*\*\*\***

74.     On September 30, 2009, at approximately 2:51 p.m., the Deutsche Bank Supervisor had a telephone conversation with a Bank Negara official ("Bank Negara Official").  Their conversation included the following exchange:

| Deutsche Bank Supervisor | I understand that.  I understand that.  Okay.  So you know in terms of account it's basically a business decision for the [client] [now]. |
| Bank Negara Official | Yeah, yeah, yeah, because we, we, I mean we do not know of the, all that when there applied to us, they got 1.5 billion will be put by the Saudi MDB, one billion by us, uh by Malaysia – |
| Deutsche Bank Supervisor | Um-hum, um-hum— |
| Bank Negara Official | --and that, and the crediting of the account and so on , is this their business decision, la, so long as it does not deviate from the original intention and that is not for Bank Negara to say but more of the government [la] because this is MOF's . . . baby [la]. |

75.     When the Bank Negara Official used the words "original intention," he/she meant the $1 billion in funds that were meant to be sent to the 1MDB-PetroSaudi JV.

76.     At approximately 3:14 p.m., Deutsche Bank transmitted to RBS Coutts a SWIFT payment order requesting that $700 million be credited to an account at RBS Coutts.[7]  The SWIFT message did not identify the owner of the RBS Coutts account, but

---

[7] SWIFT is an abbreviation for Society for Worldwide Interbank Financial Telecommunication, and a SWIFT payment order is a standard electronic

1  the account number listed on the SWIFT as the recipient of the $700 million wire

2  transfer was the number of the Good Star Account.

3       77.    Approximately six minutes later, at about 3:20 p.m., Deutsche Bank

4  transmitted a second SWIFT payment order to J.P. Morgan (Suisse) requesting that $300

5  million be credited to an account at J.P. Morgan (Suisse).  As with the other SWIFT

6  message, the SWIFT message for the $300 million wire transfer did not identify the

7  owner of the beneficiary account.  The account number listed in the SWIFT for the $300

8  million wire transfer matched the number for the J.P. Morgan JV Account.

9       78.    At approximately 5:08 p.m., a Deutsche Bank compliance officer sent an

10  email to the Deutsche Bank Employee seeking "email confirmation from 1MDB of the

11  names of the beneficiaries to both payments."  The compliance officer also advised the

12  Deutsche Bank Employee that Bank Negara approved the wire transfers for the purpose

13  of allowing 1MDB to acquire an equity interest in the 1MDB-PetroSaudi JV.  The email

14  indicates the compliance officer's belief that the $700 million wire transfer was being

15  sent to PetroSaudi (rather than Good Star).

16       79.    On October 1, 2009, the Deutsche Bank Employee sent an email to other

17  Deutsche Bank employees stating: "The 3rd party payment by 1MDB to [the 1MDB-

18  PetroSaudi JV] and [PetroSaudi] is approved from my end."  This email indicated the

19  Deutsche Bank Employee's similar belief that the $700 million wire transfer was being

20  sent to PetroSaudi.

21       80.    On October 2, 2009, an RBS Coutts employee with the Regulatory Risk

22  department emailed a Deutsche Bank employee, stating:  "Please urgently confirm the

23  **full name** of the final beneficiary of the funds per **e-mail** and **authenticated swift** (see

24  details below) in order for us to apply the funds."  (Emphasis in original).  In the email,

25  the RBS Coutts employee further explained that "[w]e are not in a position to credit the

26  funds without full beneficiary details (full name, address, account no.)."

27

28  _____

communication used by and between financial institutions to conduct monetary
transactions.

81.     Later, at approximately 6:19 p.m., the Deutsche Bank Employee sent an email to 1MDB OFFICERS 1 and 2, explaining, "I believe RBS [Coutts] needs confirmation on the beneficiary's name in order to complete their internal risk mitigating processes as no name was[.]  We will await your instructions on whether to reveal the beneficiary name and address (please provide) to RBS Coutts."

82.     Thereafter, at approximately 7:51 p.m., 1MDB OFFICER 2 emailed the Deutsche Bank Employee and 1MDB OFFICER 1 with authorization to disclose to RBS Coutts that the beneficiary of the $700 million wire was Good Star.  However, 1MDB OFFICER 2 misrepresented the nature of the relationship between Good Star and PetroSaudi.   Specifically, 1MDB OFFICER 2 stated: "This payment was for beneficiary 'Good Star Limited' in their SWIFT.  Good Star is owned 100% by PetroSaudi International Limited."  In reality, however, Good Star's sole shareholder and the signatory on its account was LOW – not PetroSaudi.  Approximately 30 minutes later, 1MDB OFFICER 2 emailed the Deutsche Bank Employee and provided Good Star's address as P.O. Box 1239, Offshore Incorporation, Victoria, Mahe, Republic of Seychelles.

83.     Finally, at approximately 9:30 p.m., Deutsche Bank submitted to RBS Coutts a revised SWIFT instruction identifying "Good Star Limited" as the beneficiary of the $700 million wire transfer, located at P.O. Box 1239, Offshore Incorporation, Victoria, Mahe, Republic of Seychelles.

84.     RBS Coutts employees also met with LOW on or about October 2, 2009, to confirm the validity of the $700 million wire.  To justify Good Star's receipt of $700 million from 1MDB, LOW had provided the bank with a copy of a purported "Investment Management Agreement" between 1MDB, as the client, and Good Star, as the investment manager.  This agreement, dated September 29, 2009, was signed by 1MDB OFFICER 1 and Li Lin Seet.  Li Lin Seet was an associate of LOW and an employee of LOW's private equity firm, the Wynton Group; he was also identified in the agreement as Good Star's chief investment officer.  According to this purported

agreement, 1MDB was a "founding investor [in Good Star] who wishes to support and assist [Good Star] in realising its purpose by providing an initial capital contribution amounting to USD700 million." The funds were to be used to "invest in real estate and private equity to provide long-term capital growth for the investor."

85.   The 1MDB Board never approved an investment agreement with Good Star. And as set forth in Section VI below, the funds transferred from 1MDB to the Good Star Account were not used for investments benefiting 1MDB.

86.   On or about October 2, 2009, after meeting with LOW and after receiving confirmation from Deutsche Bank that Good Star was the intended beneficiary of the $700 million wire, RBS Courts unblocked the $700 million and credited the Good Star Account, with a backdated value date of September 30, 2009. Bank statements for the Good Star Account confirm that the account received a payment of $700 million from 1MDB with a value date of September 30, 2009. A U.S. correspondent bank account at J.P. Morgan processed the $700 million wire transfer.

87.   Although RBS Coutts had unblocked the funds, employees at the bank continued to have concerns about the size of, and justification for, the $700 million wire from a state-owned entity. Accordingly, the bank requested that LOW arrange a meeting between RBS Coutts and someone at 1MDB capable of confirming the information LOW had provided about the purpose of the $700 million wire. On or about October 28, 2009, two RBS Coutts bankers met with LOW and 1MDB OFFICER 1 in Zurich. 1MDB OFFICER 1's identity was verified with a copy of his passport. At this meeting, 1MDB OFFICER 1 confirmed the false information that LOW had provided the bank about the purpose and validity of the $700 million transfer.

88.   By early 2010, LOW had changed the stated justification for the $700 million wire transfer, characterizing it as the proceeds of a loan from 1MDB to Good Star. LOW provided RBS Coutts a copy of a purported loan agreement between Good Star and 1MDB, dated January 12, 2010, to replace the earlier Investment Management Agreement. The agreement purported to retroactively recognize the $700 million

transfer from 1MDB to Good Star as a loan to Good Star to "finance its strategic objectives and future growth through acquisitions, in particular, in the real estate/hospitality area, the energy sector and financial services."  The 1MDB Board never approved such a loan to Good Star, and bank statements for the Good Star Account show no repayment of a loan to 1MDB.

89.    On or about October 23, 2009, Deutsche Bank informed Bank Negara through a regulatory filing that the purpose of the $700 million wire transfer was for an "equity investment in [a] new entity."  The "new entity" referred to in this regulatory filing was the 1MDB-PetroSaudi JV.

90.    The 1MDB-PetroSaudi JV never had an account at RBS Coutts.  Rather, as stated above, the 1MDB-PetroSaudi JV maintained an account at J.P. Morgan, and that account received only $300 million of the total $1 billion that was to be invested in the Joint Venture.

## E.    1MDB OFFICERS 1 AND 2 CONCEAL MISAPPROPRIATION OF FUNDS FROM 1MDB BOARD OF DIRECTORS

91.    Even after the $700 million wire transfer was made into the Good Star Account, 1MDB OFFICERS 1 and 2 continued to make material misrepresentations to the 1MDB Board relating to the true identity of the beneficiary of the $700 million wire transfer.

92.    The 1MDB Board met in Selangor, Malaysia on October 3, 2009.  The individuals present at the meeting included 1MDB OFFICERS 1 and 2, the Chairman of the 1MDB Board, 1MDB's Secretary, and three directors of the 1MDB Board.

93.    The 1MDB Board minutes for that meeting indicate that 1MDB OFFICER 2 made false and misleading representations to the Board in explaining key details relating to the $700 million wire transfer.  For example, 1MDB OFFICER 2 informed the Board that, "[o]f the US$1 billion [1MDB] was supposed to inject into the [Joint Venture], . . . US$700 million was remitted to PSI directly as settlement of all the

amounts owed by the JVCo. to PSI."  This statement is false and misleading for several reasons:

a.     First, the representation by 1MDB OFFICER 2 that the $700 million wire transfer was sent directly to PetroSaudi was false.  As noted above, these funds were sent to an account held in the name of Good Star.

b.     Second, as noted above, Good Star is not a subsidiary of PetroSaudi, nor was PetroSaudi a beneficial owner of the Good Star Account.

c.     Third, a loan does not appear to have ever been made by PetroSaudi to the 1MDB-PetroSaudi JV and, thus, the $700 million wire transfer could not have been a "settlement of all the amounts owed by the" 1MDB-PetroSaudi JV.

d.     Fourth, notwithstanding the fact that 1MDB OFFICER 2, who signed the JVA on or about September 28, 2009, was aware that the JVA included contractual terms requiring the 1MDB-PetroSaudi JV to repay PetroSaudi $700 million for a purported loan, neither 1MDB OFFICER 1 nor 1MDB OFFICER 2 disclosed this fact to the1MDB Board prior to October 3, 2009 – after the $700 million wire had already been diverted to the Good Star Account.

e.     Fifth, as noted above, 1MDB OFFICER 1 represented to RBS Coutts that the $700 million wire transfer was made pursuant to an Investment Management Agreement with Good Star (not to repay a loan to PetroSaudi).

94.     Even without having been told that the $700 million wire was sent to an account held in the name of Good Star, 1MDB Board members raised concerns about the transaction as represented by 1MDB OFFICER 2.  Specifically, the minutes state, in pertinent part:

The concerns raised by the [1MDB Board] that the recent developments in the joint venture was not in accordance with the [1MDB Board's] understanding of the process, based on representations made at the previous Special [1MDB Board] Meetings.  Specifically:

(a)     The [1MDB Board] was not consulted on the change of plans to remit $700 million to [PetroSaudi].  The [1MDB Board's] understanding was for the full USA $1 billion to be wired to the joint bank account under the name of the [Joint Venture] and the [Joint Venture's] board of directors makes the decision to remit US$700 million to [PetroSaudi].

\*\*\*

(d)  The substantial investment of US$1billion should have merited a more thorough thought and due diligence process.

95.     After expressing these concerns, 1MDB Board members asked that 1MDB determine whether it would be possible to seek the return of the $700 million "so that the funds could be remitted through the original agreed channel," namely, the BSI Bank account held in the name of the 1MDB-PetroSaudi JV.

96.     The 1MDB Board instructed 1MDB OFFICER 2 and 1MDB management "not to deviate from the [1MDB Board's] instructions and what the [1MDB Board] has agreed/understood to be the procedures of a particular transaction."

97.     The 1MDB Board met again in Selangor, Malaysia, on October 10, 2009. The individuals present at the meeting included 1MDB OFFICER 2, the Chairman of the 1MDB Board, 1MDB's Secretary, and three directors of the 1MDB Board.

98.     The 1MDB Board minutes for this meeting indicate that 1MDB OFFICER 2 sought to respond to the concerns raised by the 1MDB Board at the October 3, 2009 meeting.  Specifically, 1MDB OFFICER 2 represented that the $700 million wire transfer was sent "directly to" PetroSaudi in order to repay PetroSaudi's purported $700 million loan to the Joint Venture.  1MDB's management explained that, pursuant to clause 4.5 of the JVA, 1MDB was required to repay PetroSaudi's loan by September 30, 2009.

99.     In fact, clause 4.5 of the JVA required the 1MDB-PetroSaudi JV, rather than 1MDB itself, to repay PetroSaudi for the purported loan.  Furthermore, by the JVA's terms, the repayment of the loan could be made only after notice was provided to both 1MDB and PetroSaudi and both entities approved the repayment.  However, prior to October 3, 2009, the 1MDB Board was never told about a purported loan from PetroSaudi to the 1MDB-PetroSaudi JV.

100.    At no point prior to the execution of the Joint Venture, or in the Board meetings held shortly thereafter to discuss the transaction, did 1MDB OFFICER 1 or 2 inform the 1MDB Board that funds from 1MDB had been sent to Good Star.

**F.      AN ADDITIONAL $330 MILLION IN 1MDB FUNDS WAS DIVERTED TO LOW'S GOOD STAR ACCOUNT IN 2011**

101.    An additional $330 million in 1MDB funds was subsequently funneled into the Good Star Account in 2011 under false pretenses.  Although these funds were supposed to be transmitted to the 1MDB-PetroSaudi JV under a financing agreement signed by 1MDB and the 1MDB-PetroSaudi JV, the funds were instead transmitted via international wire transfers to the Good Star Account.  Although 1MDB officials were aware that these funds were not being sent to an account maintained by the 1MDB-PetroSaudi JV, this fact was withheld from Deutsche Bank.  Bank records for the Good Star Account, as well as J.P. Morgan correspondent bank records, demonstrate that funds were transferred to LOW's Good Star Account.

102.    In June 2010, 1MDB decided to dispose of its 40% equity interest in the 1MDB-PetroSaudi JV by selling its shares back to the Joint Venture.  In exchange, the Joint Venture agreed to give 1MDB $1.2 billion in debt notes issued by the Joint Venture.  These debt notes were issued pursuant to an Islamic loan facility called a Murabaha Financing Agreement ("MFA").  Pursuant to that MFA, 1MDB also agreed to provide the 1MDB-PetroSaudi JV with an additional loan of up to $1.5 billion at an annual rate of return of 8.75%.

103.   On or about September 14, 2010, the 1MDB-PetroSaudi JV requested to draw down on the additional loan extended to it by 1MDB in the amount of $500 million.

104.   On or about May 12, 2011, the 1MDB-PetroSaudi JV issued to 1MDB a second Notice of Drawing (the "Notice") pursuant to the MFA, seeking to draw down on the loan by an additional $330 million.  The Notice was signed by OBAID on behalf of the 1MDB-PetroSaudi JV and requested that 1MDB transmit $330 million to the Good Star Account.

105.   Good Star bank statements and J.P. Morgan correspondent bank records show that between May 20 and October 25, 2011, $330,000,000 was transferred from 1MDB to the Good Star Account over four wire transfers ("$330 million wire transfers").  Each of these transfers was a foreign exchange transaction completed through financial institutions in Malaysia, including AmBank and Deutsche Bank, and was processed through a U.S. correspondent bank account at J.P. Morgan Chase.  The following is a summary of the 2011 transfers from 1MDB to the Good Star Account:

**Table 1:  2011 Transfers from 1MDB to the Good Star Account**

| Date[8] | Amount | Originating Bank | U.S. Correspondent Bank |
|---|---|---|---|
| May 20, 2011 | $30,000,000 | AmBank | J.P. Morgan Chase |
| May 23, 2011 | $65,000,000 | AmBank | J.P. Morgan Chase |
| May 27, 2011 | $110,000,000 | Deutsche Bank | J.P. Morgan Chase |
| Oct. 25, 2011 | $125,000,000 | AmBank | J.P. Morgan Chase |

_____

[8] The dates of wire transfers may vary, even among different records for the same wire transfer, based, for example, on time zone differences and/or the lapse of time between the initiation of the wire, the crediting of funds to the correspondent bank, and the crediting of funds to the beneficiary bank.

106.   On or about May 23, 2011, 1MDB's Chief Financial Officer wrote a letter to a Bank Negara official misrepresenting the identity of the recipient of the 1MDB funds being disbursed under the MFA.  In the letter, the 1MDB official thanked Bank Negara for having approved the transmission of $330 million to the 1MDB-PetroSaudi JV and explained that "1MDB-PSI has requested us to remit the funds to the account of its parent company, PetroSaudi International Limited ("PSI Limited") instead of the account of 1MDB-PSI."  In truth, however, these funds were not being sent to PetroSaudi, but to Good Star.

107.   On or about May 25, 2011, OBAID sent 1MDB a letter on behalf of PetroSaudi and the 1MDB-PetroSaudi JV.  This letter confirmed that the account at RBS Coutts in Switzerland had received the $30 million and the $65 million wires referenced in the table above.  However, OBAID requested that 1MDB send to RBS Coutts a "SWIFT CLARIFICATION" explaining that the beneficiary of these wire transfers was actually "Account No. XXX.2000" (the Good Star Account) and not "Petrosaudi International Limited."[9]

108.   OBAID's statement in the May 25, 2011, letter that the funds were not going to "Petrosaudi International Limited" was materially inconsistent with the representation made by 1MDB OFFICER 2 in the September 30, 2009, email to Deutsche Bank, described above in paragraph 82, in which 1MDB OFFICER 2 stated that Good Star was a wholly-owned subsidiary of PetroSaudi.

109.   On or about May 27, 2011, 1MDB OFFICER 2 signed a letter of instruction, addressed to Deutsche Bank, requesting that an additional $110 million be transferred from 1MDB to the Good Star Account.

110.   To justify these substantial additional transfers of 1MDB funds to the Good Star Account, LOW represented to RBS Coutts that 1MDB had entered into a sale and

---

[9] All but the last four digits of the account number identified in OBAID's May 25, 2011, letter have been redacted pursuant to Federal Rule of Civil Procedure 5.2.  The full account number listed in the OBAID'S letter matches the account number for the Good Star Account.

purchase agreement with Good Star, for the sale of certain assets.  LOW submitted a copy of the purported agreement, which was dated February 23, 2011, and was signed by Li Lin Seet and the 1MDB-SRC OFFICER, who was then-Chief Investment Officer of 1MDB.  The agreement was fraudulent, intended only to convince the bank to process the wire transfers.  Among the assets that LOW claimed to be selling to 1MDB were (a) the Mark Hotel in New York City, which neither LOW nor Good Star owned, and (b) the L'Ermitage Beverly Hills Hotel, title to which remains to this day with LOW-affiliated entities, notwithstanding this purported sale agreement.

111.   In total, 1MDB purported to invest a total of $1.83 billion in the 1MDB-PetroSaudi Joint Venture through a combination of equity and debt investments.  Of this amount, $1.03 billion was fraudulently diverted to the Good Star Account.

## G.   FUNDS MISAPPROPRIATED FROM 1MDB WERE TRANSFERRED THROUGH AN INTERMEDIARY TO MALAYSIAN OFFICIAL 1

112.   As set forth above, between September and October 2009, $700 million was fraudulently diverted from 1MDB to the Good Star Account.  An additional $330 million was fraudulently diverted from 1MDB to the Good Star Account between May and October 2011.  According to J.P. Morgan Chase and RBS Coutts banking records, between February and June of 2011, approximately $24,500,000 of these funds was transferred to an account at Riyad Bank maintained in the name of two Saudi nationals who were associates of LOW and TAN ("SAUDI ASSOCIATE 1" AND "SAUDI ASSOCIATE 2").  From those funds, $20,000,000 was then transferred, within days, to an account belonging to MALAYSIAN OFFICIAL 1.

113.   J.P. Morgan correspondent bank records and bank records for the Good Star Account show two transfers of funds from LOW's Good Star Account to an account at Riyad Bank held in the name SAUDI ASSOCIATES 1 & 2 ("Saudi Account"): (i) one for approximately $12,500,000 on or about February 18, 2011, and (ii) another for approximately $12,000,000 on or about June 10, 2011.

114.   In response to a query from RBS Coutts, LOW represented that the purpose of the June 2011 wire transfer was to invest in real estate developments in Mecca and Medina pursuant to an Investment Management Agreement with SAUDI ASSOCIATE 1.

115.   Correspondent bank records from J.P. Morgan Chase and Wells Fargo show that days after the transfers from the Good Star Account to the Saudi Account, approximately $20,000,000 in funds was transferred from the Saudi Account to an account at AmBank, whose beneficiary is listed as "AMPRIVATE BANKING-MR" ("AMPRIVATE BANKING-MR Account").  More specifically, the AMPRIVATE BANKING-MR Account received (i) a wire of approximately $10 million on or about February 23, 2011, roughly five days after the Saudi Account received $12.5 million from the Good Star Account, and (ii) another wire for approximately $10 million on or about June 13, 2011, roughly three days after the Saudi Account received $12 million from the Good Star Account.  These funds transferred into and out of the Saudi Account are summarized below:

**Table 2:  Transfers from Good Star to the SAUDI ACCOUNT to MALAYSIAN OFFICIAL 1**

| Date | Credits into Saudi Account | | Debits from Saudi Account | |
|------|------|------|------|------|
| | From | Amount | Amount | To |
| 2/18/2011 | Good Star Account | $12,500,000 | | |
| 2/23/2011 | | | $10,000,000 | AMPRIVATE BANKING-MR Account |
| 6/10/2011 | Good Star Account | $12,000,000 | | |
| 6/13/2011 | | | $10,000,000 | AMPRIVATE BANKING-MR Account |

116.   MALAYSIAN OFFICIAL 1 is the ultimate beneficiary of the AMPRIVATE BANKING-MR Account.  The AMPRIVATE BANKING-MR Account is the same account that later received certain payments totaling approximately $681 million in March 2013.  As set forth in Paragraph 347 below, the Attorney General of Malaysia has publicly stated that the account into which these $681 million payments were made belonged to MALAYSIAN OFFICIAL 1.

## H.   FUNDS MISAPPROPRIATED FROM 1MDB WERE ALSO TRANSFERRED THROUGH THE GOOD STAR ACCOUNT TO 1MDB OFFICER 1

117.   As set forth below, diverted 1MDB proceeds were also transferred to a bank account beneficially owned by 1MDB OFFICER 1, who had helped facilitate the diversion of funds to the Good Star Account.

118.   On or about December 20, 2010, Good Star wire transferred $30,000,000 to an account at Standard Chartered Bank in Singapore held in the name of Alsen Chance Holdings Limited ("Alsen Chance Account").  "Eric" TAN Kim Loong ("TAN") was the stated beneficial owner of the Alsen Chance Account.  TAN was a close associate of LOW, who also served as a proxy for LOW in numerous financial transactions.  In the account opening documents, TAN represented to Standard Chartered Bank that Alsen Chance Limited ("Alsen Chance") did "consulting works for building and construction projects."

119.   On or about December 22, 2010, Alsen Chance wire transferred $5,000,000 to a bank account at BSI in Lugano held in the name of Totality Ltd.  ("Totality Account").  The payment details on the wire read, in relevant part: "PAYMENT FOR PURCHASES OF PLANE."  The wire transfer was processed through a correspondent bank account at Citibank in New York.

120.   1MDB OFFICER 1 was the beneficial owner of the Totality Account. Totality Ltd. was a shell company set up by 1MDB OFFICER 1 for the purpose of maintaining an account at BSI.

I.   **LOW LAUNDERED APPROXIMATELY $368 MILLION IN FUNDS DIVERTED FROM THE 1MDB JOINT VENTURE INTO THE UNITED STATES**

121.   LOW laundered hundreds of millions of dollars in proceeds from the foregoing unlawful activity into the United States for the personal benefit of himself and his associates.

122.   Between approximately October 21, 2009, and October 13, 2010, eleven wires totaling approximately $368 million were sent from the Good Star Account to an Interest on Lawyer Account held by the law firm Shearman & Sterling LLP in the United States ("Shearman IOLA Account").[10]

123.   More particularly, bank records show the following credits to the Shearman IOLA Account from the Good Star Account:

**Table 3:  Transfers from Good Star to the Shearman IOLA Account**

| Date | Amount | Notations on Wire Transfer |
| --- | --- | --- |
| 10/21/2009 | $148,000,000 | N/A |
| 1/20/2010 | $117,000,000 | A.PH52A1 C.PARK.W .NY (BID-USD 35M) B.AV. INVEST.(USD37.5M) C.STAKE V.H (USD 15M) D.VICEROY ST. M.H(USD 10M) E.PEARL ENERGY (THAILAND) USD 19.5M |

_____

[10] Bank records demonstrate that Shearman maintained one control account into which each of the wire transfers from the Good Star Account referenced above was transferred.  In addition to this control account, Shearman maintained a number of client escrow accounts to which some client funds were distributed after their receipt. References to the Shearman IOLA Account refer to the control account.

| Date | Amount | Notations on Wire Transfer |
|---|---|---|
| 3/3/2010 | $35,059,875 | A)PH52A 1 CENT WW NYC(RENOV USD10M) B)AVIATION WORKCAPINC (5M+10559875) C)INC VICEROY HOTEL GR (USD 7M) D)INC RENOV BUDGET BHH (USD2.5M) |
| 5/13/2010 | $15,780,000 | BID PROCESS - ACQUISITION OF THE EDEN HOTEL ROME (PREPARATION OF PARTIAL PORTION OF EQUITY) |
| 6/23/2010 | $8,599,985 | BID PROCESS-ASCQUISITION OF 94 PICCADILLY RD LONDON (IN AND OUT CLUB)FOR HOTEL DEVELOPMENT + SERVICRESIDENCES (PROOF OF FUNDS) |
| 8/17/2010 | $2,799,985 | N/A |
| 8/31/2010 | $653,985 | ACQUISITION OF ASSETS/PROPERTY PAYMENT FOR EXTENSION |
| 9/3/2010 | $8,645,985 | ACQUISITION OF ASSETS/PROPERTY PARTBALANCE PAYMENT |
| 9/28/2010 | $5,999,985 | ACQUISITION OF ASSETS/PROPERTY (2 PCT BID. NEW YORK HELMSLEY HOTEL - USD300M |
| 9/28/2010 | $17,999,985 | ACQUISITION OF ASSETS /PROPERTY (FULL BALANCE PAYMENT + RENOVATION) |
| 10/13/2010 | $7,999,985 | ACQUISITION OF ASSETS/PROPERTY BID HELMSLEY HOTEL NYC USD300M TRANCHE 2 |
| **Total:** | **$368,539,770.00** | |

124.   As described in further detail in Section V of the Complaint, funds transferred to the Shearman IOLA Account were then used by LOW and others to purchase assets and invest in business interests for their personal benefit, including, but not limited to, luxury real estate, a Beverly Hills hotel, a private jet, and a major Hollywood motion picture.

125.   In addition, funds transferred to Shearman were also used to fund the luxurious lifestyles enjoyed by LOW and his associates.  For instance, between on or about October 30, 2009, and June 18, 2010, a period of less than eight months, more than $85 million in funds traceable to the Good Star Account was wired from the Shearman IOLA Account to Las Vegas casinos, luxury yacht rental companies, business jet rental vendors, a London interior decorator, and associates and family members of LOW, among others.

126.   For example, between October 2009 and October 2010, misappropriated 1MDB funds sent from the Good Star Account into the Shearman IOLA Account were transferred as follows: (i) approximately $12,000,000 in wires to Caesars Palace, a Las Vegas casino; (ii) approximately $13,400,000 in wires to the Las Vegas Sands Corp., the owner of the Venetian Las Vegas, another casino; (iii) a wire for approximately $11,000,000 to TAN, an associate of LOW; (iv) approximately $4,000,000 in wires to Jet Logic Ltd., a luxury jet rental service; (v) a wire for approximately $3,500,000 to LOW's sister; (vi) a wire for approximately $3,080,000 to Rose Trading, a Hong Kong jeweler; (vii) approximately $2,698,000 in wires to Yachtzoo, a luxury yacht rental service; (viii) approximately $2,288,000 in wires to Argent Design Ltd., a United Kingdom-based interior designer; (ix) a wire for approximately $670,000 to Excel Air, a jet rental company; (x) approximately $460,000 in wires to Skyline Private Air, an aircraft rental company; and (xi) a wire for approximately $155,000 to Billiyon Air, a jet rental company.

**J.     LOW TRANSFERRED APPROXIMATELY $389 MILLION IN
1MDB FUNDS TO ANOTHER ACCOUNT CONTROLLED BY HIM
BUT HELD IN THE NAME OF ABU DHABI-KUWAIT-MALAYSIA
INVESTMENT CORPORATION (ADKMIC)**

127.   Over the course of five wire transfers between June 28, 2011, and
September 4, 2013, approximately $389 million was transferred from the Good Star
Account to an account at BSI Bank in Singapore held in the name of Abu Dhabi Kuwait
Malaysia Investment Corp. ("ADKMIC BSI Account").  LOW is the beneficial owner of
the ADKMIC BSI Account.

128.   In a document entitled "LOW FAMILY HISTORY AND BACKGROUND,
ORIGINS OF JYNWEL CAPITAL," that was emailed by LOW's brother to a New
York business person on or about August 13, 2013, the Low family represented that
"Mr. Jho Low founded the Abu Dhabi-Kuwait-Malaysia Investment Corporation in 2007
and together with third-party investment partners structured numerous multi-million
dollar buyouts with interests in construction, real estate development (Putrajaya Perdana
Berhad), water infrastructure (Loh & Loh Corporation Berhad), road concessions and oil
& gas (UBG Berhad)."

129.   J.P. Morgan Chase correspondent bank account records show the following
credits to the ADKMIC BSI Account from the Good Star Account:

**Table 4:  Transfers from Good Star to ADKMIC**

| Date | Amount |
|---|---|
| June 28, 2011 | $55,000,000 |
| September 4, 2012 | $38,000,000 |
| November 2, 2012 | $153,000,000 |
| December 27, 2012 | $142,500,000 |
| September 4, 2013 | $456,027 |

As described below, the funds transferred to the ADKMIC BSI Account were then used by LOW and others to acquire assets in the United States, among other things.

130.   The Good Star Account was closed on or about September 5, 2013, after the balance ($456,027) was transferred to the ADKMIC BSI Account.

**K.     LOW AND OTHERS TRIED TO COVER UP THE MISAPPROPRATION OF MORE THAN $1 BILLION FROM THE JOINT VENTURE**

*1.     1MDB's Interest in the Joint Venture Was Converted into "Fund Units" to Facilitate the Fraudulent Valuation of That Interest*

131.   As noted in Paragraph 112 above, between 2009 and 2011, 1MDB purported to invest approximately $1.83 billion in the 1MDB-PetroSaudi JV through equity and Murabaha loan investments, when in fact, at least $1.03 billion of this amount was siphoned off for the personal benefit of LOW and his associates.  LOW and 1MDB officials attempted to inflate the reported value of 1MDB's investment in the Joint Venture several times.  As explained below, the co-conspirators tried to achieve this end by restructuring 1MDB's investment in the Joint Venture several times, ultimately converting that interest into an opaque and illiquid asset, the value of which could not be easily verified by auditors and others.  Thereafter, the co-conspirators orchestrated a fraudulent valuation of the assets underlying the investment to massively inflate their value and to create the false impression that 1MDB's investment in the Joint Venture had generated a profit, when in fact it had been diminished significantly through misappropriation.

*a.     First Restructuring:  JV Equity Interest to Debt*

132.   As explained above in Paragraphs 102-104, in June 2010, 1MDB sold its equity interest in the Joint Venture in exchange for Islamic debt notes issued by the Joint Venture; and 1MDB purportedly increased its investment in those debt notes in 2010 and 2011.  This equity-to-debt restructuring made it easier to obscure the value of 1MDB's investment in the Joint Venture.  In its financial statements for the 2013 fiscal year,

1MDB valued the Islamic debt notes issued by the Joint Venture at approximately $2.22 billion, notwithstanding the fact that at least $1.03 billion had been diverted from 1MDB's stated investment in the Joint Venture.

> b.    *Second Restructuring: JV Debt to PSOSL Equity*

133.    In June 2012, 1MDB exchanged those Islamic debt notes for (i) a 49% stake in PetroSaudi Oil Services Limited ("PSOSL"), a subsidiary of PetroSaudi, and (ii) a call option to acquire the remaining equity stake in PSOSL.  In its financial statements for the 2013 fiscal year, 1MDB represented that the stake it had acquired in PSOSL was of a "value equivalent to" the value of the Islamic debt notes, or approximately $2.22 billion.

134.    At the time of this debt-equity swap, PSOSL's primary assets consisted of two drillships, which had contracts with state-owned Petróleos de Venezuela, S.A. ("PDVSA") to extract oil in Venezuela.  At no point has 1MDB received payments or profits from these contracts, and in fact, PSOSL reported losses in both 2012 and 2013. PSOSL's financial statements for the fiscal year ending December 31, 2012 disclose "adverse financial performance," because, among other things, PDVSA failed to make timely payments to PSOSL under the contracts and because one of the ship's contracts with PDVSA had expired in June 2012.  PSOSL's net assets were valued in those 2012 financial statements at $93,621,000, and PSOSL reported a net operating loss of $111,644,000.  Upon information and belief, the value of PSOSL's contracts with PDVSA, as well as the overall value of the company, has declined further in recent years as a result of developments in Venezuela.

> c.    *Third Restructuring: PSOSL Equity to "Fund Units"*

135.    Not long after 1MDB acquired an interest in PSOSL in exchange for its supposed investment in the Joint Venture, 1MDB sought to restructure its holdings yet again.  By restructuring its holdings, 1MDB further obscured the value of its holdings, which were not worth anywhere near their stated value or the amount that 1MDB had purportedly spent to acquire them.  1MDB officials accomplished this restructuring with assistance from bankers at BSI Bank in Singapore, with whom LOW had a close

relationship, and employees of Bridge Partners Investment Management Ltd. ("Bridge Partners"), an investment advisory firm with fund managers based in Hong Kong.

136.   LOW was himself also involved in the restructuring process.  For example, in a June 13, 2012 email exchange, two BSI bankers discussed the restructuring deal and an upcoming meeting with 1MDB on the matter at the Mandarin Oriental in Singapore.  The exchange closed, in relevant part, with the phrase, "1MDB all aligned to JL's plan," using Jho LOW's initials.

137.   The restructuring involved a series of complicated and commercially unnecessary transactions, resulting in the conversion of 1MDB's stake in PSOSL into securities in a purportedly legitimate investment fund.  To accomplish this end, 1MDB "sold" its equity stake in PSOSL to an affiliate of Bridge Partners in exchange for promissory notes, and then 1MDB used those promissory notes to subscribe to "fund units" in the Bridge Global Absolute Return Fund SPC ("Bridge Global Fund" or "Bridge Global"), a Cayman-registered corporate vehicle managed by Bridge Partners.  The Bridge Global Fund held only one asset, however – the very same equity stake in PSOSL that 1MDB had conveyed to Bridge Partners.  The transactions had no economic substance, amounting to a round trip of various securities and commercial paper that were designed to, and did, have a specific and false accounting effect—namely, the fraudulent inflation of the value of 1MDB's assets.  1MDB created a new wholly-owned subsidiary called Brazen Sky Limited ("Brazen Sky") for the express purpose of holding these fund units.

138.   Notwithstanding this restructuring, the value of Brazen Sky's holdings remained linked to the value of the drillships and drilling contracts held by PSOSL, because the fund units were solely backed by shares in PSOSL.  But the restructuring obscured this fact from third parties, including 1MDB's auditors, because it interposed several additional entities between 1MDB and its holdings in PSOSL, including an ostensibly independent investment fund.  Given the opaque nature of the Bridge Global Fund, it was difficult for third parties to independently verify the nature and value of the

1   assets underlying the fund units.  In this way, certain 1MDB officials and others were

2   able to conceal the true value of 1MDB's original investment in the Joint Venture, which

3   had been significantly diminished by the diversion of more than $1 billion to Good Star.

4        **d.**  *Fraudulent Valuation of the "Fund Units"*

5     139. On or about September 13, 2012, Brazen Sky opened a bank account at BSI

6   Bank in Singapore.  BSI Bank in Singapore thus served as the custodian of the Bridge

7   Global fund units, and these securities appear on the bank statements for Brazen Sky's

8   account at BSI ("Brazen Sky Account" or "BS Account").

9     140. During the fall of 2012, employees of BSI Bank met with 1MDB officials

10   to discuss the valuation of the Bridge Global fund units.  Among the individuals present

11   at these meetings were "Jasmine" LOO Ai Swan ("LOO"), who was then 1MDB's

12   General Counsel and Executive Director of Group Strategy, and 1MDB's Executive

13   Director of Finance ("1MDB OFFICER 4").

14     141. 1MDB officials sought to have the value of the fund units marked at $2.318

15   billion by Bridge Partners.  This is equal to the amount that 1MDB had claimed,

16   including in a press release dated April 15, 2013, that the proceeds of its investment in

17   the Joint Venture were worth, and it is slightly more than the stated valuation of the

18   1MDB-PetroSaudi JV debt notes, allowing 1MDB to claim its investment had generated

19   a profit.  As noted above, because the fund units were backed by shares in PSOSL, the

20   value of those units turned on the value of PSOSL's two drillships and drilling contracts.

21     142. 1MDB officials originally suggested that BSI and Bridge Partners rely on a

22   market valuation analysis of the PSOSL assets performed by Lazard, an international

23   asset management firm.  That analysis assigned an illustrative return value of more than

24   $2 billion to the PSOSL assets, based on certain aggressive assumptions and projections

25   provided by 1MDB.  BSI and/or Bridge Partners did not believe this analysis was

26   adequate to justify 1MDB's desired valuation of the Bridge Global investment.  At least

27   one BSI banker working on the matter ("SINGAPORE BANKER 2") expressed the view

28   that it would be "risky" to seek another market-based valuation, implying that it would

require too much "'engineering'" to achieve the target value; he also warned that a "[v]aluation report once done and if its too far fetched [sic], it will stick in the books forever."

143.    To avoid the need for an independent valuation of the asset at that point in time, BSI and Bridge Global agreed instead to value the assets on a cost-value basis, relying on 1MDB's stated costs to acquire the assets.  This meant that BSI valued the assets based on representations by 1MDB officials that 1MDB had given PetroSaudi $2.22 billion in value to acquire its stake in PSOSL.  A "premium" was added to that $2.22 billion to reach a total cost-based valuation of $2.318.  On or about November 13, 2012, BSI issued a bank statement showing that the Brazen Sky Account held $2.318 billion in securities.

144.    During this time period, there was considerable discussion among those involved about how KPMG, 1MDB's auditor, would evaluate the investment in the Bridge Global Fund.  In advance of a December 12, 2012 meeting between 1MDB and KPMG, 1MDB's Executive Director of Finance ("1MDB OFFICER 4") advised several BSI employees by email, "We will need to strengthen the story on why the funds were reinvested with the Bridge, to divert the attention away from the 'link.'"  Upon information and belief, this statement referred to diverting KPMG's attention away from the link between Brazen Sky's holdings in the Bridge Global Fund and the PSOSL drillships, assets that were neither liquid nor worth anywhere near $2.318 billion.

145.    At the December 12, 2012 meeting with KPMG, which was held at BSI's offices in Singapore, 1MDB and BSI officials misled KPMG about the nature of the Bridge Global assets held by Brazen Sky.  Minutes from the meeting show that 1MDB OFFICER 4 and the BSI bankers present at the meeting (SINGAPORE BANKER 2 and SINGAPORE BANKER 3) withheld from KPMG the fact that the assets underlying the Bridge Global investment consisted of two drillships and instead conveyed the impression that the fund units were backed by cash.

146.   1MDB's audited financial statements for the fiscal year ending March 31, 2012, were signed off by KPMG on or about December 27, 2012.  In the section of those financial statements devoted to "subsequent events," 1MDB represented that it had invested $2.318 billion in the Bridge Global Fund.  This disclosure was the direct result of the fraudulent valuation discussed above.

147.   In August 2013, 1MDB officials and others again attempted to secure a market-based valuation of the PSOSL assets to bolster BSI's earlier valuation of the Bridge Global fund units at more than $2 billion.  SINGAPORE BANKER 2 coordinated the procurement of that valuation, with the specific aim of securing a valuation of the assets at $2.4 billion.  A Singapore-based equity research company, NRA Capital Pte. ("NRA Capital"), agreed to value the PSOSL assets at $2.4 billion on the basis of PSOSL's 2012 financial statements showing less than $100 million in net assets and a net operating loss of more than $100 million.  In exchange for producing, on an urgent basis, a valuation report that met the target value, NRA Capital was paid $300,000 by an entity called Affinity Equity International Partners Limited ("Affinity Equity").  As described in Paragraph 396 below, Affinity Equity was a shell entity nominally affiliated with TAN, which was used to funnel misappropriated 1MDB funds to LOW.  The NRA Capital research analyst responsible for the valuation report was also personally bribed to produce the report on an urgent basis, with the understanding that the resulting valuation would meet the client's target value.

148.   In early 2014, KPMG resigned as 1MDB's auditor, after having expressed concern that it had insufficient information about the nature of the assets underlying the Bridge Global investment and the manner in which they had been valued.

149.   The financial statements for Brazen Sky for the fiscal year ending March 31, 2013 were reviewed by 1MDB's new auditor Deloitte and were dated March 28, 2014.  They indicated that Brazen Sky held a total of $2.318 billion in the Bridge Global Fund at the close of the fiscal year.

150.   In 2014, officials at 1MDB and others engaged in further fraudulent conduct in an effort to conceal this overvaluation of the Brazen Sky assets (which itself was used to conceal the diversion of more than $1 billion from 1MDB's investment in the Joint Venture).  In late 2014, 1MDB claimed publicly and in its financial statements that Brazen Sky had "redeemed" more than $1.2 billion-worth of Bridge Global fund units in cash.  As described in further detail in Part V.G below, this "redeemed" cash did not originate from the Bridge Global Fund, however, but rather from money that 1MDB borrowed from Deutsche Bank in 2014.  Deutsche Bank loan proceeds were passed through the Bridge Global and Brazen Sky Accounts multiple times to give the appearance that Brazen Sky was redeeming fund units.  In fact, Brazen Sky's investments in the Bridge Global Fund were not capable of producing $1.2 billion in cash.

### 2.   Low Made False Representations and Provided False Documentation to Conceal His Role in the Misappropriation

151.   In 2015, following allegations in the international press that the Good Star Account was used to siphon off funds from 1MDB, LOW tried to distance himself from Good Star.  In doing so he offered several conflicting explanations for the various transfers into and out of the Good Star Account.

152.   Employees of BSI Bank contacted LOW in approximately early March of 2015 to discuss the recent allegations concerning Good Star.  Although the Good Star Account was maintained at RBS Coutts, BSI was concerned about the allegations because LOW's ADKMIC BSI Account had received substantial incoming transfers from Good Star.  In response to BSI's query, LOW claimed that at the time of these transfers, Good Star Limited was owned by PetroSaudi.  LOW claimed that he transferred ownership of Good Star to PetroSaudi prior to the $700 million wire, by transferring custody over the company's sole bearer share to PetroSaudi.

153.   LOW supported this claim by providing BSI with a letter from OBAID, dated March 8, 2015.  In that letter, OBAID "confirm[ed] that GSL [Good Star Limited]

is part of the PetroSaudi Group on 1 September 2009 through the transfer of its bearer share to us."

154.   Contrastingly, roughly one month later, LOW represented to BSI that the money that ADKMIC had received from Good Star came from SAUDI ASSOCIATE 1, who has no known affiliation with PetroSaudi.  LOW supplied a letter to BSI, dated April 2, 2015, ostensibly from SAUDI ASSOCIATE 1, "confirming that all Good Star Limited's and other wire transfers to Abu Dhabi-Kuwait-Malaysia Investment Corporation's bank account with BSI Bank between 31 August 2009 to 30 September 2013 . . . was ultimately funded directly or indirectly by my goodself and my family" pursuant to financing agreements between ADKMIC and SAUDI ASSOCIATE 1.  The letter indicated that LOW was given "absolute discretion" under the financing agreements to use the funds from Good Star however he wished, and it "acknowledge[d] that these funds have been used for . . . gifts, expenses, investments, purchase of assets, and other uses."  The letter closed by stating that the payments "should not in any event be construed as an act of corruption since this is against the practice of Islam and I personally do not encourage such practices in any manner whatsoever.  This is merely a personal token of appreciation of [LOW's] good work in promoting in the Middle East . . . ."

155.   Both the letter from OBAID and the letter from SAUDI ASSOCIATE 1 contained false statements concerning the beneficial ownership of the Good Star Account.  Regardless of who had possession of Good Star's bearer share, LOW was the beneficial owner of, and sole authorized signatory on, the Good Star Account during all relevant time periods.  LOW was responsible for authorizing transactions out of that account, and RBS Coutts bankers met and spoke with LOW a number of times to discuss the account.  Moreover, LOW represented to BSI Bank numerous times prior to 2015 that he and/or his family owned the entity Good Star Limited.

**III.    THE AABAR-BVI PHASE:  APPROXIMATELY $1.367 BILLION IS MISAPPROPRIATED FROM 1MDB**

**A.    EXECUTIVE SUMMARY OF THE AABAR-BVI PHASE**

156.    In 2012, approximately $1.367 billion in 1MDB funds that were raised in two separate bond offerings were misappropriated and fraudulently diverted to bank accounts in Switzerland and Singapore.  In issuing these bonds, 1MDB participated in the publication and disclosure of two offering circulars that contained material misrepresentations and omissions relating to:

a.    How the proceeds of these bond issuances would be used,

b.    The nature of the relationship between the issuer (*i.e.*, subsidiaries of 1MDB) and the bond's third-party guarantor (*i.e.*, the International Petroleum Investment Company of Abu Dhabi ("IPIC")), and

c.    The existence of any related-party transactions connected to the 2012 bond issuances, including that 1MDB officials, IPIC officials, and their associates would personally benefit from the issuance of these bonds.

157.    After more than $1 billion had been misappropriated from 1MDB between 2009 and 2011 in the Good Star Phase, 1MDB needed to raise additional capital to fund its operations.  As set forth in greater detail below, 1MDB engaged Goldman to arrange and underwrite two separate bond offerings in 2012.  One of the stated purposes of the 2012 bond issues was to raise funds to allow 1MDB to acquire certain energy assets.

158.    IPIC, an investment fund wholly-owned by the government of Abu Dhabi, guaranteed, either directly or indirectly, both 2012 bond offerings and, in exchange, a nominated subsidiary of IPIC was granted an option to purchase a minority share of the energy assets acquired by 1MDB.

159.    Almost immediately after receiving the proceeds of each of the 2012 bond issues, 1MDB wire transferred a substantial portion of the proceeds – totaling approximately $1.367 billion between the two bond sales, or more than forty percent of the net proceeds raised – to a Swiss bank account belonging to an entity called Aabar

Investments PJS Limited, a British Virgin Islands-registered corporation (referred to herein as "Aabar-BVI") that bears a similar name to a legitimate subsidiary of IPIC, called Aabar Investments PJS (referred to herein as "Aabar").  At the time of these transfers, Khadem Abdulla al-QUBAISI ("QUBAISI") was the Managing Director of IPIC and the Chairman of Aabar; and Mohamed Ahmed Badawy Al-HUSSEINY ("HUSSEINY") was the CEO of Aabar.  QUBAISI and HUSSEINY were also directors of Aabar-BVI.

160.   QUBAISI and HUSSEINY opened the account at BSI Bank in Lugano in the name of Aabar-BVI ("Aabar-BVI Swiss Account") and used the account to facilitate the diversion of funds from 1MDB.  LOW was also integrally involved in setting up the Aabar-BVI Swiss Account and in arranging for the fraudulent transfer of $1.367 billion from 1MDB to the Aabar-BVI Swiss Account.

161.   In their audited financial statements for the year ending on March 31, 2014, 1MDB booked their substantial payments to Aabar-BVI as an asset rather than a payment, describing it as a "refundable deposit . . . held aside as collateral for the guarantee" that IPIC provided for the 2012 bonds.

162.   In contrast, LOW and 1MDB officers represented to bank officials involved in the transfer of the $1.367 billion that the funds represented *non-refundable* payments to Aabar-BVI in consideration of IPIC's guarantee of the 2012 bonds.  The fact that $1.367 billion in proceeds of the 2012 bond sales was to be paid to Aabar-BVI was not disclosed in the bond offering circulars.

163.   Following the dismissal of QUBAISI and HUSSEINY from their positions at IPIC and Aabar in 2015, IPIC and Aabar have recently clarified that Aabar-BVI is not owned by either entity.

164.   The Swiss bank account belonging to Aabar-BVI ("Aabar-BVI Swiss Account") was used to siphon off proceeds of the two 2012 bond sales for the personal benefit of individuals affiliated with IPIC, Aabar, and 1MDB, as well as their associates. Beginning within days of receiving funds from 1MDB, Aabar-BVI transferred a total of

approximately $636 million to the Singapore bank account held by Blackstone Asia Real Estate Partners ("Blackstone Account").  During this same time period, Aabar-BVI transferred, through multiple overseas investment funds, an additional approximately $465 million to the Blackstone Account.  The beneficial owner of the Blackstone Account was identified in bank records as "Eric" TAN Kim Loong ("TAN"), a Malaysian national and an associate of LOW.

165.   Funds transferred to the Blackstone Account by Aabar-BVI were subsequently distributed to officials of IPIC, Aabar, and 1MDB.  Between approximately May and November 2012, shortly after Blackstone's receipt of funds from the Aabar-BVI Swiss Account, Blackstone transferred $472,750,000 into a Luxembourg account beneficially owned by QUBAISI.  During roughly the same time period, Blackstone transferred $66,600,000 into two different accounts beneficially owned by HUSSEINY.  In October and November 2012, Blackstone transferred $30,000,000 to an account belonging to MALAYSIAN OFFICIAL 1.  Finally in December 2012, Blackstone transferred $5 million to a Swiss account beneficially owned by "Jasmine" LOO Ai Swan ("LOO"), who was then 1MDB's General Counsel and Executive Director of Group Strategy.

166.   Shortly after receiving proceeds of the two 2012 bond sales from 1MDB, Aabar-BVI also transferred $238,000,000 to a Singapore bank account belonging to Red Granite Capital, an entity owned by Riza Shahriz Bin Abdul AZIZ ("AZIZ").  AZIZ is a relative of MALAYSIAN OFFICIAL 1 and a friend of LOW.  Among other things, AZIZ used these funds to purchase luxury real estate in the United States and the United Kingdom for his personal benefit, and to fund his movie production company, Red Granite Pictures.  1MDB has disclaimed any investment interest in Red Granite Pictures.

**B.     IN 2012, 1MDB ISSUED $3.5 BILLION IN BONDS IN TWO SEPARATE OFFERINGS ARRANGED BY GOLDMAN**

       *1.     May 21, 2012, Bond Issue*

167.   At least as early as January 2012, officials at 1MDB approached Goldman for financial advice in connection with 1MDB's anticipated acquisition of certain power assets in Malaysia.

168.   On or about March 2, 2012, 1MDB Energy Limited ("1MDB Energy" or "1MEL"), a wholly-owned subsidiary of 1MDB, entered into a Sale and Purchase Agreement to acquire Tanjong Energy Holdings Sdn Bhd ("Tanjong Energy"), a power production company, from Tanjong Power Holdings Sdn Bhd ("Tanjong Power") for MYR 8.5 billion, or approximately $2.755 billion U.S. dollars.  1MDB planned to raise MYR 6 billion of this MYR 8.5 billion through the local bank market.

169.   1MDB engaged Goldman to assist in securing financing for the remaining MYR 2.5 billion necessary to complete the Tanjong deal.  By letter dated March 19, 2012, 1MDB engaged Goldman, through its Singapore office, as the "sole bookrunner and arranger" for debt financing in connection with its capital needs for the Tanjong acquisition.  The engagement letter was signed by 1MDB OFFICER 2 and a Managing Director of Goldman Sachs (Singapore) Pte. ("Goldman Managing Director").  Within Goldman, this bond deal was referred to by the name "Project Magnolia."

170.   LOO served as a primary point of contact between 1MDB and Goldman concerning the Project Magnolia bond transaction.

171.   Electronic communications among Goldman employees during the lead-up to the May 21, 2012, bond closing date reflect that employees at Goldman offered differing information about the nature of LOW's relationship to 1MDB and/or his role in the bond deal and the procurement of the IPIC guarantee:

       a.     In an email dated March 27, 2012, a managing director at Goldman-Asia referred to LOW as "the 1MDB Operator or intermediary in Malaysia."

b.      In approximately early April 2012, other Goldman employees discussed whether LOW was involved in the Project Magnolia deal on behalf of 1MDB. In an email dated April 3, 2012, a Goldman employee noted "that Jho Low is also known to have close friends/ contacts in Abu Dhabi."  In an email response dated April 3, 2012, another Goldman employee wrote: "[Goldman Managing Director] said Jho Low [was] not involved at all in deal as far as he aware [sic] but that Low was present when [Goldman Managing Director] met . . . [the] Chairman of IPIC, in Abu Dhabi."

172.   LOW has publicly denied that he had any involvement with 1MDB, except for a brief advisory role with TIA in 2009.  In fact, however, LOW was significantly involved with 1MDB, including its acquisition of Tanjong Energy and its financing of that acquisition through a bond issuance.  Among other things, employees of Goldman shared materials about the transactions with LOW via email.

173.   The offering circular for the Project Magnolia bonds, dated May 18, 2012, indicates that 1MDB Energy issued $1.75 billion in privately-placed notes, with an interest rate of 5.99% per annum, redeemable in 2022.  The closing date of the bond issue was May 21, 2012.  The net proceeds were projected to be approximately $1,553,800,000, once Goldman's fees, commissions, and expenses were deducted.

174.   The offering circular represented that the net proceeds of the bond issue were to be used to "partially fund" the acquisition of Tanjong Energy.  Of the approximately $1,553,800,000 raised through the Project Magnolia bond sale, MYR 2.5 billion, or approximately $810 million, was designated in the offering circular for use in acquiring Tanjong Energy.  The remainder of the net proceeds, approximately $744 million, was designated for "general corporate purposes (which may include future acquisitions)."

175.   In reality, however, nearly $577 million – a sum equivalent to more than one third of the net proceeds of the Project Magnolia bond offering – was diverted to Aabar-BVI within one day of 1MDB's having received the proceeds of the bond offering.  Nothing in the offering circular disclosed that 1MDB would transfer any of the

bond proceeds to Aabar-BVI, or that funds transferred to Aabar-BVI would subsequently be used for the benefit of officials at 1MDB, IPIC, and Aabar, including QUBAISI, IPIC's Chairman, and HUSSEINY, Aabar's CEO.

176.   In exchange for Goldman's services in arranging the bond offering and in underwriting the notes, 1MDB agreed to pay Goldman: (a) a fee of 1% of the principal amount of the notes, or $17.5 million, as an "Arranger Fee," and (b) $175,000,000, as a "Commission," for a total of $192,500,000.  These fees amount to roughly 11% of the principal amount of the offering and were to be deducted directly from the subscription proceeds of the bonds.

177.   The notes issued by 1MDB Energy as part of Project Magnolia were guaranteed by 1MDB.  The notes were also jointly and severally guaranteed by IPIC, which enabled 1MDB to obtain a better credit rating and, thus, a more favorable interest rate on the bonds.  QUBAISI signed the Representation Agreement between IPIC and Goldman in which IPIC agreed to jointly guarantee the $1.75 billion in notes.  Pursuant to an "Interguarantor Agreement" between 1MDB and IPIC, dated May 21, 2012, 1MDB agreed to "procure Ministry of Finance Inc to provide the necessary funding and support to repay IPIC" any amounts payable and due under the notes.  That agreement was signed by QUBAISI and 1MDB OFFICER 2.

178.   A document prepared by Goldman for IPIC entitled "IPIC: Meeting With Ratings Agencies, Topics to Discuss," characterized IPIC's joint guarantee for the 1MDB bond issue as "unusual by previous IPIC standards."  It went on to indicate that the guarantee was "expected to cement the strategic partnership between 1MDB and IPIC which is in line with IPIC's broader investment strategy in the energy and related sectors globally and 1MDB's mission to promote foreign direct investment into Malaysia."

179.   The offering circular, however, contained misleading statements and omitted material facts necessary to make its representations not misleading regarding the consideration received by IPIC in exchange for guaranteeing 1MDB's bonds.  For

58

example, the offering circular indicated that in exchange for IPIC's guarantee, 1MDB granted "a nominated subsidiary of IPIC a right to acquire a substantial minority interest of the share of capital in 1MDB Energy" within a ten-year period.  In reality, however, this option was actually awarded to Aabar-BVI, which was neither owned by nor affiliated with IPIC, as described further below.

180.   The consideration given by 1MDB in exchange for IPIC's guarantee was set forth in a May 18, 2012, "Option Agreement" between 1MDB Energy and "Aabar Investments PJS Limited, a company incorporated in the British Virgin Islands" (*i.e.*, Aabar-BVI).  In that agreement, 1MDB Energy granted Aabar-BVI the option to purchase, within a ten-year period, up to forty-nine percent (49%) of 1MDB Energy's shares in the holding company that acquired Tanjong Energy, for a maximum price of up to MYR 1,225,000,000.  The agreement specified that this call option was granted to Aabar-BVI "[i]n consideration of [Aabar-BVI] procuring the Guarantee from IPIC and the sum of United States Dollar One (USD1.00) paid by [Aabar-BVI] to [1MDB Energy]. . . ."  1MDB OFFICER 2 signed the agreement on behalf of 1MDB Energy, and HUSSEINY signed on behalf of Aabar-BVI.

### 2.   October 19, 2012, Bond Issue

181.   At least as early as approximately June 2012, 1MDB sought financial advice from Goldman in connection with its anticipated acquisition of power assets from Genting Berhad, a Malaysian entity, and sought Goldman's assistance in raising an additional tranche of capital to acquire those assets.  As with the Project Magnolia bond deal, 1MDB elected to have the bond issue fully underwritten by Goldman for an additional fee.  Within Goldman, this private placement bond transaction was referred to by the name "Project Maximus."

182.   LOO served as the primary point of contact between 1MDB and Goldman concerning the Project Maximus transaction.

183.   1MDB entered into an agreement to purchase power assets from Genting Berhad ("Genting") on or about August 13, 2012.  That same day, 1MDB created

another wholly-owned subsidiary called "1MDB Energy (Langat) Limited" ("1MDB Energy Langat"), for the purposes of holding the power assets and issuing debt securities to fund the acquisition Genting power assets.

184.   The offering circular for Project Maximus, dated October 17, 2012, indicated that 1MDB issued $1.75 billion in bonds through its second private placement with Goldman, with a closing date of October 19, 2012.  The notes had an interest rate of 5.75% per annum and were redeemable in 2022.  The net proceeds of the bond sale – once Goldman's fees, commissions, and expenses were deducted – were listed in the offering circular as approximately $1,636,260,000.

185.   The offering circular represented that the net proceeds of the Project Maximus bond sale were to be used by 1MDB Energy Langat, in part, to satisfy its obligations under its agreement to acquire power assets from Genting Berhad. Specifically, the offering circular represents that 1MDB Energy Langat intended to use approximately $692,357,349 of the approximately $1,636,260,000 in net proceeds for the purpose of the Genting acquisition, and it intended to use the balance of the proceeds "for general corporate purposes (which may include future acquisitions)."

186.   In truth, however, as explained in paragraphs 198-199 below, $790,354,855 – a sum equivalent to roughly half of the net proceeds of the Project Maximus bond offering – was diverted to Aabar-BVI on or about the same day that 1MDB received the proceeds of this bond sale.  As with Project Magnolia, the offering circular for Project Maximus nowhere disclosed that nearly half of the net bond proceeds would be transferred to Aabar-BVI, in the form of "collateral" or otherwise, or that funds transferred to Aabar-BVI would subsequently be used for the personal benefit of officials at IPIC, Aabar, and 1MDB, including QUBAISI and HUSSEINY.

187.   1MDB guaranteed the notes issued by 1MDB Energy Langat.  Although IPIC did not directly guarantee the Project Maximus notes as it had with the Project Magnolia bonds, it nevertheless agreed to privately secure the bonds on a bilateral basis with Goldman.  No reference to IPIC's indirect guarantee was included in the offering

circular.  The consideration given for that guarantee was set forth in an October 17, 2012, agreement entitled "Collaboration Agreement (Option)," entered into between 1MDB Energy Langat and "Aabar Investments PJS, a joint stock company organized under the laws of Abu Dhabi."  That agreement stated that, "[i]n consideration of Aabar Investments procuring the Guarantee from IPIC and the sum of United States Dollar One (USD1.00) paid by Aabar Investments to [1MDB]," 1MDB granted Aabar the option to acquire a forty-nine percent (49%) interest in 1MDB Energy Langat within a ten year period.  The existence of this "1MDB Energy Option Agreement" was disclosed in the offering circular.

188.   Taken together, in 2012, 1MDB issued $3.5 billion in bonds that were underwritten by Goldman and guaranteed by IPIC.

## C.    A SUBSTANTIAL PORTION OF THE PROCEEDS OF THE 2012 BOND SALES WAS DIVERTED TO AND THROUGH THE AABAR-BVI SWISS ACCOUNT

189.   Over the course of several months, a large portion of the proceeds of both of the 2012 bond sales – approximately $1.367 billion in total – was transferred from 1MDB to a bank account at BSI Bank in Switzerland held in the name of Aabar-BVI. Plaintiff alleges on information and belief that the funds transferred to the Aabar-BVI Swiss Account by 1MDB were not held for the benefit of 1MDB, IPIC, or Aabar. Rather, the Aabar-BVI Swiss Account was used to unlawfully divert proceeds of both the Project Magnolia and Project Maximus bonds, which were thereafter used, after having passed through various accounts, to make substantial payments to QUBAISI, HUSSEINY, MALAYSIAN OFFICIAL 1, and LOO.

*1.    On or about May 22, 2012, Within Roughly One Day of the First Bond Issue, Approximately $577 Million in 1MDB Funds Was Diverted to the Aabar-BVI Swiss Account*

190.   The closing date for the Project Magnolia bonds was on or about May 21, 2012.  Documentation associated with the bond deal shows that a total of $650,000,000

was to be deducted from the proceeds and remitted directly to accounts designated by Tanjong Power, the entity from which 1MDB Energy had agreed to purchase Tanjong Energy.

191.   On or about May 21, 2012, a total of $907,500,000 in proceeds from the bond sale was transferred, at the direction of Bank of New York–London, from an account at Bank of New York Mellon–New York in the United States to an account at Falcon Private Bank Limited ("Falcon Bank") held by 1MDB Energy.

192.   Roughly one day later, on or about May 22, 2012, a wire in the amount of $576,943,490 was sent from 1MDB Energy's bank account at Falcon Bank to an account at BSI Bank in Lugano, Switzerland maintained by Aabar-BVI (*i.e.*, the "Aabar-BVI Swiss Account").  This amount represents more than one third of the net proceeds from the bond sale.  The funds passed through correspondent bank accounts at J.P. Morgan Chase and Citibank in the United States before being transferred to Aabar-BVI.  This was the first credit to the account.

193.   Nothing in the Project Magnolia offering circular disclosed that any funds would be sent to Aabar-BVI, let alone one third of the net bond proceeds.

194.   Falcon Bank is wholly-owned by Aabar, and at the time that the $576,943,490 was transferred from 1MDB Energy's bank account at Falcon Bank to the Aabar-BVI Swiss Account, HUSSEINY was Falcon Bank's Chairman.

> 2.   *On or about October 19, 2012, Roughly the Same Day as the Second Bond Issue, Approximately $790 Million in 1MDB Funds Was Diverted to the Aabar-BVI Swiss Account*

195.   The proceeds from the Project Maximus bonds, which were issued on or about October 19, 2012, were transferred according to a similar pattern.

196.   1MDB directed that payment of the proceeds of the Project Maximus bond sale, totaling $1,640,000,000, be made on October 19, 2012, to 1MDB Energy Langat's account at Falcon Bank, via Falcon Bank's U.S. correspondent bank account at J.P. Morgan Chase.

197.   On or about October 19, 2012, 1MDB Energy Langat wired $692,174,991 from its account at Falcon Bank in Switzerland to an account at Citibank–Singapore belonging to Genting Power Holdings Limited in connection with the purchase of power assets.

198.   On or about that same day (that is, October 19, 2012), 1MDB wire transferred $790,354,855 to the Aabar-BVI Swiss Account.  This sum represents close to fifty percent (50%) of the net proceeds of the October 19, 2012 bond sale.  The funds passed through correspondent bank accounts at J.P. Morgan Chase and Citibank in the United States before being transferred to Aabar-BVI.

199.   Nothing in the Project Maximus offering circular disclosed that any portion of the funds, let alone close to fifty percent of the net proceeds of the bond sale, would be funneled to Aabar-BVI in the form of "collateral" or otherwise.

200.   Collectively, between the two 2012 bond sales, officials at 1MDB transferred approximately $1.367 billion in bond proceeds to the Aabar-BVI Swiss Account.  This represented more than forty percent (40%) of the total net proceeds of the two bond sales.

### 3.   *The Aabar-BVI Account Was Used to Siphon Off Funds from 1MDB*

201.   The Aabar-BVI Swiss Account was used by HUSSEINY, QUBAISI, and LOW (among others) to fraudulently siphon off a portion of the 2012 bond proceeds.

202.   BSI Bank in Singapore was approached about the opening of an account for Aabar-BVI in approximately March 2012, at or around the same time that 1MDB officials were in communication with Goldman employees about the bond issuance. LOW was a driving force behind the opening of the Aabar-BVI Swiss Account.  Among other things, LOW represented to BSI employees that the account would be funded with significant payments from 1MDB, in accordance with an agreement between 1MDB and IPIC that had been approved by Goldman.

203.   Upon information and belief, LOW met with SINGAPORE BANKER 1 in Los Angeles in late March 2012 to discuss the opening of the Aabar-BVI Swiss

Account.  Email records show that SINGAPORE BANKER 1 traveled to Los Angeles at LOW's invitation during this time period.  On or about March 23, 2012, SINGAPORE BANKER 1 sent an email to other employees of BSI Bank in Singapore, with the subject line "IPIC/Aabar partnership with 1MDB/1MEL – Tanjong Energy."  This email was sent to BSI employees, including compliance employees, to explain that the Aabar-BVI Swiss Account would be capitalized with funds from 1MDB.  The email explained that IPIC had agreed to guarantee $1.75 billion in funds raised by 1MDB and in exchange, 1MDB had agreed to provide Aabar with (1) options to acquire 49% interest in the Tanjong energy asset, and (2) "a contribution payment of USD$517.5m payable by 1MEL to Aabar Investments PJS Limited."  This payment was purportedly to "justify the risk taken by Aabar's delivery of IPIC's guarantee."

204.   Travel records show that at the time this email was sent, SINGAPORE BANKER 1 was in Los Angeles.  Hotel records also show that, on the day the email was sent, SINGAPORE BANKER 1 and LOW were both at the L'Ermitage Hotel in Beverly Hills (which, as described below, LOW had purchased using stolen 1MDB funds).  Upon information and belief, LOW provided SINGAPORE BANKER 1 with the transaction details contained in the email.

205.   1MDB OFFICER 4 was also involved in helping set up the Aabar-BVI Swiss Account.  He was aware of both the plan for 1MDB to transfer hundreds of millions of dollars in bond proceeds to Aabar-BVI immediately after the bond closing dates as well as the contents of the offering circulars, which did not disclose those planned payments.

206.    The process of opening the Aabar-BVI Swiss Account took several weeks.  During this period, BSI bank officials who were responsible for assuring the bank's compliance with applicable anti-money laundering and other applicable laws (sometimes referred to as the "compliance" process) asked questions about the nature of Aabar-BVI, the purpose of the account, and the business justification for the anticipated capitalization of the account with sizeable payments from 1MDB.

64

207.   The Aabar-BVI Swiss Account was opened on or about April 9, 2012. Although Aabar-BVI's account was booked in Lugano, Switzerland, bankers in the Singapore branch of BSI, including SINGAPORE BANKER 1, managed the bank's relationship with Aabar-BVI.  Accordingly, compliance officials in both the Lugano and Singapore offices of BSI were involved in reviewing transactions into and out of the Aabar-BVI Swiss Account.

208.   Shortly before the transfer of approximately $577 million from 1MDB to the Aabar-BVI Swiss Account (which, as noted above, took place on or about May 22, 2012), BSI was given a copy of an agreement between Aabar-BVI and 1MDB Energy Limited entitled "Collaboration Agreement for Credit Enhancement" (hereinafter, "Contribution Agreement").  The agreement bears the signature of 1MDB OFFICER 2 and HUSSEINY, and is dated May 21, 2012, the same day as the closing date for the bond sale.  This agreement was provided to BSI as part of the compliance process, to bolster the legitimacy of the incoming $577 million transfer from 1MDB.

209.   The Contribution Agreement provided to BSI was similar in appearance to the Option Agreement that was provided to Goldman and that was referenced in the offering circular for Project Magnolia.  Like the Options Agreement, the Contribution Agreement purported to set forth the consideration given by 1MDB in exchange for IPIC's guarantee of the Project Magnolia bond notes.  And like the Option Agreement, the Contribution Agreement provided that Aabar-BVI would receive an option to acquire a 49% interest in the power assets that 1MDB had contracted to purchase.  Unlike the Option Agreement, however, the Contribution Agreement also provided that 1MDB would pay Aabar-BVI a "credit enhancement and underwriting contribution in cash," within three days of 1MDB's receipt of the bond proceeds.  Calculation of this contribution fee was to be "based on the present value amount (utilising the 1MEL Notes annual coupon rate as the discount rate for purposes of the present value calculation) of 2.80% annual interest rate payable per annum of the Total Guaranteed Amount for the total tenure of ten (10) years."  The Contribution Agreement further provided that Aabar-

BVI was "unconditionally entitled to deal with [the cash contribution from 1MDB] as it deems fit." The agreement provided that payment would be made to the Aabar-BVI Swiss Account.

210. Alongside the Contribution Agreement, BSI Bank was also provided with a set of "payment calculations" which purported to show that, pursuant to the Contribution Agreement, "a total sum of USD576,943,490 in full is due from 1MEL to Aabar in consideration of the credit enhancement." These payment calculations were sent to SINGAPORE BANKER 1 by one of the co-conspirators and thereafter forwarded to others at BSI Bank in Singapore, including compliance officials.

211. In crediting the Aabar-BVI Swiss Account with approximately $577 million from 1MDB, BSI Bank relied on representations that the funds were a legitimate payment to a subsidiary of IPIC pursuant to the Contribution Agreement. BSI also relied on representations that this fee arrangement had been created with the input and assent of Goldman.

212. BSI was provided with a nearly-identical "Collaboration Agreement for Credit Enhancement" in order to justify Aabar-BVI's receipt of approximately $790 million in proceeds from the Project Maximus bond notes ("Maximus Contribution Agreement"). That agreement was dated October 19, 2012 – the same day the bond deal closed – and stated that 1MDB would give Aabar-BVI both an option to acquire power assets as well as a "credit enhancement and underwriting contribution in cash." Payment calculations in the bank's records show that the bank understood that the "contribution in cash" due to Aabar-BVI under this agreement was $790,354,855. As with the prior agreement submitted to BSI Bank, the Maximus Contribution Agreement provided that Aabar-BVI was "unconditionally entitled to deal with" the cash contribution "as it deems fit." The agreement bore the signature of HUSSEINY and 1MDB OFFICER 2.

213. Neither of the offering circulars contain any mention of an agreement by 1MDB to pay Aabar-BVI, either as a premium or as collateral, more than forty percent (40%) of the net proceeds from the two 2012 bond sales in order to secure the

guarantees.  This information would have been material to the transactions, because it would have significantly affected 1MDB's liquidity, as well as its ability to engage successfully in the business ventures described in the offering circulars, and thereby increased the risk of default.

214.   In its audited financial statements for the year ending on March 31, 2014, 1MDB booked their payment of $1.367 billion to Aabar-BVI as an asset rather than a liability, claiming that it represented a "refundable deposit . . . held aside as collateral for the guarantee" that IPIC provided for the 2012 bonds.  This characterization is inconsistent with the terms of the two Contribution Agreements that were provided to BSI to justify the payments.  As noted above, those agreement gave Aabar-BVI discretion to dispose of the "cash contributions" from 1MDB as it pleased.  Upon information and belief, 1MDB OFFICER 4 convinced the auditor to sign off on the characterization of these payments to Aabar-BVI as a "refundable deposit" by, among other things, soliciting HUSSEINY to provide the auditor with written confirmation, dated February 25, 2014, that the sum represented a "balance receivable" owed to 1MDB.

215.   As noted in Paragraph 62, the Malaysian Public Accounts Committee ("PAC") initiated an audit of certain 1MDB financial transactions and produced a public report of its findings.  Auditors working at the direction of the PAC concluded that the $1.367 billion in supposed "security deposit" payments made to Aabar-BVI in 2012 were "made without the approval of the 1MDB Board of Directors."

### 4.   *Funds Transferred to the Aabar-BVI Swiss Account Were Not Held for the Benefit of 1MDB, IPIC, or Aabar*

216.   At the time the Aabar-BVI Swiss Account was opened, QUBAISI and HUSSEINY falsely represented to Swiss and Singapore bankers at BSI that Aabar was the beneficial owner of the Aabar-BVI Swiss Account.  On the "Form A," which is the official declaration of beneficial ownership, dated April 9, 2012, QUBAISI and HUSSEINY both attested under penalty of criminal prosecution for forgery under Swiss

law that Aabar was the sole beneficial owner of the assets deposited in the Aabar-BVI Swiss Account.

217.    Aabar Investments PJS Limited (referred to herein as "Aabar-BVI") is an entity incorporated in the British Virgin Islands ("BVI") and is separate and distinct from the similarly-named Aabar Investments PJS (referred to herein as "Aabar"), which is controlled by IPIC and is incorporated in Abu Dhabi.

218.    A Certificate of Incumbency prepared by Aabar-BVI's registered agent in the BVI indicates that Aabar-BVI was incorporated in BVI on March 14, 2012.  That certificate lists QUBAISI and HUSSEINY as Aabar-BVI's Directors and "Aabar Investments PJS" as its sole shareholder.

219.    It is possible, however, to register an entity with a name that mimics the name of an existing entity, without the need to prove any relationship to the existing entity.  This is a common technique to lend the entity in question an appearance of legitimacy.  It is also possible to incorporate an entity in the BVI without providing evidence of the entity's true beneficial ownership and without providing evidence of the relationship between the entity and the shareholder listed in the incorporation records.

220.    Irrespective of any apparent nominal relationship between Aabar-BVI and Aabar reflected in incorporation records, Aabar-BVI was not a legitimate subsidiary of Aabar or IPIC operating within the bounds of any authority granted by Aabar or IPIC, and the funds transmitted from 1MDB to the Aabar-BVI Swiss Account were not held in that account for the benefit of 1MDB, IPIC, or Aabar.

221.    On or about April 11, 2016, IPIC and Aabar issued a statement to the London Stock Exchange in response to media reports indicating that a BVI entity called Aabar Investments PJS Limited had received substantial payments from 1MDB.  In that statement, IPIC and Aabar stated that, "Aabar BVI was not an entity within either corporate group" and that neither IPIC nor Aabar "has received any payments from Aabar BVI. . . ."

222.    In response to IPIC's statement to the London Stock Exchange, 1MDB issued a press release on April 11, 2016, in which 1MDB indicated that it paid Aabar-BVI "substantial sums" in 2012, as recorded in its financial statements.  That same release also asserted that, "1MDB company records show documentary evidence of the ownership of Aabar BVI and of each payment made, pursuant to various legal agreements that were negotiated with Khadem Al Qubaisi in his capacity as Managing Director of IPIC & Chairman of Aabar and/or with Mohamed Badawy Al Husseiny, in his capacity as CEO of Aabar."

223.    QUBAISI and HUSSEINY were dismissed from their positions at IPIC and Aabar in 2015.

224.    In June 2016, IPIC filed its consolidated financial statements for the year ending December 31, 2015, with the London Stock Exchange.  In those financial statements, IPIC indicated that it "understands that other companies outside the group's corporate structure were incorporated in other offshore jurisdictions using variations of the 'Aabar' name.  The Group is investigating these entities further."  IPIC reiterated that neither it nor Aabar were affiliated with, or received payments from, Aabar-BVI.  Finally, IPIC indicated that after 1MDB defaulted on two interest payments due under the 2012 notes in the first half of 2016, IPIC made interest payments totaling $103 million on 1MDB's behalf "pursuant to its obligations in respect of the Guarantees."

225.    Bank statements for the Aabar-BVI Swiss Account show no activity consistent with the operation of a legitimate subsidiary of IPIC.  Rather, they show that, other than temporary fiduciary deposits, the account was used in 2012 solely to collect and distribute 1MDB bond proceeds.  As set forth below, funds transferred from 1MDB to the Aabar-BVI Swiss Account were distributed, inter alia, to officials at IPIC, Aabar, and 1MDB, including QUBAISI and HUSSEINY, with several payments occurring within days of the receipt of 1MDB funds by Aabar-BVI.  Plaintiff alleges on information and belief that the Aabar-BVI Swiss Account was used to conceal and to facilitate this unlawful diversion of funds.

**D.     AABAR-BVI TRANSFERRED APPROXIMATELY $1.1 BILLION TO THE BLACKSTONE ACCOUNT, BEGINNING WITHIN DAYS OF RECEIVING FUNDS FROM 1MDB**

226.   Of the approximately $1.367 billion 1MDB sent to Aabar-BVI by 1MDB, approximately $1.1 billion was thereafter transferred, either directly or indirectly via overseas investments funds, into the Blackstone Account.  The Blackstone Account was controlled by TAN, a close associate of LOW.  Plaintiff alleges on information and belief that the Blackstone Account was used as a transit account to improperly distribute funds to individuals affiliated with 1MDB, IPIC, and Aabar.

*5.     Aabar-BVI Transferred Approximately $636 Million Directly to the Blackstone Account, Beginning Within Days of Receiving Funds from 1MDB*

227.   Between approximately May 25, 2012, and December 14, 2012, five wire transfers totaling $636,000,000 were sent from the Aabar-BVI Swiss Account to an account at Standard Chartered Bank in Singapore held in the name of Blackstone Asia Real Estate Partners ("Blackstone").  These wire transfers were processed through correspondent bank accounts at Standard Chartered Bank and Citibank in the United States.  The approximate dates and amounts of these five wires appear below:

**Table 5:  Wire Transfers from Aabar-BVI Swiss Account to Blackstone**

| Date | Amount | Sending Party | Receiving Party |
|------|--------|---------------|-----------------|
| 5/25/2012 | $295,000,000 | Aabar-BVI | Blackstone |
| 7/25/2012 | $133,000,000 | Aabar-BVI | Blackstone |
| 10/23/2012 | $75,000,000 | Aabar-BVI | Blackstone |
| 11/23/2012 | $95,000,000 | Aabar-BVI | Blackstone |
| 12/14/2012 | $39,000,000 | Aabar-BVI | Blackstone |

228.   TAN was identified as the beneficial owner of the Blackstone Account and an authorized signatory on the account.  The account was originally opened in the name

70

of Foreign FX Trading Limited.  The account name was changed to Blackstone Asia Real Estate Partners on or about May 26, 2011.

229.   TAN is a friend and associate of LOW; he also acted as LOW's proxy in financial transactions.  Plaintiff alleges on information and belief, however, that TAN's only connection to 1MDB was his relationship with LOW.

230.   Bank statements show that prior to the wire transfer of $295,000,000 from Aabar-BVI on or about May 25, 2012, the account balance for the Blackstone Account was $532,981.

231.   Plaintiff alleges on information and belief that Blackstone was a shell corporation created for the purpose of maintaining a bank account to funnel diverted money, based on the following facts and circumstances, among others:

a.   The flow of money into and out of the Blackstone Account is not consistent with what can reasonably be characterized as regular business activity.  For example, the account did not have the types of debits and credits consistent with legitimate business activity, including, for example, transfers to vendors, payroll, or receipt of proceeds from customers.

b.   Blackstone made extensive use of a money exchange business in Singapore called Raffles Cash Exchange.  Between approximately July 2011 and February 2013, twenty wires were sent from the Blackstone Account to Raffles Cash Exchange, totaling approximately $12,800,000.  Frequent use of currency exchange brokers, especially for large sums and where the entity already maintains an account at a major bank capable of processing currency exchanges, is a technique commonly used by individuals engaged in money laundering and other unlawful conduct to move money in a way that is less likely to be traced by law enforcement and regulatory officials.

c.   Blackstone's full name – Blackstone Asia Real Estate Partners – is similar, though not identical, to the name of a major real estate private equity firm, Blackstone Real Estate.   Blackstone Real Estate is an affiliate of the well-known

private investment firm Blackstone Group – an entity listed on the New York Stock Exchange – and has, according to its website, $101 billion in assets under management. The practice of utilizing a bank account held by an entity with a name that mimics a well-known commercial enterprise is a technique commonly employed to lend the appearance of legitimacy to transactions that might otherwise be subject to additional scrutiny by the financial institutions involved, for example, because of the size of the transaction or because of the role of a politically-exposed person or entity in the transaction.

> 6.     *Aabar-BVI Transferred an Additional Approximately $455 Million to the Blackstone Account Via Overseas Investment Funds*

232.   Within days of Aabar-BVI's receipt of proceeds from the Project Maximus bond offering, an additional $455,000,000 was transferred from the Aabar-BVI Swiss Account to the Blackstone Account via two overseas investment funds.

233.   On or about October 22, 2012 – roughly six days after the Project Maximus bond issue and four days after Aabar-BVI received approximately $790 million from 1MDB Energy Langat – Aabar-BVI sent approximately $75 million to a bank account at ING Bank N.V. in Amsterdam belonging to Enterprise Emerging Markets Fund ("Enterprise").  On or about the same day, Aabar-BVI also sent approximately $291 million to another bank account at ING Bank N.V. in Amsterdam belonging to Cistenique Investment Fund ("Cistenique").  On or about November 2, 2012, Aabar-BVI sent an additional approximately $97 million to Enterprise.  In the case of each of these three payments, the funds were transferred from Aabar-BVI via the clearing company Citco, before being transferred on to either Enterprise or Cistenique.

234.   Enterprise and Cistenique are relatively small investment funds located in Curacao.  Although both investment funds have other customers and hold investments unrelated to 1MDB, the money that Aabar-BVI supposedly "invested" in Cistenique and Enterprise went into segregated portfolios that "invested" solely in Blackstone.  In this way, and as describe further in Paragraph 329 below, the two investment funds

functioned as pass-through entities, allowing Aabar-BVI to send money indirectly to Blackstone while appearing to make legitimate investments in independent investment funds.

235.   Shortly after Cistenique and Enterprise received funds from Aabar-BVI, each transferred a substantially similar amount to the Blackstone Account.  More particularly:

a.   On or about October 24, 2012, roughly two days after receiving approximately $291,000,000 from Aabar-BVI, Cistenique transferred $285,000,000 to the Blackstone Account.

b.   On or about October 24, 2012, approximately two days after receiving approximately $75,000,000 from Aabar-BVI, Enterprise transferred $75,000,000 to the Blackstone Account.  On or about November 8, 2012, approximately six days after receiving $97,000,000 from Aabar-BVI, Enterprise transferred an additional $95,000,000 to the Blackstone Account, for a total of $170,000,000.

236.   Cistenique and Enterprise were used as intermediaries to pass $455,000,000 from Aabar-BVI to the Blackstone Account.

***

237.   In total, between May and December 2012, approximately $1.1 billion was transferred directly or indirectly from the Aabar-BVI Swiss Account to the Blackstone Account.

E.   **AFTER RECEIVING FUNDS FROM AABAR-BVI, BLACKSTONE DISTRIBUTED APPROXIMATELY $574 MILLION TO OFFICERS OF IPIC, AABAR, AND 1MDB**

238.   Once funds were transferred from Aabar-BVI to Blackstone, they were used to make payments to QUBAISI and HUSSEINY, who served as officers of both Aabar and Aabar-BVI, to MALAYSIAN OFFICIAL 1, and to LOO.  The distribution of these funds from the Blackstone Account for the personal benefit of officials involved in the

bond deal further evidences a misappropriation of public funds and the diversion of the bond proceeds from their intended purpose.

239.   Neither of the offering circulars for the 2012 bonds contained any disclosure that a substantial portion of the proceeds of the bonds would be paid to officials of IPIC, Aabar, and 1MDB.  This fact would have been material to the bond transaction, as it would have alerted investors to the possibility of conflicts of interest and related-party transactions.  The representation that the proceeds of the two bond deals could be used for "other corporate purposes" of 1MDB does not encompass the use of those funds for the personal benefit of officials of IPIC, Aabar, or 1MDB.

240.   Although both offering circulars also contained boilerplate language about the limits of any "forward-looking statements," this boilerplate language similarly did not encompass the possibility that 1MDB would radically depart from the stated intended use of the bond proceeds almost immediately after the closing dates for each offering.  More specifically, each offering circular indicated generically that any "forward-looking statements" contained in the circular, such as those statements containing "will" or "expect," were "reasonable" at the time of the offering circular but were not meant to give "assurance that these expectations will prove to be correct" in the future.  This boilerplate language was intended, among other things, to give 1MDB business flexibility to respond to changed circumstances in the future; it did not, however, contemplate or convey the possibility that 1MDB would almost immediately begin diverting the proceeds of the bond sale to Aabar-BVI and thereafter to accounts beneficially owned by officials of 1MDB, IPIC, and Aabar.

       7.   *Blackstone Transferred Approximately $473 Million to an Account Controlled by QUBAISI*

241.   Between approximately May 29, 2012, and November 30, 2012, four wires totaling $472,750,000 were sent from the Blackstone Account to an account at Bank Privee Edmond de Rothschild ("Bank Rothschild") in Luxembourg maintained in the name of Vasco Investments Services SA ("Vasco Account").  These wires were

processed through a correspondent bank account at Standard Chartered Bank in the United States.  As shown in the table below, each of these four wire transfers was made within a matter of days after the Blackstone Account received funds from Aabar-BVI, including two of the four that were made within about ten days of Aabar-BVI's receipt of funds from 1MDB Energy:

**Table 6:  Chronology of Wire Transfers to Vasco Investments in Relation to Other Related Transfers**

| Date | Sending Party | Receiving Party | Amount |
|---|---|---|---|
| 5/22/2012 | 1MDB Energy | Aabar BVI | $576,943,490 |
| 5/25/2012 | Aabar BVI | Blackstone | $295,000,000 |
| 5/29/2012 | Blackstone | Vasco Investments | $158,000,000 |
| 7/25/2012 | Aabar BVI | Blackstone | $133,000,000 |
| 8/1/2012 | Blackstone | Vasco Investments | $100,750,000 |
| 10/19/2012 | 1MDB Energy Langat | Aabar BVI | $790,354,855 |
| 10/22-10/24/2012 | Aabar-BVI (via Enterprise) | Blackstone | $75,000,000 |
| 10/22-10/24/2012 | Aabar-BVI (via Cistenique) | Blackstone | $285,000,000 |
| 10/23/12 | Aabar BVI | Blackstone | $75,000,000 |
| 10/29/12 | Blackstone | Vasco Investments | $129,000,000 |
| 11/23/2012 | Aabar BVI | Blackstone | $95,000,000 |
| 11/30/2-12 | Blackstone | Vasco Investments | $85,000,000 |

242.   Vasco Investments Services SA is a BVI entity affiliated with QUBAISI, and QUBAISI is the beneficial owner of the Vasco Account.

243.   QUBAISI used a portion of the $472,250,000 transferred into the Vasco Account from Blackstone to acquire real property in the United States worth roughly $100 million, as described further in Section V.  The assets purchased with funds from

75

the Vasco Account were not held by or used for the benefit of 1MDB or 1MDB's subsidiaries, nor were the assets held by or used for the benefit of IPIC or Aabar.

244.   QUBAISI's receipt of proceeds from 1MDB's 2012 bond sales for his own personal benefit is in contravention to his charge as Managing Director of IPIC. Pursuant to IPIC's Articles of Association, approved on November 30, 1999, "[n]either the Chairman nor the other Board members shall have a direct or indirect interest in the contracts and projects entered into, carried out or intended to be entered into or carried out by the Company and the Company shall not grant them any financial facilities."  To the extent that QUBAISI purported to be acting in his capacity as Managing Director of IPIC in connection with the above-described transactions relating to Aabar-BVI, including the receipt of 1MDB funds into the Aabar-BVI Swiss Account and the transfer of funds through the Blackstone Account to his own Vasco Account, he was acting *ultra vires*.

245.   Upon information and belief, at the time that LOW, TAN, and QUBAISI transferred or caused the transfer of funds from the Aabar-BVI Swiss Account to Blackstone using a U.S. correspondent bank account at Standard Chartered Bank, as well as at the time that LOW, TAN, and QUBAISI  transferred or caused the transfer of funds from Blackstone to the Vasco Account using a U.S. correspondent bank account at Standard Chartered Bank, as well as at the time that QUBAISI transferred or caused the transfer of funds from the Vasco Account into the United States for the purchase of real property, LOW, TAN, and QUBAISI knew that the funds had been misappropriated from 1MDB and/or IPIC, and they intended to deprive 1MDB and/or IPIC of ownership over those funds.

   8.   *Blackstone Transferred $66.6 Million to an Account Controlled by HUSSEINY*

246.   Between May and December 2012, entities belonging to HUSSEINY, then-CEO of Aabar, also received $66,600,000 from the Blackstone Account.

247.   Between approximately May 29, 2012, and December 3, 2012, Blackstone sent four separate wire transfers, totaling $55,000,000, to an account at BHF Bank in Frankfurt, Germany, held in the name of Rayan Inc. ("Rayan").   Each of these four wire transfers was processed through a U.S. correspondent bank account at Standard Chartered Bank.  These wire transfers are summarized below:

**Table 7:  Wire Transfers from Blackstone to Rayan**

| Date | Sending Party | Receiving Party | Amount |
|------|---------------|-----------------|--------|
| 5/29/2012 | Blackstone | Rayan | $30,000,000 |
| 7/13/2012 | Blackstone | Rayan | $5,000,000 |
| 11/2/2012 | Blackstone | Rayan | $10,000,000 |
| 12/3/2012 | Blackstone | Rayan | $10,000,000 |

248.   HUSSEINY is the beneficial owner of the Rayan Account.

249.   The first wire transfer from Blackstone to Rayan in the amount of $30,000,000 occurred roughly seven days after 1MDB transferred $576,943,490 to Aabar-BVI, and roughly three days after Aabar-BVI transferred $295,000,000 to Blackstone.  The same day that Blackstone transferred $30,000,000 to HUSSEINY's Rayan Account (that is, May 29, 2012), Blackstone separately transferred $158,000,000 to QUBAISI's Vasco Account.

250.   On or about December 18, 2012 – four days after Aabar-BVI transferred $39,000,000 into the Blackstone Account – Blackstone sent $10,100,000 to an account at Bank of America in Texas held in the name of MB Consulting LLC ("MB Consulting Account").  The payment details on the wire read: "PAYMENT FOR SERVICES."

251.   HUSSEINY is the beneficial owner of the MB Consulting Account and the only authorized signatory on the account.

252.   The MB Consulting Account received another wire transfer of $1,500,000 from the Blackstone Account on or about January 22, 2013.

     *9.    Blackstone Transferred at Least $30 million to an Account Belonging to MALAYSIAN OFFICIAL 1*

253.   Blackstone also transferred at least $30,000,000 to an account belonging to MALAYSIAN OFFICIAL 1 shortly after receiving funds from Aabar-BVI.

254.   On or about October 30, 2012 – roughly seven days after Blackstone received $75,000,000 directly from Aabar-BVI and roughly six days after it received $360,000,000 indirectly from Aabar-BVI via Enterprise and Cistenique – Blackstone transferred $5,000,000 into an account at AmBank in Malaysia held in the name of "AMPRIVATE BANKING MR."

255.   That bank account belongs to MALAYSIAN OFFICIAL 1 and is the same account that received $20,000,000 from the Saudi Account in 2011, within days of the receipt by the Saudi Account of funds from Good Star, as set forth in Section II.G.

256.   On or about November 19, 2012 – less than two weeks after Blackstone received $95,000,000 from Aabar-BVI via Enterprise – Blackstone transferred $25,000,000 to the same AMPRIVATE BANKING-MR Account belonging to MALAYSIAN OFFICIAL 1.

     *10.    Blackstone Transferred $5 million to an Account Controlled by LOO*

257.   On or about December 6, 2012, a wire in the amount of $5,000,000 was sent from the Blackstone Account to an account at Falcon Bank in Zurich maintained in the name of River Dee International SA ("River Dee Account").

258.   LOO is the beneficial owner of the River Dee Account at Falcon Bank.

          \*\*\*

259.   On or about February 22, 2013, not long after funds were distributed to the various officials as described above, the balance of the Blackstone Account fell to zero and the account had no further transactions thereafter.

260.   Blackstone was used as an intermediary to obscure the fact that 1MDB bond proceeds were being sent from Aabar-BVI – of which QUBAISI and HUSSEINY

were directors – to accounts that were beneficially owned by QUBAISI, HUSSEINY, MALAYSIAN OFFICIAL 1, and LOO.

261.   The funds sent to accounts belonging to QUBAISI, HUSSEINY, MALAYSIAN OFFICIAL 1, and LOO, as described above, were unlawfully misappropriated from 1MDB and/or IPIC.

### F.   AABAR-BVI SENT APPROXIMATELY $238 MILLION TO AN ACCOUNT CONTROLLED BY AZIZ

262.   Between June 18, 2012, and November 4, 2012, $238,000,000 was transferred directly from the Aabar-BVI Swiss Account to an account controlled by AZIZ, a relative of MALAYSIAN OFFICIAL 1.  From there, the funds were used to acquire nearly $100 million in real property for the personal benefit of AZIZ and to fund Red Granite Pictures, AZIZ's movie production company.

263.   Aabar-BVI sent three wire transfers totaling $238,000,000 to an account at BSI Singapore held in the name of Red Granite Capital Limited ("Red Granite Capital Account").  These wires are summarized below:

**Table 8:  Wire Transfers from Aabar-BVI to Red Granite Capital**

| Date | Sending Party | Receiving Party | Amount |
|------|---------------|-----------------|--------|
| 6/18/2012 | Aabar-BVI | Red Granite Capital | $133,000,000 |
| 10/23/2012 | Aabar-BVI | Red Granite Capital | $60,000,000 |
| 11/14/2012 | Aabar-BVI | Red Granite Capital | $45,000,000 |

264.   Red Granite Capital is a BVI-incorporated entity owned by AZIZ.  In his 2012 U.S. tax return, a copy of which was obtained from AZIZ's accounting firm, AZIZ listed Red Granite Capital's "principal business or profession" as "Motion Pictures."  Bank records reflect that AZIZ is also beneficial owner of the Red Granite Capital Account in Singapore.

265.   In connection with the compliance process and to justify Aziz's receipt of $133,000,000 from Aabar-BVI, BSI was provided with a loan agreement between Aabar-BVI and Red Granite Capital, dated June 13, 2012.  That agreement purported to show that Aabar-BVI had loaned Red Granite Capital $133,000,000 to fund movie "The Wolf of Wall Street."  As discussed further below, "The Wolf of Wall Street" is a film produced by AZIZ's movie production company Red Granite Pictures using misappropriated 1MDB proceeds.  AZIZ signed the agreement on behalf of Red Granite Capital, and HUSSEINY signed on behalf of Aabar-BVI.

266.   AZIZ's receipt of the $60,000,000 and $45,000,000 wires from Aabar-BVI was also justified by BSI having been provided with additional loan agreements, dated October 22, 2012, and November 12, 2012, respectively.  The agreements purported to provide for the extension of $60,000,000 and $45,000,000 loans by Aabar-BVI to Red Granite Capital to produce additional motion pictures.  Both agreements were signed by AZIZ and HUSSEINY, although one BSI official noted that the signatures appeared to be copies rather than originals.

> 11.   *AZIZ Claimed that Approximately $94.3 Million of the $238 Million from Aabar-BVI, which AZIZ Used to Purchase Real Estate, Was a "Gift" from Aabar-BVI*

267.   Notwithstanding the fact that AZIZ represented to the bank that the funds from Aabar-BVI represented loan proceeds to fund movie productions, AZIZ used more than $94,000,000 of the $238,000,000 that Aabar-BVI transferred to Red Granite Capital in 2012 to purchase real estate in the United States and the United Kingdom.  AZIZ claimed that this money was a "gift" from Aabar-BVI, including in documentation provided to his accountants in connection with the preparation of his 2012 U.S. tax return.

268.   On two separate occasions, AZIZ sent money from his Red Granite Capital Account to the Shearman IOLA Account in the United States, shortly after receiving money from the Aabar-BVI Swiss Account.  The first wire, in the amount of

$58,500,000, was sent on or about June 20, 2012, roughly two days after Red Granite Capital received $133,000,000 from Aabar-BVI.  Bank records for the Red Granite Capital Account show that BSI was led to believe that this transfer was made for the purpose of funding "The Wolf of Wall Street."

269.   The second wire to the Shearman IOLA Account, in the amount of $35,800,000, was sent on or about November 15, 2012, roughly one day after Red Granite Capital received $45,000,000 from Aabar-BVI.  In total, AZIZ caused $94,300,000 to be transferred from his Red Granite Capital Account to a Shearman IOLA Account in the United States in which funds were held for his benefit.

270.   AZIZ used this $94,300,000 to acquire three pieces of real estate – one in New York City, one in Beverly Hills, and one in London, United Kingdom.  As set forth in Section VI below, AZIZ acquired all three properties from LOW.

271.   The source and nature of the funds received from Aabar-BVI and used by AZIZ to purchase real property was a topic of discussion among AZIZ's accountants at Nigro Karlin Segal Feldstein & Bolno ("NKSFB"), a Los Angeles-based business and accounting firm, in connection with the preparation of his 2012 tax return:

a.    In an email dated October 13, 2013, a partner at NKSFB wrote: "We need something for our files that explains why AABAR Investments gave a gift to Riza for $94,300,050 and it was not income.  Is someone from the company related to Riza? . . ."

b.    By email dated the same day, a Managing Director at NKSFB who acted as the business manager for AZIZ and Red Granite ("Red Granite Business Manager"), responded: "It is the personal holding company of a family friend."

c.    The partner, in a response sent within an hour, indicated in relevant part: "The funds came from an investor in Red Granite Capital, I cannot sign the returns without proof it is not income to Riza.  The firm would be put at risk, these numbers are too high."

272.   In response to this email exchange, the Red Granite Business Manager, through AZIZ, procured a letter, purporting to be from HUSSEINY and bearing his signature.  The text of that letter reads:

> This letter is intended to confirm that the transfer of $94,500,000.00 which consisted of a wire transfer on June 18, 2012 to BSI Bank, Ltd. (account number [XXX]250A) for the benefit of Riza Aziz was intended as a gift. The transfer was made for no consideration and no services were performed or gift received for assets.  This was a gratuitous transfer made with detached and disinterested generosity based on our close personal relationship.[11]

HUSSEINY'S letter purported to have been sent "[o]n behalf of Aabar Investments PJS Limited / Solution Century Limited."

273.   Solution Century Limited is an entity affiliated with HUSSEINY and his wife.

274.   The fact that Aabar-BVI purportedly gifted approximately $94 million to AZIZ on the basis of "disinterested generosity" and the "close personal relationship" between AZIZ and HUSSEINY further demonstrates that Aabar-BVI was not operating as a legitimate subsidiary of Aabar or IPIC and that the funds held in the Swiss Aabar-BVI account were not being held for the benefit of 1MDB, Aabar, or IPIC.

### 12.   *AZIZ Used at Least $5.4 million in funds received from Aabar-BVI to Purchase Movie Posters and Other Memorabilia*

275.   From June 2013 to March 2014, AZIZ used at least $5,489,760 in 1MDB funds diverted through the Aabar-BVI Account to purchase movie posters and other

---

[11] Contrary to the statements in this letter, no wire was sent from Aabar-BVI to Red Granite Capital on June 18, 2012, in the amount of $94,500,00.  Rather, as indicated above, the June 18, 2012 wire from Aabar-BVI to Red Granite Capital was in the amount of approximately $133,000,000.  The amount claimed to be a gift, $94,500,000, is roughly equal to the amount of money that AZIZ transferred into the United States over a period of approximately five months and used to purchase personal assets.

memorabilia from the owner of Cinema Archives ("Cinema Archives Owner"), an art and movie memorabilia company.

276.   Leonardo DiCaprio, the lead actor in "The Wolf of Wall Street," introduced AZIZ to the Cinema Archives Owner at a dinner sometime before filming started on "The Wolf of Wall Street."  AZIZ in turn introduced Cinema Archives Owner to LOW and Red Granite Pictures co-founder Christopher "Joey" McFarland ("McFarland"). AZIZ told the Cinema Archives Owner that LOW was a childhood friend.

277.     From at least late 2012, AZIZ, McFarland, and the Cinema Archives Owner discussed various movie poster and memorabilia purchases over email.  One of AZIZ's earliest purchases from the Cinema Archives Owner was a 1939 original, year-of-release "Wizard of Oz" movie poster, which AZIZ purchased for $75,000 on October 16, 2012. In an email dated October 8, 2012, the Cinema Archives Owner told AZIZ and McFarland about the "Wizard of Oz" movie poster: "There are 2 copies known [and DiCaprio] has one. … Very important poster."

278.   From on or about June 11, 2013 to March 11, 2014, AZIZ sent at least eight wire transfers totaling $4,289,760 from his Red Granite Capital Account to an account at Bank of America held by Cinema Archives ("the Cinema Archives Account"), in payment for various movie posters and other memorabilia.  This included roughly 70 items, ranging from several thousand dollars to $400,000.  The walls of the PARK LAUREL CONDOMINIUM, where AZIZ lived, are covered in movie posters that AZIZ acquired using funds from Aabar-BVI.  AZIZ also gave away several posters as gifts, including to McFarland, DiCaprio, and the director of "The Wolf of Wall Street."

279.   The large wire transfers from the Red Granite Capital Account to the Cinema Archives Account for AZIZ's art purchases caused BSI Bank, which held the Red Granite Capital Account, to look into the purpose of the transfers.  On February 6, 2014, a compliance officer at BSI Bank emailed two BSI bankers who were relationship managers for AZIZ and the Red Granite Capital Account and asked, "As our BO [beneficial owner] is in the movie industry and there has been several recurring

payments over the months, could you confirm that our BO is also a collector of movie memorabilia and hence the repeated payments?"  About four days later, on or about February 10, 2014, one of the relationship managers wrote back, "Yes, our BO is also a collector of movie memorabilia and hence the repeated payments."

280.   As set forth below, in October 2012, AZIZ also purchased a rare 1927 movie poster from Cinema Archives for $1.2 million using funds from the Alsen Chance Account that were traceable to the 2012 bond proceeds.

281.   As AZIZ and McFarland continued to pursue and purchase movie posters and other memorabilia, they joked that it was becoming obsessive for them.  For example, on November 19, 2013, McFarland emailed the Cinema Archives Owner and asked, "What is the greatest poster in [the] world that is obtainable?"  In another email exchange beginning on November 29, 2013, between AZIZ, McFarland, and the Cinema Archives Owner, McFarland started the conversation by sending AZIZ and the Cinema Archives Owner a list of movie posters and said: "I have decided – I have to own these. Its [sic] a must. Not to mention a 1000 others... Can't sleep – obsessing."  AZIZ replied: "Hahaha now you feel my pain!!  Mwahahahaha – $$$$."  McFarland replied in part: "... I'm obsessing over posters... we are such neurotic obsessive creatures ... WE HAVE TO OWN THEM ALL."

> 13.   *Approximately $64 Million in Funds from Aabar-BVI Was Used to Fund Red Granite Pictures*

282.   Funds transferred from Aabar-BVI to AZIZ's Red Granite Capital Account were also used to fund Red Granite Pictures, an investment unaffiliated with 1MDB, Aabar, or IPIC.

283.   Red Granite Pictures is a movie production company co-founded by AZIZ in 2010, which produced several major motion pictures, including "The Wolf of Wall Street," "Friends with Kids," and "Dumb and Dumber To."  Red Granite Pictures was incorporated in California on September 30, 2010, as Red Granite Productions and

changed its name to Red Granite Pictures on or about June 6, 2011. Red Granite Pictures' website lists AZIZ as CEO, founder, chairman, and producer.

284. Between June 20, 2012 – two days after Aabar-BVI sent its first wire to Red Granite Capital – and November 20, 2012, eleven wires totaling $64,000,000 were sent from the Red Granite Capital Account to an account at City National Bank in the United States maintained by Red Granite Pictures.

285. These funds transferred to Red Granite Pictures in the United States were then used to fund Red Granite Picture's operations, including the production of the film "The Wolf of Wall Street," which was released in the United States on December 25, 2013.

286. The funds sent from Aabar-BVI to Red Granite Capital, which were thereafter transferred into the United States for use by Red Granite Pictures, did not represent a legitimate investment by 1MDB, IPIC, or Aabar in Red Granite Pictures. And balance sheets for Red Granite Pictures and Red Granite Capital show no payments to 1MDB, IPIC, or Aabar indicative of any investment return.

287. Public statements and media interviews by relevant individuals and entities also negate the existence of any legitimate investment by 1MDB, IPIC, or Aabar in Red Granite Pictures. For example, on August 11, 2014, the *New York Times* published an article entitled *An Audacious Studio Rattles Hollywood*, which included an interview with AZIZ and McFarland. In that article, AZIZ is reported to have identified HUSSEINY as Red Granite's principle investor. He is also reported as indicating that HUSSEINY was investing personal money rather than government funds. This same article appears in the "News" section of Red Granite Picture's website under the heading *Riza Aziz & Joey McFarland Featured in the New York Times.*

288. In an article published by the *New York Times* on February 8, 2015, entitled *Jho Low, Well Connected in Malaysia, Has an Appetite for New York,* an attorney for HUSSEINY is quoted as saying that HUSSEINY's investment in Red Granite was made with "personal money."

289.   On April 3, 2016, 1MDB issued a press release, available on its public website, denying that it had any role in investing, directly or indirectly, in Red Granite Pictures.

> **14.   *AZIZ Transferred at least $41 Million in Funds Received from Aabar-BVI to an Account That Was Then Used to Pay Gambling Expenses for Himself, LOW, and TAN***

290.   Just days after the Red Granite Capital Account received funds from Aabar-BVI, some of those funds were transferred to an account at Standard Chartered Bank in Singapore held in the name of Alsen Chance Holdings Limited ("Alsen Chance Account").  Account opening documents for the Alsen Chance Account list TAN as the director of Alsen Chance.  Shortly thereafter, the Alsen Chance Account was used to pay gambling expenses for LOW, TAN, AZIZ, and at least one former official from 1MDB.

291.   More particularly, on or about June 21, 2012 – roughly three days after Aabar-BVI transferred $133,000,000 into AZIZ's Red Granite Capital Account – AZIZ caused $41,000,000 to be wired from his Red Granite Capital Account to the Alsen Chance Account.

292.   Roughly three weeks later, on or about July 10, 2012, a wire for $11,000,000 was sent from the Alsen Chance Account to a bank account maintained by Las Vegas Sands, LLC.  Among other things, Las Vegas Sands owns and operates the Venetian Resort-Hotel-Casino ("Venetian Casino") in Las Vegas.  The payment details on the wire read: "PLAYER NO [XXX]4296."

293.   The Venetian Casino used customer account number XXX4296 to identify LOW.  On or about July 10, 2012, $11,000,000 was deposited into LOW's account at the Venetian Casino, and records show that LOW gambled there for approximately seven days beginning on or about that date.

294.   On or about July 11, 2012, an additional wire of $2,000,000 was sent from the Alsen Chance Account to Las Vegas Sands LLC.  The payment details on that wire

read: "TAN KIM LOONG PLAYER NO [XXX]8710."  The Venetian Casino Resort used customer account number XXX8710 to identify TAN.

295.   On or about July 15, 2012, LOW withdrew an aggregate cash amount of $1,150,090 at the Venetian Casino:  $500,000 as a withdrawal of deposit, and $650,090 as redemption of casino chips and other gaming instruments.  Several individuals gambled with LOW on this occasion, using his account.  These individuals included AZIZ; Red Granite Pictures co-founder McFarland; DiCaprio; and the 1MDB-SRC OFFICER, who was the former Chief Investment Officer of 1MDB and was at the time the CEO of another Ministry of Finance vehicle called SRC International ("1MDB-SRC OFFICER").[12]

*** 

296.   The use of funds traceable to proceeds of the 2012 1MDB bond sales for interests unrelated to the business of 1MDB, as described above and in further detail in Part V below, is not consistent with the intended use of those funds and further demonstrates that funds transferred from 1MDB to the Aabar-BVI Swiss Account were unlawfully diverted.

## IV.   THE TANORE PHASE:  MORE THAN $1.26 BILLION IS MISAPPROPRIATED FROM 1MDB

### A.   EXECUTIVE SUMMARY OF THE TANORE PHASE

297.   As set forth in greater detail in the sections that follow, in 2013, more than $1.26 billion in 1MDB funds that were raised in a third bond offering arranged by Goldman were misappropriated and fraudulently diverted to bank accounts in Switzerland and Singapore.  In issuing these bonds, 1MDB participated in the publication and disclosure of an offering circular that again contained material misrepresentations and omitted material facts necessary to render its representations not misleading regarding:

---

[12] LOW, TAN, AZIZ and McFarland gambled together at the Venetian Casino on other occasions, including several times in 2014.

- How the proceeds of these bond issuances would be used, and
- The existence of any related-party transactions connected to the 2013 bond issuances, including that 1MDB officials and their associates and relatives would personally benefit from the issuance of these bonds.

298.    1MDB issued an additional $3 billion in Goldman-underwritten bonds in March 2013.  Notwithstanding the fact that the stated purpose of these bonds was to generate proceeds to invest in a joint venture with Aabar called Abu Dhabi Malaysia Investment Company ("ADMIC"), more than $1.26 billion in proceeds was diverted to a bank account held in the name of Tanore Finance Corporation ("Tanore Account").  As with the Blackstone Account, TAN was the beneficial owner of record for the Tanore Account.  Although the account had no legitimate affiliation with 1MDB or ADMIC, LOO was an authorized signatory on the Tanore Account.

299.    Funds transferred to the Tanore Account were distributed for the benefit of at least one public official associated with 1MDB.  More particularly, very shortly after the bond offering closed, between approximately March 21, 2013, and March 25, 2013, $681,000,000 was transferred from the Tanore Account to an account belonging to MALAYSIAN OFFICIAL 1.  Of this amount, approximately $620 million was returned to the Tanore Account on or about August 26, 2013.

300.    1MDB funds diverted to the Tanore Account were also used by LOW and TAN to purchase artwork for their personal benefit and to purchase an interest in the Park Lane Hotel for the personal benefit of LOW.  The disposition of these funds was not consistent with the intended use of the 2013 bond proceeds nor was it made for the benefit of 1MDB or ADMIC.

### B.    IN MARCH 2013, 1MDB ISSUED $3 BILLION IN GOLDMAN-UNDERWRITTEN BONDS FOR INVESTMENT IN A JOINT VENTURE WITH AABAR

301.    On or about March 12, 2013, 1MDB entered into a 50:50 joint venture with Aabar known as ADMIC.  According to the joint venture agreement ("ADMIC

Agreement"), the formation of ADMIC was "of strategic importance to the government to government relationship between the Government of the Emirate of Abu Dhabi and the Government of Malaysia, given the strategic initiatives to be undertaken jointly by the Parties and the catalytic effect such initiatives are expected to have upon the growth and development of Malaysia and the Emirate of Abu Dhabi respectively."[13]

302.   Pursuant to the ADMIC Agreement, ADMIC was to be capitalized by an investment of $3 billion by 1MDB and $3 billion by Aabar.  1MDB and Aabar, as the two shareholders of the company, were to adopt an investment plan for ADMIC, to include a "five (5) year strategic roadmap for the investment policies of the Company," as soon as practicable after formation of the company.

303.   The ADMIC Agreement provides that "the Company [*i.e.*, ADMIC] will open and maintain bank accounts in the name of [ADMIC]."  It further provides that "[a]ll monies of [ADMIC], and all instruments for the payment of money to [ADMIC], shall be deposited in the bank accounts of [ADMIC]."

304.   The joint venture agreement was signed by QUBAISI, as the Chairman of Aabar, and by the Chairman of 1MDB's Board of Directors; and it was witnessed by HUSSEINY, the CEO of Aabar, and by 1MDB OFFICER 2, the CEO of 1MDB.  Aabar appointed QUBAISI as a director of ADMIC and 1MDB appointed its Chief Financial Officer.

305.   At least as early as mid-January 2013, officials at 1MDB enlisted Goldman's assistance to finance its capital contribution to the planned joint venture through privately placed debt securities.  LOO served as a main point of contact between

---

[13] The Abu Dhabi Malaysia Investment Company ("ADMIC") is an entity distinct from the Abu Dhabi Malaysia Kuwait Investment Corporation ("ADKMIC").  The former was a purported joint venture between 1MDB and Aabar in which the proceeds of the Project Catalyze bond were supposed to be invested, whereas the latter was an entity owned and controlled by LOW that was used to launder funds, as described in Part II.I above.

1MDB and Goldman on this deal.  Within Goldman, this bond transaction was referred to by the name "Project Catalyze."

306.   In a March 2013 presentation prepared for 1MDB, IPIC, and Aabar in connection with the deal, Goldman set forth its understanding of 1MDB's "key objectives."  Foremost among these were "maintenance of confidentiality during execution" of the deal and "speed of execution."

307.   1MDB issued approximately $3 billion in bonds through its third private placement with Goldman.  The closing date for the bond issue was March 19, 2013.  The notes had a 4.4% interest rate and were redeemable in 2023.  The offering circular, dated March 16, 2013, listed the net proceeds of the bond sale, once Goldman's fees, commissions, and expenses were deducted, as approximately $2,716,760,000.  The bonds were issued by 1MDB Global Investments Limited ("1MDB Global"), a wholly-owned subsidiary of 1MDB that was incorporated in the British Virgin Islands on March 8, 2013.

308.   The Government of Malaysia provided a "Letter of Support," dated March 14, 2013, in connection with the Project Catalyze transaction.  That Letter of Support provided, among other things, that if 1MDB failed to provide adequate capital to ensure that 1MDB Global was able to service its obligations with respect to the bonds, Malaysia would then "step-in to inject the necessary capital into the Issuer or make payments to ensure the Issuer's obligation in respect of the Debt are fully met."  The Letter of Support also indicated that, "[t]o the fullest extent permitted by law," Malaysia would waive its sovereign immunity and submit itself to the jurisdiction of English courts in connection with disputes arising out of the letter.  The letter is signed by MALAYSIAN OFFICIAL 1.

309.   The offering circular represents that 1MDB Global intended to "either on-lend all of the net proceeds of this Offering to ADMIC or use the net proceeds of the offering to fund its investment in ADMIC, which will be a 50:50 joint venture between the Issuer and Aabar."  The offering circular noted that "ADMIC has yet to adopt a

formal investment plan or establish investment criteria." It further represented that "ADMIC does not have any specific investment, merger, stock exchange, asset acquisition, reorganization, or other business combination under consideration or contemplation and ADMIC has not, nor has anyone on ADMIC's behalf, contacted, or been contacted by, any potential target investment or had any discussions, formal or otherwise, with respect to such a transaction." The circular goes on to note that, "ADMIC does not currently have an investment plan or investment criteria in place. The Board of Directors intends to adopt an investment plan as soon as is practicable. The investment plan, and any future investments, will be made with the mutual agreement of the shareholders of ADMIC," *i.e.*, Aabar and 1MDB.

310. In a press release issued on April 23, 2013, 1MDB indicated that, "[t]he proceeds from the US$3 billion capital raised will be utilised for investments in strategic and important high-impact projects like energy and strategic real estate which are vital to the long term-economic [sic] growth of both countries." The press release gave, as an example of a future investment project, the Tun Razak Exchange (TRX). The Tun Razak Exchange is a project to develop a financial center in downtown Kuala Lumpur that has yet to be completed.

311. In truth, however, as explained below in Paragraphs 314-326, instead of being used to fund ADMIC, more than $1.26 billion in bond proceeds from the 2013 bond offering were diverted to unrelated overseas shell company accounts, including the Tanore Account at Falcon Bank in Singapore and an account opened in the name of Granton Property Holdings Limited at Falcon Bank ("Granton Account").

312. The offering circular also omitted material facts necessary to makes it representations regarding the use of the bond proceeds not misleading, in that it failed to disclose that certain individuals related to 1MDB, including MALAYSIAN OFFICIAL 1, would receive hundreds of millions of dollars from the proceeds of the bond sale within days of its closing. This fact would have been material to the bond transaction, as it would have alerted investors to the possibility of conflicts of interest and related-party

transactions.  The representation that ADMIC had not determined how all of the bond proceeds would be used did not encompass using those funds, beginning almost immediately after the bond issue, for the personal benefit of individuals related to 1MDB and their associates.

## C.   FUNDS FROM THE 2013 BOND SALE WERE DIVERTED TO THE TANORE ACCOUNT

313.   Notwithstanding the fact that 1MDB represented in the offering circular and its press release that the proceeds of the 2013 bond sale would be used to fund ADMIC, more than $1.26 billion was diverted from the proceeds of the 2013 bond sale through bank accounts controlled by TAN and held in the name of various entities, including Tanore Finance Corporation and Granton Property Holdings.  This approximately $1.26 billion in funds was neither lent to ADMIC nor used to fund 1MDB's investment in ADMIC, as represented in the bond offering circular, but instead was held and used for the benefit of LOW and his associates, including public officials of 1MDB.

### 1.   The Movement of Funds Through the Overseas Investment Funds

314.   On or about March 19, 2013, a total of $2,721,000,000, representing proceeds of the bond sale, was transferred from Bank of New York Mellon into the BSI Lugano account of 1MDB Global in two separate wires of $2,494,250,000 and $226,750,000.  The payments details listed in both SWIFT messages indicate, in relevant part: "ATTN [SINGAPORE BANKER 1.]"  SINGAPORE BANKER 1 is the same individual whose name appears in Good Star's corporate records, as noted in Paragraph 49 above.  At the time of the wire transfers to 1MDB Global, SINGAPORE BANKER 1 was employed by BSI Bank in Singapore.

315.   Between May 21 and 27, 2013, 1MDB Global transferred a total of $1,590,000,000 from its account at BSI Lugano to accounts belonging to three different overseas investment funds:  Devonshire Capital Growth Fund ("Devonshire"), a fund located in the British Virgin Islands; Enterprise, a fund located in Curacao; and Cistenique, another fund located in Curacao (collectively, the "Overseas Investment

Funds" or "Funds").  This money was routed via the clearing company Citco, before being transferred into the accounts of the Overseas Investment Funds.  As described in Paragraphs 232-236 above, two of these three funds, Cistenique and Enterprise, were used in 2012 to pass funds traceable to the Project Maximus bond proceeds from Aabar-BVI to Blackstone.

316.   The approximate dates and aggregated amounts of these transfers from 1MDB Global to the three Overseas Investments Funds, via Citco, are set forth below:

**Table 9:  Wire Transfers from 1MDB Global to Overseas Investment Funds**

| Dates | Sending Party | Receiving Party | Amount |
|---|---|---|---|
| 3/21/2013 | 1MDB Global | Devonshire | $646,464,649 |
| 3/21/13 - 3/27/2013 | 1MDB Global | Enterprise | $414,756,416 |
| 3/21/13 - 3/22/2013 | 1MDB Global | Cistenique | $531,090,534 |

317.   Within approximately two days after 1MDB Global began its transfer of more than $1.5 billion to the Overseas Investment Funds, the Overseas Investment Funds collectively transferred a total of $835,000,000 to the Tanore Account.  The approximate dates and amounts of these wires, which passed through a correspondent bank account at J.P. Morgan Chase in the United States, are summarized below:

**Table 10: Wire Transfers from Overseas Investment Funds to Tanore**

| Date | Sending Party | Sending Party Bank | Receiving Party | Amount |
|---|---|---|---|---|
| 3/21/2013 | Devonshire | BSI Bank - Singapore | Tanore | $210,000,000 |
| 3/22/2013 | Enterprise | ING Bank - Netherlands | Tanore | $250,000,000 |
| 3/22/2013 | Cistenique | ING Bank Netherlands | Tanore | $375,000,000 |

318.   TAN opened the Tanore Account on or about November 2, 2012, and he was originally its sole authorized signatory.  Bank records list HUSSEINY, who was Chairman of Falcon Bank, as the "referrer" for the account.  TAN functioned as a proxy for LOW with respect to the Tanore Account, and LOW routinely communicated with bankers about the Tanore Account using TAN's email account.

319.   On or about March 20, 2013, one day before funds were first credited to the Tanore Account from the Overseas Investment Funds, LOO was given signing authority on the Tanore Account through the execution of a Power of Attorney form signed by LOO.  A copy of the Malaysian passport belonging to LOO was included in that documentation.  LOW was responsible for adding LOO as an authorized signatory to the account.

320.   Bank statements show that the above-referenced wire transfers from the Overseas Investment Funds, beginning on or about March 21, 2013, were the first credits to the Tanore Account.

321.   On or about March 21, 2013, Devonshire transferred an additional $430,000,000 in 1MDB funds to the Granton Account.  Account opening documents for the Granton Account were signed by TAN.  The $430,000,000 wire from Devonshire was processed through a U.S. correspondent bank account at J.P. Morgan Chase, and bank statements show that it was the first credit to the Granton Account.

322.   On or about that same day, March 21, 2013, Granton transferred $430,000,000 – the same amount received from Devonshire – to the Tanore Account.  As set forth above, the Tanore Account and the Granton Account have the same beneficial owner of record (TAN).

323.   Approximately four days later, on or about March 25, 2013, Tanore transferred $378,000,000 back to the Granton Account.

324.   The passage of funds back and forth through accounts held in the name of different legal entities but having the same stated beneficial owner had no legitimate commercial purpose but was instead undertaken as a means of layering these

transactions to obscure the nature, source, location, ownership and/or control of the funds.

325.   The transfer of 1MDB funds through the Overseas Investment Funds to the Tanore and Granton Accounts could not have been accomplished without the participation or acquiescence of one or more officials at 1MDB.

326.   Though they had no official position with 1MDB, LOW and TAN were also involved in arranging the transfer of funds from 1MDB to Tanore, using the Overseas Investment Funds as pass-through accounts.  HUSSEINY was also involved in the financial transactions into and out of the Tanore Account, in his capacity as Falcon Bank's Chairman.  Among other things, he worked to convince compliance officials at the bank that the transactions were legitimate.

> 2.   *The Diversion of Bond Proceeds Was Planned in Advance of the Bond Offering*

327.   The plan to divert bond proceeds to the Tanore Account via the Overseas Investment Funds pre-dated the March 19, 2013 bond offering.  For example, SINGAPORE BANKER 1, who served as the relationship manager for the 1MDB Global Account, emailed other bankers at BSI Bank in Singapore on or about February 24, 2013, with the subject "Aabar-1mdb update."  The email indicates that the 1MDB-Aabar joint venture was to be capitalized with $6 billion and that, of this, "USD2 billion is expected to be invested in 4 structured funds."  These funds included Enterprise, Cistenique, and Devonshire (i.e., the Overseas Investment Funds).

328.   In a subsequent email dated March 11, 2013, with the subject "Abu Dhabi Malaysia govt joint venture update," SINGAPORE BANKER 1 indicated that the "Abu Dhabi side is taking a little longer than anticipated" to arrange for its share of the funding for the ADMIC joint venture.  SINGAPORE BANKER 1 further indicated that "[w]hile awaiting for the Abu Dhabi side to get organised, 1MDB is expected to invest usd 1 billion into structured funds."

329.   Prior to the bond issuance, 1MDB officials and LOW had not only arranged to "invest" bond proceeds in the Overseas Investment Funds, contrary to the uses of proceeds identified in the offering circular; they had also chosen Tanore and Granton as the ultimate recipients of the money.  BSI Bank specifically marketed the Overseas Investment Funds to LOW and 1MDB as pass-through entities, designed to allow the client (*e.g.*, 1MDB) to funnel money to a third-party of the client's choosing (*e.g.*, Tanore).  Documentation was drawn up in advance by bankers at BSI to effectuate the two-step movement of funds.

330.   Bank records associated with Devonshire's account at BSI Bank in Switzerland confirm that 1MDB's "investment" in Devonshire was intended, from the outset, as a means to transmit money to Tanore.  Account opening records indicate that Devonshire opened an account at BSI Lugano on or about March 18, 2013 for the specific purpose of collecting funds beneficially owned by 1MDB and transmitting those funds to a third-party holding company identified by 1MDB officials.  According to an internal bank memorandum describing the anticipated pass-through transactions, the "target investment holding [company] . . . will be controlled and owned by [1MDB Global's] trusted investment nominee – Mr Tan Kim Loong."  The bank understood that the transactions were structured in this layered fashion to allow 1MDB Global "to dissociate it[self] from the assets by using fiduciary fund structures."

### 3.   The Funds Transferred to Tanore Were Not Used for the Benefit of 1MDB or ADMIC

331.   Bank statements for the Tanore Account demonstrate that funds transferred to the Tanore Account were not thereafter transferred to an account belonging to ADMIC or used for investment purposes with any apparent legitimate business connection to ADMIC or 1MDB.

332.   Instead, funds from the Tanore Account were sent to an account belonging to MALAYSIAN OFFICIAL 1, and were also used by TAN and LOW to purchase art. Funds from the Tanore Account were also used by LOW to acquire a substantial interest

in a luxury hotel in New York City.  These uses were inconsistent with the intended purpose of the bond proceeds as set forth in the offering circular and the April 23, 2013, 1MDB press release.

333.   TAN and LOW provided Falcon Bank with a number of fraudulent documents, including loan and investment agreements, intended to justify the sizeable transfers of funds into and out of the Tanore and Granton Accounts in the days and weeks following the 2013 bond sale.   The documentation was sufficiently suspicious to trigger concern among Falcon Bank officials.

334.   On or about March 25, 2013, the Bank Manager of Falcon Bank in Singapore ("Falcon Bank Manager") called the CEO of Falcon Bank ("Falcon Bank CEO") to discuss the recent transactions into and out of the Tanore and Granton Accounts.  According to a recorded conversation, the Falcon Bank CEO conferenced in HUSSEINY to the conversation and then proceeded to say, in relevant part:

> Mohammed, the rest of the documentation, which our friend in Malaysia has delivered is absolutely ridiculous, between you and me. . . .This is . . . gonna get everybody in trouble.  This is done not professionally, unprepared, amateurish at best. The documentation they're sending me is a joke, between you and me, Mohammed, it's a joke!  This is something, how can you send hundreds of millions of dollars with documentation, you know, nine million here, twenty million there, no signatures on the bill, it's kind of cut and paste. . . . I mean it's ridiculous!  . . . You're now talking to Jho [LOW], and tell him, look, you either, within the next, you know, six hours produce documentation, which my compliance people can live with, or we have a huge problem.

335.   Soon thereafter, in another recorded conversation, the Falcon Bank CEO called LOW and told him, in relevant part, as follows:

> The documentation which we have received, Jho, it's a joke. It is not good and it, it, if you look at all that stuff. . . . I looked at it, I mean with, with, with the best of, of whatever we want to see and with all that Eric and we can do, but

97

let, you know, my compliance guys and even my general counsel, he said, look, I mean, if an outside person looks at that and . . . we have in particularly hired an outside consultant law firm to look at it from the perspective, if, if anybody just looks at it remotely, this is going to be all over the place. Receiving banks, wiring, and, and, what I try to do here is protect Eric and anybody in the room because if, if any other bank just make "peep!" and this gets reported, . . . we are gonna have a huge problem. . . .

336.   Falcon Bank nevertheless processed the transfers into and out of the Tanore Account, apparently in part because HUSSEINY vouched for the legitimacy of the transactions.

337.   TAN closed the Tanore and Granton accounts in mid-December 2013.

338.   The ADMIC joint venture, which was the stated basis for the 2013 bond sale, was ultimately never funded.

**D.      $681 MILLION WAS TRANSFERRED FROM THE TANORE ACCOUNT TO AN ACCOUNT BELONGING TO MALAYSIAN OFFICIAL 1**

339.   Shortly after proceeds of the 2013 bond sale were diverted to the Tanore Account, $681,000,000 was sent from the Tanore Account to a bank account belonging to MALAYSIAN OFFICIAL 1.

340.   On or about March 21, 2013, Tanore transferred $620,000,000 into an account at AmBank in Malaysia, whose beneficiary was listed as "AMPRIVATE BANKING-MR."  The wire transfer was processed through correspondent bank accounts at JP Morgan Chase and Well Fargo in the United States.  On or about March 25, 2013, an additional $61,000,000 was wired from the Tanore Account to the same account at AmBank, for a total of $681,000,000.

341.   This account belonged to MALAYSIAN OFFICIAL 1 and is the same account that in 2011 received $20 million from the Saudi Account that was traceable to the Good Star Account, as set forth in Section II.G.  It is also the same account that in

2012 received at least $30 million from the Blackstone Account that was traceable to the Aabar-BVI Swiss Account and the 2012 bond proceeds, as set forth in Section III.E.3.

342.  Bank records reflect that TAN signed the wire instructions to transfer $681 million to the AMPRIVE BANKING-MR Account.  Bank records also reflect that bankers at Falcon Bank confirmed the transfer with TAN during a phone call on March 21, 2013 at 11:58pm.

343.  An email sent from TAN's account falsely represented to Falcon Bank that the AMPRIVATE BANKING-MR Account was owned by SRC International, a former 1MDB subsidiary that was transferred to the direct control of the Ministry of Finance in 2012.  The email also falsely represented that the transfer of $681 million to that account was being made pursuant to a Sharia-compliant financing agreement, known as a Mudharabah Agreement, between Tanore and SRC International.  Falcon Bank was provided with a purported copy of that financing agreement, which was dated March 18, 2013 and was signed by TAN and the 1MDB-SRC OFFICER.  Despite the existence of this purported agreement, Tanore was a shell company with no legitimate business.  The false agreement was submitted to Falcon Bank to conceal the true nature of the payment to MALAYSIAN OFFICIAL 1, which if disclosed to the bank, would have required the bank to engage in additional compliance inquiries to verify the legitimacy of such a large transfer of funds to a high-ranking public official.

344.  Bank records reflect that the validity of this supposed investment agreement was confirmed in a phone call between the 1MDB-SRC OFFICER and the Falcon Bank CEO, and that two other Falcon Bank employees were present during that call.  Bank records indicate that the Falcon Bank CEO and the 1MDB-SRC OFFICER "know each other personally."

345.  On or about August 26, 2013, $620,010,715 was wired from a different account at AmBank to the Tanore Account held in the name of AMPRIVATE BANKING-MY.  This AmBank account also belonged to MALAYSIAN OFFICIAL 1,

and the transfer represented funds from the $681 million payments that were being returned to Tanore.

346.   As discussed in Part VI.CC below, a portion of the $620 million that MALAYSIAN OFFICIAL 1 "returned" to the Tanore Account was passed through various additional accounts controlled by TAN and LOW and was ultimately used to purchase a 22-carat pink diamond pendant and necklace for the wife of MALAYSIAN OFFICIAL 1.  The necklace was commissioned in July 2013, after the jeweler met with LOW, HUSSEINY, and the wife of MALAYSIAN OFFICIAL 1 in Monaco.  The purchase price of $27,300,000 was paid on or about September 10, 2013, using funds traceable to the $620 million payment from MALAYSIAN OFFICIAL 1 to Tanore.

347.   The Attorney General of Malaysia publicly stated that he conducted an inquiry into the $681 million in payments.  In a press release issued on January 26, 2016, the Malaysian Attorney General confirmed that, "the sum of USD681 million (RM2.08 billion) [was] transferred into the personal account of [MALAYSIAN OFFICIAL 1] between 22.03.2013 and 10.04.2013," and that, "in August 2013, a sum of USD620 million (RM2.03 billion) was returned by [MALAYSIAN OFFICIAL 1]. . . ."  The Malaysian Attorney General ultimately characterized the payment of $681 million as a "personal donation to [MALAYSIAN OFFICIAL 1] from the Saudi royal family which was given to him without any consideration."

348.   In fact, as explained above, official bank records for the Tanore Account confirm that (a) the payment of $681 million came from the Tanore Account; (b) TAN was the recorded beneficial owner of the Tanore Account, (c) TAN (or someone using his email address) directed the payment; and (d) Falcon Bank was told that the payment represented an investment in SRC International.  As described above, the only funds in the Tanore Account at the time of the $681 million payment originated from 1MDB.

1
2
3

**E.      FROM APPROXIMATELY MAY THROUGH SEPTEMBER 2013, THE TANORE ACCOUNT WAS USED TO PURCHASE ART FOR THE PERSONAL BENEFIT OF TAN AND LOW**

4      349.   Notwithstanding the fact that 1MDB represented in the offering circular that
5   the proceeds of the 2013 bond sale would be used for ADMIC, funds from the 2013
6   bond sale that were diverted through the Tanore Account were used to purchase tens of
7   millions of dollars in artwork in the United States.  This artwork was acquired for the
8   personal benefit of LOW, TAN and their associates, not for the benefit of 1MDB or
9   ADMIC.

10          *4.      From Approximately May Through September 2013, Tanore*
11                   *Purchased Approximately $137 Million in Art*

12      350.   In early May 2013, TAN opened an account at Christie's Auction House
13   ("Christie's") in the name of Tanore Finance Corporation.  Christie's is a major art
14   auction house with a salesroom in New York.  The Christie's account opened for Tanore
15   was assigned account number XXX7644.  In connection with the opening of this
16   account, TAN submitted a letter to Christie's from Falcon Bank in Zurich, which was
17   dated May 8, 2013 and was signed by the Director and Managing Director of the Bank.
18   That letter represented that TAN was the beneficial owner of the Tanore Account.

19      351.   On or about May 10, 2013, TAN designated McFarland, co-founder of Red
20   Granite Pictures, as an agent authorized to bid on behalf of Tanore.   McFarland
21   corresponded with Christie's about Tanore's bidding account using his Red Granite
22   Pictures email account.

23      352.   At auctions held in New York on or about May 13, 2013, and May 15,
24   2013, Tanore purchased five works of art for a collective total price of $58,348,750.
25   Specifically, invoices show that at an "11th Hour" Charity Sale on May 13, 2013, Tanore
26   purchased an unnamed work by Mark Ryden for $714,000 ("Ryden work") and an
27   unnamed work by Ed Ruscha for $367,500 ("Ruscha work").  At a Post-War &
28   Contemporary Evening Sale on May 15, 2013, Tanore purchased *Dustheads*, by Jean-

Michel Basquiat ("*Dustheads*") for $48,843,750; *Untitled – Standing Mobile*, Alexander Calder ("Calder Standing Mobile") for $5,387,750; and *Tic Tac Toe*, by Alexander Calder (*"Tic Tac Toe")* for $3,035,750.

353.   On or about June 4, 2013, $58,348,750 was wire transferred from the Tanore Account at Falcon Bank to an account at J.P. Morgan Chase in the United States maintained by Christie's.

354.   On or about June 28, 2013, Tanore purchased two works of art in a private sale arranged by Christie's:  *Concetto spaziale, Attese*, by Lucio Fontana ("the Fontana piece"); and *Untitled (Yellow and Blue)* by Mark Rothko ("the Rothko piece").  The invoice set forth three alternative payment amounts, depending on when payment was made, including: payment of $7,950,000 by July 5, 2013, and payment of the remaining $71,550,000 by October 3, 2013, for a total purchase price of $79,500,000.

355.   On or about July 3, 2013, $7,950,000 was wired from the Tanore Account to an account at J.P. Morgan Chase in the United States maintained by Christie's.  On or about September 9, 2013, Tanore wired an additional $71,550,000 to Christie's account at J.P. Morgan Chase.  The remittance instructions for both wires contain references to Tanore's account number and "INVOICE DATE: 28JUN13."

356.   A Senior Vice President at Christie's ("Christie's VP") who served as a client representative for Tanore and LOW viewed Tanore and LOW as interchangeable, and the Christie's VP believed that LOW was making purchases for his corporate collection.  The Christie's VP also indicated that McFarland and LOW attended art auctions in New York together and that at those auctions, McFarland would bid for Tanore.

357.   TAN and LOW took deliberate steps to avoid the appearance of an association between LOW and Tanore in written documentation.  For example, on November 1, 2013, LOW was copied on an email exchange between TAN and Christie's employees about art that Tanore had recently purchased.  That same day, LOW

responded:  "Please deal with Eric directly re his works.  Don't need to cc me for confidentiality reasons unless Eric expressly says to do so."

358.   On October 1, 2013, TAN requested that Christie's reserve a specific skybox, with seating for twelve guests, at upcoming auctions on November 5 and 12.  In connection with this request for a skybox, a Christie's employee sent an email to a colleague stating in relevant part, "It better look like Ceasar Palace [sic] in there . . .The box is almost more important for the client than the art."

359.   Tanore successfully bid on additional artwork at a November 5, 2013, Impressionist and Modern Art Evening Sale, including a work by Vincent Van Gogh entitled *La maison de Vincent a Arles* ("VAN GOGH ARTWORK") for $5,485,000.  But Tanore had difficulty making payments for the purchased works due to concerns raised by the compliance department at Falcon Bank, where Tanore maintained its account.  In a November 21, 2013, email to Christie's, TAN explained in pertinent part:

I had been on the phone with Falcon Bank (for Tanore Finance Corp) on Thursday to resolve this matter as the compliance department has some questions that required my response about the amount of Art purchases made recently.

Nothing of concern, but just that I have to provide answers re when I started being interested in art, intentions for the artworks and going forward the expected outflows from purchase of Artworks or inflows from sale of Artworks (if any).

360.   In an internal email dated December 9, 2013, with the subject line "Tanore," the Christie's VP directed another Christie's employee to "send an email" to Tanore about its continued failure to make payment for the art purchased on November 5 and to "please CC Jho even though he does not like it."

361.   By email dated December 10, 2013, TAN advised two Christie's employees that he "spoke to Mr Low and he has agreed to buy the items that I recently auction at

xties n [sic] private sales since he can pay immediately." On or about December 13, 2013, a Christie's employee sent TAN an email requesting that he "execute the attached documents confirming that your obligations will be assumed by Mr. Low." Among the attachments to that email were letter agreements voiding certain purchases that Tanore had made at the November 5 sale, including the VAN GOGH ARTWORK, and letter agreements for the assignment to LOW of Tanore's interest in and payment obligations for those purchases. TAN responded in an email dated December 13, 2013: "Please do not have Mr Low in any document. I prefer just me null and void. Thank you."

362.   In an email dated December 13, 2013, a Christie's employee transmitted several documents to LOW, including copies of the unsigned assignment agreements described above. LOW responded the same day: "Please remove any reference to Tanore in the agmt."

363.   As noted in Paragraph 612-624 below, LOW ultimately purchased the VAN GOGH ARTWORK for which Tanore was unable to make payment, and he did so using money traceable to diverted 1MDB funds.

### 5. *Tanore, Through TAN, Gifted Artwork It Purchased from Christie's to McFarland and LOW*

364.   TAN gifted several pieces of artwork purchased with funds from the Tanore Account to McFarland and LOW, shortly after he acquired them. These "gifts" are consistent with his having acting as a nominee to purchase art on behalf of others, using diverted 1MDB funds.

365.   On or about August 15, 2013, TAN responded to an email chain between McFarland and several Christie's employees on which he was copied: "Please do not copy me anymore as the Painting has been officially gifted to joey in geneva free port so it is his." The subject line of the email was "Re: Mark Ryden work from 11th Hour." Based on context, the email indicates that TAN was advising Christie's that he had gifted the Mark Ryden work to Joey McFarland.

366.   On or about September 26, 2013, a Christie's employee advised TAN that, "Ed Ruscha's studio has reached out to me and asked if we can please let them know who purchased his work in the 11th Hour auction."  TAN responded, copying McFarland: "pls talk to joey, it is now owned by him."  McFarland responded further: "I am [the] owner."

367.   TAN also purported to gift several pieces of artwork to LOW, including works purchased with funds from the Tanore Account.  These "gifts" of art purchased by Tanore were memorialized in several "gift letters."  While the body of each letter was identical, each letter referenced a different work or works being gifted, including: *Dustheads*; the Rothko work; the Fontana Piece; and *Tic Tac Toe*.

368.   Each of these gift letters was: (a) dated October 2, 2013, (b) addressed to LOW from TAN and Tanore, and (c) contained the subject line: "RE: GIFT OF ART-WORK(S) AS STATED BELOW IN CONSIDERATION OF YOUR FRIENDSHIP, YOUR CHARITABLE CONTRIBUTION TO THE WORLD, AND PASSION IN PROMOTING THE UNDERSTANDING AND APPRECIATION OF ART-WORKS."

369.   Each letter included representations from TAN that he is the "sole 100% beneficial owner of TANORE FINANCE CORP," and that he is "the legal and beneficial owner of all the art-work(s) mentioned in this gift letter."

370.   The body of each letter also states:

I wish to gift you ALL of the art-work(s) mentioned in this gift letter in consideration of the followings [sic]:

• all the generosity, support and trust that you have shared with me over the course of our friendship, especially during the difficult periods of my life; and

• your continuous generosity in providing charitable contributions to advance the well-being and development of our global communities; and

• your passion in promoting the understanding and appreciation of art-works.

371.  Each gift letter closes by stating:

All the art-work(s) gifted to you should not in any event be construed as an act of corruption since this is against the Company and/or my principles and I personally do not encourage such practices in any manner whatsoever. The gift(s) is/are merely a token of appreciation and I am hoping that the gift(s) to you would encourage you to continue with your good work globally.

372.  LOW also procured an additional letter from TAN, dated April 8, 2014, confirming the content of the prior October 2, 2012, "Gift Letters."  This letter indicated that it was prepared in support of LOW's request for financing from Sotheby's Financial Services, for which LOW used certain artwork as collateral (as described further in Paragraph 622 below).  In this April 8, 2014 letter:

a.   TAN identified himself as "Tanore's 100% shareholder and 100% beneficial owner" and indicated that Tanore had been liquidated by him.

b.   TAN indicated that he "remained the sole legal and beneficial owner(s) of" the artwork listed in the Gift Letters, "until immediately prior to each Transfer" to LOW.

c.   The letter goes on to indicate, "To the best of my knowledge, as of the date of this Letter, [LOW] is the sole and absolute owner of the Property, and there is no other person or entity (including Tanore or myself) that has or can claim any interest, direct or indirect, in the Property."

d.   The letter is signed by TAN.  LOW also signed the letter as having "[a]cknowledged and [a]greed."

373.  Individuals engaged in money laundering or who otherwise wish to conceal the true nature of financial transactions will sometimes acquire assets through a nominee, who thereafter "gifts" the assets to the true intended purchaser.

374.  Based on these facts, including LOW's presence at auctions where Tanore bid on art and the fact that TAN subsequently gave more than $100 million in art to

LOW for no consideration, Plaintiff alleges that TAN acted as a nominee for LOW when purchasing art from the Tanore Account to obscure the fact that LOW was acquiring art with funds from Tanore.

## V.     THE OPTIONS BUYBACK PHASE:   APPROXIMATELY $850 MILLION IS MISAPPROPRIATED FROM 1MDB

### A.   EXECUTIVE SUMMARY OF THE OPTIONS BUYBACK PHASE

375.   As described in further detail below, in 2014, 1MDB secured two loans from Deutsche Bank, totaling $1.225 billion.  The ostensible purpose of both loans was to allow 1MDB to buy back the options that it had given to Aabar in consideration for IPIC's guarantee of the 2012 bonds, so that 1MDB could make an initial public offering of the Tanjong and Genting power assets.  1MDB officials secured approval of these two loans through material misrepresentations and omissions to Deutsche Bank, including that the proceeds of the loans would be paid to a legitimate affiliate of IPIC.  In fact, the bulk of the proceeds of both loans went to two offshore entities named to create the false impression of an affiliation with IPIC: Aabar-BVI and a similarly-named entity incorporated in the Seychelles ("Aabar-Seychelles" or "Aabar-SY").

376.   The first Deutsche Bank loan was approved in May 2014, in the amount of $250 million.  Almost immediately upon draw-down, 1MDB sent $175 million in loan proceeds to the Aabar-BVI Swiss Account.  As previously noted, the Aabar-BVI Account, which was set up by QUBAISI, HUSSEINY, and LOW, was used to siphon off funds from 1MDB and/or IPIC.  From there, the majority of the funds were passed through a series of accounts connected to TAN and LOW and ultimately ended up in the personal bank account of LOW.  Loan proceeds were also transferred indirectly to LOO and MALAYSIAN OFFICIAL 1.

377.   Deutsche Bank arranged a second syndicated loan for 1MDB in September 2014 in the amount of $975 million.  This loan was collateralized by the assets held in the Brazen Sky Account, which as noted above, consisted solely of fund units in the Bridge Global Fund.  To obtain approval of this loan, 1MDB officials made material

misrepresentations about the value of the assets held by Brazen Sky, which were not liquid and were not worth anywhere near the $2.3 billion 1MDB claimed.

378.   Upon draw-down on this second loan, 1MDB requested that Deutsche Bank send close to $700 million in loan proceeds to a bank account at UBS AG in Singapore that was held in the name of Aabar Investments PJS Limited.  At the time it released the loan proceeds, compliance and risk officers at Deutsche Bank believed that the destination account was beneficially owned by a legitimate affiliate of IPIC and that the proceeds would be used to extinguish the Aabar options.  In fact, the loan proceeds were sent to the UBS bank account belonging to Aabar-Seychelles ("Aabar-Seychelles Account").  The Aabar-Seychelles Account, like the Aabar-BVI Account, was a dummy account used to facilitate fraudulent funds transfers.

379.   The loan proceeds sent to Aabar-Seychelles were used by the co-conspirators in an elaborate series of structured transactions designed to create the appearance that Brazen Sky was "redeeming" its investments in the Bridge Global Fund for cash.  During the fall of 2014, each of the seven incoming cash transfers that Brazen Sky received from Bridge Global was actually money that 1MDB had earlier borrowed from Deutsche Bank.  From the outset, this furtive use of the Deutsche Bank loan proceeds falsely created the appearance that Brazen Sky maintained valuable investments in Bridge Global fund units, and thereby concealed the giant investment losses sustained by 1MDB because of the diversion of more than $1 billion to the Good Star Account.

## B.   IN 2014, 1MDB BORROWED $250 MILLION FROM DEUTSCHE BANK FOR THE OSTENSIBLE PURPOSE OF BUYING BACK THE AABAR OPTIONS

380.   In 2014, 1MDB began planning for an initial public offering ("IPO") of the power assets owned by its subsidiary 1MDB Energy Holdings Limited ("1MEHL") on a Malaysian stock exchange.  1MEHL was the holding company for 1MDB Energy and 1MDB Energy Langat, the entities that had acquired the Tanjong and Genting power

assets, respectively, through issuance of the 2012 bond notes.  1MDB retained Deutsche Bank-Singapore and Maybank to coordinate the IPO process.  Goldman was also asked to serve in an advisory capacity.  Within Deutsche Bank, the proposed IPO transaction was known as "Project Virtus."

381.    As noted in Part III.B above, in exchange for IPIC's guarantee of the 2012 bond notes, 1MDB Energy granted Aabar-BVI a call option to acquire a 49% stake in the Tanjong assets, and 1MDB Energy Langat granted Aabar a call option to acquire a 49% stake in the Genting assets (collectively, the "Aabar options").  Because those options could be exercised at a fixed strike price at any time over a ten year period, their value fluctuated according to the underlying value of the two power companies.  IPIC valued the Aabar options, collectively, at approximately $528 million in its 2013 consolidated financial statements.

382.    In 2014, 1MDB decided to pay Aabar to terminate the May 18, 2012 and October 17, 2012 Option Agreements ("Option Agreements"), in effect "buying back" the Aabar options.  The primary stated reason for this buyback was to allow 1MDB to retain the full benefit of any appreciation in value of the power companies as a result of the IPO (*i.e.*, to avoid having to share that upside with Aabar).

383.    In its audited financial statements for fiscal year 2014, 1MDB disclosed that it had entered into a "Settlement Agreement" with Aabar dated May 22, 2014, by which it agreed to buy back the Aabar options.  According to a copy of that agreement circulated to Deutsche Bank by 1MDB's counsel the following year, the parties to that Settlement Agreement were 1MEHL and "Aabar Investments PJS Limited," an entity located in the U.A.E.  The parties did not fix the price for the buyback in the Settlement Agreement but instead provided that 1MDB would pay a "price . . . to be mutually agreed between the parties" at a later date.  The agreement was signed by HUSSEINY and the then-CEO of 1MDB.

384.    1MDB approached Deutsche Bank in Singapore to secure financing to buy back the Aabar options in approximately Spring of 2014.  In connection with the loan

approval process, Deutsche Bank was provided copies of the offering circulars for Project Magnolia and Project Maximus.  As discussed in Part III above, those offering circulars contained material misrepresentations and omissions related to, among other things, the use of proceeds of the 2012 bonds and the consideration given by 1MDB in exchange for IPIC's guaranteeing of the bonds.  1MDB officials did not make compliance and risk officers at Deutsche Bank aware that 1MEHL had given Aabar-BVI close to $1.4 billion in proceeds from the 2012 bonds, purportedly pursuant to an alternate version of the Option Agreements that also included a provision for the payment of a cash contribution to Aabar-BVI.

385.   On or about May 26, 2014, Deutsche Bank AG, Singapore Branch extended a $250 million bridge loan facility to 1MDB Energy Holdings Limited ("$250 million loan"). The facility agreement provided that 1MEHL, 1MDB's wholly-owned subsidiary, "shall apply all amounts borrowed by it under the Facility in or towards the corporate purposes of the Group as provided in the Borrower's board of directors' resolutions date 23 May 2014. . . ."

386.   A resolution passed by 1MEHL's directors on May 23, 2014, authorized 1MEHL to borrow up to $300 million from Deutsche Bank for the purpose of "financ[ing] the acquisition of Aabar Options and/or Other Minority Interests, interest reserve and working capital."  The Resolution was signed by the Director of 1MEHL ("1MDB OFFICER 5").

387.   The $250 million loan was guaranteed by 1MEHL's parent, 1MDB.  This guarantee required the approval of Bank Negara, Malaysia's Central Bank, which 1MDB had not secured by the time the loan was finalized.  1MDB was required to secure this approval as a condition subsequent to the loan.  Ultimately, 1MDB never obtained Bank Negara approval, for reasons that were not disclosed to Deutsche Bank, and thus it never satisfied this condition of the loan.

388.   At the time that Deutsche Bank approved the loan facility, compliance and credit risk officials understood that the loan proceeds would be used to compensate a

legitimate affiliate of IPIC for the termination of the Aabar options. This understanding was based on material misrepresentations and omissions made by 1MDB OFFICER 4, who served as 1MDB's Executive Director of Finance, and others about the intended destination of the loan proceeds and the relationship between Aabar-BVI and IPIC.

### C. A Majority of the Proceeds of the $250 Million Deutsche Bank Loan Were Diverted to and through the Aabar-BVI Account to LOW, MALAYSIAN OFFICIAL #1 and LOO, Among Others

389.   As described below, the bulk of the proceeds of the $250 million Deutsche Bank loan were almost immediately diverted to the Aabar-BVI Account. Thereafter, the loan proceeds were used for the personal benefit of LOW, MALAYSIAN OFFICIAL 1, and LOO, among others.

390.   On or about May 28, 2014, $239,940,000 in proceeds from the Deutsche Bank loan were transferred into the bank account of 1MEHL at Falcon Bank in Zurich ("1MEHL Account").

391.   On or about the same day, 1MEHL transferred $175,000,000 in loan proceeds to the Aabar-BVI Swiss Account. As noted in Section III.C.4 above, Aabar-BVI is not a legitimate affiliate of Aabar or IPIC, and the funds held in the Aabar-BVI Swiss Account were not held for the benefit of Aabar or IPIC. HUSSEINY and QUBAISI falsely represented to BSI Bank that Aabar was the beneficial owner of the funds in the account, in order to facilitate the diversion of funds from 1MDB and/or IPIC.

392.   In this instance as in previous instances, the Aabar-BVI Swiss Account functioned as a pass-through account, receiving diverted funds from 1MDB and funneling them on to the co-conspirators and their associates. Following its use in 2012 to siphon off the proceeds of the 2012 bonds, the Aabar-BVI Swiss Account saw no significant financial activity until the incoming $175 million wire from 1MEHL (with the exception of one pass-through transaction in September 2013 to an entity affiliated

with TAN and LOW).  Before the $175 million wire was credited, the balance in the Aabar-BVI Swiss Account was less than $125,000.

393.   Because of the size of the transfer from 1MEHL to Aabar-BVI, BSI Bank required an explanation in order to process the incoming wire.  QUBAISI and/or HUSSEINY represented to BSI Bank that the $175 million wire transfer represented partial payment by 1MEHL to buy back the Aabar options.  BSI was provided with a copy of an "Agreement Related to Option Agreements," dated April 28, 2014, which purported to set forth the terms of the options buyback arrangement.  That agreement (hereinafter, the "BSI Buyback Agreement") provided that "Aabar Investments PJS Limited," a U.A.E. company, would assign its rights to the Aabar options to 1MEHL in exchange for $989,000,000, of which $175,000,000 was payable within 30 days of the date of the agreement.  The agreement bore the signature of QUBAISI and the then-CEO of 1MDB.

394.   The terms of the BSI Buyback Agreement were materially inconsistent with the terms of the May 22, 2014 Settlement Agreement referenced in 1MDB's audited financial statements.  As explained above in Paragraph 383, that Settlement Agreement – dated *after* the date of the BSI Buyback Agreement – provided that the cash consideration to be given to Aabar for termination of the options had not yet been determined.

395.   As set forth below, the loan proceeds transferred to the Aabar-BVI Swiss Account were used for the benefit of LOW, LOO, and MALAYSIAN OFFICIAL 1, rather than for the benefit of 1MDB, IPIC, or Aabar.  These uses were inconsistent with the purpose of the loan, which 1MDB was obligated to repay.

### 1.   *Loan Proceeds Are Transferred to LOW*

396.   On or about May 30, 2014, Aabar-BVI transferred $155,000,000 of the $175,000,000 it received from 1MEHL to an account at DBS Bank Ltd. in Singapore held in the name of Affinity Equity International Partners Limited ("Affinity Equity Account").  Affinity Equity International Partners Limited ("Affinity Equity") was a

shell company, and it had no affiliation with the similarly-named Affinity Equity Partners, a major private equity firm in Asia. Records related to the Aabar-BVI Account suggest, however, that BSI bank officials may have believed that there was a genuine affiliation between the two entities at the time they approved the $155,000,000 transfer. TAN was the recorded beneficial owner of the Affinity Equity Account.

397.   HUSSEINY represented to BSI Bank that Aabar-BVI's transfer of $155,000,000 to Affinity Equity was made pursuant to a Sharia-compliant investment and profit-sharing agreement, known as a Mudharabah agreement, between Aabar-BVI and Affinity Equity. As part of the compliance process, the bank was provided with a copy of the supposed agreement, which was dated May 26, 2014 and which bore the signatures of HUSSEINY and TAN. Bank statements for the Affinity Equity Account do not show financial activity consistent with the investment agreement provided to the bank. Indeed, Affinity Equity appears to be a shell corporation created for the purpose of maintaining a bank account and facilitating the transfer of funds among the co-conspirators and their associates.

398.   On or about June 2, 2014, Affinity Equity transferred $142,000,000 of the $155,000,000 it received from Aabar-BVI to a bank account at BSI Bank in Singapore held in the name of Alpha Synergy Limited ("Alpha Synergy Account"). According to bank records, LOW was the beneficial owner of the Alpha Synergy Account. LOW was particularly secretive about the account – for example, admonishing bankers that they should "not state [the] full name" of the account but only use its initials, "ASL," in their email communications with him.

399.   On or about one day later, LOW transferred this $142,000,000 from his Alpha Synergy Account to his personal account at BSI through an intra-bank transfer. The passage of funds through the Affinity Equity and Alpha Synergy Accounts was done to conceal the source of funds and give the false impression that the money entering LOW's personal account originated from a company he controlled rather than from Aabar-BVI or 1MEHL.

**Table 11:  Layered Transfer of Funds from 1MEHL to LOW**

| Date | Sending Party | Receiving Party | Amount |
|------|---------------|-----------------|--------|
| 5/28/14 | 1MEHL | Aabar-BVI | $175,000,000 |
| 5/30/14 | Aabar-BVI | Affinity Equity | $155,000,000 |
| 6/2/14 | Affinity Equity | Alpha Synergy | $142,000,000 |
| 6/3/14 | Alpha Synergy | LOW's personal account | $142,000,000 |

400.   As set forth in greater detail in Section T below, LOW used almost the full amount of funds he received from the Deutsche Bank loan proceeds to purchase a 300-foot luxury yacht.  The purchase of this luxury yacht was for LOW's own personal benefit rather than for the benefit of 1MDB, and it had no legitimate connection to the business of 1MDB, IPIC, or Aabar, or to the purpose of the $250 million loan.  LOW arranged to purchase the yacht well before 1MEHL entered into a loan agreement with Deutsche Bank.

2.   *Loan Proceeds Are Transferred to MALAYSIAN OFFICIAL 1 and LOO*

401.   Proceeds of the $250 million loan also ended up in the bank accounts of MALAYSIAN OFFICIAL 1 and LOO.

402.   On or about June 17, 2014, Aabar-BVI sent an additional $19,000,000 to the Affinity Equity Account.  These funds were directly traceable to the proceeds of the loan.  Travel records show that approximately one week earlier, LOW and Low Taek Szen ("Szen") flew to Abu Dhabi on June 7, 2014.  On June 8, 2014, LOW flew to London on his jet from Abu Dhabi.  Other passengers on the flight to London included HUSSEINY and Szen.

403.   On or about the following day, June 18, 2014, Affinity Equity sent $1,890,000 to a bank account held in the name of Blackrock Commodities (Global) Limited ("Blackrock Account").  Despite the similarity in names, Blackrock Commodities (Global) Limited ("Blackrock") had no affiliation with the global

114

investment management company BlackRock, Inc.  TAN was the stated beneficial owner of the Blackrock Account, although LOW also exercised de facto control over the use of funds in the account.

404.   That same day, Blackrock transferred $1,277,250 to an account at AmBank in Malaysia held in the name of AMPRIVATE BANKING-MY.  This is the same beneficiary as the beneficiary on the account that returned $620,000,000 in bond proceeds to the Tanore Account in August 2013, as set forth in Paragraph 345.  Upon information and belief, MALAYSIAN OFFICIAL 1 is the beneficial owner of this account.

405.   On or about July 1, 2014, Affinity Equity also sent $999,975 directly to LOO's River Dee Account at Falcon Bank in Switzerland.  The wire was processed through a correspondent account at JP Morgan in New York.  LOO represented to Falcon Bank that this incoming remittance was in connection with a joint venture that River Dee had just entered into with Affinity Equity for "joint investments."

### D. 1MDB BORRWED AN ADDITIONAL $975 MILLION FROM DEUTSCHE BANK FOR THE OSTENSIBLE PURPOSE OF REFINANCING THE $250 MILLION LOAN AND BUYING BACK THE AABAR OPTIONS, NOW WITH A LETTER OF SUPPORT FROM THE MALAYSIAN GOVERNMENT PROVIDED BY MALAYSIAN OFFICIAL #1

406.   In or around August 2014, 1MDB officials approached Deutsche Bank about the possibility of securing a second bridge loan to allow 1MEHL to refinance the first $250 million loan and to give them additional capital to buy back the Aabar options. The bridge loan was contemplated to provide short-term financing until 1MDB was able to complete the IPO of its power asset companies, which was projected to generate sufficient revenue to repay the loan.

407.   Upon information and belief, a major driving force behind 1MDB's interest in refinancing the earlier $250 million loan was its inability to secure Bank Negara

approval for the 1MDB loan guarantee, as required by the terms of the loan.  In a letter dated August 18, 2014, MALAYSIAN OFFICIAL 1 articulated the position that 1MDB's failure to secure Bank Negara approval for the earlier loan guarantee would be mooted if 1MEHL refinanced that loan through a new facility that contained no 1MDB guarantee.

408.   1MDB OFFICER 4 served as a primary point of contact between 1MDB and Deutsche Bank on this loan facility transaction; HUSSEINY communicated with Deutsche Bank about the loan on behalf of Aabar, where he served as CEO; and LOW was also involved in the process.  LOW, 1MDB OFFICER 4, and HUSSEINY all communicated a sense of urgency to Deutsche Bank employees about securing approval of the loan.

409.   For example, on or about August 22, 2014, 1MDB OFFICER 4 sent an email to the Deutsche Bank employees working on the proposed new loan facility, in which he indicated that "we are frustrated by DB's lack of sense of urgency/speed in this matter."  He added that "Aabar and MOF [Ministry of Finance] are especially anxious" about the timing of the loan approval.  1MDB OFFICER 4 further indicated that he had been "asked to convey [certain] points on behalf of [MALAYSIAN OFFICIAL 1]," including that approval of the $975 million facility was necessary to "ensure the successful completion of acquisition for Aabar's options in 1MDB Energy IPO by the end of August to which it is contractually bound."  1MDB OFFICER 4 copied LOO on the email and also copied HUSSEINY using his personal email address.  HUSSEINY responded to reiterate the "importance of both the IPO and the USD 975m bridge loan."  Travel records show that between August 15, 2014 and August 24, 2014, LOW and HUSSEINY were travelling together on LOW's jet to several cities including Los Angeles, Las Vegas and Kuala Lampur.

410.   Deutsche Bank extended a $975 million syndicated bridge loan to 1MEHL on or about September 1, 2014 (hereinafter, the "$975 million loan").  The facility agreement identified the following as permissible uses of the loan proceeds: (a)

"refinancing the Existing Facility," that is, the $250 million loan, (b) "financing the acquisition and cancellation of the call option granted by 1MDB energy Langat in favour of Aabar Investments PJS Limited . . . and the call option granted by 1MDB Energy Limited in favour of Aabar Investments PJS Limited . . . in accordance with the Aabar Termination Agreement," and (c) certain fees, costs, and other transactions associated with the facility agreement.

411.   1MDB warranted in the facility agreement that the Aabar Termination Agreement contained "all the terms of the acquisition, cancellation and termination of" the call options granted to Aabar, and that "there are no other agreements or arrangements between the Obligors or a member of the 1MDB Group and Aabar Investments PJS Limited in respect of the acquisition, cancellation and termination of such call options."   1MDB further warranted that "[f]ollowing payment of the sums specified in the Aabar Termination Agreement. . . no member of the 1MDB Group will have any liability or obligation . . . owing to Aabar Investments PJS Limited or any of its Affiliates" in respect to the termination of the Aabar options.  The "Aabar Termination Agreement" was to be "dated on or about the date of the first Utilisation" of loan proceeds.

412.   Deutsche Bank records reflect that at the time it approved the loan, Deutsche Bank compliance and risk officers understood that 1MDB Energy had already reached an agreement in principle with Aabar to buy back the options for a total consideration of $989 million, of which $175 million had already been paid.  This understanding was based on representations made by 1MDB OFFICERS 4 and 5, among others.

413.   On or about September 1, 2014, the same date that the loan facility was executed, HUSSEINY emailed a copy of the Aabar Termination Agreement to a Manager Director of Deutsche Bank's Singapore Branch, 1MDB OFFICER 4, and 1MDB's counsel at Wong & Partners.  The Termination Agreement took the form of a letter from HUSSEINY, on behalf of "Aabar Investments PJS Limited," to the Board of

Directors at 1MEHL, printed on Aabar letterhead.  The letter confirmed that "in consideration of the payment of US$223,333,000 received by us today, we shall terminate the Option Agreement and the Collaboration Agreement with immediate effect, and that the amount of US$590,667,000 remaining due to us as a result of such cancellation ("Amounts Owing") shall be considered as a debt due which is to be payable as early as possible once cashflow becomes available and in any event no later than by 31 March 2015."  The Termination Agreement made no mention of the prior $175 million payment to Aabar-BVI, although when that payment is added to the two payment amounts set forth in the letter, the sum is $989 million.

414.   HUSSEINY left the Termination Agreement undated.  In the cover email, he indicated that the document was "to be dated and released only upon payment being duly made, for your safekeeping in the interim."

415.   MALAYSIAN OFFICIAL 1, on behalf of the Government of Malaysia, provided a Letter of Support to Deutsche Bank in connection with the $975 million loan. That Letter of Support provided, among other things, that if 1MEHL and 1MDB were unable to pay amounts due under the loan facility, the Government of Malaysia would provide financial support to 1MEHL to ensure its ability to pay.  The Malaysian Government waived its sovereign immunity in connection with disputes arising out of the Letter of Support.

416.   Internal Deutsche Bank records reflect that 1MDB officials opted to provide a Letter of Support signed by MALAYSIAN OFFICIAL 1, rather than some form of guarantee by 1MDB (as with the prior $250 million loan), at least in part because a letter of support did not require Bank Negara or Cabinet approval.  At the request of 1MDB, all references to the Letter of Support were removed from the Facility Agreement.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### E.  THE $975 MILLION LOAN WAS APPROVED BASED ON A FRAUDULENT VALUATION OF THE BRAZEN SKY ACCOUNT

417.   As described below, Deutsche Bank approved the $975 million loan facility in reliance on false representations about the value of assets held in the Brazen Sky Account, which served as collateral for the loan.

418.   The $975 million loan was to be secured by a charge on the assets held in the Brazen Sky Account granted in favor of Deutsche Bank–Hong Kong.  In the September 1, 2014 facility agreement, 1MDB agreed that, in the absence of Deutsche Bank's consent, Brazen Sky would not "sell, lease, transfer or otherwise dispose of any asset . . . save for a redemption of any of Brazen Sky's investments for cash."

419.   The facility agreement also provided that if the loan remained outstanding six months after the first draw-down of proceeds, 1MDB was required to place and maintain a minimum cash balance in a separate account pledged to Deutsche Bank, to be funded by cash redeemed by Brazen Sky.  Based on the amounts that 1MEHL drew down on the loan, this minimum cash balance to be pledged as security amounted to roughly $1.17 billion.

420.   As explained in Section II.K above, Brazen Sky was a wholly-owned subsidiary of 1MDB that held certain illiquid fund units in a Cayman-registered vehicle called the Bridge Global Absolute Return Fund ("Global Bridge Fund").  1MDB acquired these fund units with the ostensible proceeds of its investment in the 1MDB-PetroSaudi Joint Venture.  Although 1MDB officials claimed that 1MDB had invested $1.83 billion in that Joint Venture, in fact more than $1 billion of that amount had been siphoned off by LOW and others.  To conceal this fact, the co-conspirators: (a) converted 1MDB's investment in the Joint Venture into an equity interest in a PetroSaudi subsidiary, PSOSL, whose primary assets were two drillships with contracts to drill in Venezuela; (b) converted that equity interest into opaque Bridge Global fund units backed by the PSOSL shares; and (c) caused that investment in fund units to be

fraudulently valued at $2.318 billion.  The truth about Brazen Sky's over-valued holdings was known to LOW, 1MDB OFFICER 4, and others.

421.   Deutsche Bank approved the $975 million loan, and the use of the Brazen Sky Account as collateral for the loan, in reliance on misrepresentations by 1MDB officials about the value of the assets in that account.  This included a representation that, as of June 15, 2014, the Brazen Sky Account held "available-for-sale" investments worth $2.3 billion.  Deutsche Bank also relied on representations that 1MDB intended to begin liquidating the Brazen Sky investments in September 2014 and that it intended to fully liquidate the securities by the end of the 2014 calendar year.  Had compliance and risk officers at Deutsche Bank known that the assets in the Brazen Sky Account were incorrectly and fraudulently valued, such that they would not produce significant cash even if they were capable of liquidation, they would not have approved the $975 million facility under the same terms.

## F.  A Majority of Proceeds of the $975 Million Loan Were Diverted to and Through the Aabar-Seychelles Account

422.   On or about September 2, 2014, 1MEHL drew down on the $975 million loan by submitting a utilization request to Deutsche Bank.  Among other things, 1MDB instructed Deutsche Bank to send $223,333,000 to an account at UBS AG in Singapore held in the name of Aabar Investments PJS Limited.  Although Aabar Investments PJS Limited is also the name on the Aabar-BVI Swiss Account, the banking information listed on the utilization request matched an account held in the name of an entity incorporated in the Seychelles ("Aabar-Seychelles Account") rather than the BVI.

423.   HUSSEINY opened the Aabar-Seychelles Account at UBS bank in Singapore on or about June 4, 2014.  HUSSEINY was the sole authorized signatory on the account.  On account opening documents, HUSSEINY represented that the funds in the account would be beneficially owned by the Government of Abu Dhabi.

424.   The Certificate of Incumbency for Aabar-Seychelles, a copy of which was submitted to UBS Bank, shows that the entity was incorporated on or about May 21,

2014.  HUSSEINY is listed as the entity's sole director and Aabar is listed as the sole shareholder.  It is possible, however, to register an entity in the Seychelles without providing evidence of the entity's true beneficial ownership and without providing evidence of the relationship between the entity and the shareholder listed in the incorporation records.

425.   Irrespective of any apparent nominal relationship between Aabar-Seychelles and Aabar reflected in incorporation records, Aabar-Seychelles was not in fact a subsidiary of Aabar or IPIC operating within the bounds of authority granted by Aabar or IPIC, and the funds transmitted from Deutsche Bank to the Aabar-Seychelles Account were not held in that account for the benefit of 1MDB, IPIC, or Aabar.  As noted in Paragraph 224 above, IPIC disclosed that Aabar-BVI was not an affiliate of IPIC or Aabar in its consolidated financial statements for the 2015 fiscal year.  It also disclosed that additional entities "incorporated in other offshore jurisdictions using variations of the 'Aabar' name" were "outside the group's corporate structure."

426.   In anticipation of receiving loan proceeds from 1MEHL, HUSSEINY emailed UBS bank in Singapore on or about September 1, 2014 from a personal account. In that email, HUSSEINY made material misrepresentations to the bank about the basis for the anticipated wire transfer in order to facilitate the bank's approval of the wire. HUSSEINY advised the bank that "[w]e expect to receive USD223,333,000 this week," and he represented that this transfer was being made pursuant to an agreement between Aabar-Seychelles and 1MEHL for the buyback of the Aabar options.  HUSSEINY provided UBS with a copy of the purported agreement, which was titled "Agreement Relating to Options Agreement," and was dated August 6, 2014.

427.   The agreement that HUSSEINY submitted to UBS on or about September 1, 2014 is materially inconsistent with the Termination Agreement that HUSSEINY submitted to Deutsche Bank on or about the very same day, as described in Paragraph 413 above.  Whereas HUSSEINY represented to Deutsche Bank in the Termination Agreement that Aabar would terminate the options in consideration of future payments

totaling approximately $814 million, HUSSEINY represented to UBS that 1MEHL had agreed to pay Aabar-Seychelles $2.45 billion to terminate the Aabar options. This purchase price of $2.4 billion was to be paid with a "non-refundable deposit" of $223,333,000 within 30 days of the date of the agreement, and the balance to be paid "in multiple tranches" by March 31, 2015. The version of the buyback agreement that HUSSEINY sent UBS contained no mention of any prior agreements or of 1MEHL's May 2014 transfer of $175 million to Aabar-BVI as partial payment to extinguish the Aabar options.

428. The UBS version of the buyback agreement was virtually identical in appearance and content to the April 28, 2014 agreement that was submitted to BSI in connection with the transfer of $175 million to Aabar-BVI in May 2014, as described in Paragraph 391. In the UBS version, however, the parties were identified as 1MEHL and "Aabar Investments PJS Limited, a company incorporated in the Seychelles." The consideration for the purchase was also increased from $989 million to $2.45 billion.

429. At 1MEHL's direction, Deutsche Bank wire transferred $223,333,000 to the Aabar-Seychelles account with a value date of September 2, 2014. The wire included the notation, "1MDB Drawdown Proceeds." The wire was processed through a correspondent account at UBS AG in Stamford, Connecticut. Bank statements for the Aabar-Seychelles Account at UBS Bank in Singapore record the transfer as originating from 1MEHL and having been received by Aabar-Seychelles on September 3, 2014. Prior to receipt of this wire transfer, the balance in the Aabar-Seychelles Account was less than $100,000.

430. At the time that Deutsche Bank transferred $223,333,000 to the Aabar-Seychelles account at 1MEHL's request, Deutsche Bank believed that it was transferring loan proceeds to a legitimate affiliate of IPIC in connection with 1MEHL's buyback of the Aabar options. By portraying "Aabar Investments PJS Limited" as an entity interchangeable with Aabar, HUSSEINY and 1MDB OFFICER 4, among others, made

material misrepresentations and omission to Deutsche Bank officials related to the purpose of the loan and the destination of the loan proceeds.

431.   On or about September 4, 2014, Aabar-Seychelles sent $103,333,000 of the $223,333,000 that it had received from Deutsche Bank to the Affinity Equity Account, of which TAN was the recorded beneficial owner.  That wire transfer was processed through a correspondent bank account at UBS AG in Stamford, Connecticut.  The wire instruction, signed by HUSSEINY, was dated September 1, 2014, before 1MEHL drew down on the Deutsche Bank loan and directed payment be made to the Aabar-Seychelles Account.

432.   The funds diverted to the Affinity Equity Account were thereafter distributed to accounts and entities affiliated with the co-conspirators and were used, among other things, to purchase millions of dollars in jewelry and luxury watches. Approximately $11 million was sent to LOW's Alpha Synergy Account, approximately $4 million was sent to TAN's personal bank account at BSI, and approximately $15 million was sent to an account affiliated with QUBAISI.

433.   1MEHL drew down an additional $457,984,607 on the $975 million loan on or about September 29, 2014, again instructing Deutsche Bank to send the funds to the Aabar-Seychelles Account.  In execution of that request, Deutsche Bank wired $457,984,607 to the Aabar-Seychelles Account the following day.  Deutsche Bank again did so in reliance on its understanding that it was sending the loan proceeds to a legitimate affiliate of Aabar.  1MEHL is listed as the ordering customer on wire records, and bank records for the Aabar-Seychelles Account identify 1MEHL as the sender of the funds.  The wire was processed through a correspondent account at UBS AG in Stamford, Connecticut.  Travel records show that between September 26, 2014 and September 30, 2014, LOW and LOO were travelling together in the United States and Europe on LOW's jet.

434.   In total, approximately $681 million in proceeds from the $975 million Deutsche Bank loan were diverted to the Aabar-Seychelles Account.

435.   All told, 1MDB paid entities that were nominally – through not actually – affiliated with Aabar more than $2.2 billion in connection with IPIC's guarantee of $3.5 billion in bond notes in 2012.  This includes the approximately $1.367 billion that 1MDB paid Aabar in 2012, purportedly as a flat payment for the guarantee in connection with the Contribution Agreement described in Paragraphs 208 and 212; and approximately $856 million 1MDB paid Aabar in 2014 purportedly pursuant to various conflicting agreements to extinguish the options that IPIC was given in consideration of the guarantees.

### G. Proceeds of the $975 Million Loan Were Cycled Through Various Accounts to Create the False Appearance that 1MDB "Redeemed" Fund Units Held by Brazen Sky

436.   As explained below, over the course of a three month period in late 2014, the loan proceeds diverted to the Aabar-Seychelles Account were used in service of an elaborate ruse designed to create the impression that Brazen Sky had redeemed a portion of its (illiquid) investments in the Bridge Global Fund for roughly $1.5 billion in cash.

437.   As previously noted, 1MDB officials had represented to Deutsche Bank that Brazen Sky intended to liquidate the entirety of its investment holdings beginning in September 2014 and concluding in December 2014.  1MDB officials had made similar representations to the 1MDB Board of Directors, which authorized the liquidation in or around the summer of 2014.  These representations created a difficulty for 1MDB officials:  even if these investments could be readily liquidated (which is doubtful, since they were backed by drillships rather than cash), it would have been impossible to do so without exposing the fact that the fund units were worth considerably less than $2.4 billion.

438.   To prevent 1MDB's auditors and others from learning that the fund units had been fraudulently over-valued, the co-conspirators used the proceeds of the $975 million loan to mimic the kind of fund flows that one would expect to see if Brazen Sky had been liquidating investments in the Bridge Global Fund.  Toward this end, funds

were passed from the Aabar-Seychelles Account through a series of other accounts – including the Bridge Global Fund and Brazen Sky accounts – to create the appearance that Brazen Sky was receiving cash redemptions from Bridge Global in exchange for the sale of fund units.  In fact, however, Brazen Sky was receiving money that 1MEHL had borrowed from Deutsche Bank – and indeed, as described in further detail below, Brazen Sky was receiving the same pool of loan proceeds over and over again to mimic multiple "redemptions" from the Bridge Global Fund.

### 1.    Loan Proceeds Are Sent Indirectly to Brazen Sky

439.   This subterfuge started on or about September 5, 2014, two days after Aabar-Seychelles received approximately $223 million in 1MEHL loan proceeds from Deutsche Bank.  On that day, Aabar-Seychelles transferred approximately $111 million to a bank account at Amicorp Bank & Trust ("Amicorp") in Barbados held in the name of Lambasa Global Opportunity Fund ("Lambasa Account").  Lambasa Global Opportunity Fund ("Lambasa") is a fiduciary or investment fund, similar to Enterprise and Cistenique, that functioned as a pass-through entity in these transactions.

440.   Almost immediately thereafter, Lambasa transferred approximately $110 million to a bank account held at Amicorp in the name of the Bridge Global Fund ("Bridge Global Account").  As previously noted, the Bridge Global Fund was the Cayman-registered vehicle through which Brazen Sky had invested its interest in the PetroSaudi subsidiary PSOSL.

441.   On or about September 11, 2014, Bridge Global transferred the approximately $110 million that it received from Lambasa to the Brazen Sky Account at BSI Bank in Singapore.  In bank records, BSI Bank identified this transfer as a "redemption" of fund units, though the money entering the Brazen Sky Account actually originated from Deutsche Bank.

442.   On or about September 12, 2014, Brazen Sky sent approximately $94 million of the $110 million it had received the previous day to the 1MDB Global (or "1GIL") Account at BSI Bank in Lugano.

443.   The purpose of this unnecessarily complicated funds flow was to create the appearance that fund units in the Brazen Sky Account were being redeemed for cash and being paid forward to 1MDB, thereby fraudulently disguising the fact that the fund units were illiquid and relatively worthless.

> ### 2.   Loan Proceeds Are Cycled Through the Brazen Sky Account and then Returned to Aabar-Seychelles

444.   The pattern of fund flows described above was largely repeated with the second tranche of loan proceeds that was sent to Aabar-Seychelles at the end of September 2014.  This time, however, the fund flows exhibited one notable difference. As explained below, the majority of the funds that transited through the Brazen Sky Account were returned to Aabar-Seychelles rather than being retained by 1MDB.  This allowed the funds to be recycled again and again through the same circle of entities, thereby creating the appearance of multiple "redemptions" using the same pool of money.

445.   As noted above, on or about September 29, 2014, the Aabar-Seychelles Account received a second tranche of loan proceeds from Deutsche Bank, this time in the amount of approximately $458 million.  Beginning on or about three days later, Aabar-Seychelles sent approximately $378 million to the Lamabasa Account, to be cycled through roughly the same series of accounts, before being returned to Aabar-Seychelles.  More specifically, the following transfers occurred in close succession: (a) approximately $378 million was transferred from the Aabar-Seychelles Account to the Lambasa Account on or about October 1, 2014; (b) approximately $375 million was transferred from the Lambasa Account to the Bridge Global Account on or about October 2, 2014; (c) approximately $375 million was transferred from the Bridge Global Account to the Brazen Sky Account on or about October 7, 2014; (d) approximately $375 million was transferred from the Brazen Sky Account to the 1MDB Global Account on or about October 7, 2014; and (e) approximately $356 million was

transferred from the 1MDB Global Account back to the Aabar-Seychelles Account on or about October 8, 2014.

446.   This circular flow of funds is depicted below:

**Chart 1:  Circular Flow of Funds Through Brazen Sky ("Cycle 2")**



447.   This circular flow of funds created the appearance that Brazen Sky "redeemed" $375 million in fund units from Bridge Global.  And by returning approximately $356 million back to the Aabar-Seychelles Account – the account from which those funds originated roughly one week prior – the co-conspirators ensured the continued availability of funds to be sent through another cycle of transfers to mimic more fund unit "redemptions."

448.   This pattern of cycling the loan proceeds through various accounts to mimic Bridge Global "redemptions" repeated itself again when Aabar-Seychelles injected approximately $388 million back into the cycle on or about October 8, 2014. Throughout October and November, funds were passed in close succession through the same circle of funds described above, with the minor variation that an account belonging to the Universal Ventures Fund was used in place of the Lambasa Account as the initial

pass-through account.  During each trip through the cycle of accounts, the various entities involved skimmed small amounts off the principle and passed the remainder forward.  This cycling process was repeated five additional times ("Cycles 3-7") until enough funds had passed through the Brazen Sky Account to allow 1MDB to claim that Brazen Sky had "redeemed" roughly $1.5 billion in cash from its investments in Bridge Global.

449.   By the end of November 2014, proceeds from the first tranche of the $975 million loan had passed through the Brazen Sky Account once, and proceeds of the second tranche of the loan had passed through the Brazen Sky Account six times. The table below sets forth the dates (in 2014) and the amounts of the various fund flows comprising these seven cycles of loan proceeds through the Brazen Sky Account. Transfers A through E correspond to the lettered transfers depicted in Chart 1 above; Transfer C was intended to mimic Brazen Sky's redemption of fund units from Bridge Global for cash.

/ / /

/ / /

/ / /

**Table 12: Deutsche Bank Loan Proceeds Laundered Through Brazen Sky Account**

| Cycle No. | Transfer A Aabar-SY – Fid. Fund | Transfer B Fid. Fund – Bridge | Transfer C Bridge – Brazen Sky | Transfer D Brazen Sky – 1GIL | Transfer E 1GIL – Aabar-SY |
|---|---|---|---|---|---|
| 1 | Sept-5 $111M | Sept-5 $110M | Sept-11 $110M | Sept-12 $94M | *** |
| 2 | Oct-1 $378M | Oct-1 $375M | Oct-7 $375M | Oct-7 $375M | Oct-8 $356M |
| 3 | Oct-8 $388M | Oct-8 $385M | Oct-14 $385M | Oct-14 $340M | Oct-15 $340M |
| 4 | Oct-16 $257M | Oct-16 $256M | Oct-23 $256M | Oct-23 $256M | Oct-24 $256M |
| 5 | Oct-24 $227M | Oct-24 $225M | Oct-30 $225M | Nov-4 $222M | Nov-5 $222M |
| 6 | Nov-6 $126M | Nov-7 $125M | Nov-14 $125M | Nov-14 $125M | Nov-17 $69M |
| 7 | Nov-17 $49M | Nov-17 $49M | Nov-24 $49M | *** | *** |

450. The last supposed "redemption," in the amount of approximately $49 million, was received by Brazen Sky on or about November 24, 2014. Two days later, Brazen Sky sent approximately $43 million of this amount to 1MDB's bank account at AmBank in Malaysia, and the cycling of funds ceased.

451. In a press release dated October 10, 2015, 1MDB indicated that it had "redeemed" a sizeable portion of Brazen Sky's investments in fund units in the fall of 2014, generating approximately $1.5 billion "in cash" (including a $130 million cash dividend). The press release also represented that Brazen Sky still maintained investments in the Bridge Global Fund worth $940 million.

452.    As detailed above, however, bank records from the above-named accounts show that the roughly $1.5 billion that Brazen Sky received from Bridge Global in the fall of 2014 originated from funds that 1MEHL borrowed from Deutsche Bank under the guise of paying Aabar to terminate the options agreements.  Bank records for the above-named accounts also show that 1MDB returned approximately $1.24 billion of this $1.5 billion to Aabar-Seychelles during this same time period.

453.    Upon information and belief, the plan to use Deutsche Bank loan proceeds in service of this elaborate ruse was concocted before the execution of the September 2014 facility agreement.  The execution of the various SWIFT instructions and other transfer directions, as well as the preparation of the documentation necessary to effectuate this elaborate chain of circular transfers, could not have been completed without advance planning.  Moreover, there would have been no need for HUSSEINY to provide UBS with a fraudulent buyback agreement that pegged the consideration for the Aabar options at $2.4 billion rather than $989 million, unless he knew and intended at the time he submitted the agreement (on or about September 1, 2014) that Aabar-Seychelles would imminently receive payments from 1MDB entities totaling more than $1 billion.

## H. 1MDB OFFICER 4 ENGAGED IN FURTHER FRAUDULENT CONDUCT TO CONCEAL THE MOVEMENT OF FUNDS OUT OF THE BRAZEN SKY ACCOUNT

454.    The elaborate movement of loan proceeds described above appears to have at least temporarily had the desired effect, namely, convincing auditors and other third parties that Brazen Sky's investments were indeed worth billions of dollars.  The movement of funds in a circular fashion created its own difficulty, however, with respect to 1MDB's loan facility agreement with Deutsche Bank.  In that agreement, 1MDB had agreed not to transfer funds from the Brazen Sky Account without Deutsche Bank's approval.  And yet, in order to create the appearance of "redemptions" totaling $1.5 billion using less than $700 million in available cash, the co-conspirators needed to

withdraw funds from the Brazen Sky Account so they could be recycled through the same series of accounts again.

455.    1MDB OFFICER 4 was extremely secretive about the Brazen Sky Account during and after the period that the co-conspirators were funneling money into and out of that account.  In an email to Deutsche Bank employees, he indicated that he had been "forbidden to provide soft copies of bank documents related to Brazen [Sky] apart from hard copy."  And in response to a request from a Deutsche Bank employee for quarterly financials, 1MDB OFFICER 4 represented that 1MDB had suffered a "server breakdown and all files were lost."

456.    To prevent Deutsche Bank from learning that cash had been removed from the Brazen Sky Account in contravention of the terms of the facility agreement, 1MDB OFFICER 4 submitted additional fraudulent documentation to Deutsche Bank officials. On or about December 31, 2014, 1MDB OFFICER 4 faxed Deutsche Bank a copy of what purported to be a bank statement for the Brazen Sky Account.  The statement purported to show that, as of November 30, 2014, the Brazen Sky Account held $1.35 billion in cash, in addition to $1.11 billion in securities still invested in the Bridge Global Fund.  Similarly, 1MDB faxed Deutsche Bank another bank statement the following month, purporting to show that the Brazen Sky Account held assets worth approximately $2.46 billion, including more than $1.86 billion in cash accounts.

457.    These purported bank statements not only over-valued the securities that Brazen Sky still held in Bridge Global but also fraudulently inflated the available cash in the Brazen Sky Account.  Upon information and belief, the bank statements were altered in this fashion to conceal from Deutsche Bank the fact that almost all of the cash in the Brazen Sky Account – which originated from the proceeds of the $975 million loan, as described above – had been transferred to the 1MDB Global Account, of which $1.24 billion had been returned to the Aabar-Seychelles Account.

458.    As described below, 1MDB OFFICER 4 also submitted a doctored version of 1MDB's financial statement to Deutsche Bank that conformed to the false story that

131

Brazen Sky retained the supposedly "redeemed" cash in its account, when in fact, as described above, Brazen Sky sent the cash to 1MDB Global and ultimately to Aabar-Seychelles.

459.   Under the terms of the facility agreement, 1MDB and Brazen Sky were required to make their financial statement available to Deutsche Bank.  After being delayed, 1MDB's financial statements for the fiscal year ending March 31, 2014 were signed off by Deloitte on November 5, 2014.  1MDB OFFICER 4 provided Deutsche Bank with a copy of the audited financial statements in early November 2014.

460.   In early 2015, after consultation with Deloitte, Deutsche Bank discovered that there was a material discrepancy between the financial statements it had been provided and the version of the financial statements that 1MDB had publicly filed with Suruhanjaya Syarikat Malaysia ("SSM"), the Malaysian Companies Commission.  This discrepancy related to how 1MDB disposed of the cash that Brazen Sky supposedly received from its "redemption" of securities.

461.   Both versions of the financial statements – the one provided to Deutsche Bank and the publicly-filed version – indicated (falsely) that 1MDB had received $1.22 billion from the redemption of investments held by Brazen Sky as of November 5, 2014, the date of the report.  (This amount is lower than the approximately $1.5 billion described above, because it does not include the final two supposed redemptions that took place after November 5, 2014).

462.   The version of the financial statements that 1MDB OFFICER 4 provided to Deutsche Bank indicated that this "redeemed" cash had been "substantially **set-aside** for the purposes of debt interest payment, working capital purposes and payments to Aabar as refundable deposits pursuant to a Settlement Agreement to extinguish the Options Agreements."  This disclosure was consistent with the notion that Brazen Sky had retained the cash it had "redeemed" from the Bridge Global Fund rather than sending it forward to 1MDB Global and Aabar-Seychelles.  It was also consistent with the

fraudulent bank statements for the Brazen Sky Account that 1MDB OFFICER 4 had provided Deutsche Bank for the months of November and December.

463.   In contrast, 1MDB's publicly-filed financial statements indicated that the cash supposedly received from liquidation of fund units had been "substantially **utilised** for the purposes of debt interest payment, working capital and payments to Aabar as refundable deposits pursuant to a Settlement Agreement to extinguish the Options Agreements."  This statement suggested that the cash in the Brazen Sky Account had been spent or otherwise dissipated, as in fact was the case, notwithstanding Deutsche Bank's right to a charge on the account.

464.   This discrepancy was never fully resolved because 1MDB defaulted on the $975 million loan with Deutsche Bank.  This default occurred because 1MDB failed to perfect a security charge on the Brazen Sky Account and failed to transfer the minimum cash balance of $1.17 billion from the Brazen Sky Account to a separate account pledged to Deutsche Bank.

## VI.  THE SUBJECT ASSETS WERE INVOLVED IN AND/OR TRACEABLE TO THE PROCEEDS OF THE FOREGOING CRIMINAL CONDUCT

465.   As set forth below, numerous assets, including the DEFENDANT ASSETS, represent property derived from proceeds traceable to the foregoing criminal conduct, as well as property involved in money laundering in violation of 18 U.S.C. §§ 1956 and 1957.

### A.  LOW PURCHASED THE L'ERMITAGE PROPERTY USING 1MDB FUNDS FROM GOOD STAR MOVED THROUGH THE SHEARMAN IOLA ACCOUNT

466.   Funds traceable to the $700 million wire transfer from 1MDB to the Good Star Account were used to acquire the L'ERMITAGE PROPERTY, a luxury hotel in Beverly Hills, California, in 2010.

467.   On January 15, 2010, just months after the $700 million wire transfer from 1MDB to the Good Star Account, a signed grant deed was filed with the Los Angeles

Recorder's Office ("LA Recorder's Office") transferring ownership of L'ERMITAGE PROPERTY to Wynton Real Estate (Beverly Hills) LLC ("Wynton").  Shearman represented Wynton in the transaction.  The purchase and sale agreement stated that in addition to the hotel and a fee simple ownership in the land, Wynton acquired L'ERMITAGE's business assets, including but not limited to (i) all right, title and interest in and to all transferable consents, authorizations, variances, waivers, licenses, permits and approvals from any governmental or quasi-governmental agency, and (ii) all right, title and interest and to all names related solely to the ownership and operation of L'ERMITAGE and all related goodwill and domain names ("L'ERMITAGE BUSINESS ASSETS").

468.   The final settlement statement for the purchase of the L'ERMITAGE PROPETY shows that Wynton purchased the L'ERMITAGE PROPERTY for $44,800,000.

469.   The website of the L'ERMITAGE PROPERTY states that the L'ERMITAGE PROPERTY is managed by the Viceroy Hotel Group.

470.   Real estate closing documents show that Chicago Title Insurance Company ("Chicago Title") was the escrow agent used for the purchase of the L'ERMITAGE PROPERTY.  Szen, LOW's brother, signed the transaction documents on behalf of Wynton.

471.   According to a document entitled "LOW FAMILY HISTORY AND BACKGROUND, ORIGINS OF JYNWEL CAPITAL," which was distributed to various companies by LOW and his brother, LOW was a member of the Viceroy Group's Board and had participated in several major transactions, including "[t]he acquisition of a 50% stake in [Viceroy]."

472.   Likewise, an April 7, 2015, email LOW sent to a Las Vegas casino included an attachment stating:

[LOW is] proud to be involved in . . . L'Ermitage Beverly Hills and Viceroy Hotel Group, . . . which have appreciated in value under Mr. Low's stewardship . . . .

In another attachment to this same email, LOW confirmed that Jynwel Capital, a company of which he served as the chief executive officer, owned 100 percent of the L'ERMITAGE PROPERTY.  Jynwel Capital, according to this document, manages the assets and funds of LOW's family and "is not licensed to, and does not manage third party funds.

473.   The settlement statement for the sale of the L'ERMITAGE PROPERTY as well as Shearman IOLA Account records show that, on or about December 21, 2009, a $10,000,000 deposit was made for the purchase of the L'ERMITAGE PROPERTY and that the amount due from the seller at closing, on or about January 15, 2010, was $36,700,000.

474.   J.P. Morgan correspondent bank records and Shearman IOLA Account records show that the Shearman IOLA Account was used to purchase the L'ERMITAGE PROPERTY.  Below is a summary of the credits into and debits from the Shearman IOLA Account related to the purchase of the L'ERMITAGE PROPERTY:

**Table 11:  Transfers Through the Shearman IOLA Account Related to the the L'ERMITAGE PROPERTY**

| Date | Credits into Shearman IOLA Account | | Debits from Shearman IOLA Account | |
|---|---|---|---|---|
| | From | Amount | Amount | To |
| 10/21/09 | Good Star Account | $148,000,000 | | |
| 12/21/09 | | | $10,000,000 | Chicago Title Escrow Account |

| Date | Credits into Shearman IOLA Account | | Debits from Shearman IOLA Account | |
|------|------|--------|--------|------|
| | From | Amount | Amount | To |
| 1/14/10 | | | $36,700,000 | Chicago Title Escrow Account |

475.   Shearman internal records show that Shearman segregated its funds into different internal account numbers and client and matter numbers.  Internal Shearman records show that each of the transactions set forth above were linked to internal Shearman accounts held for client 36853 (The Wynton Group) and matter 4 (Park Laurel).

476.   On January 14, 2010, $36,700,000, representing the balance of the purchase price for the L'ERMITAGE PROPERTY, was wired from the Shearman IOLA Account to an account at Bank of America maintained by Chicago Title.

477.   J.P. Morgan correspondent bank records and Shearman IOLA Account records show that on or about January 20, 2010, approximately $117 million was wired from the Good Star Account to the Shearman IOLA Account.  The notations on the wire transfer state in part: "C. STAKE V.H. (USD 15M) D. VICEROY ST. M.H(USD 10M)."  On or about March 3, 2010, $35,059,875 in additional funds was wired from the Good Star Account to the Shearman IOLA Account.  The notations on the wire transfer state in part:  "INC VICEROY HOTEL GR (USD 7M)."

478.   Delaware Secretary of State records show that Wynton changed its name to LBH Real Estate (Beverly Hills) LLC on November 4, 2013.  In a document filed with the State of California in connection with this name change, Li Lin Seet signed as the LBH Real Estate (Beverly Hills) LLC's manager.  As noted above, Li Lin Seet was an associate of LOW and an employee of LOW's company Jynwel Capital.

479.   On or about March 27, 2015, a grant deed transferring ownership of the L'ERMITAGE PROPERTY from Wynton to LBH Real Estate (Beverly Hills) LLC was signed.  This grant deed was filed with the LA Recorder's Office, on or about June 26, 2015.  Title to the L'ERMITAGE PROPERTY remains in the name of LBH Real Estate (Beverly Hills) LLC.

**B.    HILLCREST PROPERTY 1 WAS PURCHASED USING 1MDB FUNDS MOVED THROUGH SHEARMAN IOLA ACCOUNT, AND AZIZ THEREAFTER PURPORTEDLY PURCHASED THE PROPERTY FROM LOW WITH 1MDB FUNDS PASSED THROUGH THE AABAR-BVI ACCOUNT**

480.   As set forth below, funds traceable to the $700 million wire transfer from 1MDB to the Good Star Account were used in 2010 to purchase HILLCREST PROPERTY 1 in Beverly Hills, California, and funds traceable to the Aabar-BVI Phase bond sales were thereafter used to transfer the property from one legal entity to another legal entity controlled by AZIZ.

481.   A grant deed transferring ownership of HILLCREST PROPERTY 1 was signed on May 17, 2010, and filed with the LA Recorder's Office on September 30, 2010.  Real estate closing documents show that HILLCREST PROPERTY 1 was purchased by 912 North Hillcrest (BH) LLC for $17,500,000.

482.   The original contract purchasers of HILLCREST PROPERTY 1 were RGA Group, for whom the authorized signer was AZIZ, and 912 North Hillcrest Road (BH) LLC, for whom the authorized signer was an attorney with Shearman.  The amended escrow instructions state that RGA Group assigned all of its rights under the purchase contract for HILLCREST PROPERTY 1 to 912 North Hillcrest Road (BH) LLC.

483.   On or about July 27, 2010, a California realtor ("California Realtor") sent an email to AZIZ's Gmail account with the subject line "Hilcrest – Important!"  The email read in relevant part:

137

Hi Riza – We have received calls from the Seller's lawyer questioning our ability to close on schedule. . . Per escrow, we need the remaining $16,985,342.48 in escrow by Friday . . . and the name of the LLC you will be taking title under.

484.   On or about July 28, 2010, AZIZ responded to the California Realtor by email:  "Spoke to Jho and he will follow-up with you with respect to all that is necessary. Sincerely, Riza."

485.   On or about July 28, 2010, the California Realtor's executive assistant, sent an email to LOW, copying AZIZ.  The email read in relevant part:

Good morning Jho -- . . . escrow received and released to the buyer Riza's original deposit of $525,000.  Riza said he sent another $525,000 on Friday to replace the original deposit . . . In addition, escrow still needs to know the name of the LLC Riza wants to take title under – this is extremely urgent as escrow need [sic] to prepare the Grant Deed.

486.   LOW responded to that email on or about July 28, 2010.  His email read in relevant part: "Can u set-up a conf call, so we can all call in jointly with our lawyers from shearman so we can get up to speed and figure out a solution asap?"

487.   The final buyer's statement for the sale of HILLCREST PROPERTY 1 shows that three deposits in the amount of $525,000 were made for the purchase of HILLCREST PROPERTY 1 and that the total balance due to escrow at closing was $15,917,189.63.

488.   The second and third deposits of $525,000 were made to the HILLCREST PROPERTY 1 escrow account from the Shearman IOLA Account on or about July 28, 2010, and September 2, 2010.  In addition, the remaining balance of $15,917,189.63 was paid to the HILLCREST escrow account from the Shearman IOLA Account on or about September 28, 2010.

489.   Below is a summary of the credits into and debits from the Shearman IOLA Account related to the purchase of HILLCREST PROPERTY 1 ("HILLCREST ESCROW"):

**Table 12:  Transfers Through Shearman IOLA Account Related to HILLCREST PROPERTY 1**

| Date | Approximate Amount of Wire Transfers into Shearman IOLA Account | | Debits from Shearman IOLA Account | |
|---|---|---|---|---|
| | From | Amount | Amount | To |
| 6/23/2010 | Good Star Account | $8,600,000 | | |
| 7/28/2010 | | | $525,000 | HILLCREST Escrow Account |
| 8/17/2010 | Good Star Account | $2,800,000 | | |
| 8/31/2010 | Good Star Account | $654,000 | | |
| 9/2/2010 | | | $525,000 | HILLCREST Escrow Account |
| 9/3/2010 | Good Star Account | $8,646,000 | | |
| 9/28/2010 | Good Star Account | $17,999,985 | | |
| 9/28/2010 | | | $15,917,190 | HILLCREST Escrow Account |

490.   The notation on the $654,000 wire from the Good Star Account was "ACQUISITION OF ASSETS/PROPERTY PAYMENT FO REXTENSION."  The notation on the September 3, 2010, wire of $8,646,000 from Good Star to the Shearman IOLA Account was "ACQUISITION OF ASSETS/PROPERTY PARTBALANCE

PAYMENT."  The notation on the September 28, 2010 wire of $17,999,985 from Good Star to the Shearman IOLA Account was "ACQUISITION OF ASSETS /PROPERTY (FULL BALANCE PAYMENT + RENOVATION)."

491.   912 North Hillcrest Road (BH) LLC, which was the entity used to take title to HILLCREST PROPERTY 1, was owned by Great Delight Limited ("Great Delight"), an entity incorporated in the Seychelles.  On or about July 10, 2012, Great Delight sold its interest in "912 North Hillcrest Road (BH) LLC" to Kreger Trading Inc. ("Kreger Trading") for approximately $12,000,000.  AZIZ signed a purchase and sale agreement on behalf of Kreger Trading in connection with this transaction.  Li Lin Seet, an associate of LOW, signed on behalf of Great Delight.

492.   AZIZ declared himself to be the owner of Kreger Trading in his 2012 U.S. tax return, a copy of which was obtained from AZIZ's accounting firm.

493.   AZIZ used funds that had been moved through the Aabar-BVI account to acquire the entity 912 North Hillcrest Road (BH) LLC, and thereby to acquire the property at HILLCREST PROPERTY 1.

494.   As noted above in paragraph 268, records from Citibank and Red Granite Pictures show that on or about June 20, 2012, $58,500,000 was wire transferred from the Red Granite Capital Account to the Shearman IOLA Account in the United States that held funds on behalf of AZIZ.  On or about July 10, 2012, approximately $12,000,000 was transferred from the same IOLA Account to an attorney trust account held by Sullivan & Cromwell LLP ("Sullivan & Cromwell") for the purchase of the entity 912 North Hillcrest Road (BH).  Sullivan & Cromwell served as counsel to Great Delight in connection with the transfer of ownership over 912 North Hillcrest Road (BH) LLC. Internal Shearman records show that each of these transactions set forth above were linked to internal Shearman accounts held for client 37965 (Riza Aziz).

495.   On or about August 13, 2012, Sullivan & Cromwell wire transferred $10,786,706 to a bank account at BSI Bank in Singapore held by ADKMIC, with payment details that contained reference to "GREAT DELIGHT LTD."  As noted above,

ADKMIC is an entity owned by LOW.  On or about the same day, $10,500,000 was transferred from the ADKMIC BSI Account to LOW's personal account at BSI Bank in Singapore, indicating that it was "PAYMENT TO SHAREHOLDER LTJ."  This transfer of funds represented a payment from AZIZ to LOW for the purported sale of HILLCREST PROPERTY 1, through the transfer of ownership over 912 North Hillcrest Road (BH) LLC.

496.   The transfer of HILLCREST PROPERTY 1 was effectuated in 2012 through the sale of a holding company (*i.e.*, 912 North Hillcrest Road (BH) LLC) rather than the direct sale of the property itself as a means to obscure the ownership, source, and control of the assets.

## C.  LOW PURCHASED THE PARK LAUREL CONDOMINIUM USING 1MDB FUNDS MOVED THROUGH A SHEARMAN IOLA ACCOUNT

497.   Funds traceable to the $700 million wire transfer from 1MDB to the Good Star Account were used in 2010 to acquire the PARK LAUREL CONDOMINIUM in New York, New York.  The purchase contract for the Park Laurel Condominium listed the ultimate purchaser as Park Laurel (NYC) Ltd., a BVI corporation,[14] the final date of sale as February 5, 2010, and the final sales price as $23,980,000.  Thereafter, in 2012, an entity controlled by AZIZ acquired the PARK LAUREL CONDOMINIUM from Park Laurel (NYC) Ltd. for approximately $35,500,000 by using funds traceable to proceeds of the 2012 bond sales that were misappropriated through the Aabar-BVI Swiss Account.

498.   A real property transfer report filed with the New York City Department of Finance Office of the City Register ("NYC Register's Office") states that a contract for the sale of the PARK LAUREL CONDOMINIUM was signed on or about October 27,

---

[14] The original contract purchaser of the PARK LAUREL CONDOMINIUM was Assured Alliance Investment Corporation, which, on December 4, 2009, assigned its rights under the contract to Ivory Industrial Investments Ltd., which was identified in Park Laurel (NYC) Ltd. documents as the predecessor name for Park Laurel (NYC) Ltd.

2009 – less than 30 days after the $700 million wire transfer from 1MDB to the Good Star Account. The transfer report is signed by an individual affiliated with Ivory Industrial Investments Ltd. on behalf of the buyer, Park Laurel (NYC) Ltd. The buyer's attorney is identified as the same attorney from Shearman who handled the purchase of HILLCREST PROPERTY 1. The buyer's real estate agent represented that LOW was the purchaser.

499.    LOW purchased the PARK LAUREL CONDOMINIUM using funds traceable to the $700 million wire transfer from 1MDB to Good Star. J.P. Morgan correspondent bank records and Shearman IOLA Account records show that on or about October 21, 2009, $148,000,000 was wired from the Good Star Account to a Shearman IOLA Account. On or about February 5, 2010 – the same day as the final sale date listed in the property transfer records – four bank checks totaling $22,179,049.82 were written on the Shearman IOLA Account for the purchase of the PARK LAUREL CONDOMINIUM. Records related to the Shearman IOLA Account included the notation "Funds From Park Laurel Escrow" with regards to these four checks. Internal Shearman records show that each of these transactions were linked to internal Shearman accounts held for client 36853 (The Wynton Group) and matter number 4 (Park Laurel). The final settlement statement for this purchase demonstrates that checks totaling $21,626,661.58 were used in the purchase of the PARK LAUREL CONDOMINIUM.

500.    On or about July 6, 2012, a contract for the sale of the PARK LAUREL CONDOMINIUM was executed between Park Laurel (NYC) Ltd. as the seller, and Park Laurel Acquisition LLC, as the buyer. Shearman represented the buyer, Park Laurel Acquisition LLC, and Sullivan & Cromwell represented the seller, Park Laurel (NYC) Ltd., in connection with this transaction. The sales contract was signed by AZIZ on behalf of the buyer, Park Laurel Acquisition LLC.

501.    In a letter dated September 28, 2012, AZIZ requested that the Condominium Board for the PARK LAUREL CONDOMINIUM waive its first right of refusal to the transfer of title from Park Laurel (NYC) Ltd. to Park Laurel Acquisition

LLC. In that letter, AZIZ represented that he was the sole director of an entity called Sorcem Investments Inc. ("Sorcem") and that Sorcem was the sole member of Park Laurel Acquisition LLC. AZIZ also represented that upon transfer of title, "the Unit shall be occupied by Riza Aziz . . . as if Riza was the individual owner of the Unit."

502. AZIZ claimed ownership of Sorcem in his 2012 U.S. tax return. In those returns, Sorcem is listed as having the same Los Angeles address that is listed as AZIZ's address.

503. Title to the PARK LAUREL CONDOMINIUM was transferred from Park Laurel (NYC) Ltd. to Park Laurel Acquisition LLC for a purchase price of $33,500,000, by deed recorded on or about November 28, 2012. AZIZ signed the relevant transactional documents on behalf of Park Laurel Acquisition LLC.

504. On or about November 16, 2012, $33,800,000 was transferred from AZIZ's Red Granite Capital Account at BSI Bank in Singapore to the Shearman IOLA Account in the United States. Thereafter, $34,406,188 was wired from the Shearman IOLA Account to a Sullivan & Cromwell attorney trust account at Citibank on or about November 19, 2012, the date of the closing for the purchase of the PARK LAUREL CONDOMONIUM. That same day, $1,049,126 was wired from the Shearman IOLA Account to Chicago Title Insurance Company for closing costs. According to the contract of sale, Chicago Title Insurance Company was the escrow agent for the PARK LAUREL CONDOMINIUM sale. Shearman records indicate that the client on whose behalf the funds were transferred into and out of the Shearman IOLA Account was AZIZ.

505. Citibank records show that on or about November 20, 2012, the day after the closing, $34,406,188 was transferred from the Sullivan & Cromwell attorney trust account to an account at Rothschild Bank AG held in the name of "Park Laurel NYC Ltd.," the seller of the property. This wire transfer represented payment to LOW for the sale of the PARK LAUREL CONDOMINIUM.

### D.   LOW PURCHASED THE BOMBADIER JET USING 1MDB FUNDS PASSED THROUGH SHEARMAN IOLA ACCOUNT

506.   In 2010, LOW used funds traceable to the $700 million wire transfer from 1MDB to the Good Star Account to acquire the BOMBARDIER JET, a Bombardier Global 5000 aircraft bearing manufacturer serial number 9265 and registration number N689WM, with two Rolls Royce engines bearing manufacturer's serial numbers 12487 and 12488, for approximately $35,371,335.

507.   An aircraft bill of sale dated March 31, 2010, was executed transferring title and ownership of the BOMBARDIER JET from J.T. Aviation Corp. to Wells Fargo Bank Northwest in its capacity as "owner trustee" of a trust created by Wynton Aviation (Global 5000) Ltd. (hereinafter, "Wynton Aviation").  Wynton Aviation was incorporated in the British Virgin Islands on or about December 30, 2009.

508.   On or about December 31, 2009, J.T. Aviation Corp. and Wynton Aviation executed a purchase agreement to sell the BOMBARDIER JET to Wynton Aviation less than three months after the $700 million wire transfer was executed.

509.   At the time of the purchase, the BOMBARDIER JET bore FAA Registration Number N501JT and its beneficial owner was J.T. Aviation Corp.'s president.

510.   Wells Fargo records indicate that Wynton Aviation is a holding company owned by LOW.  According to these records, LOW is this entity's sole beneficial owner, controlling party, and legal owner.

511.   Escrow and transactional documents relating to the sale of the BOMBARDIER JET show that Crowe and Dunleavy ("Crowe"), a law firm in Oklahoma, served as the escrow agent for the purchase of the BOMBARDIER JET.

512.    As noted in paragraph 123 above, on or about October 21, 2009, the Shearman IOLA Account received a wire from the Good Star Account for $148,000,000. Internal Shearman records show that this transfer was linked to an internal Shearman account held for client 36853 (The Wynton Group) and matter 4 (Park Laurel).  On or

about January 26, 2010, the Shearman IOLA Account received a wire from the Good Star Account for $117,000,000.  Internal Shearman records show that this transfer was linked to an internal Shearman account held for client 36853 (The Wynton Group) and matter 8 (General).

513.   On or about December 31, 2009, the same day the purchase agreement for the sale of the BOMBARDIER JET was executed, a wire for approximately $7 million was sent from the Shearman IOLA Account to an escrow account maintained by Crowe at Bank of Oklahoma in the name of Crowe and Dunlevy Aircraft Escrow I ("Crowe Aircraft Escrow Account").  Internal Shearman records show that the $7,000,000 transfer was linked to an internal Shearman account held for client 36853 (The Wynton Group) and matter 4 (Park Laurel).

514.   On or about March 26, 2010, Wynton Aviation and Wells Fargo Bank Northwest, N.A. ("Wells Fargo") entered into a trust agreement whereby Wells Fargo agreed to serve as the "Owner Trustee" over a trust settled by Wynton Aviation for the purpose of "ensur[ing] the eligibility of [the BOMBARDIER JET] for United States registration with the Federal Aviation Administration."

515.   On or about March 29, 2010, a wire for $28,376,000 was sent from the Shearman IOLA Account to the Crowe Aircraft Escrow Account at Bank of Oklahoma. Internal Shearman records show that the $28.376 million transfer was linked to an internal Shearman account held for client 36853 (The Wynton Group) and matter 8 (General).

516.   On or about March 31, 2010, a wire for $35,371,375 was sent from the Crowe Aircraft Escrow Account to an account at Citibank in the name of the seller.

517.   On or about April 2, 2010, the FAA issued a Certificate of Registration and Assignment of Special Registration Numbers Form to Wells Fargo, indicating that the BOMBARDIER JET's new FAA Registration Number and tail number would be N689WM.

**E.   LOW PURCHASED THE TIME WARNER PENTHOUSE AND TIME WARNER STORAGE UNIT USING 1MDB FUNDS PASSED THROUGH THE ADKMIC BSI ACCOUNT**

518.   As set forth below, funds traceable to the approximately $1 billion diverted from 1MDB to the Good Star Account were used to purchase the TIME WARNER PENTHOUSE and TIME WARNER STORAGE UNIT, in New York, New York.

519.   Contracts for the sale of the TIME WARNER PENTHOUSE and TIME WARNER STORAGE UNIT were signed on or about March 22, 2011.  A transfer report filed with the City of New York listed the ultimate purchaser as 80 Columbus Circle (NYC) LLC,[15] the final date of sale as July 6, 2011, and the final sales price as $30,550,000.  Shearman represented 80 Columbus Circle (NYC) LLC in the purchase of the TIME WARNER PENTHOUSE and TIME WARNER STORAGE UNIT.  The sales contract and amendments thereto show that Harvey & Hackett was the escrow agent for the purchase of the TIME WARNER PENTHOUSE and TIME WARNER STORAGE UNIT.  As set forth below, the TIME WARNER PENTHOUSE and TIME WARNER STORAGE UNIT were purchased with funds traceable to the $700 million wire transfer and $330 million wire transfers from 1MDB to Good Star.

520.   On or about June 28, 2011, $55,000,000 was wire transferred from the Good Star Account to the ADKMIC BSI Account.  On or about the same day, the following transactions occurred:  (i) approximately $54,750,000 was wire transferred from the ADKMIC BSI Account to an account at BSI Bank held in the name of Low Hock Peng, a/k/a Larry Low, who is LOW's father, (the "LHP Account") and (ii) approximately $30,000,000 was wire transferred from the LHP Account to an account in

---

[15] The original purchaser of the TIME WARNER PENTHOUSE AND TIME WARNER STORAGE UNIT was Sabola Limited, a Seychelles company.  A document entitled "Assignment and Assumption of Contract of Sale – Condominium Unit and Purchase Agreement for Personalty" states that Sabola Limited assigned its interest under the sales contract to 80 Columbus Circle (NYC) LLC.  The assignment agreement is signed on behalf of Sabola Limited by Li Lin Seet.

the name of Selune Ltd. at Rothschild Bank AG in Switzerland ("Selune Account").
LOW represented to BSI Bank in Singapore that he was the beneficial owner of Selune
Ltd.

521.   Internal Shearman records show that approximately eight days later, on or
about July 5, 2011, a wire for $27,000,000 was sent from another account at Rothschild
Bank AG in the name of 1/80 Columbus Circle (NYC) to the Shearman IOLA Account.
Plaintiff alleges that these funds originated from Selune's account at Rothschild Bank
AG and were transferred to the 1/80 Columbus Circle account using an intra-bank
transfer.  Internal Shearman records show that this $27,000,000 wire transfer was linked
to an internal Shearman account held for client 37103 (TJL/RT MISCELLANEOUS
INVESTMENT MATTERS) and matter 6, which was associated with the address of the
TIME WARNER PENTHOUSE.

522.   Six bank checks totaling $27,247,677.74 were written on the Shearman
IOLA Account and directed to various parties involved in the purchase of the TIME
WARNER PENTHOUSE and TIME WARNER STORAGE UNIT.  Internal Shearman
records show that these checks were linked to an internal Shearman account held for the
same client and matter associated with the incoming wire of $27,000,000 discussed
above.  Specifically:

a.   A check for $534,625 and a second check for $687,375, both dated
July 5, 2011, were written on the Shearman IOLA Account to Prudential Douglas
Elliman.  The final settlement statement shows that $534,625 and $687,375 were
separate line items that were owed to the realtors as a broker's fee.

b.   A check for $17,750 dated July 5, 2011 was written on the Shearman
IOLA Account to New York State Sales Tax.  The final settlement statement shows that
$17,750 was owed as "NY Sales Tax."

c.   A check for $15,778,071.79 dated July 5, 2011 was written on the
Shearman IOLA Account to J.P. Morgan Chase.  The final settlement statement shows
that $15,778,071.79 was owed to J.P. Morgan Chase, N.A. to pay off a mortgage loan

1 owed by the former owner of the TIME WARNER PENTHOUSE and TIME WARNER

2 STORAGE UNIT.

3        d.    A check for $9,829,634.89, dated July 5, 2011, and a second check

4 for $103.20, dated July 11, 2011, was written on the Shearman IOLA Account to the

5 former owner of the TIME WARNER PENTHOUSE and TIME WARNER STORAGE

6 UNIT.  Real estate closing documents show that the former owner signed as the seller of

7 all of the personalty, namely, the furniture, furnishings, and non-fixture items, sold

8 during the transaction.

9        e.    A check for $400,221.06, dated July 5, 2011, was written on the

10 Shearman IOLA Account to Chicago Title Insurance Company.  The final settlement

11 statement shows that $400,221.06 is the sum of all title charges involved in the purchase.

12 Chicago Title Insurance Company was the title agent on this purchase.

13        523.   A Notice to the Board of Intention to Sell or Lease Condominium Unit was

14 completed in connection with the TIME WARNER PENTHOUSE and TIME WARNER

15 STORAGE UNIT.  The signed notices for both the TIME WARNER PENTHOUSE and

16 TIME WARNER STORAGE UNIT identified Low Hock Peng, also known as Larry

17 Low, LOW's father, as the occupant of the units.  However, an unsigned version of this

18 notice dated May 15, 2011, identifies that LOW is the "ultimate beneficial owner of each

19 Sabola Limited and 80 Columbus Circle (NYC) LLC."

20        524.   According to a realtor involved in the sale of the TIME WARNER

21 PENTHOUSE and TIME WARNER STORAGE UNIT, LOW was the intended

22 occupant of the apartment, and Larry Low never even viewed the apartment before the

23 purchase.

24 **F.    LOW PURCHASED THE ORIOLE MANSION USING 1MDB**
25 **        FUNDS FUNNELED THROUGH THE ADKMIC BSI ACCOUNT**

26        525.   The ORIOLE MANSION, located in Beverly Hills, California, was

27 purchased with funds traceable to diverted 1MDB funds.

28

526.   A grant deed transferring ownership of ORIOLE MANSION to Oriole Drive (LA) LLC, a Delaware corporation, was signed on November 20, 2012, and filed with the County of Los Angeles on November 30, 2012.  Real estate closing documents show that the purchase price for ORIOLE MANSION was $38,980,000.  A Notice of Completion filed with the LA Recorder's Office on July 29, 2013, states that construction of a gym, audio visual upgrade, and miscellaneous work was completed on ORIOLE MANSION on July 12, 2013.

527.   An attorney at DLA Piper ("DLA Piper"), a U.S.-based law firm, signed the Notice of Completion on behalf of Oriole Drive (LA) LLC.  DLA Piper represented the buyer in this sale.

528.   J.P. Morgan Chase bank records show that on or about November 2, 2012 – eighteen days prior to the signing of the grant deed transferring ownership of the ORIOLE MANSION – approximately $153 million was wire transferred from the Good Star Account to the ADKMIC BSI Account.

529.   This $153 million was traceable to diverted proceeds of the 2012 bond sales, as follows:

a.   Between May and December of 2012, Aabar-BVI transferred, either directly or indirectly, approximately $1.1 billion in diverted 2012 bond proceeds to the Blackstone Account.

b.   On or about October 29, 2012, Blackstone transferred $259,800,000 to the Alsen Chance Account at Standard Chartered, of which TAN was the stated beneficial owner;

c.   On or about November 1, 2012, Alsen Chance transferred $200,000,000 to the Good Star Account.

d.   On or about November 2, 2012, Good Star sent approximately $153 million of the $200 million it received from Alsen Chance to the ADKMIC Account.

530.   Approximately three days later, on or about November 5, 2012, approximately $153 million was transferred from the ADKMIC BSI Account to the LHP

Account.  Two days later, on or about November 7, 2012, approximately $150 million was transferred from the LHP Singapore Bank Account to an account in LOW's name at BSI Bank ("LOW BSI Account").

531.   Citibank records show that on or about November 7, 2012, approximately $110 million was wired from the LOW BSI Account to an account in the name of Selune Ltd. at Rothschild Bank AG in Switzerland.  As set forth above in paragraph 520, LOW is the beneficial owner of Selune Ltd.

532.   Bank of America records show that on or about November 29, 2012, $37,882,800 was wired from an account at Rothschild Bank AG in the name of 1/Oriole Drive (LA) LLC, to an account at Bank of America in the name of Chicago Title. Records from Bank of America contain a reference notice of: "[XXX]0583-994-X5TITLE OFFICER[]."  The wire instructions for the sale of ORIOLE MANSION required that $37,859,200 be sent to a Bank of America account in the name of Chicago Title Company with a reference for "[XXX]0584-994-X59 Title Officer[]."  The escrow agent involved in the purchase of ORIOLE MANSION stated in an email, dated November 29, 2012 at 11:22 p.m., that the title company had received the wire sufficient for closing.  Records from the escrow agent demonstrate that $1,849 was later credited back to Oriole Drive (LA) LLC.

### G.   LOW PURCHASED GREENE CONDOMINIUM USING 1MDB FUNDS FUNNELED THROUGH THE ADKMIC BSI ACCOUNT

533.   The GREENE CONDOMINIUM, located in New York, New York, was purchased with funds traceable to diverted 1MDB proceeds.

534.   A real property transfer report was filed regarding the sale of GREENE CONDOMINIUM on or about March 5, 2014.  The transfer report states that a contract for the purchase of the GREENE CONDOMINIUM by 118 Greene Street (NYC) LLC, a New York legal entity, was signed on or about February 5, 2014, that the final date of sale was February 27, 2014, and that the final purchase price was $13,800,000.

535.   As noted above, on or about November 2, 2012, approximately $153 million was wire transferred from the Good Star Account to the ADKMIC BSI Account. On or about November 5, 2012, $153 million was transferred from the ADKMIC BSI Account to the LHP Account.  Two days later, on or about November 7, 2012, approximately $150 million was transferred from the LHP Account to the LOW BSI Account.  That same day, approximately $110 million was wired from the LOW BSI Account to the Selune Account which, as set forth above, belongs to LOW.  This transaction left approximately $40 million in the LOW BSI Account.

536.   Citibank records show that on or about February 5, 2014, $13,800,000 was wired from the LOW BSI Account to an account at Citibank in the name of DLA Piper. On or about February 12, 2014, a wire in the amount of $13,721,286 was sent from DLA Piper to Chicago Title.  The payment details for that wire included the address for the GREENE CONDOMINIUM.

537.   According to a realtor familiar with this property, LOW claimed that he was the owner of this property.

## H.   LOW ACQUIRED AN INTEREST IN EMI MUSIC PUBLISHING USING 1MDB FUNDS DIVERTED THROUGH THE GOOD STAR ACCOUNT

538.   LOW laundered at least approximately $106,666,667 in misappropriated funds traceable to the Good Star Account to acquire a substantial interest in EMI Music Publishing Group North America Holdings Inc. ("EMI"), a music publishing company. Specifically, LOW used these funds to acquire an interest in an entity called Nile Acquisition Holding Company Ltd. ("EMI Partner A"), a Cayman Islands entity that partnered with Nile Acquisition LLC ("EMI Partner B"), a Delaware entity, to form DH Publishing L.P. (the "EMI Partnership"), EMI's parent company.

539.   On or about October 5, 2011, the EMI Partnership, a Cayman Islands limited partnership, was formed by a consortium of entities consisting of EMI Partner A and EMI Partner B with the express purpose of acquiring EMI Group Global Limited's

151

music publishing business.  EMI Partner A is comprised of several investors, including (i) Mubadala Development Company ("Mubadala"), a sovereign wealth entity owned by the Government of Abu Dhabi, and (ii) JCL Media (EMI Publishing) Ltd. (also known as JW Nile (BVI) Ltd.) ("LOW EMI Partner"), a subsidiary of Jynwel Capital Ltd., LOW's financial services firm based in Hong Kong.  The LOW EMI Partner was formed in the British Virgin Islands on or about November 7, 2011.  EMI Partner B is owned jointly by Sony Music Holdings, a New York corporation, and the Estate of Michael Jackson.

540.   On or about November 11, 2011, the EMI Partnership, through BW Publishing Ltd., an indirect, wholly-owned subsidiary of the EMI Partnership, entered into a sale and purchase agreement with EMI Group Global Limited, a United Kingdom company, to acquire EMI.

541.   Simultaneously with this acquisition, the EMI Partnership entered into an Administration Agreement with Sony/ATV Music Publishing LLC ("Sony/ATV").  Under the Administration Agreement, Sony/ATV agreed to manage EMI's day to day operations, including management and exploitation of EMI's music catalog, in exchange for an administration fee.

542.   EMI is the world's third largest music publishing company by revenue.  EMI owns or possesses the rights to publish approximately 2.3 million musical compositions, both historic and recent, from a variety of genres and a variety of musicians, including a number of Grammy-winning artists.

543.   In connection with its vast music catalog, EMI generates revenue from several sources including, among others: (i) royalties and fees earned when its songs are performed publicly; (ii) royalties from paid-streaming services; (iii) royalties and fees earned in exchange for the right to use songs for physical recordings or digital downloads; (iv) royalties and fees paid for use of music in timed synchronization with visual images; and (v) royalties and fees paid for use of a song in stage productions, and rental of orchestra scores.

### 1. *LOW's Acquisition of an Interest in EMI PARTNER A*

544. EMI Partner A was formed on or about September 29, 2011, in the Cayman Islands. Initially, EMI Partner A's sole shareholder was Fifty Sixth Investment Company Ltd., an entity based in Abu Dhabi. In June 2012, Fifty Sixth Investment Company Ltd. transferred its sole share in EMI Partner A to Mubadala.

545. On or about June 29, 2012, several entities agreed to subscribe for ordinary shares in EMI Partner A pursuant to an Investment Agreement Relating to Nile Acquisition Holding Company Limited (the "EMI Investment Agreement"). These entities included: (i) Nile Cayman Holding Ltd. ("the "Mubadala Subsidiary"), an entity owned by Mubadala; (ii) Pub West LLC, a Delaware company; (iii) GSO Capital Opportunities Fund II (Luxembourg) S.a.r.l.; (iv) Blackstone/GSO Capital Solutions Offshore Funding (Luxembourg) S.a.r.l.; (v) GSO SJ Partners LP; and (vi) the LOW EMI Partner.

546. An internal EMI document described the LOW EMI Partner as follows: [LOW EMI Partner] is a private equity investment holding company advised by Jynwel Capital Limited, an investment and advisory firm whose chief executive officer is [LOW]. [LOW] is a member of [EMI's] advisory board and served as [EMI's] Non-executive Chairman-Asia. Jynwel Capital Limited has advised [EMI] that [LOW EMI Partner] is owned by trusts for the benefit of the Low family.

547. Pursuant to the EMI Investment Agreement, several investors agreed to subscribe for shares in EMI Partner A. Specifically:

     a.    The Mubadala Subsidiary agreed to acquire approximately 66.2 percent of EMI Partner A's capital, consisting of 6,620.068965 ordinary shares, for $320,000,000.

     b.    The LOW EMI Partner agreed to acquire approximately 22.06 percent of EMI Partner A's capital, consisting of 2,206.89656 ordinary shares, for

$106,666,667.  Li Lin Seet executed the EMI Investment Agreement on behalf of the LOW EMI Partner in his capacity as its "director."

        c.    GSO Capital Opportunities Fund II (Luxembourg) S.a.r.l. agreed to acquire approximately 5.69 percent of EMI Partner A's capital, consisting of 569.36719 ordinary shares, for $27,519,414.

        d.    Blackstone/GSO Capital Solutions Onshore Funding (Luxembourg) S.a.r.l. agreed to acquire approximately 3.22 percent of EMI Partner A's capital, consisting of 322.68240 ordinary shares, for $15,596,316.[16]

        e.    Pub West LLC agreed to acquire approximately 1.37 percent of EMI Partner A's capital, consisting of 137.93104 ordinary shares, for $6,666,667.

        f.    Blackstone/GSO Capital Solutions Offshore Funding (Luxembourg) S.a.r.l. agreed to acquire approximately 1.2 percent of EMI Partner A's capital, consisting of 120.15875 ordinary shares, for $5,807,673.

        g.    GSO SJ Partners LP agreed to acquire approximately 0.22 percent of EMI Partner A's capital, consisting of 22.27442 ordinary shares, for $1,076,597.

548.    Furthermore, under the EMI Investment Agreement, the LOW EMI Partner was authorized to play a role in the management and operations of EMI through its ownership stake in EMI Partner A.  Specifically, for instance, the EMI Investment Agreement provides that the LOW EMI Partner may participate in selecting two of EMI Partner A's nine directors.

549.    Additionally, under the EMI Investment Agreement, the single largest individual shareholder within the LOW EMI Partner (the "LOW EMI Principal Shareholder") is permitted to play a role in selecting key EMI officials, including EMI Partner A's chief executive officer, EMI Partner A's general counsel, EMI Partner A's chief financial officer as well as the EMI Partnership's officers.  According to internal

---

[16] Blackstone/GSO Capital Solutions Onshore Funding (Luxembourg) S.a.r.l. is an affiliate of the private investment firm Blackstone Group, an entity discussed previously in Paragraph 231.c.  It is unrelated to the BVI shell corporation referred to herein as Blackstone.

records from Bank of New York Mellon, where the LOW EMI Partner opened a bank account, the LOW EMI Partner is a wholly-owned subsidiary of Jynwel Capital Ltd., whose sole shareholder is LOW.

550.   Additionally, the LOW EMI Principal Shareholder is permitted in his sole discretion to select the EMI Partnership's Non-Executive Chairman – Asia.  This official is responsible for "observational oversight of the business operations of the Partnership in Asia excluding Japan."  EMI's Non-Executive Chairman – Asia is also invited to attend "ceremonial events relating to [EMI] and any other related music industry public events that may be relevant to [EMI], in each case, to which all members of the board of [the EMI Partnership] are invited."

551.   According to a document entitled "LOW FAMILY HISTORY AND BACKGROUND, ORIGINS OF JYNWEL CAPITAL," which was distributed to various companies by LOW as recently as February 2015, LOW serves as the "Non-executive Chairman, Asia, for EMI Music Publishing, [and is] also serving as a member of [EMI's] advisory board."  According to this same document, LOW led recent transactions and advised the Low family investment trusts including one relating to a "USD2.2 billion acquisition of EMI Music Publishing Group by Sony, Mubadala, Blackstone Group's GSO Capital Partners and David Geffen."

552.   The proceeds of the share purchases described in Paragraph 547 above were used by EMI Partner A to, among other things, make capital contributions to the EMI Partnership.  Each partner's respective partnership interest in the EMI Partnership is calculated based upon its percentage of ownership of the partnership's Class A Units.  According to the Fourth Amended and Restated Exempted Limited Partnership Agreement of D.H. Publishing L.P., dated March 7, 2014, EMI Partner A made a capital contribution of $483,333,396 to the EMI Partnership in exchange for 60.166 percent of the EMI Partnership's Class A Units.  Likewise, EMI Partner B made a capital contribution of $320,000,038 to the partnership in exchange for 39.834 percent of the EMI Partnership's Class A Units.

### 2.     Transfer of Proceeds Through the United States

553.   As noted in Section II.I above, on or about June 8, 2012, approximately $120,000,000 in funds were wired from the Good Star Account to the ADKMIC BSI Account via a correspondent bank account in the United States at J.P. Morgan.

554.   On or about June 11, 2012, a wire of approximately $120,000,000 was sent from the ADKMIC BSI Account to the LHP Account.  That same day, (i) a wire for $118,000,000 was transmitted from the LHP Account to LOW's personal account at BSI Bank; (ii) a wire for $115 million was sent from LOW's personal account at BSI Bank to an account in the name of Jynwel Capital at BSI Bank ("Jynwel Account A"); (iii) a wire for $115 million was sent from Jynwel Account A to another account also maintained in the name of Jynwel Capital ("Jynwel Accont B") at BSI Bank; and (iv) a wire for $110 million was sent from Jynwel Account B to an account in the name of the LOW EMI Partner at BSI Bank ("LOW EMI Account").

555.   On or about June 13, 2012, an escrow account was opened by LOW EMI Partner with Bank of New York Mellon (the "EMI Escrow Account") in the United States.  The account opening documents were signed by Li Lin Seet, who identified himself as LOW EMI Partner's director.  The opening records also confirm that LOW is the "100[%] (ultimate)" owner of the LOW EMI Partner and that Jynwel Capital Ltd. is the "100% direct" owner.

556.   On June 26, 2012, a wire for $320,000,000 was sent from Mubadala Treasury Holding Co. LLC's account at First Gulf Bank in Abu Dhabi to the EMI Escrow Account.  A notation on the wire instructions indicated that the funds were intended to be sent to "NILE ACQUISITION HOLDING LTD ESCROW ACCOUNT."  As noted above at Paragraph 538, "NILE ACQUISTION HOLDING LTD" is the name of EMI Partner A.  Furthermore, as noted above at Paragraph 547, pursuant to the EMI Investment Agreement, Mubadala agreed to acquire its interest in EMI Partner A for $320,000,000.

557.   That same day, a wire for $106,666,667 was sent from the LOW EMI Account to the EMI Escrow Account.  A notation on this wire also read "NILE ACQUISITION HOLDING LTD ESCROW ACCOUNT."  As noted above at Paragraph 547, pursuant to the EMI Investment Agreement, the LOW EMI Partner agreed to acquire its interest in EMI Partner A for $106,666,667.

558.   Upon information and belief, the funds transferred by LOW into the EMI Escrow Account were used to acquire the LOW EMI Partner's interest in EMI Partner A and were transmitted in a manner intended to conceal the origin, source, and ownership of criminal proceeds, based on the following facts and circumstances, among others:

a.   Funds were moved through multiple accounts owned by different entities on or about the same day in an unnecessarily complex manner with no apparent business purpose.

b.   For instance, there is no apparent commercial reason that LOW would layer his transaction by funneling the exact same amount of money through six different bank accounts at the same financial institution on or about the same day.

c.   Individuals engaged in money laundering and other unlawful conduct often pass money through intermediary accounts to conceal the true source of the funds.

d.   In materials that LOW submitted to entities with whom he sought to do business, including materials described below in Paragraphs 609-611, LOW represented that family resources were a significant source of his wealth.  By funneling money through his father's account for a brief period of time, LOW created the appearance that funds in his personal account, which were used to acquire an interest in EMI Partner A, came from his father rather than from Good Star or ADKMIC.

559.   Upon information and belief, at the time LOW transferred misappropriated funds from his LOW EMI Partner account in Singapore to the EMI Escrow Account, he knew those funds constituted misappropriated funds and intended to deprive 1MDB of ownership of those funds.

## I. TENS OF MILLIONS OF DOLLARS IN FUNDS DIVERTED FROM 1MDB WERE USED TO FUND RED GRANITE PICTURES AND TO PRODUCE THE MOTION PICTURE "WOLF OF WALL STREET"

### 1. *LOW Distributed Millions in 1MDB Funds from Good Star to Red Granite Pictures to Fund "The Wolf of Wall Street"*

560. As set forth below, funds from the Good Star Account were transferred into and through various bank accounts at City National Bank in Los Angeles associated with Red Granite Pictures, and that money was ultimately used to fund the production of "The Wolf of Wall Street," a motion picture produced by Red Granite Pictures and released in the United States on December 25, 2013. These funds are directly traceable to the $700 million and $330 million wire transfers unlawfully diverted from 1MDB to the Good Star Account.

561. As set forth above in Sections II.D and II.F, approximately $1.03 billion was diverted from 1MDB to the Good Star Account between approximately September 30, 2009 and October 25, 2011.

562. Bank account records from City National Bank and correspondent bank records from J.P. Morgan Chase show that two wires totaling $10,173,104 were sent from the Good Star Account to a bank account at City National Bank in Los Angeles that was designated as the "Operating Account" for Red Granite Pictures ("RGP Operating Account"). AZIZ is a signatory on this account.

563. More specifically, first, on or about April 12, 2011, a wire for $1,173,104 was sent from Good Star to the RGP Operating Account. The notation on this wire read: "INVESTOR ADVANCES OF USD 1 173 104 OUT OF USD 5 000 000 to RED GRANITE (MOVIES)." Second, on or about September 10, 2012, a wire for approximately $9,000,000 was sent from Good Star to the RGP Operating Account. The notation on this wire read: "ADVANCES FOR WOLF OF WALL STREET MOVIE FOR ACHL."

564.   On or about September 11, 2012, one day after this second wire transfer, approximately $9,015,191 was transferred from the RGP Operating Account to another City National Bank account held in the name of Red Granite Pictures ("RGP Pictures Account").  On or about September 12, 2012, the same amount – $9,015,191 – was transferred from the RGP Pictures Account to yet another account at City National Bank held in the name of TWOWS LLC ("TWOWS Account #1").

565.   "TWOWS" is an acronym for "The Wolf of Wall Street," and TWOWS LLC was a special purpose vehicle ("SPV") created by Red Granite Pictures to produce "The Wolf of Wall Street."  Delaware state records show that TWOWS LLC was formed on or about April 16, 2012, and California state records show that AZIZ is one of the entity's managers.  It is common in the film industry to create an SPV, such as a limited liability corporation, for the purpose of producing a film.  It is also common to open a separate bank account or accounts in the name of that SPV and to use the funds in that account to finance the film's production.

566.   City National Bank records show that the TWOWS Account #1 was used to pay expenses associated with the production of "The Wolf of Wall Street."  In or around April 2013, the TWOWS Account #1 was closed and the balance of the funds transferred to another account at City National Bank also held in the name of TWOWS LLC (hereinafter, "TWOWS Account #2").  The TWOWS Account #2 was also used to pay expenses associated with the production of "The Wolf of Wall Street."  Collectively, these two accounts are referred to herein as the "TWOWS Accounts."

567.   The TWOWS Accounts, in which funds traceable to the Good Star Account were deposited, were used to pay for production expenses including, but not limited to, the following:  (i) between April 2013 and February 2014, 17 payments totaling approximately $3.9 million were made to Sikelia Productions, Inc., a production company belonging to the film's director; (ii) between May 2012 and April 2014, at least $48 million was paid to a company that specializes in managing payroll and production expenses for the film industry; (iii) between July 2012 and May 2014, at least $4.1

million was paid to various visual effects companies;  (iv) between May 2012 and April 2014, approximately $2.5 million was paid to the Screen Actors Guild; and (v) approximately $80,000 was paid to a yacht charter company.

568.   LOW, who distributed more than $10 million to Red Granite Pictures from the Good Star Account, received a "special thanks" full-screen credit in the closing credits of "The Wolf of Wall Street."

569.   In his acceptance speech upon winning a Golden Globe for his role in "The Wolf of Wall Street," DiCaprio thanked "the entire production team," singling out in particular "Joey, Riz, and Jho," whom he characterized as "collaborators" on the film. Upon information and belief, this reference was to Joey McFarland, a co-founder of Red Granite Pictures, AZIZ, and LOW.

570.   During at least part of the time during which the above-referenced transfers were made, LOW maintained a Red Granite email account with the domain name @redgranitepictures.com.  This email account was deleted in or around April 2012.

> 2.   *Tens of Millions in 1MDB Funds Funneled Through the Aabar-BVI Account Were Used to Fund Red Granite Pictures and "The Wolf of Wall Street"*

571.   Red Granite Pictures, and its production of "The Wolf of Wall Street" in particular, were also funded with money traceable to the proceeds of the 2012 bond sales that were diverted through the Aabar-BVI Swiss Account.

572.   As set forth in Paragraph 263 above, between June 18, 2012, and November 14, 2012, $238,000,000 in funds traceable to the diverted proceeds of the 2012 1MDB bond sales was transferred from Aabar-BVI to AZIZ's Red Granite Capital Account at BSI Bank in Singapore.

573.   Between on or about June 20, 2012 – roughly two days after Aabar-BVI sent its first wire to Red Granite Capital – and November 20, 2012, eleven wires totaling $64,000,000 were sent from AZIZ's Red Granite Capital Account in Singapore to the RGP Operating Account in the United States.

574.   Shortly after each of these eleven wires, Red Granite Capital transferred funds from its Operating Account to the RGP Pictures Account.  Between on or about June 26, 2012 and November 20, 2012, a total of $54,797,321 was transferred from the RGP Operating Account to the RGP Pictures Account.

575.   In a series of nine transfers between approximately June 27, 2012, and November 23, 2012, $52,004,162 of this $54,797,321 was then transferred from the RGP Pictures Account to the TWOWS Account #1, which, as noted above, belonged to the SPV responsible for producing "The Wolf of Wall Street."

576.   The movement of funds from the Red Granite Capital Account in Singapore through various accounts associated with Red Granite Pictures to the TWOWS Account #1 occurred in very close succession.  For example, in one series of transfers all occurring on or about August 10, 2012: (i) $3,000,000 was sent from the Red Granite Capital Account to the RGP Operating Account; (ii) $2,831,754 was sent from the Red Granite Operating Account to the RGP Pictures Account; and (iii) $2,831,754 was sent from the RGP Pictures Account to the TWOWS #1 Account.

## J.   LOW ACQUIRED AN INTEREST IN "SYMPHONY CP (PARK LANE) LLC" AND THE PARK LANE HOTEL USING 1MDB FUNDS DIVERTED THROUGH THE TANORE ACCOUNT

577.   LOW laundered more than $200 million in misappropriated funds traceable to the 2013 bond sale into an account in the United States belonging to the law firm DLA Piper.  LOW and his brother Szen used those funds to acquire an interest in an entity called "Symphony CP (Park Lane) LLC" (hereinafter, "the Park Lane Partnership" or "the Partnership"), a limited liability partnership between the New York real estate development company Witkoff Group and an investment entity controlled by LOW.  On or about November 25, 2013, the Park Lane Partnership, through wholly-owned subsidiaries, acquired 36 Central Park South, New York, New York, 10019, also known as the Park Lane Hotel, for approximately $654,316,305.

*1.     Transfer of Proceeds into the United States*

578.   On or about March 21 and 22, 2013, $835,000,000 in funds raised by 1MDB through its March 19, 2013 bond issue was transferred to the Tanore Account at Falcon Bank in Singapore, after being routed through one of three Overseas Investment Funds.

579.   On or about March 25, 2013, a wire of approximately $378,000,000 was sent from the Tanore Account to the Granton Account at Falcon Bank in Singapore.

580.   On or about the same day the Granton Account received $378,000,000 from Tanore (that is, March 25, 2013), Granton wired $378,000,000 to an account at RBS Coutts in Switzerland held in the name of Dragon Market Limited ("Dragon Market"). LOW is the beneficial owner of this account.  Bank records show that HUSSEINY, who was the Chairman of Falcon Bank, falsely represented to compliance officers at the bank that this transfer was made pursuant to a loan agreement with Aabar related to Aabar's development of the One 57 condominiums in New York.

581.   In early November 2013, two additional wires were sent from the Granton Account to the RBS Coutts account belonging to Dragon Market ("Dragon Market Account").  All three wires were processed through a U.S. correspondent bank account at J.P. Morgan Chase.  The approximate dates and amounts of these wires, totaling $518,500,000, are summarized below:

**Table 13:  Relevant Wire Transfers from Granton to Dragon Dynasty**

| Date | Sending Party | Receiving Party | Amount |
|------|---------------|-----------------|--------|
| 3/25/2013 | Granton | Dragon Market | $378,000,000 |
| 11/05/2013 | Granton | Dragon Market | $93,300,000 |
| 11/06/2013 | Granton | Dragon Market | $47,200,000 |

582.   Between on or about April 25, 2013, and November 8, 2013, four wires totaling $476,300,000 were sent from the Dragon Market Account at RBS Coutts to an

account at BSI Bank in Singapore held in the name of Dragon Dynasty Limited ("Dragon Dynasty"). These four wires were processed through a U.S. correspondent bank account at J.P. Morgan Chase. The approximate dates and amounts of these wires are summarized below:

**Table 14: Relevant Wire Transfers from Dragon Market to Dragon Dynasty**

| Date | Sending Party | Receiving Party | Amount |
|------|---------------|-----------------|--------|
| 4/25/2013 | Dragon Market | Dragon Dynasty | $98,000,000 |
| 7/5/2013 | Dragon Market | Dragon Dynasty | $120,000,000 |
| 9/10/2013 | Dragon Market | Dragon Dynasty | $9,800,000 |
| 11/8/2013 | Dragon Market | Dragon Dynasty | $248,500,000 |

583. Account opening documents for the BSI Bank account maintained by Dragon Dynasty ("Dragon Dynasty Account") list LOW as the authorized signatory on the account. Those documents also list Dragon Market as the director of Dragon Dynasty.

584. On or about November 12, 2013, $248,500,000 was wired from the Dragon Dynasty Account to the LHP Account. On or about the same day that LOW's father received $248,500,000 from Dragon Dynasty, $235,500,000 was wired from the LHP Account to the LOW BSI Account. The wire details for that transfer read: "Gift from Low Hock Peng to Low Taek Jho."

585. On or about November 12, 2013, $12,500,000 was wired from the LHP Account to an account at BSI Bank in Singapore belonging to Szen.

586. On or about November 12, 2013, LOW transferred $205,900,000 from his account at BSI to an IOLA account at Citibank New York maintained by DLA Piper ("DLA Piper IOLA Account"). The payment details on the wire read: "LOW TAEK JHO SETTLEMENT OF TRUSTS."

587.   On or about November 12, 2013, Szen transferred $12,185,189.32 from his account at BSI Bank to the same DLA Piper IOLA Account.  The payment details on the wire read: "LOW TAEK SZEN SETTLEMENT OF TRUSTS."

588.   In total, LOW and his brother Szen collectively transferred $218,085,189 to the same DLA Piper IOLA Account on or about November 12, 2013.

589.   Upon information and belief, the funds transferred by LOW and Szen into the DLA Piper IOLA Account in the United States were moved in a manner intended to conceal the origin, source, and ownership of criminal proceeds, based on the following facts and circumstances, among others:

a.   Funds were moved through multiple accounts owned by different entities on or about the same day in an unnecessarily complex manner with no apparent business purpose.

b.   For example, there is no apparent commercial reason that LOW would transfer funds from Dragon Market, an account he controlled, to Dragon Dynasty, another account he controlled, and then to an account belonging to his father, only to have a substantially similar amount of funds transferred from his father's account to LOW's personal account on or about the same day.

c.   Individuals engaged in money laundering and other unlawful conduct often pass money through intermediary accounts to conceal the true source of the funds.

d.   In materials that LOW submitted to entities with whom he sought to do business, including materials described in Paragraphs 609-611 below, LOW represented that his family was a significant source of his wealth.  By passing money through his father's account for a brief period of time, LOW created the appearance that funds in his personal account, which were used to acquire an interest in the Park Lane Partnership, came from his father rather than from Dragon Market, Granton, and Tanore.

590.   Upon information and belief, at the time LOW transferred misappropriated funds (i) from his Dragon Market Account to his Dragon Dynasty Account using a

correspondent bank account at J.P. Morgan in the United States, and (ii) from his personal account in Singapore to the DLA Piper IOLA Account in the United States, he knew those funds constituted misappropriated funds and intended to deprive 1MDB of ownership of those funds.

2. *LOW's Interest in Symphony CP (Park Lane) LLC and the Park Lane Hotel*

591. LOW entered into a limited liability partnership with an affiliate of the Witkoff Group LLC ("Witkoff Group"), a New York-based real estate investment and management company, to operate an entity called "Symphony CP (Park Lane) LLC" (hereinafter, "Park Lane Partnership" or "Partnership"). LOW used funds traceable to diverted 1MDB funds to invest in the Park Lane Partnership. The formation of the Park Lane Partnership entailed the creation of numerous legal entities, including many with similar names. LOW's investment interest in the Park Lane Partnership was held through two entities: Symphony CP Investments LLC and Symphony CP Investments Holdings LLC (collectively, "LOW Investment Entities" or "the Investor").

592. The Park Lane Partnership was formed as a Delaware limited liability company with the filing of a Certification of Formation on July 15, 2012, and with the execution of an Operating Agreement dated July 16, 2013. As originally constituted, the Park Lane Partnership represented a partnership between an affiliate of the Witkoff Group and an entity called Symphony CP Investments LLC, which was designated as the "Investor." As of October 25, 2013, LOW, Szen, and Li Lin Seet were designated as the authorized signatories on behalf of Symphony CP Investments LLC ("LOW Investment Entity I").

593. Transactional documents describe the Park Lane Partnership as follows: Symphony CP (Park Lane), LLC ("Partnership") is a partnership formed for the purpose of developing a world class residential condominium tower and the possibility of developing a 6-star boutique hotel property . . . on the parcels located at 36 Central Park South (Park Lane Hotel) and 21 West 58th Street . . . . The

165

Parcels are currently occupied by a 607-room hotel and a 66-unit residential rental building, respectively.

594.   An Amended Operating Agreement for the Partnership was executed on or about November 25, 2013.  Pursuant to that agreement, the Partnership consisted of: (1) WG Partners 36 CPS LLC, an affiliate of the Witkoff Group (hereinafter, collectively referred to as "Witkoff"), and (2) Symphony CP Investments Holdings LLC.  As the "Investor," Symphony CP Investments Holdings LLC was to contribute 85% of the capital, and Witkoff was to contribute 15%.  A then-partner at DLA Piper signed the Amended Operating Agreement on behalf of Symphony CP Investments Holdings LLC.

595.   Symphony CP Investments Holdings LLC ("LOW Investment Entity II"), the "Investor" in the Partnership, is a Delaware limited liability company having the same address as DLA Piper in Chicago.  According to its operating agreement, also dated November 25, 2013, it has a single member:  Symphony CP Investments LLC, *i.e.*, LOW Investment Entity I.

596.   LOW and Szen dealt with Witkoff in connection with the Park Lane Partnership through and on behalf of Jynwel Capital, a Hong Kong based entity founded by LOW and Szen.

597.   On or about November 20, 2013, a Managing Director of Witkoff ("Witkoff Managing Director") sent an email addressed to the "Jynwel Team."  Included on that email were LOW and Szen; other employees of Jynwel Capital and Witkoff; and lawyers from DLA Piper and U.S.-based law firm Akin Gump Strauss Hauer & Feld LLP.  The email attached a Capital Call Notice from the Park Lane Partnership, calling for a capital contribution of $214,776,720.27 for the closing of the Park Lane acquisition, of which $202,206,876.48 represented the share to be contributed by the "Investor."  The email directed payment to an account at J.P. Morgan Chase maintained by Commonwealth Land and Title Insurance Company, the escrow agent used in connection with the acquisition of the Park Lane Hotel.

598.   Bank records obtained from Citibank show that on or about November 25, 2013, DLA Piper transferred $202,206,876.48 from a DLA Piper IOLA Account at Citibank to a bank account at J.P. Morgan Chase maintained by Commonwealth Land Title Insurance Company.  These funds were sent from the same account into which LOW transferred approximately $205,900,000 on or about November 12, 2013.

599.   Documents pertaining to the formation of the Park Lane Partnership, including electronic communications, reveal that the Partnership was structured to permit the possibility that Mubadala Development Company PJSC ("Mubadala") would join Jynwel as an investor in the LOW Investment Entities after the initial capitalization of the Partnership.  As explained in Paragraph 539 above, Mubadala is an investment vehicle wholly-owned by the Government of Abu Dhabi.  In December 2013, Mubadala agreed to purchase a partial interest in the LOW Investment Entities, and thereby in the Park Lane Partnership, in exchange for $135,000,000.

600.   On or about December 23, 2013, Mubadala wire transferred $135,000,000 from its account in Abu Dhabi to a DLA Piper escrow account at The Private Bank in Chicago.  At the time, counsel at DLA Piper served as the trustee for LOW's interest in the Park Lane Partnership.  These funds represented proceeds of LOW's sale of part of his interest in the Partnership.  On or about December 26, 2013, DLA Piper distributed the proceeds of the sale to LOW, his father, and Szen as follows: (a) $63,000,000 to the LOW BSI Account; (b) $56,500,000 to the LHP Account; and (c) $2,000,000 to Szen's personal account at BSI in Singapore.  As explained further in Paragraphs 691-695 below, LOW and his father used part of the proceeds of this sale to Mubadala – proceeds that are traceable to diverted 1MDB funds – to invest in a joint venture with IPIC to acquire a Houston-based energy company.

601.   DLA Piper also distributed $1,250,000 in proceeds from Mubadala's purchase of an interest in the Partnership to the MB Consulting Account on or about December 27, 2013.  As noted above, HUSSEINY is the beneficial owner of the MB

Consulting Account and, among other things, he helped to facilitate the diversion of 2013 bond proceeds to the Tanore Account at Falcon Bank, where he was the Chairman.

602.   The Investor's total contribution to the Partnership to date has been approximately $380 million.

603.   As recently as February 2016, LOW paid a capital call on behalf of the "Investor" in the amount of approximately $2,956,162.03.  Specifically, on or about February 10, 2016, LOW transferred $3,206,162.03 from an account held in his name at Amicorp Bank and Trust in Hong Kong to the M&T Bank account held by Symphony CP Investments LLC, one of the LOW Investment Entities.  On or about February 11, 2016, Symphony CP Investments LLC sent $2,956,162.03 through an intrabank transfer to the M&T Bank account held by the Park Lane Partnership.

604.   LOW and the "Investor" failed to make the capital call dated May 5, 2016.  On May 20, 2016, Witkoff notified the "Investor" that it was in default.

### 3.   The Park Lane Partnership's Acquisition of the Park Lane Hotel

605.   On or about July 16, 2013, the Park Lane Partnership entered into a Purchase and Sale Agreement with the Leona M. and Harry B. Helmsley Charitable Trust and the Park Lane Hotel, Inc., for the purchase of 36 Central Park South, then known as the Helmsley Park Lane Hotel, for $660,000,000.  The Park Lane Partnership assigned its interests in that purchase agreement to a wholly-owned subsidiary, "Symphony CP (Park Lane) Owner LLC."

606.   Real property transfer documents from the New York City Department of Finance, Office of the City Register, indicate that, "Symphony CP (Park Lane) Owner LLC" acquired 36 Central Park South on November 25, 2013, for $654,316,305.  The deed was recorded on December 5, 2013.  The Park Lane Partnership secured a mortgage on the property from Wells Fargo Bank for a maximum principle amount of $291,700,000, with an initial loan of $266,700,000. The mortgage in the amount of $266,700,000 was recorded on December 5, 2013.

607.   "Symphony CP (Park Lane) Owner LLC," the entity used to acquire the Park Lane Hotel, is wholly-owned, through multiple subsidiaries, by the Park Lane Partnership.

### 4.   Low Acquired an Interest in the Park Lane Hotel for His Personal Benefit Rather Than That of 1MDB

608.   LOW, Szen, and Jynwel Capital did not invest in the Park Lane Partnership for the benefit of 1MDB or ADMIC.  Neither 1MDB nor ADMIC holds any interest in the Park Lane Partnership, and there is no indication that any proceeds of the investment in the Partnership have been returned to 1MDB or ADMIC.  Rather, LOW and Szen invested in the Partnership, through Jynwel, solely on behalf of themselves and their family, and LOW falsely claimed to be investing personal family funds, not 1MDB funds.

609.   On October 16, 2013, a Principal at Witkoff who worked on the Partnership deal sent an email to LOW and Szen stating in relevant part:

> We are getting down to the end with the lender, they are asking for specifics on where the money on your side of the deal is coming from given it is international money . . ., can you please provide specifics to me so I can forward it to the lender.

LOW responded the same day: "Low Family Capital built from our Grandparents, down to the third generation now."  In reply, the Witkoff Principal wrote: "Ok, thanks Jho, just didn't know if there were any other minority investors on your side, I will let the bank know."   LOW confirmed in response, in relevant part: "Just all the family."

610.   In an email dated October 17, 2013, the Witkoff Managing Director advised individuals at Wells Fargo, where the Park Lane Partnership was at the time seeking a mortgage, that "Jynwel serves as the advisory team to the Investor (Jho and Szen).  Their capital derives from a family trust which Jho and Szen control."

611.   Promotional material about Jynwel Capital, which LOW relied on to demonstrate the purported nature and source of his wealth to other entities with which he

sought to do business, characterized Jynwel's investment in the Park Lane Hotel as one of its "key investments."  Another background document relied on by LOW to show the origins of his wealth indicated that Jynwel "provides services to the Low Family Investment Trusts" and "does not manage third party funds."  This same material claims that LOW is a "third generation steward" of family wealth.

## K. LOW PURCHASED THE VAN GOGH ARTWORK USING 1MDB FUNDS FUNNELED THROUGH THE DRAGON MARKET ACCOUNT, DRAGON DYNASTY ACCOUNT, AND ADKMIC BSI ACCOUNT

612.   LOW used funds traceable to the Tanore Phase in 2013 to acquire the VAN GOGH ARTWORK, a 76 x 54 cm pen and ink drawing by Vincent Van Gogh entitled *La maison de Vincent a Arles*.

613.   As noted in Paragraphs 361-362 above, Tanore successfully bid on the VAN GOGH ARTWORK at a November 5, 2013, Christie's auction, for a purchase price of $5,485,000.  After Tanore was unable to make payments for the artwork, TAN informed Christie's that LOW would be purchasing the artwork instead.  Christie's issued LOW an invoice for $5,485,000 on December 20, 2013.

614.   LOW purchased the VAN GOGH ARTWORK using funds diverted from the 2013 bond sale.  As noted above in Paragraphs 579-580, on or about March 25, 2013, a wire of $378,000,000 was sent from the Tanore Account to the Granton Account at Falcon Bank in Singapore.  On or about that same day, a wire of $378,000,000 was sent from the Granton Account to the Dragon Market Account.  As noted above in Paragraph 408 and Table 13, on November 5 and 6, 2013, two additional wires totaling $140,500,000 were sent from the Granton Account to the Dragon Market Account.  In total $518,500,000 was transferred from the Granton Account to the Dragon Market Account between March 25, 2013 and November 6, 2013.

615.   As noted above in Paragraph 582, between April 25, 2013 and November 8, 2013, four wires totaling $476,300,000 were sent from the Dragon Market Account to

the Dragon Dynasty Account.  This included a wire in the amount of $9,800,000 sent on or about September 10, 2013.  Three days later, on or about September 13, 2013, a wire of $9,300,000 was sent from the Dragon Dynasty Account to the ADKMIC BSI Account.  That same day, $9,300,000 was sent from the ADKMIC BSI Account to LOW's personal account at BSI Bank in Singapore.

616.   As noted in Paragraph 584 above, LOW also received funds into his personal account at BSI Bank in Singapore indirectly from the Dragon Dynasty Account via his father's account.  On or about November 12, 2013, $248,500,000 was wired from the Dragon Dynasty Account to the LHP Account, which, on the same day, transferred $235,500,000 to LOW's personal bank account at BSI Bank in Singapore.

617.   On or about December 20, 2013, a wire of $7,288,667 was sent from the LOW BSI Account to Christie's bank account at J.P. Morgan Chase in the United States. A second wire of $5,120,000 was sent on or about January 22, 2014, to the same Christie's account.  The payment details for that wire read: "NOTES: NOV 2013 AUCTIONS: VAN GOGH (2ND PAYMENT USD1,583,333.00) AND BASQUIAT (2ND PAYMENT USD3,533,333.33.)  A third wire of $5,117,000 was sent from the LOW BSI Account to Christie's on or about February 5, 2014, with the payment details: "NOTES: FINAL PAYMENT FOR AUCTION 2013 (VAN GOGH AND BASQUIAT.)[17]

618.   A Christie's invoice for the VAN GOGH ARTWORK, marked "PAID," reflects that LOW paid $5,485,000 for the VAN GOGH ARTWORK.

619.   On March 13, 2014, LOW sent an email to an employee at SNS Fine Art (the "SNS Employee"), an art dealer, inquiring:  "Do you know of any banks, financiers who take art as security for raise bank loans for investments/acquisitions of more artwork?"  Later that same day, LOW explained further in another email to the SNS Employee which read in relevant part, "Just looking to borrow based on asset value. . .

---

[17] On February 4, 2014, the LOW BSI Account received a wire transfer of $334,102,534 from the LHP Account.

Abt usd 330m, so looking for 50%.  Only would like facility for 6 months to a year, so I free up cash . . . Can you let me know who can do it?  And the top 2 or 3 that would be v aggressive."

620.   That same day, the SNS Employee responded to LOW, stating in relevant part, "I think those sort of numbers would scare off Sotheby's . . ." and suggested that LOW consider other financial institutions.  LOW responded in an email, "Yes pls. Prefer the boutique banks that can move fast vs the large ones like JPM."  In another email dated March 13, 2014, LOW explained to the SNS Employee what types of lenders he would be looking to utilize.  Specifically, LOW requested that the SNS Employee look for "Quick, fast and aggressive and ones you know v well.  Out of Europe or usa or middle east not asia.  Have abt usd350m and looking for line of 50% so I can buy more."

621.   In discussing the issue of using artworks as collateral to obtain funding from a creditor, LOW sent another email to the SNS Employee on March 14, 2014, explaining that the lender "can take all the art no problems.  All in Geneva free port.  Speed is the most important and one with a fairly quick and relaxed kyc process.  Thanks!"

622.   In April 2014, LOW used several pieces of art, including the VAN GOGH ARTWORK, to secure a loan from Sotheby's Financial Services, Inc. ("Sotheby's Financial"), a Sotheby's affiliate.  The loan, with a principal amount of $107 million, was obtained by Triple Eight Ltd., a Cayman Island entity wholly-owned by LOW.  LOW secured the loan by pledging to Sotheby's, as collateral, all right and title to 17 pieces of art, which the April 14, 2014 Loan Agreement estimated to be worth between $191.6 million and $258.3 million.  The list of art used as collateral to secure the loan included the VAN GOGH ARTWORK, as well as several works originally purchased by Tanore in May and June 2012 and "gifted" to LOW in October 2013, as described in Section IV.E above.

623.   Disbursement records show that Sotheby's Financial disbursed $105,188,721.95 to an account at Caledonia Bank Ltd. in the Cayman Islands held in the name of Triple Eight Ltd. on or about April 10, 2014.

624.   After disbursing the loan amount to LOW, Sotheby's sold some of the paintings that LOW had pledged as collateral for the loan at LOW's direction.  By May 2016, Sotheby's had recovered sufficient funds from the proceeds of the sale of certain pledged art, including the painting *Dustheads* discussed in Paragraph 352, to cover the outstanding balance of the loan.  Upon repayment of the loan, Sotheby's released its security interest in the artwork.  As of June 7, 2017, Sotheby's still had the VAN GOGH ARTWORK in its possession.

## L.   LOW PURCHASED THE SAINT GEORGES PAINTING USING 1MDB FUNDS FUNNELED THROUGH THE DRAGON MARKET AND DRAGON DYNASTY ACCOUNTS

625.   LOW used funds traceable to the Tanore Phase in 2013 to acquire the SAINT GEORGES PAINTING, a 25½ x 36¼ inch (65 x 92 cm) oil on canvas painting entitled "*Saint-Georges Majeur.*"  The painting was signed and dated "Claude Monet 1908" in the lower left-hand corner of the painting.

626.   LOW purchased the SAINT GEORGES PAINTING from SNS Fine Arts ("SNS"), an art dealer, for a purchase price of $35,000,000 on December 18, 2013.

627.   SNS issued LOW an invoice for the SAINT GEORGES PAINTING, stating that LOW owed SNS an initial down payment of $5,000,000 on or before December 25, 2013.  The remaining $30,000,000 was due on or before January 31, 2014.

628.   On December 20, 2013, LOW sent an email to the SNS Employee asking, "Wld you be kind enough to send me an image of this artwork so I can show my family? Thank you."

629.   On December 22, 2013, the SNS Employee sent an email to LOW stating in pertinent part, "Dear Jho, Congratulations on acquiring Monet's stunning "Saint-Georges

Majeur' . . . which, as you know, once belonged to the Art Institute of Chicago and is also on the cover of Phillipe Piguet's book, 'Monet et Venise.'"

630.   LOW paid for the VAN GOGH ARTWORK using funds diverted from the 2013 bond sale.  As noted in Paragraphs 579-580 above: (i) a wire in the amount of $378,000,000 was sent from the Tanore Account to the Granton Account on March 25, 2013; and (ii) three wires totaling $518,500,000 were sent from the Granton Account to the Dragon Market Account between March 25, 2013 and November 6, 2013.

631.   As noted above in Paragraph 582, between April 25, 2013 and November 8, 2013, four wires totaling $476,300,000 were sent from the Dragon Market Account to the Dragon Dynasty Account.  This included a wire in the amount of $9,800,000 that was sent on or about September 10, 2013.  Three days later, on or about September 13, 2013, a wire of $9,300,000 was sent from the Dragon Dynasty Account to the ADKMIC BSI Account.  That same day, $9,300,000 was sent from the ADKMIC BSI Account to the LOW BSI Account.

632.   As noted in Paragraph 584 above, LOW also received funds into his personal account at BSI Bank in Singapore indirectly from the Dragon Dynasty Account via his father's account.  On or about November 12, 2013, $248,500,000 was wired from the Dragon Dynasty Account to the LHP Account, which, on the same day, transferred $235,500,000 to the LOW BSI Account.

633.   On December 23, 2013, a $5,000,000 wire was sent from the LOW BSI Account to SNS Fine Arts' account at J.P. Morgan Chase in connection with the purchase of the SAINT GEORGES PAINTING.

634.   On December 23, 2013, the SNS Employee sent an email to LOW confirming that SNS received the $5 million payment.  The subject line of the email read, "Re: Fw: Swift advice on USD 5 mio value 23.12.2013."  The email stated in pertinent part, "Dear Jho— I just received notification that the $5M are pending in our account.  Congratulations, it's a marvelous painting.  I would love to send you a copy of the Monet in Venice book, should I send it to the address of your invoice in HK?"

635.   On February 5, 2014, a wire for $30,000,000 was sent from the LOW BSI Account to SNS Fine Arts' account at J.P. Morgan Chase.

636.   On January 28, 2014, the SNS employee sent an email to LOW.  The email read in relevant part, "Dear Jho, . . . We are currently preparing the crate and shipment for Claude Monet's stunning Venice view 'Saint-Georges Majeur'.   Could you kindly confirm the name, address and contact information of where you would like us to arrange to send it please."  The following day, LOW responded to the SNS employee and informed him that he would like to have the painting placed in LOW's storage in "Geneva Free Port," in Switzerland.

637.   The SAINT GEORGES PAINTING was one of the pieces of art that LOW used as collateral to secure the loan from Sotheby's Financial to Triple Eight in April 2014, as referenced in Paragraph 622.  After the balance of that loan was paid through the sale of other pledged artwork, as set forth in Paragraph 624, Sotheby's released its security interest in the SAINT GEORGES PAINTING.  As of June 7, 2017, Sotheby's still had the SAINT GEORGES PAINTING in its possession.

## M.   LOW PURCHASED THE PETIT NYMPHEAS PAINTING USING 1MDB FUNDS FUNNELED THROUGH THE DRAGON MARKET AND DRAGON DYNASTY ACCOUNTS

638.   LOW used funds traceable to the Tanore Phase in 2013 to acquire the PETIT NYMPHEAS PAINTING, a 88.5 cm by 100 cm oil on canvas painting entitled "*Nympheas.*"  The painting was signed "Claude Monet" in the lower right-hand corner of the painting.

639.   LOW purchased the PETIT NYMPHEAS PAINTING on June 23, 2014, from Sotheby's for a purchase price of £33,829,500 British Pounds ("GBP") (equivalent to approximately $57.5 million).

640.   As noted in Paragraphs 579-580 above: (i) a wire in the amount of $378,000,000 was sent from the Tanore Account to the Granton Account on March 25,

2013; and (ii) three wires totaling $518,500,000 were sent from the Granton Account to the Dragon Market Account between March 25, 2013 and November 6, 2013.

641.   As noted above in Paragraph 582, between April 25, 2013 and November 8, 2013, four wires totaling $476,300,000 were sent from the Dragon Market Account to the Dragon Dynasty Account.  This included a wire in the amount of $9,800,000 on or about September 10, 2013.  Three days later, on or about September 13, 2013, a wire of $9,300,000 was sent from the Dragon Dynasty Account to the ADKMIC BSI Account. That same day, $9,300,000 was sent from the ADKMIC BSI Account to the LOW BSI Account.

642.   As noted in Paragraph 584 above, LOW also received funds into his personal account at BSI Bank in Singapore indirectly from the Dragon Dynasty Account via his father's account.  On or about November 12, 2013, $248,500,000 was wired from the Dragon Dynasty Account to the LHP Account, which, on the same day, transferred $235,500,000 to the LOW BSI Account.

643.   On July 31, 2014, a wire for £3,183,997 GBP (equivalent to approximately $5.4 million) was sent from the LOW BSI Account to an account maintained by Sotheby's as an initial payment for the PETIT NYMPHEAS PAINTING.

644.   On October 21, 2014, another wire for $65,000,000 was sent from the Dragon Market Account to the Dragon Dynasty Account.  This wire was processed through a U.S. correspondent bank account at J.P. Morgan Chase.[18]

645.   Two days later, on October 23, 2014, a wire for $65,000,000 was sent from the Dragon Dynasty Account to the LOW BSI Account.  That same day, a wire for £28,500,000 GBP (equivalent to approximately $45.7 million) was wired from the LOW BSI Account to Sotheby's in the United Kingdom to acquire the PETIT NYMPHEAS PAINTING.

---

[18] On October 16, 2014, a wire for $72,510,000 was sent from an account in the name of TKIL Capital Partners Ltd. at AmiCorp Bank in Barbados to the Dragon Market Account.

646.   On or about March 17, 2015, LOW, Triple Eight, and Sotheby's Financial executed an amendment to the April 2014 loan agreement discussed in Paragraph 622 ("Loan Amendment").  Among other things, the Loan Amendment extended the maturity date of the loan, released certain pledged artwork, and added additional artwork as collateral to secure the original loan.  The PETIT NYMPHEAS PAINTING was among the works of art that LOW added as collateral in that Loan Amendment.  Pursuant to the Loan Amendment, LOW was required to surrender possession of the PETIT NYMPHEAS PAINTING to Sotheby's.  After the balance of the loan was paid through the sale of other pledged artwork, as set forth in Paragraph 624, Sotheby's released its security interest in the PETIT NYMPHEAS PAINTING.

647.   On July 15, 2016, an art dealer in Hong Kong ("Hong Kong Art Dealer") paid €26,932,500 into an escrow account at UBS Bank, S.A. in Switzerland to acquire the PETIT NYMPHEAS PAINTING from LOW.  The Hong Kong Art Dealer was acquiring the painting on behalf of an anonymous third party.  The agreed upon purchase price for the PETIT NYMPHEAS PAINTING was €25,227,025.83.  The funds paid into the escrow account also included escrow fees owed to a Swiss escrow agent and a commission to the Hong Kong Art Dealer.

648.   On July 19, 2016, the Hong Kong Art Dealer directed that the sale proceeds from the sale of the PETIT NYMPHEAS PAINTING be transmitted from the escrow account at UBS Bank to LOW's bank account at Banque Federale de Commerce, S.A. in Comoros through Moroccan Foreign Trade Bank International, S.A., with whom Banque Federale de Commerce possessed a correspondent bank relationship.

649.   On July 22, 2016, Moroccan Foreign Trade Bank International, S.A. declined to process the transaction until certain compliance-related facts could be obtained from the escrow agent in Switzerland.  When the escrow agent could not provide satisfactory answers to these questions, the sale proceeds ("PETIT NYMPHEAS PROCEEDS") were returned to the escrow account at UBS Bank.

**N.    QUBAISI ACQUIRED THE WALKER TOWER PENTHOUSE USING FUNDS DIVERTED THROUGH THE AABAR-BVI SWISS ACCOUNT**

650.    Funds traceable to the proceeds of the 2012 bond sales, which were diverted from 1MDB and/or IPIC, were used by QUBAISI to acquire a penthouse condominium unit in the Walker Tower in New York, New York.  The property was purchased by an entity called 212 West 18th Street LLC on January 21, 2014, for approximately $50,912,500.  Greenberg Traurig, LLP, a U.S.-based law firm, represented 212 West 18th Street LLC in connection with the purchase.

651.    As noted in Paragraphs 189-200, beginning on or about May 22, 2012, the Aabar-BVI Swiss Account received approximately $1.367 billion in funds traceable to the 2012 bond sales.  And, as set forth in Section III.D above, between May and November 2012, Aabar-BVI, of which QUBAISI was a purported director, sent five wires totaling approximately $637,000,000 from its account at BSI Lugano in Switzerland to the Blackstone Account at Standard Chartered in Singapore.  On or about October 24, 2012, Aabar-BVI also caused an additional $366,000,000 to be sent to Blackstone via intermediaries.

652.    As described in Paragraph 241, between on or about May 29, 2012, and November 30, 2012, four wires totaling $472,750,000 were sent from the Blackstone Account to the Vasco Account.

653.    On or about February 20, 2013, $20,750,000 was wired from the Good Star Account to the Vasco Account.

654.    On October 28, 2013, a wire of $15,000,000 was sent from the Vasco Account to an account at Citibank in the United States maintained by Greenberg Traurig. The payment details on the wire read: "WALKER TOWER, PH1 CLIENT/MATTER NO: 148376/010100 ATTORNEY NAME:" followed by the name of the attorney at Greenberg Traurig who represented the buyer in the transaction.

178

655.   On January 21, 2014, another wire of $36,596,281 was sent from the Vasco Account to the same Citibank account maintained by Greenberg Traurig.  The payment details on the wire indicated, in relevant part: "WALKER TOWER ON BEHALF AL QUBAISI FAMILY TRUST FOR LOAN TO AL QUBAISI212 WEST 18 STREET LLC"; the payment details also included the name of the attorney at Greenberg Traurig who represented the buyer in the transaction.

656.   On October 30, 2013, QUBAISI entered into a Purchase Agreement with "SMJ 210 West 18 LLC," a Delaware limited liability company, for the purchase of THE WALKER TOWER PENTHOUSE for the price of $50,000,000.  The agreement is signed by QUBAISI as the purchaser.

657.   On January 21, 2014, QUBAISI assigned his interest in the Purchase Agreement to "212 West 18th Street LLC f/k/a Al Qubaisi 212 West 18th Street LLC." QUBAISI signed on behalf of himself as the assignor, and also on behalf of "Al Qubaisi 212 West 18th Street LLC" as the assignee.  Neil Moffitt ("Moffitt") signed as the Manager of "Al Qubaisi 212 West 18th Street LLC."

658.   The property was purchased by "212 West 18th Street LLC" by deed dated January 21, 2014, for a purchase price of $50,912,500.  Moffitt signed as the Manager of "212 West 18th Street LLC."  Moffitt manages or managed several properties on behalf of QUBAISI.

659.   On March 9, 2015, $158,664.71 was transferred from the Vasco Account to an account at J.P. Morgan Chase maintained by Moffitt.  Payment details on the wire read: "WALKER TOWER COMPLETE EXPENSES . . . TOTAL TO 2.20.2015."

## O.   QUBAISI ACQUIRED THE LAUREL BEVERLY HILLS MANSION USING FUNDS DIVERTED THROUGH THE AABAR-BVI SWISS ACCOUNT

660.   As described below, QUBAISI used funds from the Vasco Account, which are traceable to the proceeds of the 2012 bond sales, to purchase THE LAUREL BEVERLY HILLS MANSION in Beverly Hills, California.  The property was

purchased for $31,000,000 on or about February 5, 2014, by Laurel Beverly Hills Holdings LLC, a Delaware limited liability company.

661.   On or about January 10, 2014, QUBAISI transferred $930,000 from an account at Falcon Bank in Switzerland held in his name to an account at Chase Manhattan Bank belonging to Escrow of the West.  The Buyer's Final Settlement Statement for the property acquisition, dated February 5, 2014, characterizes this transfer as a deposit for the purchase of the LAUREL BEVERLY HILLS MANSION "from Khadem Al-Qubaisi FBO Neil Moffitt."

662.   On or about January 30, 2014, $31,050,387.75 was wired from the Vasco Account to an account at City National Bank in New York held in the name Escrow of the West.  The wire notations indicate: "7 M. FOR EQUITY TO AL QUBAISI WALKER TOWER TRUST AND 24 M. FOR LOAN CONTRIB. FROM AL QUBAISI TO LAUREL BEVERLY HOLDING LLC."

663.   Escrow of the West recorded a deposit of $31,050,387.75 for the purchase of the LAUREL BEVERLY HILLS MANSION from Vasco Investments "FBO Laurel Beverly" on the Buyer's Final Settlement Statement for the property acquisition.

664.   LAUREL BEVERLY HILLS MANSION was purchased by Laurel Beverly Hills Holdings LLC by deed dated January 14, 2014, which was recorded in the land records on February 5, 2014.  The purchase price was $31,000,000.  Neil Moffitt was an authorized signor for Laurel Beverly Hills Holdings LLC.

## P.   QUBAISI ACQUIRED HILLCREST PROPERTY 2 USING FUNDS DIVERTED THROUGH THE AABAR-BVI SWISS ACCOUNT[19]

665.   QUBAISI used funds traceable to the proceeds of the 2012 bond sales to purchase HILLCREST PROPERTY 2 in Beverly Hills, California.  The property was

---

[19] On or about May 26, 2017, the United States entered into a stipulation and request to enter a consent judgment with respect to the HILLCREST Property 2, based on representations by Neil Moffitt that he acquired the property from QUBAISI after the events alleged above, through an arm's length commercial transaction.

purchased on or about March 24, 2014 by 1169 Hillcrest LLC, a Nevada limited liability company, for $15,000,000.

666.   On or about March 21, 2014, $14,749,071.51 was wired from the Vasco Account to an account at First American Trust, F.F.B. in the United States, held in the name of First American Title Company.  The payment details on the wire contain the address for HILLCREST PROPERTY 2.

667.   First American Title Company is the title company used in connection with the acquisition of HILLCREST PROPERTY 2.  First American Title Company recorded the receipt of a deposit in the amount of $14,749,071.51 from Vasco Investments on March 21, 2014 for the purchase of HILLCREST PROPERTY 2.

668.   Land records maintained by the LA Recorder's Office show that a Nevada limited liability company called 1169 Hillcrest LLC purchased the property by deed dated March 20, 2014, which was recorded in the land records on March 24, 2014.

669.   According to the final closing statement for the transaction, dated March 24, 2014, 1169 Hillcrest LLC acquired the property for the purchase price of $15,000,000. This included a deposit of $14,749,071.51 from First American Title Company.

670.   The Operating Agreement for 1169 Hillcrest LLC, dated March 20, 2014, lists Neil Moffitt as the manager and sole member of the entity.

671.   On or about January 8, 2016, a wire of $490,522.79 was sent from the Vasco Account to an account at J.P. Morgan Chase in the United States held in the name of 1169 Hillcrest LLC.  The wire details read: "OUTSTANDING INVOICES FOR WALKER TOWER (USD 26.194,81) AND BEVERLY LAUREL (USD 463.327,98) PERIOD FROM SEPTEMBER TO DECEMBER."

**Q.    AZIZ ACQUIRED THE QENTAS TOWNHOUSE AND PARKING SPACE 2 USING FUNDS DIVERTED THROUG THE AABAR-BWI SWISS ACCOUNT**

672.   Funds traceable to proceeds of the 2012 bond sales were used by AZIZ to purchase the QENTAS TOWNHOUSE, Belgravia, London, United Kingdom –

including a leasehold for PARKING SPACE 2.  The property was purchased by Qentas Holdings Limited on or about July 12, 2012, for £23,250,000.  In accounting records for AZIZ, the amount he paid for the QENTAS TOWNHOUSE is recorded as equivalent to $41,799,886.  AZIZ purchased the property from LOW, who acquired it in 2010 using diverted 1MDB money from the Good Star Account.

673.   In 2010, LOW entered into a Contract for Sale to acquire the QENTAS TOWNHOUSE from O & Property Developments Ltd. through a holding company called "Lygon Place (London) Limited."  Macfarlanes, a London law firm, represented LOW's holding company in the transaction.  The purchase price was £17,000,000.  The closing on the property was scheduled for August 6, 2010.

674.   On or about August 4, 2010, LOW instructed RBS Coutts to send GBP £18,000,000 to an escrow account in the United Kingdom maintained by Macfarlanes.  Internal bank records list the reason for this transfer as "Property purchase (investment)," with the address of the QENTAS TOWNHOUSE.  LOW also provided the bank with a copy of the Contract for Sale in support of the wire transfer.  LOW submitted modified wire instructions shortly thereafter, directing Coutts to send the GBP £18,000,000 first to an account at Rothschild Bank in Switzerland held in the name of One Universe Trust ("One Universe Account"), so that the closing could be handled out of that account.

675.   The One Universe Trust was a trust administered by Rothschild Trust for the benefit of LOW and (at least nominally) his family.  LOW was the stated beneficial owner of the One Universe Account.  LOW used the One Universe Account to intermediate payments between his numerous bank accounts around the world and bank accounts set up by Rothschild in the name of various trusts, each created to hold a specific asset of LOW's.

676.   Bank statements confirm that this layered transaction occurred consistent with LOW's instructions.

677.   In 2012, AZIZ acquired the QENTAS TOWNHOUSE from LOW.  A purchase agreement for the QENTAS TOWNHOUSE was signed on July 2, 2012.

Lygon Place (London) Limited, LOW's holding company, is listed as the seller;  Qentas Holdings Limited ("Qentas"), a British Virgin Islands entity, is listed as the purchaser; and Shearman & Sterling's London office is listed as the purchaser's counsel.  The purchase price was £23,250,000.

678.   Qentas acquired the QENTAS TOWNHOUSE from "Lygon Place (London) Limited" by deed dated July 27, 2012, for £23,250,000.  AZIZ signed the deed on behalf of Qentas, and the Red Granite Business Manager signed as a witness.

679.   Qentas also acquired leasehold rights to PARKING SPACE 2 as part of the transaction.  Closing documents indicate that a lease agreement was originally entered on August 9, 2010 between O & H Properties Developments Limited and "Lygon Place (London) Limited," the entity that sold the property to Qentas.  The lease agreement granted "Lygon Place (London) Limited" a 999 year lease, beginning on January 1, 2009, to PARKING SPACE 2 for rent of "a peppercorn per annum."  "Lygon Place (London) Limited" conveyed this leasehold interest to Qentas by the same deed that transferred title to the QENTAS TOWNHOUSE.

680.   AZIZ paid LOW to acquire the QENTAS TOWNHOUSE using funds traceable to diverted 2012 bond proceeds.  As noted in Paragraphs 263 and 268 above, on or about June 18, 2012, Aabar-BVI transferred $133,000,000 in funds traceable to the proceeds of the 2012 Project Magnolia bond sale to AZIZ's Red Granite Capital Account at BSI Bank in Singapore.  On or about June 20, 2012—approximately two days later— AZIZ transferred $58,500,000 from his Red Granite Capital Account to the Shearman IOLA Account at Citibank.

681.   One day later, on June 21, 2012, the Shearman IOLA Account wired $43,000,000 from the same funds held on behalf of AZIZ to an account maintained by Shearman & Sterling's London office for the purchase of the QENTAS TOWNHOUSE from LOW.  Proceeds of the sale of the QENTAS TOWNHOUSE were ultimately transferred to LOW and used to acquire an interest in the Viceroy Hotel Group, as explained in further detail in Section VI.T below.

183

682.   AZIZ claimed beneficial ownership of Qentas in his 2012 tax return.  That tax return lists a Los Angeles address for Qentas.

### R.   LOW ACQUIRED AN INTEREST IN THE STRATTON PENTHOUSE AND THE STRATTON FLAT USING 1MDB PROCEEDS FUNNELED THROUGH THE GOOD STAR ACCOUNT

683.   LOW acquired  the "Penthouse Flat" located in a building known as the "Stratton House" in Mayfair, London, United Kingdom ("The STRATTON PENTHOUSE") and another Mayfair property located several doors down from the STRATTON PENTHOUSE ("The STRATTON FLAT") with proceeds traceable to the $700 million wire transfer from 1MDB to the Good Star Account.

684.   On or about March 19, 2010, approximately £35 million was wired from the Good Star Account to a Royal Bank of Scotland PLC ("RBS London") account named "Macfarlanes LLP Client Account Number 1."  Macfarlanes LLP is a U.K. law firm based in London.  Internal bank records on the transaction indicate that this wire was "needed to complete a property purchase in the UK.  The payment goes to Macfarlanes . . . .  Because of bad connection (client was in a plane) no more details could have been asked.  However, we will obtain detailed information when we meet the client next time."

685.   In a letter on Good Star letterhead dated on or about March 19, 2010, and bearing a signature similar to one LOW used on his Malaysian and St. Kitts and Nevis passports, LOW provided RBS Coutts with additional details about the £35 million wire. LOW stated, in part: "I hope all is well.  As discussed, please kindly arrange for the . . . wire transfer [of] GBP 35,000,000.00 in full to the account details below for value date asap."  LOW then provided the details for the Macfarlanes RBS London account, previously defined as Macfarlanes LLP Client Account Number 1,  and indicated that the approximately £35 million wire was in reference to "Completion UK Property."  As explained above, LOW was the Good Star Account's beneficial owner and sole authorized signatory.

686.   Land registry records from the U.K. showed that approximately four days later, on or about March 23, 2010, an entity called Stratton Street (London) Limited acquired a leasehold for the STRATTON PENTHOUSE for a term of approximately 125 years.  In a subsequent lease executed in or around February 2014, Stratton Street (London) Limited extended its lease of the STRATTON PENTHOUSE to approximately 215 years pursuant to a provision in its original lease.

687.   Land registry records from the U.K. also show that on or about May 27, 2010, Seven Stratton Street (London) Limited, an entity with a name strikingly similar to Stratton Street (London) Limited, "received . . . the price stated to be payable for [the STRATTON FLAT] in a contract dated 27 May 2010."  According to land registry records, the "Price paid/Value" for the STRATTON FLAT was "over £1 million."

688.   Lawyers with Macfarlanes registered with the land registry office in the U.K. both (i) the lease of the STRATTON STREET PENTHOUSE on behalf of Stratton Street (London) Limited, and (ii) the purchase of the STRATTON FLAT on behalf of Seven Stratton Street (London) Limited.

689.   Plaintiff alleges on information and belief that LOW was affiliated with both Stratton Street (London) Limited and Seven Stratton Street (London) Limited and used these entities to acquire these properties with funds from the approximately £35 million wire from Good Star, based on the following facts and circumstances, among others:

a.     The approximately £35 million wire from the Good Star Account to the Macfarlanes RBS London account occurred approximately four days before Stratton Street (London) Limited leased the STRATTON PENTHOUSE and approximately two months before—according to land registry records—Seven Stratton Street (London) Ltd. "received . . . the price stated to be payable for [the STRATTON FLAT] in a contract dated 27 May 2010."

b.     LOW authorized the £35 million wire from the Good Star Account and directed the trustee of the Good Star Account to transfer the proceeds to a RBS

London client account established in the name of Macfarlanes, the law firm that registered the lease of the STRATTON PENTHOUSE on behalf of Stratton Street (London) Limited and the purchase of the STRATTON FLAT on behalf of Seven Stratton Street (London) Limited.

c.     In late 2016, LOW and the members of LOW's immediate family ("LOW Family") filed proceedings in New Zealand seeking to replace Rothschild Trust (Schweiz) AG ("Rothschild Trust"), the trustee responsible for administering the bulk of LOW's assets.  In a submission made in those proceedings, Rothschild Trust disclosed that both the Stratton Street (London) Trust and the Seven Stratton Street (London) Trust were held for the benefit of LOW and the LOW Family.  They are two of three known London properties administered in trust for LOW and the LOW Family.

d.     As alleged in Paragraph 346, LOW was the beneficial owner of Selune Ltd.  Bank records for the Selune Account show several wire transfers from the Selune Account to "Stratton Street (London) Trust" and "Seven Stratton Street (London)," two entities with names identical or nearly identical to the entities that that acquired the leases for the STRATTON PENTHOUSE and the STRATTON FLAT.

## S.     LOW PURCHASED THE STRATTON OFFICE USING DIVERTED 2013 BOND PROCEEDS.

690.   In or around February 2014, LOW used funds traceable to misappropriated 1MDB proceeds to purchase the STRATTON OFFICE, consisting of multiple units located down the street from the STRATTON PENTHOUSE and STRATTON FLAT in Mayfair, London, United Kingdom, for approximately £42 million.

691.   LOW paid for the STRATTON OFFICE using purported investment returns from a joint venture with IPIC, which were traceable to money laundered through the Park Lane deal.  As noted above in Paragraph 600, on or about December 26, 2013, DLA Piper transferred approximately $56,500,000 to the LHP Account, representing proceeds of the sale of a partial interest in the Park Lane Partnership to Mubadala.  LHP and LOW used the proceeds of the sale of equity in the Park Lane Partnership to invest

in a different joint venture with IPIC.  This venture, called Condor Acquisition (Cayman) Limited ("Condor"), was formed to acquire Coastal Energy, a Houston-based company with oil assets in Southeast Asia.  Ultimately, LOW and his father participated in the deal through an entity called Strategic Resources (Global) Ltd., and IPIC participated through its wholly-owned subsidiary, Compañía Española de Petróleos S.A. (CEPSA), a Spanish oil and gas company.  Both HUSSEINY and QUBAISI, the latter of whom served as CEPSA's chairman, were involved in the deal.  SRG invested roughly one-twentieth of the necessary capital, with CEPSA responsible for the remainder.

692.   On or about December 27, 2013, the day after the LHP Account received $56,500,000 from DLA Piper, $55,500,000 in funds were transferred from the LHP Account to another bank account at BSI Bank in Singapore held in the name of SRG ("SRG Account").  LHP was the stated beneficial owner of the SRG Account at BSI.  LOW was also an authorized signatory on the account and gave BSI bankers instructions with respect to the account.

693.   On or about the same day that SRG received $55,500,000, it transferred $50,000,500 to another bank account at BSI Bank in Singapore held in the name of Condor Acquisition (Cayman) Limited.  This account belonged to the entity that, according to LOW, was investing in the Condor joint venture on behalf of SRG.  LHP was the stated beneficial owner of the account, and Szen and Li Lin Seet were authorized signatories.

694.   On or about January 24, 2014, Condor Acquisition (Cayman) Limited transferred $50,003,611 to a bank account at Banco Bilbao Vizcaya Argentaria SA in Spain that was beneficially owned by CEPSA.  These funds represented the investment by LOW and LHP in the acquisition of Coastal Energy, using money laundered through the Park Lane deal.

695.   On or about February 3, 2014 – roughly a week after this initial investment – CEPSA transferred $350,000,000 back to SRG, ostensibly as the proceeds from the sale of SRG's shares in the joint venture to CEPSA.  The commercial basis for this

nearly-immediate 600% return on investment is not immediately apparent.  LOW characterized the payment as having resulted from a decision by CEPSA that it "wanted full control and ownership of the business" and, thus, had decided to buy out SRG's shares in the venture (which were preferred, to CEPSA's common stock).  Because this $350,000,0000 was proceeds of an investment of funds derived from the sale of equity in the Park Lane, which itself was purchased with misappropriated bond proceeds, the $350,000,000 is itself also traceable to misappropriated bond proceeds.

696.   On or about February 4, 2014, SRG transferred the approximately $350 million in supposed investment returns to the LHP Account.  In an email to BSI employees, on which LHP and Szen were copied, LOW represented that these funds were "100% owned by Mr. HP Low," LOW's father.  On or about the same day, $334,102,534 in funds were transferred from the LHP Account to LOW's personal account at BSI, purportedly as a "gift" to him.

697.   Approximately three days later, on or about February 7, 2014, LOW transferred $50,000,000 from his personal account at BSI to the One Universe Account.  Approximately eleven days later, on or about February 18, 2014, LOW transferred an additional $25,000,000 from his personal account at BSI to the One Universe Account for a total of approximately $75,000,000 in funds traceable to the 2013 misappropriated bond proceeds transferred from the LOW BSI Account to the One Universe Account.

698.   LOW routinely used the One Universe Account as an intermediary account, sending funds to the One Universe Account from one of his many bank accounts around the world, for onward passage of those funds to another account maintained by Rothschild on his behalf in connection with a specific asset purchase.

699.   One Universe Account records show that on or about March 5, 2014, One Universe exchanged approximately $70,930,672 for £42,476,000.  While One Universe Account records show that these proceeds were transferred to "Seneca World Ltd.," they also indicate that the proceeds were a "[d]istribution to LTJ."  One Universe records commonly refer to LOW as "LTJ."

700.   U.K. land registry records show that approximately eight days later, on or about March 13, 2014,  an entity called Eight Nine Stratton Street (London) Limited purchased the STRATTON OFFICE for a total of £42 million – a purchase price roughly equal to the proceeds transferred from the One Universe Account for distribution to LOW.  As with the lease and purchase of the STRATTON PENTHOUSE and the STRATTON FLAT, Macfarlanes acted on behalf of Eight Nine Stratton (London) Limited and registered the transfer of the STRATTON OFFICE with the U.K. land registry office.

701.   Plaintiff alleges on information and belief that LOW was affiliated with Eight Nine Stratton Street (London) Limited and used that entity and the approximately £42 million from the One Universe Account to purchase the STRATTON OFFICE based on the following facts and circumstances, among others:

a.   The STRATTON OFFICE served as the office space for Myla, a lingerie company that LOW acquired with funds traceable to diverted proceeds of the 2013 bonds.  Emails dated in or around July 2014 and August 2014 between LOW and a representative of Red Granite Pictures confirm that LOW acted on behalf of Myla, a company that operated from the STRATTON OFFICE and that was described in the emails as a "luxury lingerie brand."  For example, in an email dated on or about July 23, 2014, and sent "at 1:05" from the email account "Jho.Low@Myla.com," LOW introduced a Red Granite representative to Myla executives to "follow up . . . on any opportunities for Myla in the movie space," but instructed the Red Granite representative to "not c.c. me or have my name/e-mail on chains going forward."  In another email dated on or about November 7, 2014, at 4:22 p.m., LOW used the email account "joh.low.jw@gmail.com" to email a representative of K2 Intelligence to schedule a meeting in London on or about November 11, 2014, at "either at K2's office or 9SS whichever is closer."  One day later, on or about November 8, 2014, at 1:06 A.M., one of LOW's affiliates emailed the K2 Intelligence representative and proposed a November 11, 2014, meeting with LOW "at [the STRATTON OFFICES] or your office,"

indicating both that LOW's use of "9SS" in his earlier email was an abbreviation for the STRATTON OFFICES and that LOW was scheduling meetings at that property.

b.     Eight Nine Stratton Street (London) Limited shared a similar nomenclature to Stratton Street (London) Limited and Seven Stratton Street (London) Limited, the other two entities affiliated with LOW that used illicit 1MDB proceeds to lease and purchase the STRATTON PENTHOUSE and STRATTON FLAT.

c.     Proceeds roughly equal to the £42 million purchase price of the STRATTON OFFICE were transferred from the One Universe Account for distribution to LOW approximately eight days before Eight Nine Stratton Street (London) Limited purchased the property.

d.     In a submission made in the 2016 proceedings filed by the LOW Family in New Zealand court references in Paragraph 689.c above, then-trustee Rothschild Trust disclosed that Eight Nine Stratton Street (London) Trust was held for the benefit of LOW and the LOW family.  It is one of three known London properties administered in trust for LOW and the LOW family.

## T.     MORE THAN $250 MIILION IN LAUNDERED FUNDS WERE USED TO PROCURE THE EQUANIMITY

702.   As set forth below, LOW used proceeds diverted from (i) 1MDB's 2013 bond issuance, and (ii) a loan issued by Deutsche Bank to 1MDB in May 2014, to acquire the *Equanimity*, a 300-foot yacht registered in the Cayman Islands ("THE EQUANIMITY").

703.   THE EQUANIMITY was built in 2014 by Oceanco, a builder of custom yachts based in Rotterdam, Netherlands at the Alblasserdam shipyard.  THE EQUANIMITY is a luxury mega-yacht capable of carrying up to twenty-six guests and up to thirty-three crew members and includes a helicopter landing pad, an on-board gymnasium, a cinema, a massage room, a sauna, a steam room, an experiential shower, and a plunge pool.  In 2014, THE EQUANIMITY was awarded the prize for "Best in Show" at the Monaco Yacht Show.

704.   The funds LOW used in 2014 to acquire THE EQUANIMITY were harbored in an account at Caledonian Bank in the Cayman Islands maintained in the name of World View Ltd. (the "World View Account").  As described below, between January 7, 2014, and June 3, 2014, over $250 million in funds diverted from 1MDB was funneled into the World View Account in four major tranches for the purpose of acquiring and maintaining THE EQUANIMITY.

705.   On or about March 24, 2014, a lawyer at Hill Dickinson LLP in London, who was representing LOW, provided Sotheby's Financial with a "structure chart" detailing the "intragroup funds flow" for the "yacht acquisition."  The subject line of the email reads, "Equanimity Structure Chart."  The "structure chart" indicates that World View Ltd., a Cayman Islands company, serves as trustee over the Global View Discretionary Trust.  The Global View Discretionary Trust, according to the "structure chart," controls Equanimity Holdings (Cayman) Ltd., whose wholly-owned subsidiary is Equanimity (Cayman) Ltd.  THE EQUANIMITY is titled in the name of Equanimity (Cayman) Ltd.  The "structure chart" indicates further that the funds for the THE EQUANIMITY's purchase would be paid for by the Global View Discretionary Trust whose trustee is World View Ltd.

706.   On or about June 30, 2015, LOW emailed a lawyer at Hill Dickinson LLP, as well as a senior BSI banker, to confirm that "World View Limited is a family trust of which only the Low Family are beneficial owners of."  Travel records reveal that on or about September 9, 2013, while THE EQUANIMITY was still under construction near Rotterdam, LOW, as well as his parents—LHP and "Evelyn" Goh Gaik Ewe ("Goh")— flew from Barcelona to Rotterdam and spent the following day viewing the "shipyard and yacht."

1.   *First Tranche of Purchase Funds:  LOW Funneled Approximately $27 Million in Funds Laundered Through the Park Lane Partnership into the World View Account to Acquire the Equanimity*

707.  As explained in Section VI.H above, LOW acquired an 80% interest in the Park Lane Partnership using more than $200 million in misappropriated 2013 bond proceeds.  Shortly after this acquisition, LOW sold a portion of his interest to Mubadala for approximately $135,000,000.  These proceeds were initially placed into a client trust account maintained by DLA Piper, which at the time served as the trustee for the Park Lane Partnership assets.  Thereafter, DLA Piper made a distribution of those funds to LOW, LHP, and Szen in the amounts of $63,000,000, $56,5000,000, and $2,000,000, respectively.

708.  On or about January 7, 2014, within two weeks of LOW's receipt of $63,000,000 from DLA Piper, LOW transferred approximately $27,197,355 to the World View Account.

2.   *Second Tranche of Purchase Funds:  Low Wired Approximately $29 Million in Additional Funds Laundered Through the Park Lane Partnership and Bank Accounts Purportedly Controlled by LHP into the World View Account*

709.  LOW also paid for THE EQUANIMITY using investment returns traceable to money laundered through the Park Lane deal.

710.  As noted above in Paragraph 600, on or about December 26, 2013, DLA Piper transferred approximately $56,499,980 to the LHP Account, representing proceeds of the sale of a partial interest in the Park Lane Partnership to Mubadala.

711.  And as noted in Paragraph 691, LHP and LOW used these proceeds to invest in a different joint venture with IPIC to acquire Coastal Energy, using an entity called SRG.  On or about December 27, 2013, the day after LHP received $56,500,000 in proceeds from the sale of Partnership equity to Mubadala, LHP transferred $55,500,000 to another bank account at BSI Bank in Singapore held in the name of SRG.

Approximately $50 million of this amount was invested in the Condor joint venture, resulting in a $350,000,000 return to SRG shortly thereafter as proceeds of the investment.

712.   On or about February 4, 2014, SRG transferred $350,102,534 in supposed investment returns to the LHP Account.  In an email to BSI employees, on which LHP and Szen were copied, LOW represented that these funds were "100% owned by Mr. H P Low," LOW's father.  On or about the same day, $334,102,534 in funds were transferred from the LHP Account to LOW's personal account at BSI Bank, purportedly as a "gift" to him.

713.   Between on or about February 5, 2014, and April 2, 2014, LOW transferred $29,170,450 in total from this personal account of LOW's into the World View Account. Specifically, wires were sent from the LOW BSI Account into the World View Account (i) on or about February 5, 2014, for $1,357,525; (ii) on or about February 18, 2014, for $24,074,775; and (iii) on or about April 2, 2014, for $3,738,150.

> 3.   *Third Tranche of Purchase Funds:  LOW Utilized the World View Account to Harbor Approximately $65.5 Million in Funds He Borrowed from Sotheby's Financial in 2014*

714.   As described in Section IV.E above, funds diverted from 1MDB's 2013 bond sale were funneled through the Tanore Account and used by LOW to purchase tens of millions of dollars in artwork in the United States and Europe.  To further transfer the value of the artwork to LOW, on or about April 10, 2014, LOW obtained a loan from Sotheby's Financial for $107,000,000.  LOW secured the loan by pledging to Sotheby's, as collateral, all right and title to seven pieces of art worth approximately $144 million originally purchased by Tanore and "gifted" to LOW in 2013.  These artworks included the VAN GOGH ARTWORK, the SAINT GEORGES PAINTING, "Dustheads" by Basquiat, Tic Tac Toe by Calder, the Calder Standing Mobile, the Fontana Piece and the Rothko Piece (collectively the "Tanore Artworks").  The proceeds of the Sotheby's loan were wired to an account maintained in the name of Triple Eight, Ltd., an entity

controlled by LOW, at Caledonian Bank in the Cayman Islands (the "Triple Eight Account").

715.   In addition to the Tanore Artworks, several other art pieces LOW acquired between October 2, 2013, and March 31, 2014, were also used by LOW to secure the 2014 loan.  These artworks, which are worth cumulatively over $100 million, included, among other things:  (i) an untitled painting described as "Head of Madman" by Basquiat, which LOW acquired from Christie's for approximately $12,037,000 on or about December 20, 2013; (ii) "Gypsophilia on Black Skirt" by Calder, which LOW acquired from a Monaco art dealer ("Monaco Art Dealer") for approximately $3,727,500 on or about March 31, 2014; (iii) "Accord Bleu" by Yves Klein, which LOW acquired from the Monaco Art Dealer for approximately $7,573,500 on March 31, 2014; (iv) "Untitled" by Calder, which LOW acquired from the Monaco Art Dealer for approximately $1,879,000 on or about March 31, 2014; (v) "Concetto Spaziale" by Fontana, which LOW acquired from Christie's for approximately $36,000,000 on or about December 20, 2013; (vi) "Tete de femme" by Pablo Picasso, which LOW acquired from Sotheby's for approximately $39,925,000 on or about November 6, 2013; (vii) "Four Multicolored Marilyns" by Andy Warhol, which LOW acquired from TAN on or about October 2, 2013 as a purported "gift"; and (viii) "Brushstroke" by Roy Lichtenstein, which LOW also acquired from TAN on or about October 2, 2013 as a purported "gift."  TAN had himself acquired "Brushstroke" for approximately $727,500 and "Four Multicolored Marilyns" for approximately $4,300,000 from the Monaco Art Dealer.

716.   On March 20, 2014, a Sotheby's Financial executive ("Sotheby's Executive 1") emailed his colleagues at Sotheby's explaining his dealings with LOW. The email reads in relevant part that:

> Just wanted to bring you up to speed on the big loan opportunity. . . [The borrower] doesn't want us to use his name in our communications, he wants to be

referred to as 'the client' and we will refer to this transaction as project Cheetah (referring to the speed at which we are trying to move).

Confidentiality is absolutely critical to him.  I've been having multiple calls with him and his lawyers on the structure as he will most likely want to use a Cayman/BVI entity as a borrower but keep the ownership and pledge the artwork for the debt of the company plus personally guarantee it. . . . While he didn't tell me himself, his lawyers indicated he is using the money to buy a yacht (his principal lawyer is in the shipping practice but they also have a banking lawyer on the case).

717.   On March 24, 2014, LOW emailed Sotheby's Executive 1 to reiterate that, "Most imp is that client name or if bvi borrower (then guarantor name) does not show up in any public searchable document or public accesible [sic] doc re linked to loan or artworks."  In a separate email that same day, LOW explained, "Let's push ahead at speed.  Wld like to target loan draw-down and funds disbursed no later than mon, 7 apr 2014."

718.   On or about March 28, 2014, LOW executed a "Summary of Indicative Terms and Conditions" detailing a term loan of $107,000,000 from Sotheby's Financial to Triple Eight.  The document indicates that it was sent "from" "MR LOW, JHO" whose address at that time was the "L'ERMITAGE BEVERLY HILLS."  The document also lists a telephone number for LOW with a Los Angeles area code.

719.   On or about April 7, 2014, a lawyer at Hill Dickinson emailed Sotheby's Financial Executive 1 to explain that the funds that Triple Eight intended to borrow from Sotheby's Financial would be "on-lent" to LOW.  According to this email, "It is the intention of my client to settle these funds into discretionary family trusts. . . [The Trustees] have indicated that it is their intention to utilize these funds to part fund the purchase of luxury yachts and homes which have been committed to.  Please treat this email as confidential and do not forward except as strictly necessary."  LOW was also copied on this email.

720.   On or about April 10, 2014, Sotheby's Financial wired approximately $105,188,722 to the Triple Eight Account.  The following day, on or about April 11, 2014, $65,500,000 was transferred from the Triple Eight Account to the World View Account.

721.   Even before construction of THE EQUANIMITY was completed, LOW personally participated in discussions about how the vessel should be furnished.  For instance, on or about May 21, 2014, LOW emailed an Oceanco executive requesting, "For owner's cabin, perhaps if you can get expert advice from Tempur specialist which is:  -most top of the line and expensive with most functions for mattress . . ."

722.   Even after acquiring THE EQUANIMITY, LOW continued to rely on Sotheby's Financial to finance the maintenance and upkeep of the vessel.  On or about June 7, 2016, for instance, LOW emailed Sotheby's Financial Executive 1 to inform him in relevant part, "I URGENTLY need the funds as we are months overdue for legal fees and separately Equanimity Yacht crew salaries (which you will recall were the initial purpose of the initial SFS loan for the acquisition of the Yacht)."

> 4.     *Fourth Tranche of Purchase Funds:  LOW Funneled Funds Traceable to 1MDB's 2014 Loan from Deutsche Bank into the World View Account*

723.   As described in Section V.B above, on or about May 26, 2014, Deutsche Bank AG extended a $250 million bridge loan facility to 1MDB's subsidiary 1MEHL. On or about May 28, 2014, $239,940,000 in proceeds from the Deutsche Bank loan were deposited into the 1MEHL Account.   That same day, 1MEHL transferred $175,000,000 in loan proceeds to the Aabar-BVI Swiss Account under the pretense of paying Aabar to extinguish certain options.

724.   On or about Friday, May 30, 2014, $155,000,000 was wired from the Aabar-BVI Swiss Account to the Affinity Equity Account controlled by LOW.

725.   On or about that same day, LOW emailed an Oceanco executive informing him in relevant part that "the funds have been cleared and will credit to my a/c tomorrow

(given that Lugano is public holiday today).  It will be sent to the Trust on Mon 2 June. . . . Just to confirm, the full amount payable by the trustees to you upon delivery (which they have agreed to pay before 5 June morning) is EUR101m?"  An Oceanco executive responded to LOW via email stating, "The balance owing under the contract, including the agreed change orders and delivery payment, is €101,089,075."

726.    On May 31, 2014, LOW exchanged emails with an Oceanco executive regarding planning for a birthday celebration for LOW's sister aboard THE EQUANIMITY.  The Oceanco executive inquired of LOW, "Would it be appropriate to make a dragon-cake with text 'Happy birthday May-Lin'.  Celebrate birthday during the river-cruise Saturday as a surprise?  Please let me know your ideas."

727.    On or about June 2, 2014, approximately $142,000,000 was wired from the Affinity Equity Account to the Alpha Synergy Account at BSI Bank.  The following day, on or about June 3, 2014, $142,000,000 was transferred from the Alpha Synergy Account to LOW's personal account at BSI.  That same day, approximately $140,636,225 was transferred from LOW's personal account at BSI Bank to the World View Account.

728.    Oceanco delivered THE EQUANIMITY to LOW in or around June 2014.  In an email from an Oceanco executive to LOW on June 10, 2014, the Oceanco executive stated, "It was again a pleasure to welcome you and your family to Oceanco.  On behalf of all I would like to sincerely thank you for Friday's delivery party. . . Everyone who has worked or contributed to the project is extremely proud of Equanimity and were very grateful for the recognition . . . .  We hope that you and your family enjoyed the Christening ceremony on Saturday morning as well as the short cruise."

729.    Upon information and belief, the funds transferred into the World View Account were used to acquire THE EQUANIMITY and were transmitted in a manner intended to conceal the origin, source, and ownership of criminal proceeds, based on the following facts and circumstances, among others:

a.     Funds were moved through multiple accounts owned by different entities on or about the same day in an unnecessarily complex manner with no apparent business purpose.

b.     For instance, there is no apparent commercial reason that LOW would layer his transaction by funneling the exact same amount of money through multiple bank accounts at the same financial institution on or about the same day.

c.     Individuals engaged in money laundering and other unlawful conduct often pass money through intermediary accounts to conceal the true source of the funds.

730.   Upon information and belief, at the time funds were transferred into the World View Account, LOW knew those funds were misappropriated from 1MDB.

## U.     LOW ACQUIRED AN INTEREST IN THE VICEROY HOTEL GROUP USING 1MDB FUNDS DIVERTED THROUGH THE GOOD STAR ACCOUNT.

731.   LOW laundered at least approximately $30,690,750 in misappropriated funds traceable to the Good Star Account to acquire a substantial interest in Viceroy Hotel Group ("Viceroy"), a company that provides hotel management and development services.  Specifically, LOW acquired his interest in Viceroy through two entities affiliated with Jynwel Capital:  "JW Hospitality (VHG US) LLC" (formerly known as "Wynton Hospitality (VHG US) LLC") and "JW Hospitality (VHG Intl) Ltd." (formerly known as "Wynton Hospitality (VHG Intl) Ltd.") (collectively, "JW Hospitality").

732.   Viceroy is comprised of five sister entities: Viceroy Hotel Management, LLC; VHG Domestic GP, LLC; VHG Brands, LLC; Viceroy International Holdings, Ltd.; and Viceroy Cayman, Ltd.  Three of these entities, Viceroy Hotel Management, LLC, VHG Domestic, LLC, and VHG Brands, LLC, are domiciled in the United States and manage hotels and own intellectual property primarily within the United States. Viceroy International Holdings, Ltd. and Viceroy Cayman, Ltd. are domiciled in the Cayman Islands and manage hotels and own intellectual property internationally.

733.   Viceroy is owned by: (1) Mubadala, the Abu Dhabi sovereign wealth fund that partnered with LOW in the Park Lane Partnership and in the acquisition of EMI, through a Delaware limited liability company called MH Hotels Investcorp, LLC; and (2), JW Hospitality.  Mubadala and JW Hospitality each hold a 50% ownership interest in Viceroy.

734.   Viceroy provides hotel management services and hotel development services to related hotel owners, as well as to third-party hotel owners on a contractual basis.  Viceroy also generates revenue through the sale of branded real estate.  Although Viceroy's primary hotel brand is Viceroy Hotel and Resorts, it also operates some independently branded hotels.

735.   In 2009, VHG was owned by two entities:  Mubadala and Kor Holdings.  Each entity owned a 50% ownership interest in VHG.  Kor Holdings, in turn, was owned by three individuals:  Brad Korzen, who held a 70% interest; Jeff Smith, who held a 15% interest; and Frank Iaffaldano, who also held a 15% interest.

736.   Mubadala and Kor Holdings operated Viceroy as a joint venture, and any potential transaction required the approval of both Mubadala and Kor Holdings.  Each VHG sister entity's board consisted of six seats, with three held by Mubadala and one seat each held by Korzen, Smith, and Iaffaldano.

*1.  LOW's 2010 Acquisition of an Interest in VHG*

737.   In late 2009, an official at Mubadala introduced LOW to Viceroy as a potential business partner.  LOW frequently attended Mubadala's quarterly meetings with Korzen Holdings in Abu Dhabi.  Mubadala also brought the management business from the L'Ermitage Hotel, which was owned by LOW, to Viceroy.

738.   Upon information and belief, sometime in 2010 or 2011, Smith and Iaffaldano agreed to sell their interests in Viceroy, held through Kor Holdings, to LOW in an acquisition totaling $12,440,000.  In connection this transaction, Viceroy's corporate structure was reworked to allow JW Hospitality to assume a 15% ownership

interest in Viceroy, rather than to assume ownership of any interest held by Kor Holdings.

739.   On or about May 13, 2010, the Good Star Account wired approximately $15,780,000 in diverted 1MDB funds to the Shearman IOLA Account at Citibank in New York.  On or about June 23, 2010, the Good Star Account wired an additional $8,599,985 to the Shearman IOLA Account.

740.   On or about August 2, 2010, the Shearman IOLA Account transmitted three wires totaling $12,440,000 in connection with LOW's acquisition of an interest in the Viceroy.  One wire, in the amount of $6,750,000, was sent to an account at EastWest Bank maintained by Frank Iaffaldano.  The two remaining wires, one in the amount of $5,122,729.13, and one in the amount of $567,270.87, were sent to accounts maintained by Jeffrey Smith.

### 2.   LOW's 2012 Acquisition of an Additional Interest in VHG

741.   Upon information and belief, sometime in 2011 or 2012, Brad Korzen agreed to sell his interest in Viceroy, held through Kor Holdings, to LOW in an acquisition totaling $18,250,750.  As a result of this transaction, JW Hospitality acquired a 50% ownership interest in VHG.  DLA Piper represented LOW in this transaction.

742.   LOW funded this acquisition of an additional interest in the Viceroy using proceeds traceable to diverted 1MDB funds.  More specifically, he used funds laundered through the sale of the QENTAS TOWNHOUSE to AZIZ for £23,250,000 in August 2012.  As discussed above in Section VI.R, LOW acquired the QENTAS TOWNHOUSE in 2010 using money from the Good Star Account traceable to diverted 1MDB funds.  Accordingly, the proceeds of his sale of that property to AZIZ in August 2012 represented proceeds traceable to the diversion of 1MDB funds through the Good Star Account.

743.   On or about August 21, 2012, LOW caused $36,246,670 in proceeds of the sale of the QENTAS TOWNHOUSE to be transferred from an account at Rothschild Bank held by Lygon Place (London) Limited, the holding company that LOW had used

to acquire the property, to the Selune Account at Rothschild Bank.  As indicated above, LOW was the stated beneficial owner of the Selune Account.  Like the One Universe Account, the Selune Account was used primarily to transmit money between and among various accounts at Rothschild Bank associated with LOW-affiliated trusts and other LOW-owned bank accounts around the world.  Selune then transferred the $36,246,670 it received from Lygon Place (London) Limited to the One Universe Account on or about the same day.  Bank records for the One Universe Account list the transfer as a "LOAN REPAYMENT TO LTJ."

744.   Approximately one month later, on or about September 20, 2012, One Universe Trust wired $18,250,000 back to the Selune Account, and Selune then transmitted the full amount to Wynton Investments (US) the same day.

745.   The movement of funds back and forth among various accounts beneficially owned by LOW had no legitimate commercial purpose but instead was intended to conceal the origin, source, and ownership of criminal proceeds.

746.   These funds were ultimately sent to DLA Piper for the acquisition of Kor Holding's interest in the Viceroy.  On September 20, 2012, an Interest on Lawyer Trust Account ("IOLTA") in the name of DLA Piper, LLP held at The Private Bank in the United States received two wires from an account held at Rothschild Bank in Switzerland.  The first wire, in the amount of $11,862,485, includes wire notations indicating that it was received from "Wynton Hospitality (VHG Intl) LTD" in favor of Viceroy International Holdings and Viceroy Cayman.  The second wire, in the amount of $6,387,485, includes wire notations indicating that it was received from "Wynton Hospitality (VHG US) LLC" in favor of Kor Hotel Management and Kor/KSI Brands.  Together, these wires totaled $18,249,970.  Both wires were processed through a correspondent bank account at HSBC in the United States.

747.   On or about October 26, 2012, the DLA Piper IOLTA transmitted a wire in the amount of $18,250,750 to a Bank of America account held by Chicago Title

201

Company, the escrow company that handled the sale of Korzen's interest in Viceroy to JW Hospitality.

748.   According to a document entitled "LOW FAMILY HISTORY AND BACKGROUND, ORIGINS OF JYNWEL CAPITAL," which was distributed to various companies by LOW and his brother, LOW was a member of Viceroy's board, and he participated in several major transactions, including "[t]he acquisition of a 50% stake in [Viceroy]."

749.   As a result of JW Hospitality's 50% ownership interest in Viceroy, JW Hospitality holds three seats on the board of each of VHG's sister entities.  Minutes from a Viceroy board of directors meeting reflect that, as recently as March 15, 2015, JW Hospitality's board member seats were held by LOW, his brother Szen, and Li Lin Seet.

750.   As previously stated in Section VI.A, LOW also owns the L'Ermitage Hotel, which is managed by Viceroy.  An email written by LOW to a Las Vegas casino on or about April 7, 2015 included an attachment that stated that LOW was "proud to be involved in . . . L'Ermitage Beverly Hills and Viceroy Hotel Group, all of which have appreciated in value under Mr. Low's stewardship . . . ."

## V.   OBAID PURCHASED EQUITY SHARES IN PALANTIR USING 1MDB FUNDS FROM GOOD STAR ACCOUNT

751.   OBAID, the CEO of PetroSaudi, used funds traceable to the $700 million wire transfer from 1MDB to the Good Star Account to acquire an equity interest in Palantir Technologies, a software engineering company with offices in Los Angeles, Palo Alto, and New York, among other places.

752.   On or about October 5, 2009, days after the $700 million wire transfer from 1MDB to the Good Star Account, Good Star sent $85,000,000 to a bank account at J.P. Morgan (Suisse) in Geneva held by OBAID.  The wire transfer was processed through a correspondent bank account at J.P. Morgan Chase in New York.  RBS Coutts recorded the reason for the wire transfer as "Client sends USD 85 M to Private Equity firm for investments."

753.    On or about January 12, 2010, approximately three months after the $700 million wire transfer, LOW transferred an additional $68,000,000 from the Good Star Account to OBAID's account at J.P. Morgan (Suisse).  RBS Coutts recorded the reason for the wire transfer, in relevant part, as "Investment Management with Tarek Obaid/PetroSaudi International Ltd."

754.    On or about March 10, 2010, less than six months after the $700 million wire to Good Star, a Stock Purchase Agreement was executed between Palantir and OBAID.  Under the terms of the agreement, OBAID agreed to purchase Series D Preferred Stock in Palantir at a price of $0.80 per share.  OBAID signed the agreement himself and listed Fininfor & Associes, a Swiss financial management firm, as a point of contact.

755.    In addition to the Stock Purchase Agreement, OBAID signed an Investor Questionnaire form on or about March 10, 2010, affirming that he was an "Accredited Investor" for purposes of Rule 501 of Regulation D.  OBAID signed the questionnaire in his own handwriting.

756.    On or about March 11, 2010, a Palantir employee sent an email to Raphael Cabasso, OBAID's representative in Switzerland, stating:  "I am confirming receipt of Mr. Tarek Obaid's signature pages.  The final step will be receiving his wire for $2,000,000 USD to purchase 2,500,000 shares of Series D preferred stock in our investment closing this Friday.  To confirm, I understand the investment will be made in the name 'Tarek Obaid'."  An individual using a "petrosaudi.com" email address ("PSI Employee A") is also copied on the email.

757.    On or about March 15, 2010, a wire for $2,000,000 was sent from OBAID's account at J.P. Morgan (Suisse) to an account maintained by Palantir at Silicon Valley Bank in California.

758.    A stock certificate issued by Palantir shows that OBAID was issued 2,500,000 shares of Series D Preferred Stock in Palantir on or about March 12, 2010.  Schedule A to the Stock Purchase Agreement shows that, on or about March 12, 2010,

OBAID acquired 2,500,000 shares of Series D Preferred Stock in Palantir for a purchase price of $2,000,000.

### W.   LOW ACQUIRED AN INTEREST IN THE ELECTRUM GROUP USING 1MDB FUNDS DIVERTED THROUGH THE AABAR-BVI ACCOUNT

759.   LOW laundered at least approximately $150 million in funds diverted from 1MDB's 2012 bond issuance to acquire an interest in various companies owned by or affiliated with the Electrum Group, a private equity firm in the United States.  These entities include (i) Electrum Global Holdings, L.P. ("Electrum Global"); (ii) TEG Global GP Ltd.; and (iii) TEG Services Holding Inc. ("Electrum Services") (collectively "Electrum").  LOW's investment was made in the name of JW Aurum (Cayman) GP Ltd. ("JW Aurum"), a Cayman Islands entity.

760.   Electrum, whose offices are located in New York and Colorado, invests in public and private companies involved in the exploration and development of natural resources, precious metals, base metals, and oil and gas.  Electrum is managed by the Electrum Group LLC ("TEG"), a wholly-owned subsidiary of Electrum Services.

761.   TEG is a registered investment adviser with the United States Securities and Exchange Commission.

### 1.   *LOW's Acquisition of a Class A Investment Interest in Electrum*

762.   JW Aurum is a wholly-owned subsidiary of JW Aurum (BVI) Ltd., whose parent company is JW Aurum Holdings (BVI) Ltd.  Jynwel Capital, according to a document provided to BSI Bank by Li Lin Seet, owns "100%" of JW Aurum Holdings (BVI) Ltd.

763.   According to a document provided to BSI Bank by Li Lin Seet, "JW Aurum Holdings (BVI) Limited . . .  [was] looking to invest US$150m to acquire a direct minority interest in the Electrum Group . . . It [was] expected that JW Aurum post-investment [would] own a minority stake of 8.03% in Electrum."  Li Lin Seet further explained, JW Aurum was introduced to Electrum "by [Mubadala] in early 2012 . . . In

order to expedite [JW Aurum's] due diligence, [Mubadala] agreed to share their research and due diligence with ourselves and we were granted access to their third party consultants who assisted with due diligence in connection with the deal."

764.   JW Aurum Holdings (BVI) Ltd. also directly owned two subsidiaries—JW Aurum Series M Ltd. and JW Aurum Series Ltd.

765.   JW Aurum Series Ltd. directly owned its subsidiary JW Aurum Holdings (LUX) S.a.r.l., a Luxembourg company, whose wholly-owned subsidiaries included JW Aurum Series J (LUX) S.a.r.l. and JW Aurum Series M (LUX) S.a.r.l.

766.   On or about November 20, 2012, a master agreement (the "Master Agreement") was executed by and between, among others, (i) JW Aurum; (ii) a subsidiary of Mubadala Development Co. ("Mubadala"); and (iii) multiple legal entities affiliated with or owned by Electrum.  Li Lin Seet signed the Master Agreement on behalf of JW Aurum as its director.

767.   Pursuant to the Master Agreement, JW Aurum and Mubadala agreed to purchase interests in and subscribe for shares in various legal entities affiliated with Electrum—namely, Electrum Global and Tegcorp, Inc., a Delaware corporation. Specifically, JW Aurum agreed to acquire approximately a 7.7 percent interest in Electrum, consisting of Class A interests, for approximately $150 million.  In addition to its purchase of a Class A interest in Electrum, JW Aurum also agreed to lend approximately $4,906,985 to Tegcorp, Inc., a Delaware corporation affiliated with Electrum.  In addition to JW Aurum and Mubadala, the Kuwait Investment Authority also acquired a Class A interest in Electrum.

768.   As a Class A investor, J.W. Aurum was entitled to receive preferred dividends from Electrum at a rate of 6.5 percent per annum as well as an accelerated rate of return equal to 275 percent of its pro rata share of any Electrum distributions until JW Aurum's original investment in Electrum was fully returned.  Additionally, JW Aurum was entitled to (i) select one person to serve on TEG Global GP Ltd.'s board; (ii) select one person to sit on Electrum Group, LLC's board as an observer; and (iii) receive

special voting shares in Electrum Group, Ltd.  In various public filings with the United States Securities and Exchange Commission, Electrum disclosed that LOW was a member of certain Electrum boards.

769.   According to a document entitled "LOW FAMILY HISTORY AND BACKGROUND, ORIGINS OF JYNWEL CAPITAL," which was distributed to various companies by LOW as recently as February 2015, LOW had participated in a number of investment projects including a "USD$450 million investment in a global multi-billion dollar leading commodities company with Mubadala, Kuwait Investment Authority ("KIA") and Jynwel Capital."

   *2.*   *In Connection with JW Aurum's Investment in Electrum, JW Aurum Opened Several Accounts at BSI Bank in December 2012*

770.   In December 2012, bank accounts were opened in the name of JW Aurum Holdings (BVI) Ltd., JW Aurum Series Ltd., JW Aurum Series M Ltd. and JW Aurum Series J Ltd. (collectively "JW Aurum Accounts") at BSI Bank.

771.   On or about December 5, 2012, Li Lin Seet communicated with an attorney at Baker McKenzie via electronic mail, informing him that both JW Aurum Holdings (BVI) Ltd. and JW Aurum (BVI) Ltd. intended to open bank accounts with BSI Bank. The email further stated, "The signing arrangement is that any one of [LOW], Low Taek Szen or Seet Li Lin may sign singly."  Li further explained, "This is urgent as we need to have the funds for payment by 28th December 2012.  Please coordinate with BSI on this."  Three BSI bankers were copied on this email.

772.   Later that same day, Li Lin Seet emailed a BSI banker "Singapore Banker 4"), informing her that, "[i]n order to expedite the account opening, we will only have Mr. Szen Low and myself as signatories to sign singly.  We will add Mr. Jho Low at a later date."

773.   On or about December 11, 2012, a different BSI banker ("Singapore Banker 5") sent signature form sheets for the JW Aurum Accounts via email to Szen.  Szen

responded, "Jho was with me over the last 2 days but has just left.  But please send the forms sheets to me asap, so I can organize for his signatory."

774.   On or about December 14, 2012, Li Lin Seet emailed one of LOW's relationship managers at BSI to confirm that the signatories on the account for JW Aurum Holdings (BVI) Ltd. (the "JW Aurum Holdings Account") at BSI Bank would be LOW, Szen, and himself.  Li Lin Seet further explained that JW Aurum Holdings was an "[i]nvestment holding company for investee companies invested in global commodities" and that JW Aurum Holdings (BVI) Ltd. "is the parent of JW Aurum (BVI) Limited as per advise by legal counsel."  LOW and Szen, among others, were copied on this email.

775.   On or about December 17, 2012, Singapore Banker 5 sent a communication to Szen via electronic mail to confirm that she had "received the signatures of Mr. Taek Jho on the requested form-sheets this morning by FAX."  Szen responded via electronic mail that, "I'll be bring[ing] the signed originals by Jho to Luxembourg during my visit this week.  I believe that the managers of Lux companies are scheduled to meet with you on Dec 19 morning to sign the relevant documents."  LOW, among others, was copied on Szen's email.

776.   JW Aurum Series J (LUX) S.a.r.l.'s board of managers' minutes indicate that on or about December 20, 2012, at approximately 3 p.m., a board meeting for the company was convened at 43 Avenue John F. Kennedy ("Kennedy Building") in the Grand Duchy of Luxembourg.  Present at the board meeting were, among others, Szen in his capacity as one of the company's two "manager[s]" as well as Baker & McKenzie, who were representing Jynwel Capital.  The board approved JW Aurum Series J (LUX) S.a.r.l.'s participation in JW Aurum's investment in Electrum.  The meeting concluded at approximately 3:25 p.m.

777.   JW Aurum Series M (LUX) S.a.r.l.'s board of managers' minutes indicate that on or about December 20, 2012, at approximately 3:30 p.m., a second board meeting was convened at the Kennedy Building.  The attendees were the same as the board of managers meeting for JW Aurum Series J (LUX) S.a.r.l..  The board approved JW

Aurum Series M (LUX) S.a.r.l.'s participation in JW Aurum's investment in Electrum. The meeting concluded at approximately 3:55 p.m.

778.   JW Aurum Series  (LUX) S.a.r.l.'s board of managers' minutes indicate that on or about December 20, 2012, at approximately 4:10 p.m., a third board meeting was convened at the Kennedy Building.  The attendees included, among others, Szen in his capacity as one of the company's three managers and the same Baker & McKenzie lawyers who attended the prior meetings.  The board approved (i) JW Aurum Series (LUX) S.a.r.l. obtaining a loan from its parent company JW Aurum Series (BVI) Ltd. via a "profit participating loan facility agreement"; and (ii) JW Aurum Series (LUX) S.a.r.l., in turn, lending funds to its subsidiaries JW Aurum Series J (LUX) S.a.r.l. and JW Aurum Series M (LUX) S.a.r.l. through separate profit participating loan facility agreements.  The meeting concluded at approximately 4:20 p.m.

> ### 3.   *LOW and Others Used Funds Traceable to the 2012 1MDB Bond Sales to Acquire An Interest in Electrum.*

779.   As noted in Section III above, on or about October 19, 2012, 1MDB wire transferred $790,354,855 to the Aabar-BVI Swiss Account.  Roughly several days later, $435 million was transferred, either directly or through the Overseas Investment Funds, from the Aabar-BVI Swiss Account to the Blackstone Account.

780.   On or about October 29, 2012, $259,800,000 of these funds were wired from the Blackstone Account to the Alsen Chance Account.  Approximately three days later, on or about November 1, 2012, $200 million was wired from the Alsen Chance Account to the Good Star Account.  Although on or about November 2, 2012, $153 million was withdrawn from the Good Star Account and wired to the ADKMIC BSI Account (leaving a balance of approximately $47 million remaining in the Good Star Account), an additional $72,500,000 was wired into the Good Star Account from the Alsen Chance Account on or about December 27, 2012.

781.   The wire for $72.5 million sent on or about December 27, 2012, from the Alsen Chance Account to the Good Star Account is also traceable to funds diverted from 1MDB's 2012 bond sale.  Specifically:

a.   Between approximately November 23, 2012, and December 14, 2012, two wires totaling $134 million were sent from the Aabar-BVI Swiss Account to the Blackstone Account.  On December 20, 2012, $60 million of these funds were sent to the Alsen Chance Account.  On December 24, 2012, an additional $1,500,000 was sent from the Blackstone Account to the Alsen Chance Account.

b.   Additionally, on or about October 23, 2012, $60 million was wired from the Aabar-BVI Swiss Account to AZIZ's Red Granite Capital Account.  On November 5, 2012, approximately $12,500,000 was wired from the Red Granite Capital Account to the Alsen Chance Account.

782.   On or about December 27, 2012, Szen emailed Singapore Banker 5, advising her that several requests would be forthcoming to transfer funds between various JW Aurum Accounts maintained at BSI Bank, including between (i) JW Aurum Series (BVI) Ltd. and JW Aurum Holdings (LUX) S.a.r.l.; (ii) JW Aurum Holdings (LUX) S.a.r.l. and JW Aurum Series J (LUX) S.a.r.l.; and (iii) JW Aurum Holdings (LUX) S.a.r.l. and JW Aurum Series M (LUX) S.a.r.l.  LOW was also copied on this email.

783.   On or about December 27, 2012, a wire for approximately $142,500,000 was sent from the Good Star Account to the ADKMIC BSI Account.  The following day on or about December 28, 2012, (i) a wire for $142,250,000 was transmitted from the ADKMIC BSI Account to LOW's personal account at BSI Bank; (ii) a wire for $154,250,000 was sent from LOW's personal account at BSI Bank to an account in the name of Jynwel Capital at BSI Bank ("Jynwel Account A"); (iii) a wire for $151 million was sent from Jynwel Account A to the JW Aurum Holdings Account; and (iv) a wire for $150,995,000 was sent from the JW Aurum Holdings Account to an account in the name of JW Aurum Series (BVI) Ltd. ("JW Aurum Series Account") at BSI Bank.

784.    On or about December 28, 2012, Szen emailed Singapore Banker 5 informing her that, "We need the wire transfer out today if not we may be in breach of the agreements." The subject line on the email read, "AURUM:  VERY URGENT." LOW, among others, was copied on the email.

785.    Later that day, Szen emailed Singapore Banker 5 again to inquire, "Have you received the funds?  Can you kindly send us a copy of the SWIFT message for the wires to [Electrum] so that we can forward them to Electrum to trace the wires on their end?"  Singapore Banker 5 responded, "I just had a colleague on the phone who confirmed that we just received the money 5 minutes ago.  I'm preparing the transfer instructions . . . ."  LOW was copied on both of these emails.

786.    Between on or about December 28, 2012, and December 31, 2012, several internal transfers were made between various JW Aurum Accounts, including (i) a transfer of approximately $143,627, 900 from the JW Aurum Series Account to the JW Aurum Holdings Account; (ii) a transfer of approximately $1,465,028 from the JW Aurum Series Account to an account in the name of JW Aurum Holdings (LUX) S.a.r.l.; (iii) a transfer of approximately $143,354,800 from JW Aurum Holdings (LUX) S.a.r.l. to JW Aurum Series J (LUX) S.a.r.l.; (iv) a transfer of approximately $1,448,028 from JW Aurum Holdings (LUX) S.a.r.l. to JW Aurum Series J (LUX) S.a.r.l.; and (iv) a transfer of approximately $273,186 from JW Aurum Holdings (LUX) S.a.r.l. to JW Aurum Series M (LUX) S.a.r.l.

787.    On or about December 31, 2012, a wire for $143,170,438 was sent from JW Aurum Series J's account to an account at JP Morgan Chase Bank in the United States maintained in the name of Electrum Global ("Electrum Account").  A notation on this wire read "EQUITY CONTRIBUTION TO ELECTRUM [GLOBAL]."  As noted above at Paragraph 767, pursuant to the Master Agreement, JW Aurum agreed to acquire its Class A interests in Electrum for approximately $150 million.

788.    On or about December 31, 2012, a second wire for $1,632,391 was sent from JW Aurum Series J's account to an account at JP Morgan Chase maintained in the

name of Electrum US Holdings I LP ("Electrum US Holdings Account").  A notation on this wire read "EQUITY CONTRIBUTION TO TEGCORP INC."

789.  On or about December 31, 2012, a third wire for $4,906,985 was sent from JW Aurum Series' account to the Electrum US Holdings Account.  A notation on this wire read "LOAN TO TEGCORP INC."  As noted above at Paragraph 767, pursuant to the Master Agreement, JW Aurum agreed to loan $4,906,985 to Tegcorp, Inc.

790.  On or about December 31, 2012, a fourth wire for $286,915 was sent from JW Aurum Series M's account to the Electrum US Holdings Account.  A notation on this wire read "EQUITY CONTRIBUTION TO ELECTRUM."

791.  On or about December 31, 2012, a fifth wire for $3,271 was sent from JW Aurum Series M's account to the Electrum Account.  A notation on this wire read "EQUITY CONTRIBUTION TO TEGCORP INC."

792.  In an email dated March 12, 2015, LOW informed several BSI bankers that "The wire transfer of an estimated USD$143m+ to Electrum (via Aurum entities, the total USD150m was split via various entities for tax planning purposes, through Luxembourg and various) is for investment in Electrum Group.  All this were advised by international best practice tax advisory firms (such as the big four) and lawyers."  The email further stated, "In total, the Low family trusts invested approximately USD$150m in equity for an interest in the Electrum Group alongside Kuwait Investment Authority and Mubadala Development Company."

793.  Upon information and belief, the funds transferred into the Electrum Account and the Electrum US Holdings Account were used to acquire JW Aurum's interest in Electrum and were transmitted in a manner intended to conceal the origin, source, and ownership of criminal proceeds, based on the following facts and circumstances, among others:

a.     Funds were moved through multiple accounts owned by different entities on or about the same day in an unnecessarily complex manner with no apparent business purpose.

b.      For instance, there is no apparent commercial reason that LOW would layer his transaction by funneling the exact same amount of money through multiple bank accounts at the same financial institution on or about the same day.

c.      Individuals engaged in money laundering and other unlawful conduct often pass money through intermediary accounts to conceal the true source of the funds.

794.   Upon information and belief, at the time funds were transferred from the JW Aurum Accounts in Luxembourg to the Electrum Account and the Electrum US Holdings Account, LOW knew those funds constituted misappropriated funds and intended to deprive 1MDB of ownership of those funds.

## X.    TENS OF MILLIONS OF DOLLARS IN FUNDS DIVERTED FROM 1MDB WERE USED TO PRODUCE THE MOTION PICTURE "DUMB AND DUMBER TO"

795.   Ten of millions of dollars in diverted 1MDB funds were transferred into and through various bank accounts at City National Bank in Los Angeles associated with Red Granite Pictures in 2013 and 2014, and that money was ultimately used to fund the production of "Dumb and Dumber To," a motion picture co-produced by Red Granite Pictures, Universal Pictures and New Line Pictures.  "Dumb and Dumber To" was released in the United States on November 11, 2014.  Funds utilized by Red Granite Pictures in 2013 to finance "Dumb and Dumber To" are traceable to the $238 million in wire transfers funneled into the Red Granite Capital Account and diverted from 1MDB's 2012 bond sales.

796.   As set forth in Paragraph 263 above, between June 18, 2012, and November 14, 2012, Aabar-BVI sent three wires totaling $238,000,000 in diverted 2012 bond proceeds to AZIZ's Red Granite Capital Account at BSI Bank in Singapore.  This included a wire in the amount of $45,000,000 on or about November 14, 2012.

797.   Between on or about December 11, 2012 – roughly four weeks after Aabar-BVI sent the $45,000,000 wire to Red Granite Capital – and December 4, 2013, bank account records from City National Bank and correspondent bank records from Citibank

212

show that eleven wires totaling approximately $58,400,000 were sent from the Red Granite Capital Account to the RGP Pictures Account at City National Bank.  AZIZ is one of the signatories on this account.

798.   Specifically the following wires were sent from the Red Granite Capital Account to the RGP Pictures Account:

| Date of Wire | Amount |
|---|---|
| December 11, 2012 | $7,500,000 |
| January 7, 2013 | $7,000,000 |
| January 17, 2013 | $4,500,000 |
| June 24, 2013 | $4,000,000 |
| July 17, 2013 | $1,400,000 |
| August 28, 2013 | $6,000,000 |
| September 20, 2013 | $6,000,000 |
| September 30, 2013 | $3,000,000 |
| October 10, 2013 | $6,000,000 |
| October 22, 2013 | $7,500,000 |
| December 4, 2013 | $5,500,000 |

799.   Between September 2013 and December 2013, shortly after each of the wires were sent from the Red Granite Capital Account to the RGP Pictures Account, funds were sent from the RGP Pictures Account to an account held in the name of Dumb and Dumber To LLC ("Dumb and Dumber Account A").  More specifically, between on or about September 18, 2013, and December 19, 2013, nine transfers totaling approximately $21,500,000 were sent from the RGP Pictures Account to Dumb and Dumber Account A.

800.   Dumb and Dumber To LLC was a special purpose vehicle created by Red Granite Pictures to produce "Dumb and Dumber To."  Delaware state records show that Dumb and Dumber To LLC was formed on or about June 20, 2013, and California state records show that AZIZ is one of the entity's managers.

801.   Between on or about September 18, 2013, and December 4, 2013, approximately $21,200,000 in funds was transferred from Dumb and Dumber Account A to a second account at City National Bank in Los Angeles opened in the same name of Dumb and Dumber LLC ("Dumb and Dumber Account B").

802.   Between on or about July 26, 2013, and September 5, 2013, six transfers were executed to funnel approximately $2,439,600 in additional funds from the RGP Pictures Account to Dumb and Dumber Account B.

803.   Between on or about July 26, 2013, and November 25, 2013, a series of thirty-seven (37) wires totaling approximately $22,781,058 were sent from Dumb and Dumber Account B to an account held in the name of Entertainment Partners Services Group at Bank of America.  Funds from this latter account were used to pay for expenses relating to the production of "Dumb and Dumber To."

804.   Entertainment Partners Services Group is a company engaged in the business of providing services of individuals for work on theatrical motion pictures and other productions in the entertainment industry.  Entertainment Partners Services Group and Dumb and Dumber To LLC entered into a Personnel Services Agreement on or about August 15, 2013, for such services.  Joey McFarland signed the contract on behalf of Dumb and Dumber To, LLC.

## Y.   MILLIONS OF DOLLARS IN FUNDS DIVERTED FROM 1MDB WERE USED TO PRODUCE THE MOTION PICTURE "DADDY'S HOME"

805.   Red Granite Pictures used money traceable to diverted 1MDB funds to help finance the production of "Daddy's Home," a motion picture co-produced by Red

Granite Pictures and Paramount Pictures ("Paramount") in 2015. "Daddy's Home" was released in the United States on December 25, 2015.

806.   Red Granite Pictures opened and maintained a bank account in the name of Daddy's Home LLC at City National Bank ("Daddy's Home Account") in Los Angeles, California in connection with this production. Financing provided by Red Granite Pictures to Paramount in connection with "Daddy's Home" was generally channeled through this account.

807.   Daddy's Home LLC was a special purpose vehicle created by Red Granite Pictures to produce "Daddy's Home." Delaware state records show that Daddy's Home LLC was formed on or about September 25, 2014. Daddy's Home LLC is a wholly-owned subsidiary of Red Granite Pictures.

808.   As described below, between November 21, 2014, and June 12, 2015, over $30,000,000 in funds traceable to diverted 1MDB proceeds was funneled into the Daddy's Home Account in two tranches for the purpose of producing the film.

> 1.   *First Tranche of Production Financing Derived From "Dumb and Dumber To" Distribution Proceeds*

809.   In December 2014, Red Granite Pictures transferred more than $3 million to Paramount Pictures' account at Chase Bank (the "Paramount Account") to co-finance "Daddy's Home." As explained below, these funds consisted of distribution proceeds owed to Red Granite Pictures in connection with its co-financing of "Dumb and Dumber To." As noted in Section VI.X above, Red Granite Pictures co-financed the production of "Dumb and Dumber To" with funds misappropriated from 1MDB.

810.   On or about December 19, 2014, $3,650,614.87 in "Dumb and Dumber To" distribution proceeds were transferred from the Dumb and Dumber Escrow Account to an account maintained in the name of Red Granite Capital US LLC at City National Bank ("RGC US Account") in Los Angeles.

811.   Red Granite Capital U.S. LLC, which was formed on or about June 9, 2013, is a Delaware company based in Los Angeles whose members are AZIZ and the Red

Granite Business Manager.  Red Granite Capital owns 99 percent of the equity in Red Granite Capital U.S. LLC.  Red Granite Pictures utilized the RGC US Account maintained in the name of Red Granite Capital U.S. LLC to, among other things, collect the distribution proceeds of films produced by Red Granite Pictures, including "Dumb and Dumber To."

812.   On or about December 22, 2014, $3,650,614.87 of these funds was transferred from the RGC US Account to the Daddy's Home Account.

813.   On or about that same day, $3,012,883 was wire transferred from the Daddy's Home Account to the Paramount Account to finance "Daddy's Home."

*2.     Second Tranche of Production Financing Attributable to a Loan Obtained from Morgan Stanley*

814.   Between November 21, 2014, and June 5, 2015, additional funds amounting to more than approximately $27 million was transferred into the Daddy's Home Account to finance "Daddy's Home."  These funds constituted the proceeds of a loan obtained by Red Granite Capital US, LLC from Morgan Stanley ("Morgan Stanley Portfolio Loan").  The Morgan Stanley Portfolio Loan was secured with funds contained in six collateral accounts opened by various affiliates of Red Granite Pictures at Morgan Stanley (the "Morgan Stanley Collateral Accounts").  As explained below, the vast majority of the money in the Morgan Stanley Collateral Accounts – and thus the vast majority of the collateral for the loan used to finance "Daddy's Home" – consisted of the proceeds of a loan from Union Bank ("Union Bank Loan"), which was itself secured with distribution proceeds owed to Red Granite Pictures from its production of "The Wolf of Wall Street."

815.   As part of a loan agreement executed by and between Red Granite Pictures and Union Bank, Red Granite Pictures executed an Accommodation and Security Agreement whereby Red Granite Pictures agreed to grant Union Bank a continuing first priority security interest in Red Granite Picture's right, title and interest in, among other things, the distribution proceeds of "The Wolf of Wall Street."  Red Granite Pictures

would not have been able to obtain the Union Bank Loan on the same terms without using its interest in the "The Wolf of Wall Street" as security.

816.   As part of the Union Bank Loan, on or about April 14, 2014, $49,924,525 was wire transferred from Union Bank to the RGC US Account.

817.   On or about October 3, 2014, $50,000,000 was transferred from the RGC US Account to an account in the name of Red Granite Capital US LLC at Morgan Stanley ("Red Granite Morgan Stanley Account").

818.   Between on or about November 14, 2014, and December 12, 2014, the bulk of this $50,000,000 was distributed to additional Morgan Stanley Collateral Accounts to be used as collateral.  Specifically, (i) $20,000,000 of the $50,000,000 was transferred to one of the Morgan Stanley Collateral Accounts on or about November 14, 2014; (ii) $15,000,000 was transferred into a second Morgan Stanley Collateral Account on or about December 1, 2014; and (iii) $3,253,258.18 was transferred into a third Morgan Stanley Collateral Account on or about December 12, 2014.  These funds, which are indirectly traceable to the "The Wolf of Wall Street," collateralized the Morgan Stanley Portfolio Loan, the proceeds of which financed, in part, "Daddy's Home."

819.   After Red Granite Pictures opened and placed sufficient funds into its Morgan Stanley Collateral Accounts to secure the Morgan Stanley Portfolio Loan, a loan application was signed by AZIZ in his capacity as director of Red Granite Capital and the Red Granite Business Manager in her capacity as COO of Red Granite Capital.  In the application, AZIZ represented that the purpose of the Morgan Stanley Portfolio Loan was for "Movie Production."

820.   In funding the Morgan Stanley Collateral Accounts, the Red Granite Business Manager, as "Riza's Business Manager," represented to Morgan Stanley that Red Granite Pictures intended to deposit "around $80 mm" in the Morgan Stanley Collateral Accounts from the proceeds of "The Wolf of Wall Street," the proceeds of "Dumb and Dumber To," and "a private source."  According to an internal Morgan Stanley document, this "private source" was Aabar-BVI.

821.   On or about November 18, 2014, as part of the Morgan Stanley Portfolio Loan, approximately $11,750,000 was wired from one of the Morgan Stanley Collateral Accounts to the RGC US Account.

822.   Three days later, on or about November 21, 2014, approximately $10,000,000 was transferred from the RGC US Account to the Daddy's Home Account. Between on or about November 21, 2014, and December 22, 2014, five wires totaling $10,044,626 were sent from the Daddy's Home Account to the Paramount Account to finance the production of "Daddy's Home."   Specifically, the following wires were sent from the Daddy's Home Account to the Paramount Account:  (i) a wire for $1,942,052 on or about November 21, 2012; (ii) a wire for $480,854 on or about November 26, 2014; (iii) a wire for $2,287,960 on or about December 5, 2014; (iv) a wire for $2,753,415 on or about December 10, 2014; and (v) a wire for $2,580,345 on or about December 22, 2014.

823.   Additionally, between on or about January 9, 2015, and June 12, 2015, 21 additional wires, totaling approximately $17,582,700, consisting of Morgan Stanley Portfolio Loan proceeds were wired directly from Morgan Stanley to the Daddy's Home Account.  During that same time period, 23 wires totaling $18,138,935 were sent from the Daddy's Home Account to the Paramount Account to produce "Daddy's Home."

## Z.   AZIZ ACQUIRED THE METROPOLIS MOVIE POSTER USING FUNDS DIVERTED THROUGH THE AABAR-BVI ACCOUNT

824.   AZIZ used funds from the Alsen Chance Account, which are traceable to the proceeds from the 2012 bond sales, to purchase the METROPOLIS POSTER, a framed, 3-sheet color lithograph poster created by the German artist Heinz Schulz-Neudamm for the 1927 silent film "Metropolis," directed by Fritz Lang. AZIZ purchased the METROPOLIS POSTER from the owner and president of Cinema Archives, a movie memorabilia company, on or about October 29, 2012, for $1,200,000.

825.   On October 18, 2012, McFarland, the co-owner of Red Granite Pictures, exchanged emails with the Cinema Archives Owner about the METROPOLIS POSTER,

with the aim of possibly acquiring the poster from the Cinema Archives Owner. This exchange took place one day before the closing date for the Project Maximus bonds.

826. As noted in Section II.B above, on or about October 19, 2012, 1MDB wire transferred $790,354,855 to the Aabar-BVI Swiss Account. From on or about October 23, 2012, to on or about October 24, 2012, approximately $435 million in diverted 1MDB funds was wire transferred, either directly or through the Overseas Investment Funds, to the Blackstone Account.

827. On or about October 29, 2012, approximately $259,800,000 of these funds was wire transferred from the Blackstone Account to the Alsen Chance Account.

828. On or about October 29, 2012, $1,200,000 was wire transferred from the Alsen Chance Account to Cinema Archives' account at Bank of America in the United States. This wire transfer represented payment for AZIZ's purchase of the METROPOLIS POSTER. At the time of payment, the Cinema Archives Owner understood that the money came from TAN, who he thought was an associate of either LOW or AZIZ.

829. Other records, including records maintained by AZIZ's accounting firm NKSFB, confirm that the poster was purchased for AZIZ. For example, on or about February 28, 2013, a Los Angeles-based appraisal company conducted an appraisal of the METROPOLIS POSTER for AZIZ. The appraisal company valued the METROPOLIS POSTER at $1,300,000.

830. As of April 2014, AZIZ also held an insurance policy with a major U.S. national insurance agency that covered the METROPOLIS POSTER; according to policy documents, the policy period extended until December 19, 2014, and it insured the METROPOLIS POSTER for $1,300,000. In February 2015, AZIZ's insurance broker created a "Summary of Insurance" that included the METROPOLIS POSTER under the fine arts section of AZIZ's policy.

831. As of November 2015, the METROPOLIS POSTER hung in AZIZ's office in the Red Granite Pictures offices in Los Angeles. After AZIZ stopped coming into the

Red Granite Pictures offices, his office was locked. Upon information and belief, the METROPOLIS POSTER has not been moved since AZIZ's office was locked.

### AA.   LOO PURCHASED THE ONE MADISON PARK CONDOMINIUM USING DIVERTED 2012 BOND PROCEEDS

832.   LOO used funds traceable to the misappropriated proceeds of the 2012 bond sales to acquire a residential unit in the building known as One Madison Park Condominium tower in New York, New York ("ONE MADISON PARK CONDOMINIUM").  LOO purchased the property in the name of an entity called Cricklewood One Madison LLC ("Cricklewood").  Costello & Associates represented Cricklewood in connection with the purchase.

833.   As noted in Paragraphs 226 above, of the approximately $1.367 billion in 2012 bond proceeds that were diverted to the Aabar-BVI Swiss Account, approximately $1.1 billion was transferred, either directly or via Overseas Investment Funds, to the Blackstone Account.

834.   As set forth in Paragraph 257 above, on or about December 6, 2012, a wire in the amount of approximately $5,000,000 was sent from the Blackstone Account to an account at Falcon Bank in Zurich maintained in the name of River Dee International SA ("River Dee Account").  LOO, who worked on the 2012 bond deals on behalf of 1MDB, was the beneficial owner of the River Dee Account, which was opened in early November 2012.  Account opening records indicate that LOO was referred to Falcon Bank as a potential client by HUSSEINY.  At the time the account was opened, LOO represented that she intended to capitalize the account with existing personal wealth obtained from inheritance.  The $5 million wire from Blackstone was the first credit to the account.

835.   Between on or about August 30, 2013 and June 19, 2014, three wires totaling $4,608,883 were sent from the River Dee Account to an account at J.P. Morgan Chase in the United States held by Costello & Associates.  The approximate dates and amounts of these wires are detailed below:

| Date | Sending Party | Receiving Party | Amount |
|------|---------------|-----------------|--------|
| 8/30/13 | River Dee International | Costello & Assoc. | $600,000 |
| 9/30/13 | River Dee International | Costello & Assoc. | $300,000 |
| 6/19/14 | River Dee International | Costello & Assoc. | $3,708,883 |

836.   On or about October 4, 2013, shortly after the second wire transfer to Costello & Associates, LOO signed a Residential Unit Purchase Agreement for the acquisition of the ONE MADISON PARK CONDOMINIUM on behalf of Cricklewood, as the purchaser.  Pursuant to that agreement, Cricklewood agreed to acquire the unit for the purchase price of $4,450,000, with a deposit of $890,000 due upon signing and the balance due at closing.

837.   Escrow accounting documentation maintained by Costello & Associates reflects that Cricklewood made deposits to Costello & Associates in the amounts $600,000 and $300,000 on or about August 30 and September 30, 2013, respectively; and that Cricklewood made a final deposit of $3,708,882.91 on June 19, 2014.  That same documentation reflects that Costello & Associates, on behalf of Cricklewood, transmitted $3,560,108.50 to the seller of the ONE MADISON PARK CONDOMINIUM and transmitted $890,000 to the escrow agent representing the seller. Additional amounts were transmitted to the title company and others, for a total expenditure of $4,608,882.91 in connection with the property transaction.

838.   A Real Property Transfer Report for the State of New York–State Board of Real Property Services reflects that Cricklewood acquired the ONE MADISON PARK CONDOMINIUM on June 24, 2014 for the purchase price of $4,531,212.   LOO signed on behalf of Cricklewood.  On June 24, 2014, LOO signed the Residential Unit Deed on behalf of Cricklewood.

**BB.   SZEN PURCHASED EQUITY SHARES IN FLY WHEEL USING 1MDB FUNDS DIVERTED FROM THE 2013 BOND SALES**

839.   Funds traceable to 1MDB's 2013 bond sale and to the proceeds of LOW's sale of equity in the Park Lane Partnership to Mubadala were used by Szen to acquire an equity interest in Fly Wheel Sports, Inc. ("Flywheel"), a Delaware corporation with multiple branches operating fitness clubs throughout the United States, including Los Angeles.

840.   On or about March 16, 2014, a Transaction Agreement was executed between Flywheel and FW Acquisition Company LLC, a Delaware limited liability company.  Under the terms of the Transaction Agreement, FW Acquisition Company LLC agreed to purchase shares of common stock in Flywheel.  In exchange, FW Acquisition Company LLC agreed to provide capital to Flywheel as part of a recapitalization of Flywheel.

841.   Approximately five days earlier on or about March 11, 2014, FW Acquisition Company LLC and FW Sports Investments LLC, a Delaware limited liability company owned by Szen, entered into a Joinder Agreement whereby FW Sports Investments LLC agreed to acquire 3,000,000 membership interests in FW Acquisition Company LLC in exchange for a capital contribution of $3 million.

842.   On or about March 30, 2014, a letter agreement was executed by and between FW Acquisition Company LLC and FW Sports Investments LLC.  Under the letter agreement, FW Sports Investments LLC reiterated its interest in acquiring certain equity interests in FW Acquisition Company LLC for approximately $3 million.  In exchange, FW Acquisition Company LLC agreed to distribute equity shares in Flywheel to FW Sports Investments LLC.  These shares were obtained by FW Acquisition Company LLC pursuant to the Transaction Agreement.  According to the letter agreement, the capital provided by FW Sports Investments LLC to FW Acquisition Company LLC was used to fund 4.9 percent of the amount FW Acquisition Company LLC was required to invest in Flywheel pursuant to the Transaction Agreement.

843.   On or about March 31, 2014, a Shareholders Agreement was executed by and between Flywheel and FW Sports Investments LLC.  The Shareholders Agreement governed the management of Flywheel and the relationship between Flywheel and its shareholders, including FW Sports Investments LLC.

844.   As described above in Paragraph 695, on or about February 3, 2014, CEPSA returned approximately $350 million to SRG in connection with its sale of its shares in Condor to CEPSA.  This $350,000,000 represented proceeds traceable to the sale of equity in the Park Lane Partnership to Mubadala – proceeds that themselves were traceable to diverted 1MDB funds.

845.   On or about February 4, 2014, SRG sent $350,102,534 to the LHP Account. On that same date, $13,000,000 was transferred from the LHP Account to Szen's personal account at BSI Bank.

846.   On or about March 31, 2014, approximately $3 million was wired from Szen's account at BSI Bank to a client account maintained by DLA Piper at Privatebank in the United States.  That same day, (i) approximately $3 million was transferred from the DLA Piper account to an account maintained by FW Acquisition Company LLC at JP Morgan Chase, and (ii) approximately $3 million was transferred from FW Acquisition Company LLC to Flywheel's account at SunTrust Bank.

## CC.   LOW ARRANGED TO PURCHASE A 22-CARAT PINK DIAMOND NECKLACE FOR THE WIFE OF MALAYSIAN OFFICIAL 1 USING DIVERTED 2013 BOND PROCEEDS

847.   Funds traceable to the diverted proceeds of the 2013 bond sale were used to purchase a 22-carat pink diamond, set in a diamond necklace, ("22-CARAT PINK DIAMOND NECKLACE") for the wife of MALAYSIAN OFFICIAL 1.  The stone and necklace were purchased from New York-based jeweler and jewelry designer Lorraine Schwartz Inc., which specializes in high-end bespoke diamond jewelry.  The total purchase price for the stone and necklace was $27,300,000.

848.   On or about June 2, 2013, LOW texted Lorraine Schwartz ("Schwartz"), the proprietor of Lorraine Schwartz, Inc.: "Need a 18 carrot pink heart diamond vivid or slightly short of vivid.  On diamond necklace urgent."  By early July of 2013, Schwartz had identified a pink diamond available for purchase, and she discussed with LOW the logistics of making it available for viewing by him and others.  Initially, LOW suggested that he would send HUSSEINY to pick up the diamond from Schwartz in New York.  Ultimately, Schwartz agreed to show the diamond to LOW and to the "client" in Monaco.  At this time, Schwartz did not know the identity of the "client."

849.   On or about July 5, 2013, Schwartz traveled to Monaco and met LOW aboard the Topaz, one of the largest private yachts in the world.  LOW and TAN had chartered the 147-meter yacht for seven days in early July 2013, and according to an invoice submitted to Falcon Bank, they paid €3.5 million for the rental, using proceeds of the 2013 bonds.

850.   Aboard the Topaz, Schwartz showed the pink diamond to a group of people that included LOW, HUSSEINY, the wife of MALAYSIAN OFFICIAL 1, and one of her friends ("Malaysian Friend").  The group discussed the design of the necklace to hold the 22-carat pink diamond, which itself would be made of smaller diamonds.

851.   On or about September 10, 2013, an email from TAN's account, with the subject "22 CARAT PINK DIAMOND," was sent to Schwartz Inc. advising: "pls ensure design, stone, etc. is ready for the VVIP Lorraine met (without stating names) as the VVIP will be in nyc on 23 sept."  An employee of Lorraine Schwartz Inc. responded that the necklace would not be ready by then but that Schwartz would like to "meet the client [to] insure [sic] correct measurement . . . and discuss any final touches needed" on the necklace.

852.   On or about September 28, 2013, Schwartz met again with LOW and the wife of MALAYSIAN OFFICIAL 1 in a hotel suite in the Mandarin Time Warner in New York in order to show them the layout of the necklace that Schwartz had designed.  Travel records confirm that the wife of MALAYSIAN OFFICIAL 1 was in New York

City at this time.  Travel records show that on September 27, 2013, LOW flew from Las Vegas to Teterboro Airport in New Jersey on his jet.  Other passengers on that flight included AZIZ, TAN and McFarland.

853.   Although LOW arranged for the purchase of the 22-CARAT PINK DIAMOND NECKLACE from Lorraine Schwartz Inc., TAN was the nominal purchaser.  Schwartz was asked to invoice Blackrock Commodities (Global) Limited ("Blackrock"), an entity nominally owned by TAN, for the entirety of the purchase. Thereafter, LOW and TAN took pains to avoid any association between LOW and the purchase in written records.  For example, an August 29, 2013 email concerning the 22-CARAT PINK DIAMOND NECKLACE that was sent to Schwartz's assistant from TAN's email account reads: "Please as mentioned on many occasions, do not state Mr. Low's name on email as he is just an introducer and not the buyer! V sensitive!"  There is evidence that LOW may have used TAN's email address in order to conceal his association with transactions nominally made by TAN.

854.   Schwartz Inc. issued two invoices in connection with the purchase of the 22-CARAT PINK DIAMOND NECKLACE.  The first invoice, dated July 3, 2013, was for $23,000,000 for the 22-carat diamond itself.  The diamond is described in the invoice as "22.17carat Natural Fancy Intense Pink VS2 clarity (GIA#2115637296) Cut-Cornered Square Modified Brilliant Cut diamond."  The second invoice, dated July 31, 2013, was for $4,300,000 for the accompanying necklace, which was described as "ONE GRADUATE FANCY INTENSE PINK AND OVAL WHITE DIAMOND NECKLACE WITH INTERCHANGEABLE PENDANT TO RING."

855.   TAN and/or LOW originally claimed to have difficulty paying these invoices with funds from the account that Blackrock maintained at DBS Bank in Singapore, because of "compliance issues" with the bank.  Over the course of more than a month, TAN emailed Schwartz on at least three occasions claiming that the wire transfer had been completed when it had not been.

856.   The invoices were ultimately paid using funds traceable to diverted 2013 bond proceeds, and more specifically, to the funds that Tanore sent to MALAYSIAN OFFICIAL 1 under the guise of investing in SRC International.

857.   As noted in Paragraphs 317 above, beginning on or about March 21, 2013, $835,000,000 in funds raised by 1MDB through its 2013 bond issue was diverted to the Tanore Account at Falcon Bank in Singapore, after being routed through one of three Overseas Investment Funds.  On or about the same day, Tanore transferred $620,000,000 to the AMPRIVATE BANKING-MR account at AmBank in Malaysia belonging to MALAYSIAN OFFICIAL 1.  On or about March 25, 2013, an additional $61,000,000 was wired from the Tanore Account to the same account, for a total of $681,000,000.

858.   As noted in Paragraph 345 above, on or about August 26, 2013, $620,010,715 of the $681,000,000 in diverted 1MDB funds sent to MALAYSIAN OFFICIAL 1 was returned to the Tanore Account from another account at AmBank belonging to MALAYSIAN OFFICIAL 1.

859.   On or about September 9, 2013, $58,849,050 was wired from the Tanore Account to another account at Falcon Bank in Singapore held in the name of Midhurst Trading Limited ("Midhurst Trading Account").  TAN was the recorded beneficial owner of the Midhurst Trading Account, and LOO had power of attorney over the account.  The following day, on or about September 10, 2013, Midhurst transferred $32,760,000 to an account at DBS Bank Ltd. in Singapore held by Blackrock (the "Blackrock Account").  The wire transfer was processed through a correspondent bank account at Bank of New York Mellon in New York.  TAN was also the recorded beneficial owner of the Blackrock Account.

860.   In response to an inquiry by DBS Bank about the purpose of the incoming $32,760,000 wire, TAN represented that Midhurst Trading was a "long-term wholesale buyer of jewelry" and that the transfer represented payment by Midhurst to Blackrock for goods sold.  In fact, TAN was the stated beneficial owner of both Midhurst and Blackrock, and both entities were shell companies that conducted no legitimate business.

861.   On or about the same day that Midhurst sent $32,760,000 to Blackrock, Blackrock made two separate wire transfers to a bank account at Bank of America in New York held by Lorraine Schwartz Inc. in payment of the two invoices for the 22-CARAT PINK DIAMOND NECKLACE – one in the amount of $23,000,000 and another in the amount of $4,300,000.

862.   This was far from the only time that TAN and LOW used the Blackrock Account to pay for jewelry purchases for themselves and their associates.  Between April 2013 and September 2014, the Blackrock Account was used to purchase a total of approximately $200 million in jewelry from firms located around the world, using funds traceable to the 2013 bonds and the 2014 Deutsche Bank loans.  Typically, as in this case, funds intended for jewelry purchases would be routed to the Blackrock Account from other TAN- and LOW-affiliated entities, such as Affinity Equity, Tanore, and Midhurst.

863.   The finished 22-CARAT PINK DIAMOND NECKLACE, which included the 22-carat pink diamond as a pendant, was delivered to the Malaysian Friend in Hong Kong on or about March 7, 2014, so that she could deliver it to the wife of MALAYSIAN OFFICIAL 1 in Kuala Lumpur.  Records reflect that the Malaysian Friend accepted receipt of the necklace "[o]n behalf of" Blackrock.

**DD.   LOW ARRANGED TO PURCHASE 27 ASSORTED GOLD NECKLACES FOR THE WIFE OF MALAYSIAN OFFICIAL 1 USING MISAPPROPRAITED DEUSCHE BANK LOAN PROCEEDS**

864.   In October 2014, $1,300,000 in funds traceable to misappropriated Deutsche Bank loan proceeds were used to purchase 27 different 18-carat gold necklaces and bracelets ("27 ASSORTED GOLD NECKLACES AND BRACELETS") from Schwartz Inc. in New York.  LOW arranged for the purchase and payment of this jewelry on behalf of the wife of MALAYSIAN OFFICIAL 1.

865.   Schwartz was invited to show MALAYSIAN OFFICIAL 1 jewelry at the Hotel Bel-Air in Los Angeles on or about January 3, 2014.  LOW texted Schwartz that

day to confirm that she was there.  At the Bel Air Hotel, Schwartz had dinner with MALAYSIAN OFFICIAL 1 and others, and thereafter was invited to a suite to show jewelry to her.  She selected 27 different necklaces and bracelets.

866.   The invoice for the 27 ASSORTED GOLD NECKLACES AND BRACELETS, dated June 23, 2014, was sent to Blackrock, "Attention: Board of Directors."  The invoice number was 6039.  Twenty-seven different pieces of jewelry were listed on the invoice, as set forth below:

| Qty. | Description | Total Price |
|------|-------------|-------------|
| 1 | 18K WHITE GOLD WHITE DIAMOND ROSE CUT BANGLE (MEDIUM) | $52,000 |
| 1 | 18K YELLOW GOLD WHITE DIAMOND ROSE CUT BANLGE (MEDIUM) | $52,000 |
| 1 | 18K ROSE GOLD WHITE DIAMOND ROSE CUT BANGLE (MEDIUM) | $52,000 |
| 2 | 18K BLACK GOLD BROWN DIAMOND ROSE CUT BANGLE (MEDIUM) | $99,000 |
| 3 | 18K WHITE GOLD WHITE DIAMOND ROSE CUT BANGLE (THIN) | $91,200 |
| 2 | 18K YELLOW GOLD FANCY DIAMOND ROSE CUT BANGLE (THIN) | $60,800 |
| 3 | 18K BLACK GOLD BROWN DIAMOND ROSE CUT BANGLE (THIN) | $76,125 |
| 2 | 18K BLACK GOLD BLACK DIAMOND ROSE CUT BANGLE (THIN) | $35,500 |
| 2 | 18K WHITE HOLD WHITE DIAMOND ROSE CUT TURQUOISE BANGLE (MEDIUM) | $92,000 |

| 4 | 18K WHITE GOLD WHITE DIAMOND AND BLACK JADE BANGLES | $68,000 |
|---|---|---|
| 1 | 18K YELLOW GOLD WHITE DIAMOND BANGLE | $65,000 |
| 1 | 18K ROSE GOLD MULTI COLOR HEART SHAPE SAPPHIRE NECKLACE | $150,000 |
| 1 | 18K ROSE GOLD WHITE DIAMOND 2B HAPPY NECKLACE | $70,714 |
| 1 | 18K YELLOW GOLD WHITE DIAMOND 2B HAPPY NECKLACE | $55,489 |
| 1 | 18K WHITE HOLD WHITE DIAMOND 2B HAPPY NECKLACE | $40,172 |
| 1 | 18K WHITE GOLD WHITE DIAMOND AND BLACK DIAMOND NECKLACE | $240,000 |

These twenty-seven pieces corresponded to the pieces that the wife of MALAYSIAN OFFICIAL 1 had selected in Los Angeles on or about January 3, 2014.  The total purchase price for all 27 ASSORTED GOLD NECKLACES AND BRACELETS was $1,300,000.

867.   Although LOW communicated with Schwartz about the jewelry purchase for the wife of MALAYSIAN OFFICIAL 1, he directed that documents and records omit referring to his part in the purchase.  For example, when Schwartz mentioned invoicing Blackrock, LOW responded, in relevant part: "Re rock biz, pls don't text me!  All email eric better and safe! :) thanks!"

868.   On or about October 6, 2014, Schwartz texted LOW about paying several outstanding invoices, including the one for the 27 ASSORTED GOLD NECKLACES AND BRACELETS.  LOW responded that "Eric will follow up separately."  A Schwartz employee separately emailed TAN about the outstanding invoices.

869.   On or about October 8, 2014, LOW texted Schwartz to advise her that payment had been sent for the 27 ASSORTED GOLD NECKLACES AND BRACELETS.  His text read:  "Sent from world merit mgmt.  USD4m+"

870.   On or about October 10, 2014, an entity called World Merit Management Ltd. ("World Merit") wire transferred $4,100,000 from its bank account at Bank of East Asia in Hong Kong to the Citibank account of Lorraine Schwartz Inc. in New York ("Schwartz Inc. Account").  These funds were sent to pay several outstanding invoices, including the $1,300,000 invoice for the 27 ASSORTED GOLD NECKLACES AND BRACELETS.

871.   After noticing that payment was made by an entity other than the one that was invoiced for the jewelry, an employee at Schwartz Inc. sent an email to TAN's email account, with the subject "Hi Eric."  In that email, the employee indicated that, "[s]ince payment was received from a party other than the invoiced party, our company policy is to ask that you respond to the attached questionnaire."  Attached to the email was a Purchaser AML Questionnaire that asked about the payment details, the source of funds, and an explanation for "why the source of funds differed from the purchased."

872.   On the completed questionnaire, TAN claimed that payment was made by a third-party, World Merit, rather than by Blackrock, because World Merit "extended a loan to Blackrock Commodities (Global) Limited beneficial owner and thus paid on behalf of Blackrock."  TAN also falsely identified the source of funds as "[p]ersonal."

873.   In fact, the funds sent to Schwartz Inc. from World Merit were traceable to misappropriated Deutsche Bank loan proceeds.  As noted in Section 433 above, at 1MDB's direction, Deutsche Bank wired $457,984,607 in proceeds from the $975 million loan to the Aabar-Seychelles Account at UBS Bank in Singapore on or about September 29, 2014, with the understanding that the funds were being sent to a legitimate subsidiary of IPIC.

874.   As explained below, a portion of these misappropriated funds was thereafter laundered through a series of pass-through accounts, and ultimately to the World Merit Account, within a two-week period.

875.   On or about September 30, 2014, Aabar-Seychelles sent $71,773,000 to an account held in the name of Aabar International Investments Ltd. ("Aabar International").  Like Aabar-Seychelles and Aabar-BVI, Aabar International was an entity named to mimic the real IPIC subsidiary, Aabar Investments PJS.

876.   On or about October 1, 2014, Aabar International sent $33,500,000 of the $71,773,000 it had received from Aabar-Seychelles to a bank account held by Enterprise, one of the Overseas Investment Funds used to divert 2013 bond proceeds to Tanore.  On or about the same day, Aabar-Seychelles sent an additional $38,223,000 to a bank account held by Cistenique, another Overseas Fund.  In total, Aabar International sent nearly all the money it received from Aabar-Seychelles to the Overseas Investment Funds.

877.   These Overseas Investment Funds functioned solely as pass-through entities.  On or about October 2, 2014 – one day after Aabar International "invested" in the Funds – the Funds wired the "invested" money to an account at BSI Bank in Singapore held in the name of SRC International (Malaysia) Ltd. ("SRC (Malaysia) Account").  These pass-through transfers are depicted below:

| Date | Credits into Enterprise | | Debits from Enterprise | |
|---|---|---|---|---|
| | From | Amount | Amount | To |
| 10/1/14 | Aabar Int'l Account | $33,500,000 | | |
| 10/6/14 | | | $33,500,000 | SRC (Malaysia) Account |

| Date | Credits into Cistenique | | Debits from Cistenique | |
|---|---|---|---|---|
| | From | Amount | Amount | To |
| 10/1/14 | Aabar In't Account | $38,223,000 | | |
| 10/2/14 | | | $38,223,000 | SRC (Malaysia) Account |

878.   SRC International (Malaysia) Ltd. is an ostensible subsidiary of SRC International.  At the time SRC International (Malaysia) Ltd. was created in 2011, its parent SRC International was a wholly-owned subsidiary of 1MDB.  SRC International was transferred to direct ownership by the Ministry of Finance in 2012.  As noted in Paragraph 344 above, the 1MDB-SRC OFFICER, who was CEO of SRC International, was involved in the transfer of $681 million in diverted 2013 bond proceeds to the bank account of MALAYSIAN OFFICIAL 1 in March 2013.

879.   On or about October 7, 2014, $65,000,000 was wire transferred from the SRC (Malaysia) Account back to the Aabar-Seychelles Account, where the money had originated roughly one week prior.  Thereafter, on or about that same day, Aabar-Seychelles wire transferred $39,750,000 to the World Merit Account.  These funds were then used to make payment on the 27 ASSORTED GOLD NECKLACES AND BRACELETS that the wife of MALAYSIAN OFFICIAL 1 had ordered in Los Angeles earlier that year.

## EE.   LOW PURCHASED AN 11.72-CARAT HEART-SHAPED DIAMOND USING DIVERTED 2013 BOND PROCEEDS

880.   In February 2014, LOW used funds traceable to misappropriated 2013 bond proceeds to purchase a $1.29 million 11.72-carat heart-shaped diamond ("11.72-CARAT HEART-SHAPED DIAMOND") from Schwartz Inc. in New York.  LOW gave the jewelry as gifts to Miranda Kerr, an Australian national.

232

881.   On or about January 29, 2014, LOW texted Schwartz to inquire about the possibility of purchasing a necklace with a heart-shaped diamond in time for Valentine's Day.  LOW indicated he had a budget of $1-2 million, and that "[s]ize matters."  A few days later, Schwartz met LOW at the Time Warner complex to allow LOW to choose the diamond.  LOW later asked Schwartz to inscribe Kerr's initials ("MK") on the back of the piece.

882.   Schwartz Inc. sent LOW an invoice for $1,290,000, dated February 5, 2014. The invoice describes the item as "11.72CT HEART SHAPE D VVS2 TYPE IIA (GIA#2155273833) INCLUDING MULTIPLE CHAINS."

883.   On or about February 7, 2014, LOW wired $1,815,520 from his personal bank account at BSI to the Schwartz Inc. Account as payment for the 11.72-CARAT HEART-SHAPED DIAMOND, as well as for previous purchases of jewelry for LOW's mother.  The payment details on the SWIFT indicate: "INVOICE 5945 (V-DAY), AND PREVIOUS PURCHASES FOR MOTHER."  Invoice number 5945 corresponds to the invoice for the 11.72-CARAT HEART-SHAPED DIAMOND.

884.   LOW used funds traceable to the 2013 bond proceeds, which had been laundered through the Park Lane deal and through an additional investment with IPIC, to pay for the 11.72-CARAT HEART-SHAPED DIAMOND.

885.   As explained in Paragraphs 710-712 above, LOW and his father LHP used the proceeds of the sale of equity in the Park Lane Partnership to invest in a joint venture called "Condor" with IPIC's subsidiary CEPSA.  On or about December 27, 2013, the day after LHP received $56,500,000 in proceeds from the sale of Partnership equity to Mubadala, LHP transferred $55,500,000 to another bank account at BSI Bank in Singapore held in the name of SRG.  Approximately $50 million of this amount was invested in the Condor joint venture, resulting in a $350,000,000 return to SRG several days later as proceeds of the investment.

886.   On or about February 4, 2014, SRG transferred the approximately $350 million in supposed investment returns to the LHP Account.  On or about the same day,

LHP transferred $334,102,534 to LOW's personal account, purportedly as a "gift" to him.

887.   Three days later, LOW used a portion of those funds to pay for the 11.72-CARAT HEART-SHAPED DIAMOND, as set forth in Paragraph 883.

888.   LOW directed that the 11.72-CARAT HEART-SHAPED DIAMOND be delivered (along with other items) to his TIME WARNER PENTHOUSE in New York, where his assistant would accept them.  LOW gave the 11.72-CARAT HEART-SHAPED DIAMOND to Kerr, who resides in Los Angeles, as a Valentine's Day present.

### FF.   LOW PURCHASED AN 8.88-CARAT DIAMOND PENDANT USING DIVERTED DEUTSCHE BANK LOAN PROCEEDS

889.   In November 2014, LOW used funds traceable to the diverted proceeds of the $975 million Deutsche Bank loan to purchase an 8.88-carat diamond pendant for $3,800,000 ("8.88-CARAT DIAMOND PENDANT") from Schwartz Inc. in New York. LOW gave the 8.88-CARAT DIAMOND PENDANT to Kerr as a gift.

890.   On or about November 18, 2014, LOW texted Schwartz to inquire:  "2 dec, can u find me a pink heart diamond? Cost? For a necklace? Light pink is fine, size more imp."  Over the next few days, LOW and Schwartz communicated about different stones that might fulfill LOW's request.

891.   On or about November 21, 2014, Schwartz suggested that a particular pink heart-shaped diamond might be available for between $4.5 and $4.8 million.  After viewing a photo of the stone, LOW wrote:  "4.5M offer ok / Heart looks beautiful / Let's take it and be ready for asap! London 27 or earlier if possible nov."  In response, Schwartz advised LOW of the "need to pay them Monday in order to keep [the] stone . . . ."

892.   In response to Schwartz's request for immediate payment, on or about November 26, 2014, LOW wired $3,800,000 from his personal account at BSI to the

Schwartz Inc. Account, in partial payment for the 8.88-CARAT DIAMOND PENDANT.

893.   LOW paid for the 8.88-CARAT DIAMOND PENDANT using funds traceable to misappropriated Deutsche Bank loan proceeds.  As noted in Section V.F above, at 1MDB's direction, Deutsche Bank wired $457,984,607 in proceeds from the $975 million loan to the Aabar-Seychelles Account on or about September 29, 2014, with the understanding that the funds were being sent to a legitimate subsidiary of IPIC. A portion of these funds was cycled through various accounts in October and November to create the impression that Brazen Sky was redeeming its investments in the Bridge Global Fund, but the majority of the funds were ultimately returned to the Aabar-Seychelles Account.

894.   On or about November 6, 2014, Aabar-Seychelles sent $92,000,000 from its account at UBS in Singapore to an account at Amicorp held in the name of Aabar Investments International Partners Ltd. ("Aabar International").  Like Aabar-Seychelles and Aabar-BVI, Aabar International was an entity named to mimic the real IPIC subsidiary, Aabar Investments PJS.

895.   On or about November 7, 2014, Aabar International sent that same $92,000,000 to a bank account at Amicorp held in the name of Vista Equity International Partners Ltd. ("Vista Equity Account").  TAN was the stated beneficial owner of this account.

896.   On or about the same day that Vista Equity received $92,000,000 from Aabar International, it sent $44,595,000 to a bank account at Amicorp held in the name of TKIL Capital Partners ("TKIL Account").  TAN was also the stated beneficial owner of the TKIL Account.

897.   On or about November 10, 2014, TKIL sent the $44,595,000 it had received from Vista Equity to the Dragon Market Account at RBS Coutts in Switzerland.  As noted above, LOW is the stated beneficial owner of the Dragon Market Account.  On or

about November 12, 2014, Dragon Market sent $39,950,000 to the Dragon Dynasty Account at BSI Bank in Singapore, which is also beneficially owned by LOW.

898.   On or about the same day, or November 12, 2014, LOW transferred the $39,950,000 again to his personal account at BSI in Singapore.  All told, five different pass-through accounts – some with the same beneficial owner – were used within the span of one week to launder misappropriated Deutsche Bank loan proceeds from Aabar-Seychelles to LOW's personal bank account.  LOW used these laundered funds to make a $3,800,000 payment to Schwartz Inc. on or about November 26, 2014, for the 8.88-CARAT DIAMOND PENDANT.

899.   The 8.88-CARAT DIAMOND PENDANT was delivered to LOW on or about November 27, 2104 at the STRATTON OFFICE, the London office of a lingerie company that he owned, described in further detail in Section VI.S.

900.   An invoice dated February 12, 2015 shows that LOW was billed $4,800,000 for the 8.88-CARAT DIAMOND PENDANT.  The piece is described as an "18K ROSE GOLD 8.88CT FANCY INTENSE PINK DIAMOND PENDANT SURROUNDING BY 11CT FANCY INTENSE PINK DIAMONDS."  Also included on the same invoice were a chain and a necklace, totaling $800,000.  The invoice shows that LOW owed a balance of $1,800,000 on all three items.  This reflects a credit for LOW's earlier payment of $3,800,000 on or about November 26, 2014, for the 8.8-CARAT DIAMOND PENDANT.

901.   LOW gave the 8.88-CARAT DIAMOND PENDANT to Kerr as a gift.

**GG.  LOW PURCHASED A MATCHING DIAMOND JEWELRY SET and 11-CARAT DIAMOND EARRINGS USING DIVERTED DEUTSCHE BANK LOAN PROCEEDS**

902.   In October 2014, LOW used funds traceable to the diverted proceeds of the $975 million Deutsche Bank loan to purchase an 11-carat pair of diamond earrings ("11-CARAT DIAMOND EARRINGS") and a matching set of diamond earrings, necklace, ring, and bracelet ("MATCHING DIAMOND JEWELRY SET") from Schwartz Inc. in

New York.  LOW gave the 11-CARAT DIAMOND EARRINGS and the MATCHING DIAMOND JEWELRY SET to Kerr as gifts.

### 1.   *The MATCHING DIAMOND JEWELRY SET*

903.   LOW first approached Schwartz about the purchase of the MATCHING DIAMOND JEWELRY SET on or about June 17, 2014, texting her:  "Thinking of super casual, simple, bracelet, necklace, earring and ring all similar style as picture white gold with simple diamonds.  (not too big).  Think / the one she wore in pic is from tiffany."  He also requested that Schwartz "initial whatever items u can with MK."  LOW indicated in a later text to Schwartz that he needed the items by July 29, 2014 in London.

904.   The invoice for the MATCHING DIAMOND JEWELRY SET, bearing Invoice Number 6070, was dated July 29, 2014, in the amount of $1,980,000.  It was directed to LOW.  The jewelry was described as an "18K WHITE GOLD DIAMOND SET INCLUDING NECKLACE, EARRINGS, BRACELET AND RING."

905.   The MATCHING DIAMOND JEWELRY SET was delivered to LOW in London on or about July 30, 2014.  LOW gave the MATCHING DIAMOND JEWELRY SET to Kerr as a gift during a multi-day excursion aboard his new yacht the Equanimity, in late July and early August of 2014.  The excursion was planned at LOW's direction by a high-end concierge service, and meticulous planning went into arranging the manner in which LOW would present each piece of the MATCHING DIAMOND JEWELRY SET to Kerr.

### 2.   *THE 11-CARAT DIAMOND EARRINGS*

906.   On or about October 7, 2014, Schwartz approached LOW to see if he was interested in purchasing two 5-carat, internally-flawless, pear-shaped diamonds that could be mounted as earrings, *i.e.*, the 11-CARAT DIAMOND EARRINGS.  LOW confirmed that he would buy them, and he asked that Kerr's initials be engraved in them.

907.   The invoice for the 11-CARAT DIAMOND EARRINGS was dated October 7, 2014, and was directed to LOW.  The jewelry was described as "18K WHITE GOLD DIAMOND EARRINGS – 5.55 CT DIF GIA # 2165455706 AND 5.49 CT DIF

GIA # 2165635932 PEAR BRILLIANT CUT DIAMONDS." The purchase price was $1,050,000.

908. LOW signed for the receipt of the 11-CARAT DIAMOND EARRINGS on October 9, 2014. The "Good Received" form indicates that they were delivered in New York City. LOW gave the jewelry to Kerr as a gift.

909. On or about October 29, 2014, LOW wire transferred $4,050,000 from his personal account at BSI Bank in Singapore to the Schwartz Inc. Account in New York. The payment details on the wire read: "INVOICE : 6047, 6070 & 6072." Invoice 6070 matches the invoice for the MATCHING DIAMOND JEWELRY SET. Payment records associated with the purchase also show that the wire of $4,050,000 included payment for Invoice 6102, which matches the invoice for the 11-CARAT DIAMOND EARRINGS.

910. The money used to purchase the MATCHING DIAMOND JEWELRY SET and the 11-CARAT DIAMOND EARRINGS was traceable to the misappropriated proceeds of the $975 million Deutsche Bank loan. As noted in Section V.F above, at 1MDB's direction, Deutsche Bank wired $223,000,000 in proceeds from the $975 million loan to the Aabar-Seychelles Account at UBS Bank in Singapore on or about September 2, 2014, with the understanding that the funds were being sent to a legitimate subsidiary of IPIC.

911. A portion this money was laundered through five different pass-through accounts to LOW's personal account within a five-day period, as follows: (a) Aabar-Seychelles sent $28,000,000 to the Aabar International Account on or about October 24, 2014; (b) Aabar International sent $28,000,000 to the Vista Equity Account on or about October 27, 2014; (c) Vista Equity sent $25,000,000 to the TKIL Account on or about October 27, 2014; (d) TKIL sent $25,000,000 to the Dragon Market Account on or about October 28, 2014; (e) Dragon Market sent $25,000,000 to the Dragon Dynasty Account on or about October 29, 2014; and (f) Dragon Dynasty sent $25,000,000 to LOW's

238

personal account at BSI on or about October 29, 2014 – the same day that LOW sent $4,050,000 to Lorraine Schwartz Inc. from his BSI account.

### HH. LOW PURCHASED MATCHING DIAMOND RING AND EARRINGS FOR HIS MOTHER USING DIVERTED 2012 BOND PROCEEDS

912. LOW used funds traceable to diverted 2012 bond proceeds to purchase a pair of diamond earrings and a matching diamond ring for his mother ("MATCHING DIAMOND RING AND EARRINGS").  The purchase price of these items was $1,695,475.

913. On or about November 20, 2012, LOW texted Schwartz, in relevant part: "Also separately for my mom, and [sic] I need two simple same quality diamonds 3 carrat each / for earrings nice timeless (but not old looking setting), maybe can give her the stone and she can work with u all on setting and design later?"  After additional back and forth with Schwartz about various available stones, LOW wrote: "For mom 7.7 round brilliant and a pair of same quality ear rings. / Buy both, she can decide on how she wants ring n ear rings set later."

914. Schwartz met with Low's mother, "Evelyn" Goh Gaik Ewe ("Goh"), in both New York and Hong Kong to discuss the design of a ring and earrings using the stones that LOW had selected for her.

915. The invoice to LOW for the MATCHING DIAMOND RING AND EARRINGS was dated November 28, 2012, and included the following items:

| Description | Price |
|---|---|
| 7.53CT RB D FLAWLESS TYPE 2A GIA#2145864026 | $1,167,150 |
| 3.05CT RB D FLAWLESS TYPE 2A GIA#2136117071 | $312,625 |
| 3.08CT RB D FLAWLESS TYPE 2A GIA#2145977021 | $315,700 |
| **Total:** | $1,695,475 |

239

The invoice also included a 7-carat diamond engagement ring that LOW had ordered for an unidentified woman, bringing the invoice total to $2,842,475.

916.   LOW paid for the MATCHING DIAMOND RING AND EARRINGS with a wire transfer in the amount of $2,842,475 from his personal account at BSI bank to the Schwartz Inc. Account in New York on or about December 5, 2012.  These funds were traceable to diverted 2012 bond proceeds.

917.   As noted in Section III.D above, between May and December of 2012, Aabar-BVI transferred, either directly or indirectly, approximately $1.1 billion in diverted 2012 bond proceeds to the Blackstone Account.

918.   Beginning on or about October 29, 2012, funds from the Blackstone Account were laundered in rapid sequence through several accounts associated with TAN and LOW, ending up in LOW's personal account at BSI in a matter of days.  More specifically: (a) on or about October 29, 2012, Blackstone transferred a total of $259,800,000 to the Alsen Chance Account at Standard Chartered, of which TAN was the recorded beneficial owner; (b) on or about November 1, 2012, Alsen Chance transferred $200,000,000 to the Good Star Account at RBS Coutts; (c) on or about November 2, 2012, Good Star transferred $153,000,000 to the ADKMIC BSI Account, which was beneficially owned by LOW; (d) on or about November 5, 2012, LOW transferred $150,000,000 from the ADKMIC BSI Account to the personal bank account of his father at BSI Bank (*i.e.*, the LHP Account); and (e) on or about November 7, 2012, $150,000,000 was transferred from the LHP Account to LOW's personal account at BSI Bank.

919.   Compliance officials at BSI raised concerns about the flow of funds from Good Star through various BSI account, with a particular focus on the movement of such a large sum of money beneficially owned by LOW through his father's account and back to another account owned by LOW.  One compliance official characterized the flow of funds as "nebulous to say the least and not acceptable in Compliance's view."

920.   In response to a query from BSI, LOW attempted to explain these suspicious fund flows by email dated November 7, 2012:

"-The sender of funds [i.e., Good Sar] and the recipient (Abu Dhabi-Kuwait-Malaysia Investment Corporation, ADKMIC) have the same Beneficial Owner.

-The different vehicles serve different investment objectives in different jurisdictions, asset allocation and other functions.

-In our family tradition and hierarchy, we are always respectful of my family and the older generation. . . .

-Therefore, when good wealth creation is generated, as a matter of cultural respect and good fortune that arises from respect, we always give our parents the proceeds.  This is part of our custom and culture.

-It is of course then up to the parents/elder to determine what to do with the funds and in this case, my father receives it as a token of gesture, respect and appreciation and decides to give it back for me to then subsequently provide a portion for the benefit of the family trust."

LOW closed by saying, in relevant part: "I hope I do not need to keep explaining the same matter over and over again as our time is better spent generating wealth so that the AUM [assets under management] in BSI Bank can be increased as opposed to providing answers for questions which have already been provided previously."

921.   BSI Bank accepted LOW's word that what appeared to be red flags for money laundering were actually the result of "family tradition," and it proceeded to process the transfers.

922.   Roughly one month later, LOW transferred $2,842,475 from his personal account at BSI to the Schwartz Inc. Account in payment for his mother's MATCHING DIAMOND RING AND EARRINGS.

923.   Goh picked up the MATCHING DIAMOND RING AND EARRINGS in Hong Kong.

## II.   PICASSO PAINTING ACQUIRED WITH FUNDS DIVERTED FROM 1MDB'S 2013 BOND SALE

924.   On or about January 2, 2014, approximately $3,280,000 in diverted proceeds of the 2013 bond sale were used to acquire a painting entitled "Nature Morte au Crane de Taureau" by Pablo Picasso (the "PICASSO PAINTING"), an oil on canvas painting measuring 65.5 x 92.5 cm.

925.   As explained in Section VI.J above, LOW acquired an 80% interest in the Park Lane Partnership using more than $200 million in misappropriated 2013 bond proceeds.  Shortly after this acquisition, LOW sold a portion of his interest to Mubadala for approximately $135,000,000.  These proceeds were initially placed into a client trust account maintained by DLA Piper, which at the time served as the trustee for the Park Lane Partnership assets.  Thereafter, DLA Piper made a distribution of those funds to LOW for approximately $63,000,000 on or about December 26, 2013.

926.   A portion of these funds were laundered through two pass-through accounts within a three-day period to an account in the name of Platinum Global Luxury Services ("Platinum Global Account"), as follows:  (i) on or about December 30, 2013, approximately $25,100,000 was transferred from the LOW's personal account at BSI to his Alpha Synergy Account; (ii) on or about January 2, 2014, approximately $25,000,000 was transferred from the Alpha Synergy Account to the Affinity Equity Account; and (iii) on or about that same day, approximately $3,380,000 was transferred from the Affinity Equity Account to the Platinum Global Account.  TAN is the stated beneficial owner of the Platinum Global Account.

927.   On or about January 2, 2014, approximately $3,200,000 was wired from the Platinum Global Account to the Monaco Art Dealer to acquire the PICASSO PAINTING.

928.   That same month, the PICASSO PAINTING was tendered as a gift to DiCaprio.  In a handwritten note to DiCaprio, TAN wrote, "Dear Leonardo DiCaprio,

242

Happy belated Birthday!  This gift is for you."  The note is signed "TKL," which are TAN's initials.

### JJ. DIANE ARBUS PHOTOGRAPH ACQUIRED WITH FUNDS DIVERTED FROM 1MDB'S 2013 BOND SALE

929. In November 2013, a photograph entitled "Boy with the Toy Hand Grenade" by Diane Arbus ("ARBUS PHOTOGRAPH") was purchased from Cinema Archives in New Jersey for $750,000 using diverted 1MDB funds.

930. As explained in Paragraph 345 above, on or about August 26, 2013, $620,010,715 in funds traceable to 1MDB's 2013 bond sale was wired from an account at AmBank belonging to MALAYSIA OFFFICIAL 1 to the Tanore Account.

931. On or about August 30, 2013, two wires were sent from Tanore: (i) a wire transfer on or about August 30, 2013 for approximately $171,000,000 to Enterprise, and (ii) another wire transfer that same day to Cistenique for approximately $163,000,000. As noted in Section IV.C above, Enterprise and Cistenique are overseas investment funds that, as relevant here, functioned as pass-through accounts for diverted 1MDB bond proceeds.

932. Between on or about September 4, 2013, and September 5, 2013, five wires totaling $171,300,190 were sent from Enterprise to the SRC (Malaysia) Account. Between on or about September 5 and 6, 2013, the SRC (Malaysia) Account also received six wires from Cistenique totaling approximately $61,642,769.  As noted in Paragraph 878 above, SRC (Malaysia) Ltd. was an entity ostensibly affiliated with the Malaysian-owned fund SRC International.

933. On or about September 5, 2013, two wires totaling $233,442,981 were sent from the SRC International Account to an account held by Pacific Harbor Global Growth Fund Ltd. ("Pacific Harbor.").  Like Cistenique and Enterprise, Pacific Harbor was an overseas investment fund marketed by BSI to 1MDB as a means of transmitting funds to a designated third party confidentially.

934.  Five days later, on or about September 10, 2013, two wires totaling $228,774,140 were sent from Pacific Harbor to the Affinity Equity Account.

935.  Between on or about October 28, 2013, and October 30, 2013, two wires totaling $1,000,000 were sent from the Affinity Equity Account to the Platinum Global Account.

936.  Approximately two days later, on or about November 1, 2013, $750,000 was wired from the Platinum Global Account to Cinema Archives to acquire the ARBUS PHOTOGRAPH.

937.  In March 2014, the ARBUS PHOTOGRAPH was given as a gift by LOW to DiCaprio.

## KK.  THE BASQUIAT COLLAGE WAS ACQUIRED WITH FUNDS DIVERTED FROM 1MDB'S 2013 BOND SALE

938.  In March 2013, a collage entitled "Redman One" by Jean-Michel Basquiat ("BASQUIAT COLLAGE") was purchased for $9,191,040 from the Helly Nahmad Gallery in New York, using diverted proceeds of the 2013 bond sale.  The BASQUIAT COLLAGE is an acrylic, oilstick and paper collage laid down on canvas and mounted on wood.

939.  As explained in Paragraph 317 above, between roughly March 21 and March 22, Tanore received wire transfers totaling $835,000,000 in diverted proceeds of 1MDB's 2013 bond sale.

940.  On or about March 25, 2013, approximately $9,200,000 was transferred from the Tanore Account to the Midhurst Trading Account, another account at Falcon Bank that TAN nominally owned.  That same day, on or about March 25, 2013, $9,191,040 was wired from the Midhurst Trading Account to the Helly Nahmad Gallery to acquire the BASQUIAT COLLAGE.

941.  In a letter dated March 25, 2014, from LOW to an art gallery in Switzerland, where the BASQUIAT COLLAGE was being stored, LOW instructed the gallery, "Please transfer the below work to the account of [DiCaprio].  I shall have no

further claims on any ownership of the below-artworks and indemnify [DiCaprio] from any liability whatsoever resulting directly or indirectly from these art-work." The letter is signed by both LOW and DiCaprio.

### FOREIGN LAW BASES FOR FORFEITURE

942. Misappropriating public funds by a public official is a criminal offense under Malaysian law, as enumerated by the Penal Code of Malaysia, including but not limited to sections 403 (dishonest misappropriation of property), 405 (criminal breach of trust), 409 (criminal breach of trust by public servant or agent), 166 (Public servant disobeying a direction of the law, with intent to cause injury to any person (including a company)), 415 (cheating), 418 (cheating with knowledge that wrongful loss may be thereby caused to a person whose interest the offender is bound to protect), and 420 (cheating and dishonestly inducing delivery of property); and the Malaysian Anti-Corruption Act 2009, including sections 16, 17, and 23. Copies of these laws are set forth in Attachment B.

943. Bank fraud is a criminal offense under Malaysian law, as enumerated by the Penal Code of Malaysia, including but not limited to section 415 (cheating), 418 (cheating with knowledge that wrongful loss may be thereby caused to a person whose interest the offender is bound to protect), and 420 (cheating and dishonestly inducing delivery of property).

944. Misappropriating public funds by a public official is a criminal offense under U.A.E. law, as enumerated in Federal Law No. (3) of 1987 on Issuance of the Penal Code, including but not limited to Articles 224, 225, 227, 228, 229, and 399. Copies of these laws, translated into English, are set forth in Attachment C.

945. Forgery, including the production of a false document and the false certification of a fact of legal significance, is a criminal offense under Swiss law, as enumerated in Article 251 of the Swiss Criminal Code of 21 December 1937 are set forth in Attachment D.

946.   Bank fraud is a criminal offense under Singapore law, as enumerated by the Penal Code of Singapore, including but not limited to section 415 (cheating) are set forth in Attachment E.

## FIRST CLAIM FOR RELIEF
### (18 U.S.C. § 981(a)(1)(C))

947.   Paragraphs 1 through 946 above are incorporated by reference as if fully set forth herein.

948.   The DEFENDANT ASSETS are property that constitutes, and is derived from, proceeds traceable to one or more violations of: (i) a foreign offense involving the misappropriation of public funds by or for the benefit of a public official (18 U.S.C. § 1956(c)(7)(B)(iv)); (ii) fraud by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)); (iii) wire fraud (18 U.S.C. §  1343); and/or (iv) international transportation or receipt of stolen or fraudulently obtained property (18 U.S.C. § 2314), and receipt of stolen money (18 U.S.C. § 2315), each of which is a specified unlawful activity under 18 U.S.C. §§ 1956(c)(7)(A), 1956(c)(7)(B)(iv) and 1956(c)(7)(D), and a conspiracy to commit such offenses.

949.   The DEFENDANT ASSETS are therefore subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

## SECOND CLAIM FOR RELIEF
### (18 U.S.C. § 981(a)(1)(A))

950.   Paragraphs 1 through 949 above are incorporated by reference as if fully set forth herein.

951.   The DEFENDANT ASSETS were involved in, and is traceable to property involved in, one or more transactions or attempted transactions in violation of section 18 U.S.C. § 1957 and a conspiracy to commit such offenses in violation of section 18 U.S.C. § 1956(h).  Specifically, the DEFENDANT ASSETS were involved in and is traceable to property involved in one or more financial transactions, attempted transactions, and a conspiracy to conduct or attempt to conduct such transactions in

criminally derived property of a value greater than $10,000 that was derived from specified unlawful activities, that is: (i) a foreign offense involving the misappropriation of public funds by or for the benefit of a public official (18 U.S.C. § 1956(c)(7)(B)(iv)); (ii) fraud by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)); (iii) wire fraud (18 U.S.C. § 1343); and/or (iv) international transportation or receipt of stolen or fraudulently obtained property (18 U.S.C. § 2314), and receipt of stolen money (18 U.S.C. § 2315).

952.   The DEFENDANT ASSETS are therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## THIRD CLAIM FOR RELIEF
### (18 U.S.C. § 981(a)(1)(A))

953.   Paragraphs 1 through 952 above are incorporated by reference as if fully set forth herein.

954.   The DEFENDANT ASSETS were involved in, and is traceable to property involved in, one or more transactions, or attempted transactions in violation of section 18 U.S.C. § 1956(a)(1)(B)(i) and a conspiracy to commit such offenses in violation of section 18 U.S.C. § 1956(h).  Specifically, the DEFENDANT ASSETS were involved in and is traceable to property involved in one or more financial transactions, attempted transactions, and a conspiracy to conduct or attempt to conduct such transactions involving the proceeds of specified unlawful activity, that is: (i) a foreign offense involving the misappropriation of public funds by or for the benefit of a public official (18 U.S.C. § 1956(c)(7)(B)(iv)); (ii) fraud by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)); (iii) wire fraud (18 U.S.C. § 1343); and/or (iv) international transportation or receipt of stolen or fraudulently obtained property (18 U.S.C. § 2314), and receipt of stolen money (18 U.S.C. § 2315), and were designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership or the control of the proceeds of the specified unlawful activities in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

955.   The DEFENDANT ASSETS were therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## FOURTH CLAIM FOR RELIEF

### (18 U.S.C. § 981(a)(1)(A))

956.   Paragraphs 1 through 955 above are incorporated by reference as if fully set forth herein.

957.   The DEFENDANT ASSETS were involved in, and is traceable to property involved in, one or more transactions or attempted transactions in violation of section 18 U.S.C. § 1956(a)(2)(B) and a conspiracy to commit such offenses in violation of section 18 U.S.C. § 1956(h).  Specifically, the DEFENDANT ASSETS were involved in and are traceable to funds that were and were attempted to be, transported, transmitted, or transferred, and a conspiracy to transport, transmit, or transfer, to a place in the United States from or through a place outside the United States, with the knowledge that the funds involved in the transportation, transmission, or transfer represented the proceeds of some form of unlawful activity and knowledge that such transportation, transmission, or transfer was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activities, that is: (i) a foreign offense involving the misappropriation of public funds by or for the benefit of a public official (18 U.S.C. § 1956(c)(7)(B)(iv)); (ii) fraud by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)); (iii) wire fraud (18 U.S.C. § 1343); and/or (iv) international transportation or receipt of stolen or fraudulently obtained property (18 U.S.C. § 2314), and receipt of stolen money (18 U.S.C. § 2315).

958.   The DEFENDANT ASSETS are therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

WHEREFORE, plaintiff United States of America prays that:

(a)   due process issue to enforce the forfeiture of the DEFENDANT ASSETS;

(b)   due notice be given to all interested parties to appear and show cause why forfeiture should not be decreed;

1     (c)    this Court decree forfeiture of the DEFENDANT ASSETS to the United

2   States of America for disposition according to law; and

3     (d)    for such other and further relief as this Court may deem just and proper,

4   together with the costs and disbursements of this action.

5

6   Dated: June 15, 2017                    Respectfully submitted,

7
                                            DEBORAH CONNOR
8                                           Acting Chief, MLARS

9                                           SANDRA R. BROWN
10                                          Acting United States Attorney

11                                           /s/ *Kyle R. Freeny*
                                            _____
12                                          JOHN J. KUCERA
                                            CHRISTEN A. SPROULE
13                                          Assistant United States Attorneys

14
                                            WOO S. LEE
15                                          Deputy Chief, MLARS
16                                          KYLE R. FREENY
                                            JONATHAN BAUM
17                                          Trial Attorneys, MLARS

18
                                            Attorneys for Plaintiff
19                                          UNITED STATES OF AMERICA
20

21

22

23

24

25

26

27

28

1

**VERIFICATION**

2          I, Robert B. Heuchling, hereby verify and declare under penalty of perjury

3   that I am a Special Agent with the Federal Bureau of Investigation, that I have read

4   the foregoing Verified Complaint for Forfeiture *In Rem* and know the contents

5   thereof, and that the matters contained in the Verified Complaint are true to the best

6   of my knowledge and belief.

7          The sources of my knowledge and information and the grounds of my belief

8   are official files and records of the United States, publicly available files and

9   historical information, information supplied to me by other law enforcement

10  officers, experts, and other witnesses, as well as my investigation in this case,

11  together with others, as a Special Agent of the Federal Bureau of Investigation.

12         I hereby declare under penalty of perjury that the foregoing is true and

13  correct.

14

15  Executed this 15 day of ___June___, 2017, at _New York, NY._.

16

17

18                              _____

19                              Robert B. Heuchling
                                Special Agent
20                              Federal Bureau of Investigation

21

22

23

24

25

26

27

28