UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>v.<br><br>CERTAIN RIGHTS TO AND INTERESTS IN SHARES OF SERIES D PREFERRED STOCK IN PALANTIR TECHNOLOGIES,<br>Defendant. | CV 17-4446 (DSF) (PLAx)<br><br>Order DENYING Claimant Tarek Obaid's Motion to Dismiss and Motion to Strike (Dkt. 45). |

Claimant Tarek Obaid has moved to dismiss the Government's Complaint against certain stock in Palantir Technologies for failing to state a claim for forfeiture.[1] Alternatively, Obaid has moved to strike large portions of the Government's complaint. Dkt. 45 (Mot.) The Government filed an opposition, dkt. 97 (Opp'n), and Obaid filed a reply, dkt. 99 (Reply). The Court deems this matter appropriate for decision without oral argument. See Fed. R. Civ. P. 78; Local Rule 7-15.

---

[1] This motion initially also sought dismissal for lack of personal jurisdiction and improper venue. Dkt. 45. The parties stipulated that only the personal jurisdiction and venue issues would be addressed, and the case would otherwise be stayed. Dkt. 71. The Court denied the motion as to those grounds and certified its order for interlocutory appeal. Dkts. 75, 79. The Ninth Circuit affirmed. Dkt. 86; United States v. Obaid, 971 F.3d 1095 (9th Cir. 2020). The stay was partially lifted to allow full briefing and adjudication of the 12(b)(6) motion and motion to strike. Dkt. 96.

For the reasons states below, the motion to dismiss and the motion to strike are DENIED.

## I. BACKGROUND

In this forfeiture action in rem the res at issue, shares in Palantir Technologies, is allegedly traceable to a complex international conspiracy to launder money misappropriated from the Malaysian Government-owned investment and development company 1Malaysia Development Berhad (1MDB). Dkt. 1 (Compl.) ¶¶2, 6. The Complaint is verified and exceeds 200 pages, separating the alleged criminal conduct into four phases. The Complaint alleges that in 2009 as part of the so-called Good Star Phase, PetroSaudi International Ltd. (PSI) and 1MDB formed a joint venture called 1MDB PetroSaudi Limited (the JV). Id. at ¶¶21, 57. The purpose of the JV was to exploit energy rights owned by PSI in Turkmenistan and Argentina. Id. at ¶44. 1MDB was to contribute $1 billion in cash and PSI agreed to contribute "energy concession rights" valued at $2.7 billion. Id. However, Jho Low, a Malaysian national with no formal position at 1MDB, and Low's associates, diverted funds from 1MDB "under the pretense of investing in the joint venture." Id. at ¶9.

Under the terms of the joint venture agreement, the JV was obligated to pay PSI $700 million as repayment of a loan PSI purportedly made to the JV. Id. at ¶61. According to the Government, there was no loan. Id. at ¶62. Instead, $700 million of 1MDB's $1 billion cash investment, was routed to the Good Star Account controlled by Low[2]. Id. at ¶¶9, 45, 50, 65-86. Low and others, including certain 1MDB directors, misled foreign bank officials to facilitate the $700 million transfer. Id. at ¶¶70, 73, 74, 82, 84, 88.

---

[2] As alleged, Good Star Limited was formed in May 2009. Its sole director was Smart Power and Low was the sole director of Smart Power. Compl. ¶48. Low opened a bank account at RBS Coutts' Singapore branch (Good Star Account). Id. at ¶ 50. Low is identified as the sole beneficial owner and the sole authorized signatory on the Good Star Account. Id.

Out of the initial $700 million in diverted funds, $153 million was transferred to the personal bank account of Obaid, the CEO and co-founder of PSI. Compl. ¶¶57, 752-753. Around October 5, 2009, $85 million was transferred from the Good Star Account, processed through a corresponding bank account in New York, to Obaid's personal account in Geneva. Id. at ¶752. Around January 12, 2010, another $68 million was transferred from the Good Star Account to Obaid's personal account. Id. at ¶753. Around March 2010, Obaid purchased 2,500,000 shares in Palantir stock with $2 million from his personal account. Id. at ¶¶751-758.

## II. LEGAL STANDARD

A.  Motion to Dismiss

A party may move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In the face of a 12(b)(6) motion "a judge must accept as true all of the factual allegations contained in the complaint." Erickson v. Pardus, 551 U.S. 89, 94 (2007). However, a complaint must "state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). This means that the complaint must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id.

Additionally, "[i]n rem forfeitures are conducted in accordance with the Supplemental Rules of Certain Admiralty and Maritime Claims." United States v. Real Prop. at 2659 Roundhill Dr., Alamo, Cal., 194 F.3d 1020, 1024 n.3 (9th Cir. 1999). The Complaint must "state sufficiently detailed facts to support a reasonable belief that the Government will be able to meet its burden of proof at trial."[3] Fed.

---

[3] The Government's burden of proof at trial is preponderance of the evidence. 18 U.S.C. § 983(c)(1).

3

Suppl. R. Civ. P. G(2)(f). A complaint for forfeiture should "'state[] the circumstances giving rise to the forfeiture claim with sufficient particularity that [the claimant] [can] commence[] a meaningful investigation of the facts and draft[] a responsive pleading' and 'permit a reasonable belief for pleading purposes that [the property in question] . . . [is] subject to forfeiture.'" United States v. Aguilar, 782 F.3d 1101, 1108–09 (9th Cir. 2015) (quoting United States v. Mondragon, 313 F.3d 862, 866–67 (4th Cir. 2002)). This is a "low bar" to meet. See Aguilar, 782 F.3d at 1109.

B.  Motion to Strike

Allegations in the Complaint will not be stricken if they do not fall into one of the five categories contemplated by Federal Rule of Civil Procedure 12(f) (insufficient defense, redundant, immaterial, impertinent, or scandalous matter). See Whittlestone, Inc. v. Handi-Craft Co., 618 F.3d 970, 974-975 (9th Cir. 2010). Motions to strike are generally not granted unless it is clear that the matter to be stricken could have no possible bearing on the subject matter of the litigation. LeDuc v. Kentucky Cent. Life Ins. Co., 814 F. Supp. 820, 830 (N.D. Cal. 1992). "[A]llegations supplying background or historical material or other matter of an evidentiary nature will not be stricken unless unduly prejudicial to defendant." Id.

### III. DISCUSSION

A.  Motion to Dismiss

    1.  Federal Rules of Civil Procedure: Rule 9(b)

Obaid argues that Rule 9(b) should apply to allegations grounded in fraud. Mot. at 12; See Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.") The Court disagrees.

The Supplemental Rules provide for a pleading standard applicable to forfeiture actions in rem. See Fed. Suppl. R. Civ. P. G(2)(f) (requiring complaint to "state sufficiently detailed facts to support a reasonable

4

belief that the government will be able to meet its burden of proof at trial."). "Few courts have interpreted Supplemental Rule G(2)(f), but the advisory committee's note indicates that the language is designed to codify the 'standard' that 'has evolved' from case law interpreting its predecessor—Supplemental Rule E(2)(a)—and 'carr[y] this forfeiture case law forward without change.'" Aguilar, 782 F.3d at 1108. Other courts have also declined to apply Rule 9(b). E.g., United States v. Real Prop. Located In Brentwood, California, Case No. CV 15-06794 RGK, 2016 WL 11121402, at *2 n.1 (C.D. Cal. Mar. 15, 2016) (civil forfeiture action alleging wire fraud and money laundering); United States v. One White Crystal Covered Bad Tour Glove & Other Michael Jackson Memorabilia, Case No. CV 11-3582 GW, 2012 WL 8467453, at *4 (C.D. Cal. Sept. 6, 2012) ("Rule G(2)(F) standard is not as stringent as that required for fraud causes of action under Fed. R. Civ. P. 9(b)" (citing United States v. All Funds on Deposit in Dime Sav. Bank of Williamsburg Acct. No. 58-400738-1 in the Name of Ishar Abdi & Barbara Abdi, 255 F. Supp. 2d 56, 68, n.18 (E.D.N.Y. 2003))).

    2.    Forfeiture under 18 U.S.C. § 981(a)(1)(C)

The Government's first claim for forfeiture arises under 18 U.S.C. § 981(a)(1)(C), Compl. ¶¶ 947-949, which provides: "Any property . . . which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' . . . , or a conspiracy to commit such offense" is subject to forfeiture by the United States. The Government alleges four possible specified unlawful activities (SUAs) and conspiracy to commit the SUAs:

> (i) a foreign offense involving the misappropriation of public funds by or for the benefit of a public official (18 U.S.C. § 1956(c)(7)(B)(iv); (ii) fraud by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii); (iii) wire fraud (18 U.S.C. § 1343); and/or (iv) intentional transportation of receipt of stolen or fraudulently obtained property (18 U.S.C. § 2314), and receipt of stolen money (18 U.S.C. § 2315).

5

Compl. ¶¶ 948, 951, 954, 957. As discussed below, the Government has stated sufficiently detailed facts to support a reasonable belief that it will be able to meet its burden of proof at trial to show the Palantir Shares are "derived from proceeds traceable to" a conspiracy to misappropriate 1MDB funds by and for the benefit of public officials and fraud against foreign banks. Having found the Palantir Shares traceable to one or more alleged SUAs, the Court does not address the alternative SUAs alleged in the Complaint, namely, wire fraud or international transportation of stolen property or receipt of stolen property.

> a. <u>A foreign offense involving the misappropriation of public funds by or for the benefit of a public official</u>

Under section 1956, the term "specified unlawful activity" includes, "with respect to a financial transaction occurring in whole or in part in the United States, an offense against a foreign nation involving . . . (iv) bribery of a public official, or the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official." 18 U.S.C. § 1956(c)(7)(B)(iv). The Government alleges that the misappropriation of public funds by a public official is a criminal offense under Malaysian law. Compl. ¶ 942, Att. B.

Here, the Complaint alleges that Low and his co-conspirators, some of whom were public officials,[4] misappropriated funds from 1MDB under the pretense of investing in the JV. Specifically, during the Good Star Phase Malaysian Official 1 and the co-founders of PSI met on a yacht in the summer of 2009 and "discussed the idea of a joint venture." Compl. ¶ 51. This meeting was arranged by Low. <u>Id.</u> After this meeting, Low sent an email stating "[j]ust closed a deal with petrosaudi. Looks like we may have hit a goldmine[e]." <u>Id.</u> Thereafter, the joint venture agreement was executed by Obaid, CEO and co-founder on behalf of PSI and by 1MDB Officer 2 on behalf of 1MDB. <u>Id.</u> at ¶ 57. The terms of

---

[4] Malaysian Official 1, 1MDB Officer 1, and 1MDB Officer 2 are alleged to be public officials under federal law and public servants under Malaysian law. Compl. ¶¶ 27, 28, 32.

6

the joint venture agreement required that the JV pay PSI $700 million "purportedly as repayment of a loan" PSI made to the JV. Id. ¶61.

But according to the Government, PSI "made no such loan." Among other things, there appeared no commercial purpose of the loan; the bank account for the JV was not opened until after the alleged loan was said to have been made; the bank account for PSI was "inactive" from June 2009 to December 2009, during the time the loan was supposedly made; and a report published by the Malaysian Public Accounts Committee (PAC) indicated that "auditors tasked by the PAC to examine the 1MDB's activities were unable to validate documents related to PetroSaudi's purported $700 million loan to the [JV] and were unable to verify the existence of such a loan." Id. at ¶62.

The Complaint also alleges other indicia that the loan arrangement was used to misappropriate $700 million to the Good Star Account. First, the funds were not directed to a PSI-owned account and PSI was not a beneficial owner of the Good Star Account and Good Star Limited was not a subsidiary of PSI. Compl. ¶¶66, 93. Rather, Low was the "sole beneficial owner" and "sole authorized signatory" on the Good Star Account and "was responsible for authorizing transactions out of that account." Id. at ¶¶50, 155. Second, the paper formally requesting that the 1MDB Board of Directors authorize a $1 billion investment to the JV (Position Paper) did not disclose a loan arrangement between PSI and the JV. Id. at ¶63. This Position Paper was signed by 1MDB Officer 1 and 1MDB Officer 2. Id. at ¶53. Third, an unnamed official at PSI called BSI Bank in Geneva to open an account for the JV and stated that an unspecified sum of money from the $1 billion 1MDB investment would be transferred to Low as "commission" for arranging the meeting between Malaysian Official 1 and PSI. Id. at ¶60. The bank refused to open an account due to Low's involvement, so the JV account was opened at J.P. Morgan (Suisse), without a discussion about any alleged "commission" to Low. Id. Finally, from December 2010 and June 2011, Malaysian Officer 1 and 1MDB Officer 1 received $20 million and $5 million respectively, some of which appears to be from the proceeds of the $700 million transfer to the Good Star Account. Id. at ¶¶112-120.

7

Obaid argues that the Government failed to allege that the Palantir Shares are traceable to the proceeds of any "scheme to defraud or theft" because the express terms of the joint venture agreement between 1MDB and PSI contemplates the existence of a loan and therefore the $700 million transfer related to the purchase of the Palantir shares was conduct "consistent with a legitimate business transaction." Mot. at 12. To support this argument Obaid attached to his motion a copy of the joint venture agreement and a letter purporting to amend the terms of the joint venture agreement. New Decl., Exs. 1 and 2. Obaid claims these documents should be incorporated by reference into the Complaint. Mot. at 13, n. 6.

Whether the $700 million loan arrangement was real, and part of a legitimate business transaction, is a question of fact. It would be improper to accept as true the terms of a letter amending the joint venture agreement to resolve the question of whether the loan was genuine or part of a scheme to misappropriate 1MDB funds. See Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988, 1014 (9th Cir. 2018) ("Although incorporation by reference generally permits courts to accept the truth of matters asserted in incorporated documents, we reiterate that it is improper to do so only to resolve factual disputes against the plaintiff's well-pled allegations in the complaint."). Moreover, even assuming the $700 million transfer to the Good Star Account was part of the loan agreement, Mot. at 14, the Complaint alleges subsequent transfers from the Good Star Account to non-PSI related entities and individuals that support the Government's claim that the money was not intended for PSI as repayment of a loan. See Compl. ¶¶112-126.

### b. Fraud by or against a foreign bank

Under 18 U.S.C. § 1956(c)(7)(B), the term "specified unlawful activity" includes, "with respect to a financial transaction occurring in whole or in part in the United States, an offense against a foreign nation involving . . . "(iii) fraud, or any scheme or attempt to defraud, by or against a foreign bank[.]" 18 U.S.C. § 1956(c)(7)(B)(iii). The Government also alleges that bank fraud and forgery are criminal

8

offenses under Malaysian law, Swiss law, and Singapore law. Compl. ¶¶943, 945, 946, Att's. B, D, and E.

The Complaint alleges that misrepresentations were made to bank officials to facilitate the $700 million transfer to the Good Star Account. In emails and phone calls, 1MDB Officers told Deutsche Bank[5] employees that the beneficiary of the $700 Million wire was PSI, when the beneficiary was the Good Star Account. Id. at ¶¶70,74. In one email, 1MDB Officer 2 told a Deutsche Bank employee that the bank had authorization to disclose to receiving bank RBS Coutts that the beneficiary of the $700 million wire was "Good Star," but "misrepresented the nature of the relationship between Good Star and PetroSaudi" stating "Good Star is 100% owned by PetroSaudi International Limited." Id. at ¶82.

The Government also alleges that Low misrepresented the purpose of the $700 million transfer to induce RBS Coutts[6] to release the funds. In one instance, Low presented RBS Coutts with an Investment Management Agreement signed by 1MDB Officer 1 stating that 1MDB was a founding investor in Good Star "who wishes to support and assist Good Star in realizing its purpose by providing initial capital contribution amounting to USD 700million" and the funds were to "invest in real estate and private equity to provide long-term capital growth for the investor." Compl. ¶84. A few months later, Low provided RBS Coutts with a different agreement, this one purporting to memorialize a loan between Good Star and 1MDB that "retroactively recognize[d] the $700 million transfer from 1MDB to Good Star as a loan to Good Star." Id. at ¶88.

Obaid argues that the alleged misrepresentations made to foreign banking officials were not "material" and do not support foreign bank

---

[5] 1MDB board meeting minutes indicated that the $1 billion transfer was to occur "though a foreign exchange transaction with Deutsche Bank (Malaysia) Berhad." Compl. at ¶56.

[6] The RBS Coutts branches relevant to the motion are located in Singapore and Switzerland. Id. at ¶¶49-50, 66.

9

fraud. Mot. 14-15. The Court disagrees. "In general, a false statement is material if it has 'a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed.'" United States v. Lindsey, 850 F.3d 1009, 1013 (9th Cir. 2017) (quoting Neder v. United States, 527 U.S. 1, 16 (1999)); see also United States v. Plany, 711 F.App'x. 392, 394 (9th Cir. 2017) (evidence was sufficient to conclude forged bank draw requests were material to support bank fraud and conspiracy to commit bank fraud convictions). As alleged, the contradictory explanations and representations made to both Deutsche Bank and RBS Coutts influenced both banks to facilitate the $700 million transfer to the Good Star Account.

There appears to be no dispute that the Palantir Shares are derived from proceeds traceable to the initial $700 million transfer to the Good Star Account. As outlined above, the Government has pleaded sufficiently detailed facts to support a reasonable belief that the Government will be able to meet its burden of proof at trial that the Palantir Shares are traceable to the proceeds of one or more alleged SUAs.

The Government's first claim for forfeiture therefore survives Obaid's motion to dismiss.

3. Forfeiture Under 18 U.S.C. § 981(a)(1)(A)

The Government's second, third, and fourth claims for forfeiture arise under 18 U.S.C. § 981(a)(1)(A), which provides that any property involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960, or any property traceable to such property, is subject to forfeiture. To survive Obaid's motion to dismiss, the Government must have alleged sufficiently detailed facts to support a reasonable belief that it will be able to meet its burden of proof at trial to establish that the Palantir Shares were "involved in a transaction" in violation of the aforementioned sections or "property traceable to such property." See 18 U.S.C. § 981(a)(1)(A).

10

### a. Government's Second Claim: 18 U.S.C. § 1957

The Government's second claim for relief alleges that the Palantir Shares (and other property) are property "involved in and [are] traceable to property involved in" a violation of 18 U.S.C. § 1957 and conspiracy to commit such offenses in violation of 18 U.S.C. § 1956(h). See Compl. ¶ 951. A conviction for money laundering under 18 U.S.C. § 1957 requires the Government to show: (1) the [alleged launderer] knowingly engaged in a monetary transaction; (2) he knew the transaction involved criminal property; (3) the property's value exceeded $10,000; and (4) the property was derived from a specified unlawful activity." United States v. Rogers, 321 F.3d 1226, 1229 (9th Cir. 2003).

Obaid recognizes, Mot. at 16, and the Government points to, Opp'n at 14, at least two transactions following the initial diversion of $700 million to the Good Star Account that could form the basis for a section 1957 violation—the $85 million sent to Obaid's personal account and the purchase of the Palantir Shares. Compl. ¶¶752, 757.

Obaid argues that because the Government failed to identify "who" at Good Star Limited caused the transfer to his account, the Government failed to allege the "knowing" requirement necessary to show a violation of section 1957. Mot. at 17. The Court is unconvinced. The Government need only plead "sufficiently detailed facts to support a reasonable belief that the Government will be able to meet its burden of proof at trial." Fed. R. Civ. P. Supp. R. G(2)(f). Here, the Complaint alleges that Low was the "sole beneficial owner" and "sole authorized signatory" on the Good Star Account and that "Low was responsible for authorizing transactions out of that account." Compl. ¶¶50, 155. Low is alleged to be a central figure in the scheme to misappropriate $700 million from 1MDB and participated in defrauding RBS Coutts to facilitate the transfer of the funds. Id. at ¶¶84-88. These allegations are sufficiently detailed to support a reasonable belief that the Government will be able to meet its burden of proof at trial to show that Low authorized the $85 million transfer to Obaid's account and did so knowing the transaction involved proceeds derived from the above-

11

discussed SUAs. See Rogers, 321 F.3d at 1230 (finding Government produced sufficient evidence for a jury to infer defendant's knowledge).

Obaid was the CEO and co-founder of PSI and executed the joint venture agreement that, as discussed above, memorialized an allegedly false loan between PSI and the JV. This loan arrangement was used as a pretense to misappropriate $700 million from 1MDB. The Court finds the Government has adequately alleged that Obaid knew that when he purchased the Palantir Shares the transaction involved proceeds from the described SUAs.

The Government's second claim for forfeiture survives Obaid's motion to dismiss.

    b.  The Government's Third and Fourth Claims: 18 U.S.C. §§ 1956(a)(1)(B)(i) and (a)(2)(B)

The Government's third and fourth claims for relief allege that the Palantir shares (and other property) were "involved in, and [are] traceable to property involved in, one or more transactions" in violation of 18 U.S.C §§ 1956(a)(1)(B)(i) or 1956(a)(2)(B), and a conspiracy to commit that offense in violation of 18 U.S.C. § 1956(h). Compl. ¶¶ 954, 957. Section 1956(a)(1)(B)(i) prohibits entering into certain transactions while "knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(B)(i). 18 U.S.C. § 1956(a)(2)(B) prohibits international money laundering. Both sections require that the Government show a transaction was knowingly designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of an SUA. See 18 U.S.C. §§ 1956(a)(1)(B)(i), 1956(a)(2)(B).

To the extent that the Government alleges that the purchase of the Palantir Shares was a transaction "involved in" concealment money laundering, this claim fails because the Complaint does not allege Obaid purchased the shares with intent to conceal anything. See Compl. ¶¶754-758. Even if purchasing the Palantir Shares had the

12

effect of concealing the nature of the proceeds used for the purchase, it is the "purpose" that is the focus of concealment money laundering. See United States v. Sun, 673 F.App'x. 729, 733 (9th Cir. 2016) (finding evidence sufficient for jury to infer defendant "had the purpose to conceal" illegal nature or source of funds) (citing to Regalado Cellular v. United States, 553 U.S. 550, 567 (2008) (analyzing concealment for purposes of § 1956(a)(2)(B) focusing on "purpose" of transfer not merely effect).

But the Government has adequately alleged that the Palantir Shares are "traceable to property involved in" a transaction in violation of section 1956(a)(1)(B)(i) and (a)(2)(B). It alleges that when the Good Star Account transferred $85 million to Obaid's account, "RBS Coutts recorded the reason for the wire transfer as 'Client sends USD 85 M to Private Equity firm for investments.'" Compl. ¶752. Because the transfer was to Obaid's personal account, and not a private equity firm as stated to RBS Coutts, the Government has adequately alleged the transaction was done with intent to conceal the source or nature of the funds.

The Government's third and fourth claims for forfeiture survive Obaid's motion to dismiss.

B. Motion to Strike

Obaid argues that allegations referring to conduct occurring after the purchase of the Palantir Shares or that refer to conduct not related to the purchase of the Palantir Shares should be stricken as immaterial or prejudicial. Mot. at 23-25. The Court disagrees.

The Ninth Circuit affirmed venue based on conduct alleged in the Complaint not directly attributable to Obaid or the purchase of the Palantir Shares. See Obaid, 971 F.3d at 1106. And the Complaint alleges conduct attributable to Obaid relevant to the alleged conspiracy to misappropriate 1MDB funds that occurred after the Palantir Shares were purchased. For example, in May 2011 Obaid signed on behalf of the JV, a Notice of Drawing that requested 1MDB transmit $330 million to the Good Star Account. Compl. ¶104. Thereafter, Obaid sent

a letter to 1MDB requesting that 1MDB send a SWIFT clarification to RBS Coutts stating that the beneficiary of the $330 million transfers was the Good Star account number and not "PetroSaudi International Limited." Id. at ¶107. But in 2015, Low gives BSI Bank a letter allegedly signed by Obaid stating that prior to the 2009 $700 million transfer, Good Star Limited was owned by PSI. Id. at ¶153. Additionally, allegations about other phases and the purchase of other items from misappropriated funds, provide similar context and background regarding the extent of the alleged conspiracy. For these reasons, the Court cannot say that the allegations not directly related to the purchase of the Palantir Shares "could have no possible bearing on the subject matter of the litigation." See Smith v. Levine Leichtman Cap. Partners, Inc., 723 F. Supp. 2d 1205, 1217 (N.D. Cal. 2010).

The Court declines to strike any portion of the Government's Complaint.

## IV. CONCLUSION

Obaid's motion to dismiss and motion to strike are DENIED.

IT IS SO ORDERED.

Date: May 27, 2022

Dale S. Fischer
United States District Judge